# Exhibit A

US010419817B2

(12) **United States Patent**
Fishman et al.

(10) Patent No.: **US 10,419,817 B2**
(45) Date of Patent: **\*Sep. 17, 2019**

(54) **SMART PLAYLIST**

(71) Applicant: **OpenTV, Inc.**, San Francisco, CA (US)

(72) Inventors: **Alex Fishman**, San Francisco, CA (US); **Crx K. Chai**, Oakland, CA (US)

(73) Assignee: **OPENTV, INC.**, San Francisco, CA (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/637,561**

(22) Filed: **Jun. 29, 2017**

(65) **Prior Publication Data**

US 2018/0020255 A1      Jan. 18, 2018

**Related U.S. Application Data**

(63) Continuation of application No. 12/877,034, filed on Sep. 7, 2010, now Pat. No. 9,699,503.

(51) **Int. Cl.**
*H04N 21/25* (2011.01)
*H04N 21/442* (2011.01)
(Continued)

(52) **U.S. Cl.**
CPC ..... *H04N 21/44204* (2013.01); *H04N 21/252* (2013.01); *H04N 21/4668* (2013.01); *H04N 21/4826* (2013.01)

(58) **Field of Classification Search**
CPC ........... G06F 17/3002; G06F 17/30035; G06F 17/30038; H04N 21/252; H04N 21/4668; H04N 21/4788
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,718,107 | A | 1/1988 | Hayes et al. |
| 4,769,697 | A | 9/1988 | Gilley et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| AU | 201101152 | 10/2011 |
| EP | 0262757 A2 | 4/1988 |

(Continued)

OTHER PUBLICATIONS

"U.S. Appl. No. 12/877,993, Non Final Office Action dated Dec. 15, 2017", 36 pgs.

(Continued)

*Primary Examiner* — Nathan J Flynn
*Assistant Examiner* — Tung T Trinh
(74) *Attorney, Agent, or Firm* — Schwegman Lundberg & Woessner, P.A.

(57) **ABSTRACT**

A smart playlist system is described. In one example embodiment, a collector module obtains content utilization data from a plurality of client devices associated with respective plurality of viewers. A hot list generator module generates a list of popular content items based on the obtained content utilization data. A customization module generates a customized playlist for a target viewer from the plurality of viewers, based on the list of popular content items and a profile of the target viewer. The communications module communicates the customized playlist to a client device of the target viewer.

**20 Claims, 5 Drawing Sheets**



**US 10,419,817 B2**

Page 2

(51) **Int. Cl.**
**H04N 21/466** (2011.01)
**H04N 21/482** (2011.01)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,907,079 | A | 3/1990 | Turner et al. |
| 4,930,160 | A | 5/1990 | Vogel |
| 4,931,865 | A | 6/1990 | Scarampi |
| 5,019,899 | A | 5/1991 | Boles et al. |
| 5,034,807 | A | 7/1991 | Von Kohorn |
| 5,068,733 | A | 11/1991 | Bennett |
| 5,099,322 | A | 3/1992 | Gove |
| 5,227,874 | A | 7/1993 | Von Kohorn |
| 5,264,933 | A | 11/1993 | Rosser et al. |
| 5,283,639 | A | 2/1994 | Esch et al. |
| 5,353,392 | A | 10/1994 | Luquet et al. |
| 5,373,315 | A | 12/1994 | Dufresne et al. |
| 5,382,983 | A | 1/1995 | Kwoh et al. |
| 5,410,326 | A | 4/1995 | Goldstein |
| 5,467,288 | A | 11/1995 | Fasciano et al. |
| 5,483,276 | A | 1/1996 | Brooks et al. |
| 5,497,185 | A | 3/1996 | Dufresne et al. |
| 5,508,731 | A | 4/1996 | Kohorn |
| 5,515,485 | A | 5/1996 | Luquet et al. |
| 5,524,193 | A | 6/1996 | Covington et al. |
| 5,543,856 | A | 8/1996 | Rosser et al. |
| 5,546,471 | A | 8/1996 | Merjanian |
| 5,579,002 | A | 11/1996 | Iggulden et al. |
| 5,583,980 | A | 12/1996 | Anderson |
| 5,590,262 | A | 12/1996 | Isadore-Barreca |
| 5,600,368 | A | 2/1997 | Matthews, III |
| 5,600,775 | A | 2/1997 | King et al. |
| 5,603,078 | A | 2/1997 | Henderson et al. |
| 5,604,896 | A | 2/1997 | Duxbury et al. |
| 5,613,909 | A | 3/1997 | Stelovsky |
| 5,614,940 | A | 3/1997 | Cobbley et al. |
| 5,621,454 | A | 4/1997 | Ellis et al. |
| 5,627,936 | A | 5/1997 | Prasad et al. |
| 5,631,903 | A | 5/1997 | Dianda et al. |
| 5,635,989 | A | 6/1997 | Rothmuller |
| 5,652,615 | A | 7/1997 | Bryant et al. |
| 5,655,144 | A | 8/1997 | Milne et al. |
| 5,661,516 | A | 8/1997 | Caries |
| 5,663,756 | A | 9/1997 | Blahut et al. |
| 5,664,046 | A | 9/1997 | Abecassis |
| 5,675,511 | A | 10/1997 | Prasad et al. |
| 5,680,639 | A | 10/1997 | Milne et al. |
| 5,708,845 | A | 1/1998 | Wistendahl et al. |
| 5,715,014 | A | 2/1998 | Perkins et al. |
| 5,724,472 | A | 3/1998 | Abecassis |
| 5,727,141 | A | 3/1998 | Hoddie et al. |
| 5,740,549 | A | 4/1998 | Reilly et al. |
| 5,758,257 | A | 5/1998 | Herz et al. |
| 5,758,259 | A | 5/1998 | Lawler |
| 5,765,164 | A | 6/1998 | Prasad et al. |
| 5,771,307 | A | 6/1998 | Lu et al. |
| 5,774,664 | A | 6/1998 | Hidary et al. |
| 5,774,666 | A | 6/1998 | Portuesi |
| 5,793,409 | A | 8/1998 | Tetsumura |
| 5,794,210 | A | 8/1998 | Goldhaber et al. |
| 5,798,785 | A | 8/1998 | Hendricks et al. |
| 5,801,747 | A | 9/1998 | Bedard |
| 5,818,510 | A | 10/1998 | Cobbley et al. |
| 5,828,402 | A | 10/1998 | Collings |
| 5,854,927 | A | 12/1998 | Gelissen |
| 5,859,662 | A | 1/1999 | Cragun et al. |
| 5,861,881 | A | 1/1999 | Freeman et al. |
| 5,894,320 | A | 4/1999 | Vancelette |
| 5,898,838 | A | 4/1999 | Wagner |
| 5,917,830 | A | 6/1999 | Chen et al. |
| 5,920,642 | A | 7/1999 | Merjanian |
| 5,929,849 | A | 7/1999 | Kikinis |
| 5,929,850 | A | 7/1999 | Broadwin et al. |
| 5,931,908 | A | 8/1999 | Gerba et al. |
| 5,945,988 | A | 8/1999 | Williams et al. |
| 5,951,639 | A | 9/1999 | MacInnis |
| 5,970,504 | A | 10/1999 | Abe et al. |
| 5,973,683 | A | 10/1999 | Cragun et al. |
| 5,977,962 | A | 11/1999 | Chapman et al. |
| 5,978,013 | A | 11/1999 | Jones et al. |
| 5,982,399 | A | 11/1999 | Scully et al. |
| 5,987,509 | A | 11/1999 | Portuesi |
| 5,990,911 | A | 11/1999 | Arrott |
| 5,995,091 | A | 11/1995 | Near et al. |
| 6,002,393 | A | 12/1999 | Hite et al. |
| 6,002,443 | A | 12/1999 | Iggulden |
| 6,006,241 | A | 12/1999 | Purnaveja et al. |
| 6,006,256 | A | 12/1999 | Zdepski et al. |
| 6,012,098 | A | 1/2000 | Bayeh et al. |
| 6,020,882 | A | 2/2000 | Kinghorn et al. |
| 6,021,275 | A | 2/2000 | Horwat |
| 6,028,950 | A | 2/2000 | Merjanian |
| 6,029,045 | A | 2/2000 | Picco et al. |
| 6,038,367 | A | 3/2000 | Abecassis |
| 6,049,821 | A | 4/2000 | Theriault et al. |
| 6,057,833 | A | 5/2000 | Heidmann et al. |
| 6,057,872 | A | 5/2000 | Candelore |
| 6,058,430 | A | 5/2000 | Kaplan |
| 6,061,056 | A | 5/2000 | Menard et al. |
| 6,061,719 | A | 5/2000 | Bendinelli et al. |
| 6,069,672 | A | 5/2000 | Claessen |
| 6,075,526 | A | 6/2000 | Rothmuller |
| 6,075,971 | A | 6/2000 | Williams et al. |
| 6,078,322 | A | 6/2000 | Simonoff et al. |
| 6,083,276 | A | 7/2000 | Davidson et al. |
| 6,091,886 | A | 7/2000 | Abecassis |
| 6,100,916 | A | 8/2000 | August et al. |
| 6,104,334 | A | 8/2000 | Allport |
| 6,104,423 | A | 8/2000 | Elam |
| 6,124,877 | A | 9/2000 | Schmidt |
| 6,125,259 | A | 9/2000 | Perlman |
| 6,128,011 | A | 10/2000 | Peng |
| 6,134,243 | A | 10/2000 | Jones et al. |
| 6,144,401 | A | 11/2000 | Casement et al. |
| 6,151,444 | A | 11/2000 | Abecassis |
| 6,154,205 | A | 11/2000 | Carroll et al. |
| 6,154,771 | A | 11/2000 | Rangan et al. |
| 6,163,272 | A | 12/2000 | Goode |
| 6,166,780 | A | 12/2000 | Bray |
| 6,173,317 | B1 | 1/2001 | Chaddha et al. |
| 6,173,437 | B1 | 1/2001 | Polcyn |
| 6,175,718 | B1 | 1/2001 | Kim et al. |
| 6,175,840 | B1 | 1/2001 | Chen et al. |
| 6,177,931 | B1 | 1/2001 | Alexander et al. |
| 6,178,446 | B1 | 1/2001 | Gerszberg et al. |
| 6,195,090 | B1 | 2/2001 | Riggins, III |
| 6,201,538 | B1 | 3/2001 | Wugofski |
| 6,216,263 | B1 | 4/2001 | Elam |
| 6,226,793 | B1 | 5/2001 | Kwoh |
| 6,229,524 | B1 | 5/2001 | Chemock et al. |
| 6,229,546 | B1 | 5/2001 | Lancaster et al. |
| 6,230,172 | B1 | 5/2001 | Purnaveja et al. |
| 6,240,555 | B1 | 5/2001 | Shoff et al. |
| 6,256,785 | B1 | 7/2001 | Klappert et al. |
| 6,263,189 | B1 | 7/2001 | Reagor |
| 6,263,332 | B1 | 7/2001 | Nasr et al. |
| 6,263,500 | B1 | 7/2001 | Yoshida et al. |
| 6,266,793 | B1 | 7/2001 | Mozdzen et al. |
| 6,269,216 | B1 | 7/2001 | Abecassis |
| 6,292,805 | B1 | 9/2001 | Basso et al. |
| 6,297,853 | B1 | 10/2001 | Sharir et al. |
| 6,308,327 | B1 | 10/2001 | Liu et al. |
| 6,314,568 | B1 | 11/2001 | Ochiai et al. |
| 6,317,881 | B1 | 11/2001 | Shah-Nazaroff et al. |
| 6,324,519 | B1 | 11/2001 | Eldering |
| 6,330,719 | B1 | 12/2001 | Zigmond et al. |
| 6,345,278 | B1 | 2/2002 | Hitchcock et al. |
| 6,349,410 | B1 | 2/2002 | Lortz |
| 6,356,933 | B2 | 3/2002 | Mitchell et al. |
| 6,357,042 | B2 | 3/2002 | Srinivasan et al. |
| 6,359,661 | B1 | 3/2002 | Nickum |
| 6,363,380 | B1 | 3/2002 | Dimitrova |
| 6,377,995 | B2 | 4/2002 | Agraharam et al. |
| 6,404,445 | B1 | 6/2002 | Galea et al. |

## US 10,419,817 B2
Page 3

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,415,438 | B1 | 7/2002 | Blackketter et al. |
| 6,426,778 | B1 | 7/2002 | Valdez, Jr. |
| 6,438,752 | B1 | 8/2002 | McClard |
| 6,446,246 | B1 | 9/2002 | Suto |
| 6,446,261 | B1 | 9/2002 | Rosser |
| 6,449,766 | B1 | 9/2002 | Fleming |
| 6,449,767 | B1 | 9/2002 | Krapf et al. |
| 6,463,585 | B1 | 10/2002 | Hendricks et al. |
| 6,476,828 | B1 | 11/2002 | Burkett et al. |
| 6,476,833 | B1 | 11/2002 | Moshfeghi |
| 6,477,579 | B1 | 11/2002 | Kunkel et al. |
| 6,481,011 | B1 | 11/2002 | Lemmons |
| 6,483,547 | B1 | 11/2002 | Eyer |
| 6,493,872 | B1 | 12/2002 | Rangan et al. |
| 6,513,160 | B2 | 1/2003 | Dureau |
| 6,519,770 | B2 | 2/2003 | Ford |
| 6,551,357 | B1 | 4/2003 | Madduri |
| 6,560,366 | B1 | 5/2003 | Wilkins |
| 6,560,777 | B2 | 5/2003 | Blackketter et al. |
| 6,581,207 | B1 | 6/2003 | Sumita et al. |
| 6,594,825 | B1 | 7/2003 | Goldschmidt Iki |
| 6,615,408 | B1 | 9/2003 | Kaiser et al. |
| 6,675,384 | B1 | 1/2004 | Block et al. |
| 6,675,388 | B1 | 1/2004 | Beckmann et al. |
| 6,698,020 | B1 | 2/2004 | Zigmond et al. |
| 6,721,954 | B1 | 4/2004 | Nickum |
| 6,725,421 | B1 | 4/2004 | Boucher et al. |
| 6,760,043 | B2 | 7/2004 | Markel |
| 6,766,524 | B1 | 7/2004 | Matheny et al. |
| 6,785,902 | B1 | 8/2004 | Zigmond et al. |
| 6,791,579 | B2 | 9/2004 | Markel |
| 6,795,826 | B2 * | 9/2004 | Flinn ................... G06F 21/6218 |
| 6,804,675 | B1 | 10/2004 | Knight et al. |
| 6,826,597 | B1 | 11/2004 | Lonnroth et al. |
| 6,845,374 | B1 * | 1/2005 | Oliver ................... H04L 51/18 |
| 6,880,171 | B1 | 4/2005 | Ahmad et al. |
| 6,938,270 | B2 | 8/2005 | Blackketter et al. |
| 6,941,521 | B2 | 9/2005 | Lin et al. |
| 7,644,427 | B1 * | 1/2010 | Horvitz ................... H04N 60/37 |
| | | | 725/13 |
| 7,757,250 | B1 * | 7/2010 | Horvitz ................... H04N 60/37 |
| | | | 725/14 |
| 7,853,600 | B2 * | 12/2010 | Herz ................... G06Q 20/383 |
| | | | 707/694 |
| 8,108,341 | B2 | 1/2012 | Barsook et al. |
| 8,234,147 | B2 | 7/2012 | Olejniczak et al. |
| 8,286,206 | B1 | 10/2012 | Aaron et al. |
| 8,346,624 | B1 * | 1/2013 | Goad ................... G06Q 30/02 |
| | | | 705/26.1 |
| 8,402,031 | B2 | 3/2013 | Govani et al. |
| 8,515,975 | B1 | 8/2013 | Federici |
| 8,539,359 | B2 * | 9/2013 | Rapaport ................... G06Q 10/10 |
| | | | 715/751 |
| 8,666,979 | B2 * | 3/2014 | Chen ................... G06F 16/335 |
| | | | 707/732 |
| 8,677,235 | B2 | 3/2014 | Chronister et al. |
| 8,803,882 | B2 | 8/2014 | Lam et al. |
| 8,949,871 | B2 | 2/2015 | Chai et al. |
| 9,602,563 | B2 * | 3/2017 | Barkai ................... H04L 65/4084 |
| 9,699,503 | B2 * | 7/2017 | Fishman ................... H04N 21/252 |
| 9,800,927 | B2 | 10/2017 | Chai |
| 2001/0011375 | A1 | 8/2001 | Yun et al. |
| 2001/0021994 | A1 | 9/2001 | Nash |
| 2001/0023436 | A1 | 9/2001 | Srinivasan et al. |
| 2001/0037500 | A1 | 11/2001 | Reynolds et al. |
| 2002/0010625 | A1 * | 1/2002 | Smith ................... G06Q 30/02 |
| | | | 705/14.52 |
| 2002/0010923 | A1 | 1/2002 | Pack et al. |
| 2002/0011998 | A1 | 1/2002 | Sai et al. |
| 2002/0023263 | A1 | 2/2002 | Ahn et al. |
| 2002/0029256 | A1 | 3/2002 | Zintel et al. |
| 2002/0035728 | A1 | 3/2002 | Fries |
| 2002/0049983 | A1 | 4/2002 | Bove, Jr. et al. |
| 2002/0049984 | A1 | 4/2002 | Klappert et al. |

| | | | |
|---|---|---|---|
| 2002/0053084 | A1 | 5/2002 | Escobar et al. |
| 2002/0056090 | A1 | 5/2002 | Wagner et al. |
| 2002/0056136 | A1 | 5/2002 | Wistendahl et al. |
| 2002/0057286 | A1 | 5/2002 | Markel |
| 2002/0057837 | A1 | 5/2002 | Wilkinson et al. |
| 2002/0059117 | A1 | 5/2002 | Yoch et al. |
| 2002/0059588 | A1 | 5/2002 | Huber et al. |
| 2002/0059590 | A1 | 5/2002 | Kitsukawa et al. |
| 2002/0059629 | A1 | 5/2002 | Markel |
| 2002/0065678 | A1 | 5/2002 | Peliotis et al. |
| 2002/0069405 | A1 | 6/2002 | Chapin et al. |
| 2002/0073416 | A1 | 6/2002 | Ramsey Catan |
| 2002/0088008 | A1 | 7/2002 | Markel |
| 2002/0088011 | A1 | 7/2002 | Lamkin et al. |
| 2002/0089542 | A1 | 7/2002 | Imamura |
| 2002/0095687 | A1 | 7/2002 | Shintani et al. |
| 2002/0112249 | A1 | 8/2002 | Hendricks et al. |
| 2002/0120931 | A1 | 8/2002 | Huber et al. |
| 2002/0126990 | A1 | 9/2002 | Rasmussen et al. |
| 2002/0129364 | A1 | 9/2002 | Smith et al. |
| 2002/0131511 | A1 | 9/2002 | Zenoni |
| 2002/0133817 | A1 | 9/2002 | Markel |
| 2002/0147987 | A1 | 10/2002 | Reynolds et al. |
| 2002/0162117 | A1 | 10/2002 | Pearson et al. |
| 2002/0162121 | A1 | 10/2002 | Mitchell |
| 2002/0166119 | A1 | 11/2002 | Cristofalo |
| 2002/0174425 | A1 | 11/2002 | Markel et al. |
| 2003/0028873 | A1 | 2/2003 | Lemmons |
| 2003/0037334 | A1 | 2/2003 | Khoo et al. |
| 2003/0093790 | A1 * | 5/2003 | Logan ................... G10H 1/0033 |
| | | | 725/38 |
| 2003/0149983 | A1 | 8/2003 | Markel |
| 2003/0172374 | A1 | 9/2003 | Vinson et al. |
| 2003/0177199 | A1 | 9/2003 | Zenoni |
| 2003/0196164 | A1 | 10/2003 | Gupta et al. |
| 2003/0217365 | A1 * | 11/2003 | Caputo ................... H04N 7/106 |
| | | | 725/95 |
| 2003/0237093 | A1 | 12/2003 | Marsh et al. |
| 2004/0021679 | A1 | 2/2004 | Chapman et al. |
| 2004/0031062 | A1 | 2/2004 | Lemmons |
| 2004/0054572 | A1 * | 3/2004 | Oldale ................... G06F 16/337 |
| | | | 706/1 |
| 2004/0056900 | A1 | 3/2004 | Blume |
| 2004/0073953 | A1 | 4/2004 | Xu et al. |
| 2004/0163045 | A1 | 8/2004 | Hui et al. |
| 2004/0210947 | A1 | 10/2004 | Shusman |
| 2004/0237108 | A1 | 11/2004 | Drazin et al. |
| 2005/0028194 | A1 | 2/2005 | Elenbaas et al. |
| 2005/0038717 | A1 * | 2/2005 | McQueen, III ........ G06Q 30/02 |
| | | | 705/26.61 |
| 2005/0144499 | A1 | 6/2005 | Narahara et al. |
| 2005/0160458 | A1 | 7/2005 | Baumgartner |
| 2006/0008256 | A1 * | 1/2006 | Khedouri ................... G06Q 20/206 |
| | | | 386/234 |
| 2006/0010464 | A1 | 1/2006 | Azami |
| 2006/0123448 | A1 | 6/2006 | Ma et al. |
| 2006/0200434 | A1 * | 9/2006 | Flinn ................... G06Q 30/0255 |
| | | | 706/12 |
| 2006/0242554 | A1 | 10/2006 | Gerace et al. |
| 2006/0277098 | A1 | 12/2006 | Chung et al. |
| 2007/0011702 | A1 | 1/2007 | Vaysman |
| 2007/0033607 | A1 | 2/2007 | Bryan |
| 2007/0041705 | A1 * | 2/2007 | Bontempi ................... H04N 5/76 |
| | | | 386/262 |
| 2007/0100824 | A1 | 5/2007 | Richardson ............ G06F 16/951 |
| 2007/0136753 | A1 | 6/2007 | Bovenschulte et al. |
| 2007/0157242 | A1 | 7/2007 | Cordray et al. |
| 2007/0157248 | A1 | 7/2007 | Ellis |
| 2008/0092173 | A1 * | 4/2008 | Shannon ................... H04N 5/44543 |
| | | | 725/47 |
| 2008/0117202 | A1 * | 5/2008 | Martinez ................... G06Q 30/0201 |
| | | | 345/418 |
| 2008/0155588 | A1 | 6/2008 | Roberts et al. |
| 2008/0163059 | A1 | 7/2008 | Craner |
| 2008/0178239 | A1 * | 7/2008 | Yampanis ................... H04L 41/5064 |
| | | | 725/110 |
| 2008/0222106 | A1 | 9/2008 | Rao et al. |
| 2008/0301118 | A1 * | 12/2008 | Chien ................... G06F 16/954 |

## US 10,419,817 B2
Page 4

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2008/0320517 | A1 | 12/2008 | Beadle et al. |
| 2009/0006374 | A1* | 1/2009 | Kim ..................... G06F 16/335 |
| 2009/0031354 | A1 | 1/2009 | Riley et al. |
| 2009/0037254 | A1 | 2/2009 | Colando |
| 2009/0046101 | A1* | 2/2009 | Askey ................... G06Q 30/02 |
| | | | 345/470 |
| 2009/0052859 | A1 | 2/2009 | Greenberger et al. |
| 2009/0060469 | A1* | 3/2009 | Olague .............. H04N 7/17318 |
| | | | 386/297 |
| 2009/0070185 | A1* | 3/2009 | Farrelly .............. G06Q 20/123 |
| | | | 705/14.4 |
| 2009/0083326 | A1* | 3/2009 | Pelton ................ G06F 16/4387 |
| 2009/0089433 | A1* | 4/2009 | Kisel ................... H04L 67/1008 |
| | | | 709/226 |
| 2009/0092183 | A1* | 4/2009 | O'Hern ............... H04N 21/2407 |
| | | | 375/240.01 |
| 2009/0100469 | A1* | 4/2009 | Conradt ............. H04N 7/17318 |
| | | | 725/46 |
| 2009/0144773 | A1 | 6/2009 | Cavanaugh et al. |
| 2009/0150214 | A1 | 6/2009 | Mohan |
| 2009/0150786 | A1* | 6/2009 | Brown ................... G06Q 10/10 |
| | | | 715/733 |
| 2009/0158337 | A1* | 6/2009 | Stiers ................ H04N 5/44591 |
| | | | 725/44 |
| 2009/0163183 | A1* | 6/2009 | O'Donoghue ........ G06Q 30/02 |
| | | | 455/414.1 |
| 2009/0164450 | A1 | 6/2009 | Martinez et al. |
| 2009/0182725 | A1 | 7/2009 | Govani et al. |
| 2009/0210902 | A1 | 8/2009 | Slaney et al. |
| 2009/0217324 | A1 | 8/2009 | Massimi |
| 2009/0249393 | A1 | 10/2009 | Shelton et al. |
| 2009/0265359 | A1 | 10/2009 | Barsook et al. |
| 2010/0042608 | A1* | 2/2010 | Kane, Jr. ............ G06F 16/9535 |
| | | | 707/732 |
| 2010/0058241 | A1 | 3/2010 | Saijo et al. |
| 2010/0083318 | A1* | 4/2010 | Weare ................. G11B 27/105 |
| | | | 725/46 |
| 2010/0088312 | A1* | 4/2010 | Goldfeder .......... G11B 27/105 |
| | | | 707/732 |
| 2010/0293034 | A1* | 11/2010 | Olejniczak ......... G06Q 10/063 |
| | | | 705/14.45 |
| 2011/0035707 | A1 | 2/2011 | Kitayama |
| 2011/0060649 | A1* | 3/2011 | Dunk ................... G06Q 30/0255 |
| | | | 705/14.53 |
| 2011/0145040 | A1 | 6/2011 | Zahn et al. |
| 2011/0162008 | A1* | 6/2011 | Aldrey ................ H04N 21/235 |
| | | | 725/40 |
| 2011/0225290 | A1* | 9/2011 | Kansal ................ H04L 67/1097 |
| | | | 709/224 |
| 2011/0283304 | A1 | 11/2011 | Roberts et al. |
| 2012/0059825 | A1 | 3/2012 | Fishman et al. |
| 2012/0060094 | A1 | 3/2012 | Irwin et al. |
| 2012/0060176 | A1 | 3/2012 | Chai et al. |
| 2012/0060195 | A1 | 3/2012 | Fishman et al. |
| 2015/0121406 | A1 | 4/2015 | Chai et al. |
| 2018/0035161 | A1 | 2/2018 | Fishman et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0921696 A1 | 6/1999 |
| EP | 0967804 A2 | 12/1999 |
| EP | 0982943 A2 | 3/2000 |
| EP | 1021036 A2 | 7/2000 |
| EP | 0967804 A3 | 11/2000 |
| EP | 1056273 A2 | 11/2000 |
| EP | 1071287 A2 | 1/2001 |
| EP | 1056273 A3 | 1/2002 |
| FR | 2730837 A1 | 2/1995 |
| GB | 2327837 A | 2/1999 |
| JP | 10042271 A | 2/1998 |
| JP | 2000227851 A | 8/2000 |
| JP | 2003308145 A | 10/2003 |
| WO | WO-9115921 A1 | 10/1991 |

| | | |
|---|---|---|
| WO | WO-9510919 A1 | 4/1995 |
| WO | WO-9625821 A1 | 8/1996 |
| WO | WO-9633572 A1 | 10/1996 |
| WO | WO-9637075 A1 | 11/1996 |
| WO | WO-9749236 A1 | 12/1997 |
| WO | WO-9749239 A1 | 12/1997 |
| WO | WO-9831114 A1 | 7/1998 |
| WO | WO-9915968 A1 | 4/1999 |
| WO | WO-1999031881 A1 | 6/1999 |
| WO | WO-9935832 A1 | 7/1999 |
| WO | WO-0005884 A1 | 2/2000 |
| WO | WO-0038427 A1 | 6/2000 |
| WO | WO-0049520 A1 | 8/2000 |
| WO | WO-0049801 A1 | 8/2000 |
| WO | WO-0057295 A1 | 9/2000 |
| WO | WO-0128235 A1 | 4/2001 |
| WO | WO-2001050752 A1 | 7/2001 |
| WO | WO-0199416 A2 | 12/2001 |
| WO | WO-0232136 A2 | 4/2002 |
| WO | WO-2002032136 A2 | 4/2002 |
| WO | WO-2012033489 A1 | 3/2012 |
| WO | WO-2012033921 A1 | 3/2012 |

OTHER PUBLICATIONS

"U.S. Appl. No. 12/878,001, Examiner Interview Summary dated Dec. 18, 2017", 3 pgs.
"U.S. Appl. No. 12/878,001, Response filed Dec. 22, 2017 to Non Final Office Action dated Aug. 24, 2017", 16 pgs.
"Canadian Application Serial No. 2,810,511, Response filed Dec. 15, 2017 to Office Action dated Jun. 21, 2017", 37 pgs.
"Canadian Application Serial No. 2,810,521, Office Action dated Mar. 1, 2018", 5 pgs.
"About TVML", Product Documentation, [Online]. Retrieved from the Internet: <URL: http://web.archive.org/web/19961214195058/http://www.tvml.co.uk/developer/about.htm>, (1996), 2 pgs.
"U.S. Appl. No. 09/941,148, Advisory Action dated May 20, 2004", 3 pgs.
"U.S. Appl. No. 09/941,148, Amendment filed Apr. 26, 2004", 14 pgs.
"U.S. Appl. No. 09/941,148, Amendment filed Sep. 19, 2005", 17 pgs.
"U.S. Appl. No. 09/941,148, Examiner Interview Summary dated May 27, 2005", 2 pgs.
"U.S. Appl. No. 09/941,148, Final Office Action dated Apr. 25, 2007", 18 pgs.
"U.S. Appl. No. 09/941,148, Final Office Action dated May 19, 2005", 10 pgs.
"U.S. Appl. No. 09/941,148, Final Office Action dated Oct. 24, 2003", 11 pgs.
"U.S. Appl. No. 09/941,148, Non Final Office Action dated Apr. 1, 2003", 8 pgs.
"U.S. Appl. No. 09/941,148, Non Final Office Action dated Aug. 2, 2006", 16 pgs.
"U.S. Appl. No. 09/941,148, Non Final Office Action dated Aug. 11, 2004", 13 pgs.
"U.S. Appl. No. 09/941,148, Non Final Office Action dated Nov. 28, 2005", 19 pgs.
"U.S. Appl. No. 09/941,148, Preliminary Amendment filed Jun. 19, 2002", 1 pg.
"U.S. Appl. No. 09/941,148, Response filed Feb. 2, 2007 to Non Final Office Action dated Aug. 2, 2006", 17 pgs.
"U.S. Appl. No. 09/941,148, Response filed Jul. 31, 2003 to Non Final Office Action dated Apr. 1, 2003", 10 pgs.
"U.S. Appl. No. 09/941,148, Response filed Nov. 12, 2004 to Non Final Office Action dated Aug. 11, 2004", 15 pgs.
"U.S. Appl. No. 12/877,034, Appeal Brief filed Jun. 11, 2015", 21 pgs.
"U.S. Appl. No. 12/877,034, Appeal Decision mailed Jan. 3, 2017", 10 pgs.
"U.S. Appl. No. 12/877,034, Decision on Pre-Appeal Brief Request mailed Dec. 11, 2014", 2 pgs.
"U.S. Appl. No. 12/877,034, Examiner Interview Summary dated Jul. 24, 2013", 3 pgs.

**US 10,419,817 B2**

Page 5

(56)        **References Cited**

OTHER PUBLICATIONS

"U.S. Appl. No. 12/877,034, Final Office Action dated Mar. 25, 2013", 14 pgs.

"U.S. Appl. No. 12/877,034, Final Office Action dated Jun. 13, 2014", 14 pgs.

"U.S. Appl. No. 12/877,034, Non Final Office Action dated Aug. 10, 2012", 11 pgs.

"U.S. Appl. No. 12/877,034, Non Final Office Action dated Oct. 1, 2013", 13 pgs.

"U.S. Appl. No. 12/877,034, Notice of Allowance dated Mar. 29, 2017", 9 pgs.

"U.S. Appl. No. 12/877,034, Pre-Appeal Brief Request filed Nov. 4, 2014", 5 pgs.

"U.S. Appl. No. 12/877,034, Response filed Feb. 26, 2014 to Non Final Office Action dated Oct. 1, 2013", 13 pgs.

"U.S. Appl. No. 12/877,034, Response filed Aug. 26, 2013 to Final Office Action dated Mar. 25, 2013", 12 pgs.

"U.S. Appl. No. 12/877,034, Response filed Nov. 13, 2012 to Non Final Office Action dated Aug. 10, 2012", 11 pgs.

"U.S. Appl. No. 12/877,875, Advisory Action dated Aug. 2, 2013", 3 pgs.

"U.S. Appl. No. 12/877,875, Final Office Action dated Apr. 23, 2013", 12 pgs.

"U.S. Appl. No. 12/877,875, Non Final Office Action dated Apr. 15, 2014", 13 pgs.

"U.S. Appl. No. 12/877,875, Non Final Office Action dated Nov. 6, 2012", 13 pgs.

"U.S. Appl. No. 12/877,875, Notice of Allowance dated Sep. 17, 2014", 12 pgs.

"U.S. Appl. No. 12/877,875, Response filed Mar. 11, 2013 to Non Final Office Action dated Nov. 6, 2012", 10 pgs.

"U.S. Appl. No. 12/877,875, Response filed Jul. 16, 2013 to Final Office Action dated Apr. 23, 2013", 11 pgs.

"U.S. Appl. No. 12/877,875, Response filed Aug. 15, 2014 to Non Final Office Action dated Apr. 15, 2014", 12 pgs.

"U.S. Appl. No. 12/877,993, Amendment with Request to Reopen Prosecution filed Jul. 7, 2017", 18 pgs.

"U.S. Appl. No. 12/877,993, Appeal Brief filed Feb. 24, 2016", 20 pgs.

"U.S. Appl. No. 12/877,993, Appeal Decision mailed May 8, 2017", 9 pgs.

"U.S. Appl. No. 12/877,993, Final Office Action dated Jan. 28, 2015", 35 pgs.

"U.S. Appl. No. 12/877,993, Final Office Action dated Mar. 15, 2013", 30 pgs.

"U.S. Appl. No. 12/877,993, Non Final Office Action dated Jun. 20, 2014", 31 pgs.

"U.S. Appl. No. 12/877,993, Non Final Office Action dated Aug. 2, 2012", 26 pgs.

"U.S. Appl. No. 12/877,993, Response filed Jul. 22, 2013 to Final Office Action dated Mar. 15, 2013", 17 pgs.

"U.S. Appl. No. 12/877,993, Response filed Oct. 14, 2014 to Non Final Office Action dated Jun. 20, 2014", 19 pgs.

"U.S. Appl. No. 12/877,993, Response filed Dec. 3, 2012 to Non Final Office Action dated Aug. 2, 2012", 17 pgs.

"U.S. Appl. No. 12/878,001, Appeal Brief filed May 12, 2015", 16 pgs.

"U.S. Appl. No. 12/878,001, Appeal Decision mailed Mar. 20, 2017", 10 pgs.

"U.S. Appl. No. 12/878,001, Examiner Interview Summary dated Jul. 24, 2013", 3 pgs.

"U.S. Appl. No. 12/878,001, Final Office Action dated Mar. 29, 2013", 13 pgs.

"U.S. Appl. No. 12/878,001, Final Office Action dated Jul. 17, 2014", 12 pgs.

"U.S. Appl. No. 12/878,001, Non Final Office Action dated Aug. 9, 2012", 11 pgs.

"U.S. Appl. No. 12/878,001, Non Final Office Action dated Aug. 24, 2017", 14 pgs.

"U.S. Appl. No. 12/878,001, Non Final Office Action dated Oct. 3, 2013", 12 pgs.

"U.S. Appl. No. 12/878,001, Request to Reopen Prosecution under 37 C.F.R. § 41.50 filed May 19, 2017", 8 pgs.

"U.S. Appl. No. 12/878,001, Response filed Apr. 1, 2014 to Non Final Office Action dated Oct. 3, 2013", 13 pgs.

"U.S. Appl. No. 12/878,001, Response filed Aug. 23, 2013 to Final Office Action dated Mar. 29, 2013", 12 pgs.

"U.S. Appl. No. 12/878,001, Response filed Nov. 9, 2012 to Non Final Office Action dated Aug. 9, 2012", 11 pgs.

"U.S. Appl. No. 14/588,871, Final Office Action dated Mar. 7, 2016", 12 pgs.

"U.S. Appl. No. 14/588,871, Final Office Action dated Mar. 31, 2017", 17 pgs.

"U.S. Appl. No. 14/588,871, Non Final Office Action dated Jun. 29, 2015", 13 pgs.

"U.S. Appl. No. 14/588,871, Non Final Office Action dated Sep. 9, 2016", 12 pgs.

"U.S. Appl. No. 14/588,871, Non Final Office Action dated Sep. 15, 2016", 16 pgs.

"U.S. Appl. No. 14/588,871, Notice of Allowance dated Jun. 26, 2017", 5 pgs.

"U.S. Appl. No. 14/588,871, Notice of Allowance dated Sep. 12, 2017", 2 pgs.

"U.S. Appl. No. 14/588,871, Preliminary Amendment filed Jan. 27, 2015", 8 pgs.

"U.S. Appl. No. 14/588,871, Response filed Jan. 17, 2017 to Non Final Office Action dated Sep. 15, 2016", 20 pgs.

"U.S. Appl. No. 14/588,871, Response filed May 31, 2017 to Final Office Action dated Mar. 31, 2017", 19 pgs.

"U.S. Appl. No. 14/588,871, Response filed Jul. 7, 2016 Final Office Action dated Mar. 7, 2016", 12 pgs.

"U.S. Appl. No. 14/588,871, Response filed Oct. 29, 2015 to Non Final Office Action dated Jun. 29, 2015", 11 pgs.

"U.S. Appl. No. 14/588,871, Supplemental Notice of Allowability dated Jul. 17, 2017", 2 pgs.

"U.S. Appl. No. 15/726,102, Preliminary Amendment filed Oct. 6, 2017", 7 pgs.

"Australian Application Serial No. 2011101152, Examination Report No. 1 dated May 6, 2013", 4 pgs.

"Australian Application Serial No. 2011101152, Response filed Sep. 17, 2013 to Examination Report No. 1 dated May 6, 2013", 13 pgs.

"Australian Application Serial No. 2011299221, Response filed Jan. 15, 2015", 19 pgs.

"Australian Application Serial No. 2011299234, Amendment filed Apr. 4, 2013", 11 pgs.

"Australian Application Serial No. 2011299234, Amendment filed Aug. 25, 2015", 26 pgs.

"Australian Application Serial No. 2011299234, First Examiner Report dated Aug. 25, 2014", 3 pgs.

"Australian Application Serial No. 2011299234, Response filed Oct. 26, 2015 to Subsequent Examiners Report dated Sep. 4, 2015", 3 pgs.

"Australian Application Serial No. 2011299234, Subsequent Examiners Report dated Sep. 4, 2015", 4 pgs.

"Australian Application Serial No. 2016201377, First Examiner Report dated Feb. 1, 2017", 3 pgs.

"Australian Application Serial No. 2016201377, Response filed May 25, 2017 to First Examiner Report dated Feb. 1, 2017", 55 pgs.

"Australian Application Serial No. 2016201377, Response filed Aug. 9, 2017 to Subsequent Examiners Report dated Jun. 6, 2017", 2 pgs.

"Australian Application Serial No. 2016201377, Subsequent Examiners Report dated Jun. 6, 2017", 3 pgs.

"Australian Application Serial No. 2016201377, Subsequent Examiners Report dated Aug. 23, 2017", 3 pgs.

"Australian Serial No. 2011299221, First Examiner Report dated May 2, 2014", 3 pgs.

"Brazilian Application Serial No. BR112013055251, Voluntary Amendment filed Sep. 8, 2014", with English Translation, 9 pgs.

"Canadian Application Serial No. 2,810,511, Office Action dated Jun. 21, 2017", 4 pgs.

## US 10,419,817 B2
Page 6

(56)                **References Cited**

OTHER PUBLICATIONS

"Canadian Application Serial No. 2,810,521, Office Action dated Jun. 8, 2017", 3 pgs.
"Canadian Application Serial No. 2,810,521, Response filed Sep. 7, 2017 to Office Action dated Jun. 8, 2017", 15 pgs.
"European Application Serial No. 01968190.7, European Amendment filed Aug. 18, 2011", 1 pg.
"European Application Serial No. 01968190.7, European Amendment filed Sep. 20, 2011", 3 pgs.
"European Application Serial No. 01968190.7, Office Action dated May 17, 2010", 9 pgs.
"European Application Serial No. 01968190.7, Office Action dated Nov. 6, 2006", 4 pgs.
"European Application Serial No. 01968190.7, Response filed May 16, 2007 to Office Action dated Nov. 6, 2006", 26 pgs.
"European Application Serial No. 01968190.7, Response filed Sep. 24, 2010 to Office Action dated May 17, 2010", 5 pgs.
"European Application Serial No. 11824132.2, Extended European Search Report dated Feb. 25, 2014", 6 pgs.
"European Application Serial No. 11824132.2, Response filed Aug. 29, 2014", 12 pgs.
"HTML 4.0 Specification", W3C Recommendation, XP002191626, (Apr. 24, 1998), 12 pgs.
"HTML Support—Multimedia and Images", [Online] Retrieved from the Internet: <URL: http://www.citycat.ru/doc/HTML/IExplorer.30/mmedia.htm#Marquee>, (1996), 4 pgs.
"International Application Serial No. PCT/US01/26801, International Preliminary Examination Report dated Nov. 25, 2003", 12 pgs.
"International Application Serial No. PCT/US01/26801, International Search Report dated Mar. 14, 2002", 3 pgs.
"International Application Serial No. PCT/US2011/50712, International Preliminary Report on Patentability dated Mar. 21, 2013", 8 pgs.
"International Application Serial No. PCT/US2011/50712, International Search Report dated Jan. 5, 2012", 2 pgs.
"International Application Serial No. PCT/US2011/50712, Written Opinion dated Jan. 5, 2012", 6 pgs.
"International Application Serial No. PCT/US2011/50839, International Preliminary Report on Patentability dated Mar. 21, 2013", 6 pgs.
"International Application Serial No. PCT/US2011/50839, International Search Report dated Dec. 30, 2011", 2 pgs.
"International Application Serial No. PCT/US2011/50839, Written Opinion dated Dec. 30, 2011", 4 pgs.
"MPEG-4 Authoring Tools Let Pros, Consumers Create Mutimedia for Web Pages, TV, HDTV", Sarnoff Document, XP002155140, (Dec. 10, 1998), 2 pgs.
Alvaer, Jose, "Realnetworks' Realaudio and Realvideo", Webdeveloper.com, guide to streaming multimedia, XP002150113, ISBN:0-471-24822-3, (1998), 20 pgs.
Chambers, C. S., "Designing a set-top box operating system", International conference on consumer electronics,IEEE US vol. CONF. 14, XP000547858 ISBN 0-7803-2141-3, (Jun. 7, 1995), 368-369.
Clearplay, "Being a Very Cool Responsible Parent Just Got a Whole Lot Easier", [Online]. Retrieved from the Internet: <URL: http://www.clearplay.com/>, (Accessed Jan. 13, 2003), 2 pages.
Clearplay, "Enjoy the Show!", Press Release, Dec. 10, 2001, "ClearPlay Launches Groundbreaking Movie Filtering.", [Online]. Retrieved from the Internet: <URL: http://www.clearplay.com/10Dec2001.asp>, (Dec. 10, 2001), 2 pages.
Cobb, Jerry, "Taking Violence out of DVD Movies—System from ClearPlay Removes 'R' Content from DVDs", CNBC, [Online]. Retrieved from the Internet: <URL: http://www.msnbc.com/news/857154.asp?cp1=1,>, (Jan. 9, 2003), 3 pgs.

EBU Project Group B/CA, "Functional model of a conditional access system", EBU Technical Review, 266, Grand-Saconnex, CH, (Winter 1995), 64-77.
Fernandez, Panadero MC, et al., "Mass-customizing electronic journals", Online!, XP002177409, (May 10, 1999), 11 pgs.
Giles, Aaron, "Transparency—A Quick and Dirty Utility for Creating Tranparent GIF Images", [Online]. Retrieved from the Internet: <URL: http://www.mit.edu:8001/people/nocturne/etc/Transparency_notes.html>, (Aug. 19, 1994), 2 pgs.
Levin, "Software Design of a Personal Television Service", ICCE 2000, (2000), pp. 26-27.
Shim, S.Y. Shim, et al., "Template Based Synchronized Multimedia Integration Language Authoring Tool", Proceedings of the SPIE, SPIE, Bellingham, VA, vol. 3964, (Jan. 2000), 134-142.
Vuorimaa, Petri, et al., "XML Based Text TV", IEEE—WISE '00 Proceedings of the First International Conference on Web, (2000), 109-113.
Watson, Christopher, "Scripting the Web (times 2)", [Online]. Retrieved from the Internet: <URL: http://groups.google.com/groups?q=javascript+hypermedia&hl=en&selm=cwatson-3008961022470001%40204.212.150.108&rnum=7>, (Aug. 30, 1996), 2 pages.
"U.S. Appl. No. 12/877,993, Examiner Interview Summary dated Mar. 19, 2018", 3 pgs.
"U.S. Appl. No. 12/877,993, Final Office Action dated Jul. 9, 2018", 37 pgs.
"U.S. Appl. No. 12/877,993, Response filed Mar. 15, 2018 to Non Final Office Action dated Dec. 15, 2017", 25 pgs.
"U.S. Appl. No. 12/878,001, Final Office Action dated Apr. 23, 2018", 18 pgs.
"U.S. Appl. No. 15/726,102, Non Final Office Action dated Apr. 18, 2018", 32 pgs.
"Canadian Application Serial No. 2,810,511, Office Action dated Jun. 12, 2018", 4 pgs.
"U.S. Appl. No. 12/878,001, Examiner Interview Summary dated Jul. 27, 2018", 3 pgs.
"U.S. Appl. No. 12/878,001, Response filed Jul. 23, 2018 to Final Office Action dated Apr. 23, 2018", 12 pgs.
"Canadian Application Serial No. 2,810,521, Response filed Jul. 30, 2018 to Office Action dated Mar. 1, 2018", 17 pgs.
"Canadian Application Serial No. 2,810,511, Response filed Aug. 24, 2018 to Office Action dated Jun. 12, 2018", 26 pgs.
"U.S. Appl. No. 12/878,001, Notice of Allowance dated Oct. 2, 2018", 12 pgs.
"Canadian Application Serial No. 2,810,511, Office Action dated Dec. 10, 2018", 5 pgs.
"Canadian Application Serial No. 2,810,521, Examiner's Rule 30(2) Requisition mailed Jan. 4, 2019", 4 pgs.
"European Application Serial No. 11824132.2, Response filed Mar. 5, 2019 to Summons to Attend Oral Proceedings mailed Nov. 5, 2018", 29 pgs.
"European Application Serial No. 11824078.7, Communication Pursuant to Article 94(3) EPC mailed Aug. 16, 2018", 7 pgs.
"U.S. Appl. No. 12/877,993, Response filed Nov. 8, 2018 to Final Office Action dated Jul. 9, 2018", 15 pgs.
"European Application Serial No. 11824132.2, Summons to Attend Oral Proceedings mailed Nov. 5, 2018", 5 pgs.
"U.S. Appl. No. 12/877,993, Non Final Office Action dated Feb. 4, 2019", 34 pgs.
"Canadian Application Serial No. 2,810,511, Response filed Apr. 4, 2019 to Office Action dated Dec. 10, 2018", 36 pgs.
"U.S. Appl. No. 12/877,993, Response filed May 6, 2019 to Non Final Office Action dated May 6, 2019", 15 pgs.
"U.S. Appl. No. 16/237,022, Preliminary Amendment Filed May 14, 2019", 8 pgs.
"U.S. Appl. No. 12/877,993, Examiner Interview Summary dated May 21, 2019", 3 pgs.

* cited by examiner



FIG. 1



*FIG. 2*



*FIG. 3*



*400*

OBTAIN CONTENT UTILIZATION DATA FROM A PLURALITY OF CLIENT DEVICES ASSOCIATED WITH RESPECTIVE PLURALITY OF VIEWERS, THE CONTENT UTILIZATION DATA FOR A VIEWER FROM THE PLURALITY OF VIEWERS BEING INDICATIVE OF THE VIEWER'S INTEREST IN RESPECTIVE CONTENT ITEMS — *410*

GENERATE A LIST OF POPULAR CONTENT ITEMS BASED ON THE OBTAINED CONTENT UTILIZATION DATA — *420*

GENERATE A CUSTOMIZED PLAYLIST FOR A TARGET VIEWER FROM THE PLURALITY OF VIEWERS, THE CUSTOMIZING BASED ON THE LIST OF POPULAR CONTENT ITEMS AND A PROFILE OF THE TARGET VIEWER — *430*

COMMUNICATE THE CUSTOMIZED PLAYLIST TO A CLIENT DEVICE OF THE TARGET VIEWER — *440*

*FIG. 4*

U.S. Patent        Sep. 17, 2019        Sheet 5 of 5        US 10,419,817 B2



FIG. 5

US 10,419,817 B2

1

# SMART PLAYLIST

## PRIORITY APPLICATION

This application is a continuation of U.S. patent application Ser. No. 12/877,034, filed on Sep. 7, 2010, which is incorporated herein by reference in its entirety.

## TECHNICAL FIELD

This application relates to the fields of media and entertainment and specifically to a smart playlist system.

## BACKGROUND

The approaches described in this section could be pursued, but are not necessarily approaches that have been previously conceived or pursued. Therefore, unless otherwise indicated herein, the approaches described in this section are not prior art to the claims in this application and are not admitted to be prior art by inclusion in this section.

In the field of media and entertainment, there is a new generation of viewers that has a high expectation of the level of entertainment to be enjoyed from various sources of content, such as, e.g., television programming, the Internet, and locally stored content. These viewers may expect more choice, more flexibility, as well as the ability to interact and participate more with the viewable content.

On the other hand, the sheer volume of content that is available for viewing is exploding dramatically. Just the number of television channels that are now available is almost unmanageable. The amount of content that is available via free video or video on demand service is also increasing. It is now possible to view content over a wider span of time by employing time shifting technologies, such as Personal Video Recording (PVR) (sometimes referred to as DVR or Digital Video Recording). This explosion of content may be described as a paradox of choice, where the excess of choice causes a viewer's inability to choose.

## BRIEF DESCRIPTION OF DRAWINGS

Embodiments are illustrated by way of example and not limitation in the figures of the accompanying drawings, in which like references indicate similar elements and in which:

FIG. **1** illustrates an environment within which an example smart playlist may be implemented, in accordance with an example embodiment;

FIG. **2** is a network diagram illustrating architecture within which a smart playlist may be utilized, in accordance with an example embodiment;

FIG. **3** is a block diagram illustrating a smart playlist system, in accordance with an example embodiment;

FIG. **4** is a flow chart illustrating a method for providing a smart playlist to a viewer's client device, in accordance with an example embodiment; and

FIG. **5** illustrates a diagrammatic representation of a machine in the example form of a computer system within which a set of instructions, for causing the machine to perform any one or more of the methodologies discussed herein, may be executed.

## DETAILED DESCRIPTION

The description that follows includes systems, methods, techniques, instruction sequences, and computing machine

2

program products that embody illustrative embodiments of the present invention. In the following description, for purposes of explanation, numerous specific details are set forth in order to provide an understanding of various embodiments of the inventive subject matter. It will be evident, however, to those skilled in the art that embodiments of the inventive subject matter may be practiced without these specific details. In general, well-known instruction instances, protocols, structures, and techniques have not been shown in detail.

A system is described to collect information from a great number of viewers' client devices, determine a list of popular content items based on the collected information, customize the list for a particular viewer, and send that list to the viewer's device. This approach to aiding a viewer in making choices in the universe of viewable content may be termed a smart playlist system. Example embodiments described herein provide systems and methods to generate a smart play list.

In one embodiment, a smart playlist system obtains from viewers' client devices content-related information such as, e.g., which programs are being currently viewed, which programs are being recorded and scheduled to be recorded, which content has been rated and the associated ratings, as well as recommendations pertaining to programs, purchases of various programs, etc. For the purposes of this description the terms content, content item, show, and program will be understood to denote viewable content. Data collected indiscriminately from the entire accessible community of viewers may be accumulated in a repository termed a global bucket. Data from the global bucket may be analyzed to determine programs that appear to be most popular at the time of the analyzing, i.e., appear to be of heightened interest to viewers. A certain number of programs that have been determined as most popular are compiled into a so-called hot list. The hot list may be made available to viewer, e.g., by communicating the list to the viewers' client devices or providing an access link that can be invoked from the users' devices.

Before a hot list is provided to a viewer, it may be personalized for the viewer by determining how relevant the items in the hot list are to that particular viewer and presenting to the viewer only those programs that have been determined to be of high relevance to the viewer. The relevancy of a particular program to a particular viewer may be determined by associating each item in the hot list with a score based on the viewer's profile, on the viewer's content viewing history and patterns, as well as based on information collected from the client devices of a subset of viewers who are members of the particular viewer's social network.

In one example embodiment, in addition to providing a personalized hot list of content items, a smart playlist system may trigger recording of a certain program as soon as the program has been identified as a live program and of high relevance to the viewer. For example, a viewer may not be tuned into a channel broadcasting a particular live sports event. If the smart playlist system determined that the live sports event is of high relevance to the viewer, the smart playlist system may trigger the recording of the live broadcast of the sports event on the viewer's client device (e.g., a set top box, a desktop computer, etc.) and also alerts the user to the fact that she may be interested in the event being currently broadcast on a certain channel. The viewer may then ignore the alert. If the viewer, instead, tunes to the suggested channel the viewer would not have missed the beginning of the broadcast because the recording of the program has been automatically triggered by an instruction provided to the viewer's client device from the smart playlist

US 10,419,817 B2

3

system. In one example, the high relevancy of the live broadcast may have been determined based on the fact that all of the viewer's social network contacts have either tuned into the associated channel or have scheduled the recording of the broadcast. In another example, the high relevancy of the live broadcast may have been determined based on the viewer's profile or on the viewer's viewing history. An example smart playlist system may be implemented within architecture illustrated in FIG. **1**.

FIG. **1** illustrates network architecture of an example interactive media environment **100** wherein some embodiments of the present invention may be deployed. The interactive media environment **100** includes a source system **102** that communicates data (e.g., media content data and interactive application data) via a distribution network or system **104** (e.g., the Internet, a mobile communication network, or any other network capable of communicating digital data) and a modulator box **106** to a receiver system **108**. In one example embodiment, the interactive media environment **100** optionally includes a storage unit **110** (e.g., a personal computer) that communicates stored data via a network **112** to the modulator box **106** which, in turn, communicates the stored data, media content data, and interactive application data to the receiver system **108**. The modulator box **106**, storage unit **110**, and the receiver system **108** may be co-located in a user's home. Thus, in one embodiment, the modulator box **106** may combine media content data and interactive application data received from the remote source system **102** with a local stored data provided by the storage unit **110** provided at the user's home.

Turning first to the source system **102**, an example head-end system **114** operates to communicate the data as a broadcast transmission. To this end, the headend system **114** is shown to include one or more broadcast servers **116** and, optionally, one or more application servers **118**. Each of the broadcast servers **116** may operate to receive, encode, packetize, multiplex, modulate, and broadcast data from various sources and of various types. While the example embodiment is described herein as transmitting data from the headend system **114** as a broadcast, it will be appreciated that the relevant data could also be unicast or multicast from the source system **102** via the distribution system **104** and modulator box **106** to the receiver system **108**. In various embodiments, data could also be transmitted from the source system **102** via a network connection to the receiver system **108**. Further, in other example embodiments the source system **102** may be modified to facilitate communications via the Internet, a mobile phone network, or any other network capable of communicating digital data.

Each application server **118**, in one example embodiment, compiles and provides interactive data modules to the broadcast server **116**. The interactive data modules may also include data that is utilized by an interactive television application. The application server **118** may also include multiplexing functionality to enable multiplexing of, for example, interactive television applications and associated data with audio and video signals received from various sources. The application server **118** may also have the capability to feed (e.g., stream) multiple interactive television applications to one or more broadcast servers **116** for distribution to the receiver system **108**. To this end, each application server **118** may implement a so-called "carousel," whereby code and data modules are provided to a broadcast server **116** in a cyclic, repetitive manner for inclusion within a transmission from the headend system **114**. In other embodiments, code may reside permanently in

4

a set-top box (STB) **120** (e.g., the code may be stored in non-volatile memory of the STB **120**), may be pushed of downloaded to the STB **120**, or be provided to the STB **120** in any other manner. In one embodiment, the application server **118** provides a smart playlist mechanism to collect information from viewers, determine a list of popular content items, customizing the list for a particular user and sending that lit to the user's device. The smart playlist mechanism will be discussed by way of example in more detail in connection with FIGS. **2-4**.

The headend system **114** is also shown, by way of example, to include one or more backend servers **122**, which are coupled to the application servers **118** and to an input/output device **124** (e.g., a modem pool). Specifically, the I/O device **124** is coupled to receive data from the receiver system **108** via a network **126** (e.g., the Internet) and to provide this data to backend servers **122**. The backend servers **122** may then provide the data, received from the receiver system **108**, to the application servers **118** and the broadcast servers **116**. Alternatively, data received from the receiver system **108** may be directly provided to the application servers **118**.

Accordingly, the network **126** and the I/O device **126** may operate as a return channel whereby the receiver system **108** is provided with interactivity with the source system **102**. Data provided to the headend system **114** via the return channel may include, merely for example, user input to an interactive media application executed at the receiver system **108** or data that is generated by the receiver system **108** and communicated to the source system **102**. The return channel may also provide a channel whereby programs, targeted advertisements/commercials, and applications from the source system **102** are provided to the receiver system **108**.

Within the source system **102**, the headend system **114** is also shown optionally to receive data (e.g., content, code, and application data) from external sources. For example, the headend system **114** may be coupled to one or more content sources **128** and one or more application sources **130** via a network **132** (e.g., the Internet). For example, a content source **128** may be a provider of entertainment content (e.g., movie), a provider of real-time dynamic data (e.g., weather information), and the like. The application source **130** may be a provider of any interactive media application. For example, one or more application sources **130** may provide a TV media player application, electronic program guide and navigation applications, messaging and communication applications, information applications, and so forth. The application sources **130** may be configured to execute on different client devices (e.g., mobile phones, personal computer, STBs, or the like).

Turning now to the example distribution system **104**, the distribution system **104** may, in one embodiment, support the broadcast distribution of data from the source system **102** to the receiver system **108**. As shown, the distribution network or system **104** may comprise a satellite, cable, terrestrial or Digital Subscribers Line (DSL) network, or any other data communication network or combination of such networks.

The receiver system **108** is shown, in one example embodiment, to include the set-top box (STB) **120** that receives data (e.g., primary and secondary content streams) via the distribution system **104** and modulator box **106** and an input/output device **132** (e.g., modem) for return channel communications with the headend system **114**. The receiver system **108** is also shown to include other optional external systems such as a user input device **134** (e.g., a keyboard, remote control, mouse etc.) and a display device **136**,

US 10,419,817 B2

5

coupled to the set-top box **120**, for the display of content received at the set-top box **120**. In one example embodiment, the display device **136** may be a television set.

The modulator box **106**, in one example embodiment, receives stored data from the storage unit **110** and a broadcast transmission from the source system **102**. The modulator box **106** multiplexes the stored data into the broadcast transmission thereby generating a second transmission that is communicated to the receiving system **108**. It will, however, be appreciated that storage unit functionality is optional. The storage unit **110** may store data and, upon request, communicate the stored data to the modulator box **106** over the network **112** (e.g., Ethernet). The storage unit **110** may communicate the stored data in response to commands that are entered by a user from the set-top box **120** and communicated to the storage unit **110** over a link **138**.

It will be appreciated to one skilled in the art that one or more of the modules, applications, or the like of the modulator box **106**, the set-top box **120**, and the storage unit **110** may be combined or integrated. In general, components, protocols, structures, and techniques not directly related to functions of example embodiments have not been shown or discussed in detail. The description given herein simply provides a variety of example embodiments to aid the reader in an understanding of the systems and methods used herein. While the interactive media environment **100** is illustrated having a receiving system **108** including a set-top box **120**, it is noted that the receiving system **108** may comprise a mobile device or a personal computer coupled to a network for receiving media.

Smart playlist may be utilized beneficially in the context of a network environment. FIG. **1** illustrates an environment **100** within which an example smart playlist may be implemented. The environment **100** includes a set top box **110** in communication with an entertainment display device **120** and a control device **130**. The set-top box (STB) **110** may be a device that connects to a television and an external source of signal, turning the signal into content which can then be displayed on the television screen. In one example embodiment, the entertainment display device **120** is a television set, and the control device **130** is a remote control device that may be used for switching between television channels, for example. The set-top box **110** may be configured to include a system **112** to provide a smart playlist that may include features outlined above. The set-top box **110** may be configured to receive content from sources such as, e.g., an Ethernet cable, a satellite dish, a coaxial cable, a telephone line (including digital subscriber line (DSL) connections), Broadband over Power Line, as well as very high frequency (VHF) or ultra high frequency (UHF) antenna. Content, in this context, could mean any or all of video, audio, Internet web pages, interactive games, or other possibilities. As shown in FIG. **1**, the set-top box **110** is shown as having access to signal sources **140**, including broadcast programming **142**, video on demand programs **144**, as well as to local content **146** and Internet content **148**.

FIG. **2** is a network diagram illustrating architecture **200** within which a smart playlist may be utilized, in accordance with an example embodiment. The architecture **100** includes a client device **210** and a client device **220**, each configured to receive content from content sources **250** and to be in communication with a server system **240** via a communications network **230**. The client devices **210** and **220** may be set top boxes, desktop computers, mobile devices, etc. The communications network **230** may be a public network (e.g., the Internet, a wireless network, etc.) or a private network (e.g., a local area network (LAN), a wide area network

6

(WAN), Intranet, etc.). The server **240** may include a smart playlist system **242** configured to collect information related to utilization of viewable content from viewers' client devices, to aggregate and customize the collected information, and to provide the resulting hot list to viewers personalized for each particular user, as was described above.

The client device **210** may be configured to include a smart playlist agent **212** that may be configured to cooperate with the smart playlist system **242** with respect to collecting information regarding viewable content accessed or referenced on the client device **210**. In some embodiments, the smart playlist system **242** may be configured to obtain information regarding viewable content accessed or referenced on a client device without the use of a smart playlist agent. As shown in FIG. **2**, the client devices **210** and **220** have access to signal sources **250**. The signal sources **250** include broadcast programming **252**, video on demand programs **254**, as well as to local content **256** and Internet content **258**. An example system to generate a smart playlist may be described with reference to FIG. **2**.

FIG. **3** illustrates an example system **300** to generate a smart playlist based on content utilization information collected from client devices of the entire community of users that can be accessed by the smart playlist system. The system **300** includes a collector module **310**, a hot list generator **320**, a customization module **340**, and a communications module **350**. The collector module **310** may be configured to obtain content utilization data from a plurality of client devices (e.g., the client devices **210** and **220** of FIG. **2**. The content utilization data for a viewer from the plurality of viewers may be indicative of the viewer's interest in respective content items. In one embodiment, the collector module **310** obtains content utilization data from a real time listener provided at a client device, e.g., the smart playlist agent **212** of FIG. **2**. The hot list generator **320** may be configured to generate a list of popular content items based on the obtained content utilization data.

The collector module **310** obtains content utilization information from all client devices accessible to the smart playlist system **300**. This information, collected from the entire universe of viewers that have diverse tastes, viewing habits, and content source preferences and that reflects content utilization of the entire viewing community, is stored, by a storing module **340**, in a repository termed a global bucket. The data from the global bucket is analyzed by the hot list generator **320** to determine those content items that are of most interest to the global community of viewers and assemble those content items into a list of popular items, a so-called hot list. In one embodiment, the hot list generator **320** may generate a hot list based on how many viewers are watching or recording a show, the duration of the watching, ratings and recommendations associated with the program, and so on. As the collector module **310** continuously obtains content utilization data from client devices, the hot list generator **320** may be configured to continuously update the hot list, e.g., once a day or based on any predetermined time period.

The customization module **330** may be configured to customize the hot list that is generated based on the information from the global bucket that reflect preferences of the entire community of viewers to target more closely the actual and projected preferences of a particular viewer (a target viewer) and generate a so-called customized playlist. The customizing may be based on the viewer's profile that may be stored at the application server **240** of FIG. **2**, as well as on the viewing history of the viewer and the viewing history of members of the viewer's social network. In one

US 10,419,817 B2

7                                                                     8

embodiment, the storing module **340** stores content utilization data for individual viewers in respective repositories termed personal buckets. A viewer's profile stored at the application server **240** may indicate that one or more other viewers are associated with the viewers as "friends" in terms of social networking. The storing module **340** stores content utilization data collected from client devices of the viewer's "friends" or social connections in a repository termed a social bucket. The customization module **330** may utilize data from the viewer's personal bucket and the viewer's social bucket to generate the customized playlist. The customization module **330** may be configured to periodically update the customized playlist, e.g., based on the changes in the hot list, based on the changes in the data stored in the personal bucket and the social bucket, as well as based on the changes in the viewer's profile.

In one embodiment, a customized playlist is generated by generating a score for each item from the list of popular content items and including items into in the customized playlist based on respective scores of the items from the list of popular content items. The scoring may be based on the viewer's preferences identified in the viewer's profile, based on data from the viewer's personal bucket and the viewer's social bucket. A content item from a category that is not indicated in the viewer's profile as being of interest to the viewer and that is not considered as being of interest to the viewer based on the viewing history of the viewer may still be assigned a high score by the customization module **330** based on the information from the viewers social bucket. For example, the customization module **330** may be configured to weigh heavily an indication that a certain content item is of high interest to a great number of the viewer's social contacts.

The communications module **350** may be configured to communicate the customized playlist to a client device of the target viewer. The communications module **350** may be configured to communicate to the client device an instruction to start recording of a live program identified in the customized playlist. The communications module **350** may also be configured to communicate to the client device an instruction to display an alert message regarding of a live program identified in the customized playlist. As mentioned above, a client device may be a set top box, a desktop computer, or a mobile device. Content items referenced in the hot list or in the customized playlist may be associated with a variety of content sources, such as, e.g., the Internet, video on demand, and live broadcast. Example operations performed by the system **400** may be described with reference to FIG. **4**.

FIG. **4** illustrates an example method **400** of providing a smart playlist. The method **400** may be performed in the context of media and entertainment, e.g., in the context of television entertainment. The method **400** may be performed by processing logic that may comprise hardware (e.g., dedicated logic, programmable logic, microcode, etc.), software (such as run on a general purpose computer system or a dedicated machine), or a combination of both. It will be noted, that in an example embodiment, the processing logic may reside in any of the modules shown in FIG. **3**.

As shown in FIG. **4**, the method **400** commences with operation **410**, where the collector module **310** of FIG. **3** obtains content utilization data from a plurality of client devices associated with respective plurality of viewers. At operation **420**, the hot list generator **320** of FIG. **3** generates a list of popular content items based on the obtained content utilization data. At operation **430**, the customization module **330** of FIG. **3** generates a customized playlist for a target

viewer from the plurality of viewers, based on the list of popular content items and a profile of the target viewer. At operation **440**, the communications module **340** of FIG. **3** communicates the customized playlist to a client device of the target viewer.

FIG. **5** shows a diagrammatic representation of machine in the example form of a computer system within which a set of instructions, for causing the machine to perform any one or more of the methodologies discussed herein, may be executed. In alternative embodiments, the machine operates as a standalone device or may be connected (e.g., networked) to other machines. In a networked deployment, the machine may operate in the capacity of a server or a client machine in server-client network environment, or as a peer machine in a peer-to-peer (or distributed) network environment. The machine may be a personal computer (PC), a tablet PC, a set-top box (STB), a Personal Digital Assistant (PDA), a cellular telephone, a web appliance, a network router, switch or bridge, or any machine capable of executing a set of instructions (sequential or otherwise) that specify actions to be taken by that machine. Further, while only a single machine is illustrated, the term "machine" shall also be taken to include any collection of machines that individually or jointly execute a set (or multiple sets) of instructions to perform any one or more of the methodologies discussed herein.

The example computer system **500** includes a processor **502** (e.g., a central processing unit (CPU), a graphics processing unit (GPU) or both), a main memory **504** and a static memory **506**, which communicate with each other via a bus **508**. The computer system **500** may further include a video display unit **510** (e.g., a liquid crystal display (LCD) or a cathode ray tube (CRT)). The computer system **500** also includes an alphanumeric input device **512** (e.g., a real or virtual keyboard), a viewer interface (UI) navigation device **514** (e.g., a remote control or a mouse), a disk drive unit **516**, a signal generation device **518** (e.g., a speaker) and a network interface device **520**.

The disk drive unit **516** includes a machine-readable medium **522** on which is stored one or more sets of instructions and data structures (e.g., software **524**) embodying or utilized by any one or more of the methodologies or functions described herein. The software **524** may also reside, completely or at least partially, within the main memory **504**, within the processor **502** during execution thereof by the computer system **500**, the main memory **504** and the processor **502** also constituting machine-readable media. The main memory **504** comprises storage locations that are addressable by the processor **502** for storing software program code. The memory may comprise a form of random access memory (RAM). Those skilled in the art will appreciate that other memory means, such as FLASH memory media, may also be used for storing the program instructions and data structures shown in the main memory **504**.

The software **524** may further be transmitted or received over a network **526** via the network interface device **520** utilizing any one of a number of well-known transfer protocols (e.g., HTTP).

While the machine-readable medium **522** is shown in an example embodiment to be a single medium, the term "machine-readable medium" may be taken to include a single medium or multiple media (e.g., a centralized or distributed database, and/or associated caches and servers) that store the one or more sets of instructions. The term "machine-readable medium" shall also be taken to include any medium (e.g., FLASH memory media) that is capable of storing, encoding or carrying a set of instructions for execu-

US 10,419,817 B2

9

tion by the machine and that cause the machine to perform any one or more of the methodologies of the present invention, or that is capable of storing, encoding or carrying data structures utilized by or associated with such a set of instructions. The term "machine-readable medium" shall accordingly be taken to include, but not be limited to, solid-state memories, optical and magnetic media.

The embodiments described herein may be implemented in an operating environment comprising software installed on a computer, in hardware, or in a combination of software and hardware.

Thus, method and system to generate and update a smart playlist have been described. In the description above, for purposes of explanation, numerous specific details have been set forth in order to provide a thorough understanding of one example embodiment. It will be evident, however, to one skilled in the art that the present invention may be practiced without these specific details. It is to be noted that the delivery mechanism for the content for viewing may be via a satellite, cable, terrestrial broadcast, Internet, local storage, a local network, mobile telephony, or any other content distribution network. Accordingly, the viewing device need not be a television set but may be any display unit of any device (including portable devices). It will be noted that any references to television content will be understood to include any content available for viewing on an entertainment display device, such as a television screen. Such content may include television programming, as well as locally stored content, such as stored video files or digital images, as well as content accessible via the Internet. It will be noted that the term viewer may be understood broadly as any viewer of the system to navigate television content.

The invention claimed is:

**1**. A computer-implemented method comprising:

accessing a database to obtain content utilization data of a plurality of client devices, each client device associated with a respective viewer of a plurality of viewers, wherein the content utilization data for a first viewer from the plurality of viewers is indicative of an interest of the first viewer in respective content items, and wherein the plurality of viewers comprises a second viewer who is not identified as a social connection of the first viewer;

automatically generating, by a computer system, a list of popular content items that are currently popular among the plurality of viewers based on the content utilization data;

customizing, by the computer system, the list of popular content items to generate a playlist, the customizing based on profile data of the first viewer , wherein the customizing is performed by the computer system and comprises:

generating a score for each item from the list of popular content items based on the profile data of the first viewer; and

including items in the playlist based on at least some of the scores of the items from the list of popular content items; and

based on the generating of the playlist, automatically sending, by the computer system, to a client device of the first viewer, an instruction that causes the client device to perform an operation for an item of the items included in the playlist.

**2**. The method of claim **1**, wherein the customizing of the list of popular content items to generate the playlist is further

10

based on viewing history data of at least one viewer who is identified in social connection data as a social connection of the first viewer.

**3**. The method of claim **2**, wherein the generating of the score for each item from the list of popular content items is further based on the viewing history data of the at least one viewer who is identified in the social connection data as a social connection of the first viewer.

**4**. The method of claim **2**, wherein the customizing comprises selecting at least one of the popular content items for the playlist based on the viewing history data of the at least one viewer who is identified in the social connection data as a social connection of the first viewer indicating a high level of interest in the at least one of the popular content items while viewing history data of the first viewer indicates a low level of interest in the at least one of the popular content items by the first viewer.

**5**. The method of claim **1**, further comprising: communicating the playlist to a client device of the first viewer.

**6**. The method of claim **1**, wherein the sending of the instruction that causes the client device to perform the operation for the item of the items included in the playlist comprises sending an instruction that causes initiation of recording of a live program identified in the playlist.

**7**. The method of claim **1**, wherein the sending of the instruction that causes the client device to perform the operation for the item of the items included in the playlist comprises sending an instruction that causes display of an alert message regarding a live program identified in the playlist.

**8**. The method of claim **1**, wherein the items in the playlist include at least one of a first item that identifies Internet content, a second item that identifies video on demand content, and a third item that identifies a live program.

**9**. The method of claim **1**, wherein the client device comprises a set top box.

**10**. The method of claim **1**, wherein the client device comprises a desktop computer.

**11**. The method of claim **1**, wherein the client device comprises a mobile device.

**12**. The method of claim **1**, wherein the customizing of the list of popular content items is also based at least in part on a content category of interest to the first viewer.

**13**. The method of claim **1**, wherein the content utilization data indicates lengths of time during which the plurality of viewers have viewed a content item.

**14**. A system comprising:

a memory that stores instructions; and

one or more processors configured by the instructions to perform operations comprising:

accessing a database to obtain content utilization data of a plurality of client devices associated with a plurality of viewers, wherein the content utilization data for a first viewer from the plurality of viewers is indicative of an interest of the first viewer in respective content items, and wherein the plurality of viewers comprises a second viewer who is not identified as social connections of the viewer;

automatically generating a list of popular content items that are currently popular among the plurality of viewers based on the content utilization data;

generating a playlist by performing customization operations comprising:

generating a score for each item from the list of popular content items based on a profile of the first viewer; and

US 10,419,817 B2

11

including items in the playlist based on respective scores of the items from the list of popular content items; and based on the generating of the playlist, automatically sending, to a client device of the first viewer, an instruction that causes the client device to perform an operation for an item of the items included in the playlist.

**15.** The system of claim **14**, wherein the generating of the playlist is further based on viewing history data of at least one viewer who is identified in social connection data as a social connection of the first viewer.

**16.** The system of claim **15**, wherein the generating of the score for each item from the list of popular content items is further based on viewing history data of the at least one viewer who is identified in social connection data as social connections of the first viewer.

**17.** The system of claim **15**, wherein the customization operations further comprise selecting at least one of the popular content items for the playlist based on viewing history data of the at least one viewer who is identified in social connection data as social connections of the first viewer indicating a high level of interest in the at least one of the popular content items while viewing history data of the first viewer indicates a low level of interest in the at least one of the popular content items by the first viewer.

**18.** The system of claim **14**, wherein the operations further comprise:

communicating the playlist to a client device of the first viewer.

**19.** The system of claim **14**, wherein the sending of the instruction that causes the client device to perform the operation for the item of the items included in the playlist

12

comprises sending an instruction that causes initiation of recording of a live program identified in the playlist.

**20.** A machine-readable non-transitory storage medium storing instructions that, when executed by one or more processors of a machine, cause the machine to perform operations comprising:

accessing a database to obtain content utilization data of a plurality of client devices, each client device associated with a respective viewer of a plurality of viewers, wherein the content utilization data for a first viewer of the plurality of viewers is indicative of an interest of the first viewer in respective content items, and wherein the plurality of viewers comprises a second viewer who is not identified as a social connection of the viewer;

automatically generating a list of popular content items that are currently popular among the plurality of viewers based on the content utilization data;

generating a playlist , the generating of the playlist being based on the list of popular content items and profile data of the first viewer, wherein the generating of the playlist comprises:

generating a score for each item from the list of popular content items based on the profile data of the first viewer; and

including items in the playlist based on at least some of the scores of the items from the list of popular content items; and

based on the generating of the playlist, automatically sending, to a client device of the first viewer, an instruction that causes the client device to perform an operation for an item of the items included in the playlist.

\* \* \* \* \*

# Exhibit B

US009699503B2

(12) **United States Patent**
Fishman et al.

(10) Patent No.: **US 9,699,503 B2**
(45) **Date of Patent:** **Jul. 4, 2017**

(54) **SMART PLAYLIST**

(75) Inventors: **Alex Fishman**, San Francisco, CA (US); **Crx K. Chai**, Oakland, CA (US)

(73) Assignee: **OpenTV, Inc.**, San Francisco, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 331 days.

(21) Appl. No.: **12/877,034**

(22) Filed: **Sep. 7, 2010**

(65) **Prior Publication Data**

US 2012/0060195 A1    Mar. 8, 2012

(51) **Int. Cl.**
| | |
|---|---|
| *H04N 21/4788* | (2011.01) |
| *H04N 21/442* | (2011.01) |
| *H04N 21/25* | (2011.01) |
| *H04N 21/466* | (2011.01) |
| *H04N 21/482* | (2011.01) |

(52) **U.S. Cl.**
CPC ..... ***H04N 21/44204*** (2013.01); ***H04N 21/252*** (2013.01); ***H04N 21/4668*** (2013.01); ***H04N 21/4826*** (2013.01)

(58) **Field of Classification Search**
CPC ........... G06F 17/3002; G06F 17/30035; G06F 17/30038; H04N 21/252; H04N 21/4668
USPC .................................................. 725/46, 47
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,798,785 | A * | 8/1998 | Hendricks et al. .............. | 725/46 |
| 8,949,871 | B2 | 2/2015 | Chai et al. | |
| 2003/0037334 | A1* | 2/2003 | Khoo et al. ..................... | 725/46 |
| 2003/0093790 | A1* | 5/2003 | Logan ............... G06F 17/30265 725/38 |

| | | | | |
|---|---|---|---|---|
| 2003/0217365 | A1* | 11/2003 | Caputo .................. | H04N 7/106 725/95 |
| 2003/0237093 | A1 | 12/2003 | Marsh et al. | |
| 2005/0144499 | A1 | 6/2005 | Narahara et al. | |
| 2007/0033607 | A1 | 2/2007 | Bryan | |
| 2007/0041705 | A1 | 2/2007 | Bontempi | |
| 2007/0157242 | A1 | 7/2007 | Cordray et al. | |
| 2008/0117202 | A1* | 5/2008 | Martinez .......... | G06F 17/30035 345/418 |
| 2008/0222106 | A1 | 9/2008 | Rao et al. | |
| 2008/0320517 | A1 | 12/2008 | Beadle et al. | |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0262757 A2 | 4/1988 |
| WO | WO-0232136 A2 | 4/2002 |

OTHER PUBLICATIONS

"U.S. Appl. No. 12/877,993 , Response filed Dec. 3, 2012 to Non Final Office Action mailed Aug. 2, 2012", 17 pgs.

(Continued)

*Primary Examiner* — Nathan Flynn
*Assistant Examiner* — Tung T Trinh
(74) *Attorney, Agent, or Firm* — Schwegman Lundberg & Woessner, P.A.

(57) **ABSTRACT**

A smart playlist system is described. In one example embodiment, a collector module obtains content utilization data from a plurality of client devices associated with respective plurality of viewers. A hot list generator module generates a list of popular content items based on the obtained content utilization data. A customization module generates a customized playlist for a target viewer from the plurality of viewers, based on the list of popular content items and a profile of the target viewer. The communications module communicates the customized playlist to a client device of the target viewer.

**18 Claims, 5 Drawing Sheets**



## US 9,699,503 B2

Page 2

(56)                References Cited

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2009/0083326 A1* | 3/2009 | Pelton | G06F 17/30053 |
| 2009/0100469 A1* | 4/2009 | Conradt | H04N 7/17318 |
| | | | 725/46 |
| 2009/0150786 A1* | 6/2009 | Brown | G06F 17/30035 |
| | | | 715/733 |
| 2009/0210902 A1 | 8/2009 | Slaney et al. | |
| 2009/0217324 A1 | 8/2009 | Massimi | |
| 2010/0058241 A1 | 3/2010 | Saijo et al. | |
| 2011/0060649 A1* | 3/2011 | Dunk | G06F 17/3002 |
| | | | 705/14.53 |
| 2011/0145040 A1 | 6/2011 | Zahn et al. | |
| 2015/0121406 A1 | 4/2015 | Chai et al. | |

OTHER PUBLICATIONS

"U.S. Appl. No. 12/878,001 , Response filed Nov. 9, 2012 to Non Final Office Action mailed Aug. 9, 2012", 11 pgs.
U.S. Appl. No, 12/877,993, filed Sep. 8, 2010, System and Method for Displaying Information Related to Video Programs in a Graphical User Interface.
U.S. Appl. No. 12/877,875, filed Sep. 8, 2010, Smart Media Selection Based on Viewer User Presence.
U.S. Appl. No. 12/878,001, filed Sep. 8, 2010, Collecting Data From Different Sources.
"U.S. Appl. No. 12/877,875 , Response filed Mar. 11, 2013 to Non Final Office Action mailed Nov. 6, 2012", 10 pgs.
"U.S. Appl. No. 12/877,875, Advisory Action mailed Aug. 2, 2013", 3 pgs.
"U.S. Appl. No. 12/877,875, Final Office Action mailed Apr. 23, 2013", 12 pgs.
"U.S. Appl. No. 12/877,993, Final Office Action mailed Mar. 15, 2013", 30 pgs.
"U.S. Appl. No. 12/877,993, Response filed Jul. 22, 2013 to Final Office Action mailed Mar. 15, 2013", 17 pgs.
"U.S. Appl. No. 12/878,001 , Response filed Aug. 23, 2013 to Final Office Action mailed Mar. 29, 2013", 12 pgs.
"U.S. Appl. No. 12/878,001, Examiner Interview Summary mailed Jul. 24, 2013", 3 pgs.
"U.S. Appl. No. 12/878,001, Final Office Action mailed Mar. 29, 2013", 13 pgs.
"International Application Serial No. PCT/US2011/50712, International Preliminary Report on Patentability mailed Mar. 21, 2013", 8 pgs.
"International Application Serial No. PCT/US2011/50839, International Preliminary Report on Patentability mailed Mar. 21, 2013", 6 pgs.
Chai, Crx K., "U.S. Appl. No. 12/877,875 / Smart Media Selection Based on Viewer User Preference", 11.
"U.S. Appl. No. 12/877,875, Non Final Office Action mailed Apr. 15, 2014", 13 pgs.
"U.S. Appl. No. 12/877,875, Response filed Jul. 16, 2013 to Final Office Action mailed Apr. 23, 2013", 11 pgs.
"U.S. Appl. No. 12/878,001, Response filed Apr. 1, 2014 to Non Final Office Action mailed Oct. 3, 2013", 13 pgs.
"Australian Application Serial No. 2011101152, Examination Report No. 1 mailed May 6, 2013", 4 pgs.
"Australian Application Serial No. 2011101152, Response filed Sep. 17, 2013 to Examination Report No. 1 mailed May 6, 2013", 13 pgs.
"Australian Application Serial No. 2011299234, Amendment filed Apr. 4, 2013", 11 pgs.
"U.S. Appl. No. 12/878,001, Non Final Office Action mailed Oct. 3, 2013", 12 pgs.

"U.S. Appl. No. 12/877,875, Non Final Office Action mailed Nov. 6, 2012", 13 pgs.
"U.S. Appl. No. 12/877,875, Notice of Allowance mailed Sep. 17, 2014", 12 pgs.
"U.S. Appl. No. 12/877,875, Response filed Aug. 15, 2014 to Non Final Office Action mailed Apr. 15, 2014", 12 pgs.
"U.S. Appl. No. 12/877,993, Appeal Brief filed Feb. 24, 2016", 20 pgs.
"U.S. Appl. No. 12/877,993, Final Office Action mailed Jan. 28, 2015", 35 pgs.
"U.S. Appl. No. 12/877,993, Non Final Office Action mailed Jun. 20, 2014", 31 pgs.
"U.S. Appl. No. 12/877,993, Response filed Oct. 14, 2014 to Non Final Office Action mailed Jun. 20, 2014", 19 pgs.
"U.S. Appl. No. 12/878,001, Final Office Action mailed Jul. 17, 2014", 12 pgs.
"U.S. Appl. No. 12/879,001, Appeal Brief filed May 12, 2015", 16 pgs.
"U.S. Appl. No. 14/588,871, Final Office Action mailed Mar. 7, 2016", 12 pgs.
"U.S. Appl. No. 14/588,871, Non Final Office Action mailed Jun. 29, 2015", 13 pgs.
"U.S. Appl. No. 14/588,871, Non Final Office Action mailed Sep. 9, 2016", 12 pgs.
"U.S. Appl. No. 14/588,871, Non Final Office Action mailed Sep. 15, 2016", 16 pgs.
"U.S. Appl. No. 14/588,871, Preliminary Amendment filed Jan. 27, 2015", 8 pgs.
"U.S. Appl. No. 14/588,871, Response filed Jan. 17, 2017 to Non Final Office Action mailed Sep. 15, 2016", 20 pgs.
"U.S. Appl. No. 14/588,871, Response filed Jul. 7, 2016 Final Office Action mailed Mar. 7, 2016", 12 pgs.
"U.S. Appl. No. 14/588,871, Response filed Oct. 29, 2015 to Non Final Office Action mailed Jun. 29, 2015", 11 pgs.
"Australian Application Serial No. 2011299221, Response filed Jan. 15, 2015", 19 pgs.
"Australian Application Serial No. 2011299234, Amendment filed Aug. 25, 2015", 26 pgs.
"Australian Application Serial No. 2011299234, First Examiner Report mailed Aug. 25, 2014", 3 pgs.
"Australian Application Serial No. 2011299234, Response filed Oct. 26, 2015 to Subsequent Examiners Report mailed Sep. 4, 2015", 3 pgs.
"Australian Application Serial No. 2011299234, Subsequent Examiners Report mailed Sep. 4, 2015", 4 pgs.
"Australian Application Serial No. 2016201377, First Examiner Report mailed Feb. 1, 2017", 3 pgs.
"Australian Serial No. 2011299221, First Examiner Report mailed May 2, 2014", 3 pgs.
"Brazilian Application Serial No. BR1120130055251, Voluntary Amendment filed Sep. 8, 2014", 7 pgs.
"European Application Serial No. 11824132.2, Extended European Search Report mailed Feb. 25, 2014", 6 pgs.
"European Application Serial No. 11824132.2, Response filed Aug. 29, 2014", 12 pgs.
"Australian Application Serial No. 2016201377, Response filed May 25, 2017 to First Examiner Report mailed Feb. 1, 2017", 55 pgs.
"U.S. Appl. No. 12/877,993, Advisory Action mailed May 8, 2017", 9 pgs.
"U.S. Appl. No. 12/878,001, Appeal Decision mailed Mar. 20, 2017", 10 pgs.
"U.S. Appl. No. 14/588,871, Final Office Action mailed Mar. 31, 2017", 17 pgs.

* cited by examiner



FIG. 1



*FIG. 2*



**FIG. 3**

U.S. Patent          Jul. 4, 2017          Sheet 4 of 5          US 9,699,503 B2



*400*

OBTAIN CONTENT UTILIZATION DATA FROM A PLURALITY OF CLIENT DEVICES ASSOCIATED WITH RESPECTIVE PLURALITY OF VIEWERS, THE CONTENT UTILIZATION DATA FOR A VIEWER FROM THE PLURALITY OF VIEWERS BEING INDICATIVE OF THE VIEWER'S INTEREST IN RESPECTIVE CONTENT ITEMS — *410*

GENERATE A LIST OF POPULAR CONTENT ITEMS BASED ON THE OBTAINED CONTENT UTILIZATION DATA — *420*

GENERATE A CUSTOMIZED PLAYLIST FOR A TARGET VIEWER FROM THE PLURALITY OF VIEWERS, THE CUSTOMIZING BASED ON THE LIST OF POPULAR CONTENT ITEMS AND A PROFILE OF THE TARGET VIEWER — *430*

COMMUNICATE THE CUSTOMIZED PLAYLIST TO A CLIENT DEVICE OF THE TARGET VIEWER — *440*

*FIG. 4*



**FIG. 5**

US 9,699,503 B2

**1**

# SMART PLAYLIST

## TECHNICAL FIELD

This application relates to the fields of media and enter-
tainment and specifically to a smart playlist system.

## BACKGROUND

The approaches described in this section could be pur-
sued, but are not necessarily approaches that have been
previously conceived or pursued. Therefore, unless other-
wise indicated herein, the approaches described in this
section are not prior art to the claims in this application and
are not admitted to be prior art by inclusion in this section.

In the field of media and entertainment, there is a new
generation of viewers that has a high expectation of the level
of entertainment to be enjoyed from various sources of
content, such as, e.g., television programming, the Internet,
and locally stored content. These viewers may expect more
choice, more flexibility, as well as the ability to interact and
participate more with the viewable content.

On the other hand, the sheer volume of content that is
available for viewing is exploding dramatically. Just the
number of television channels that are now available is
almost unmanageable. The amount of content that is avail-
able via free video or video on demand service is also
increasing. It is now possible to view content over a wider
span of time by employing time shifting technologies, such
as Personal Video Recording (PVR) (sometimes referred to
as DVR or Digital Video Recording). This explosion of
content may be described as a paradox of choice, where the
excess of choices causes a viewer's inability to choose.

## BRIEF DESCRIPTION OF DRAWINGS

Embodiments are illustrated by way of example and not
limitation in the figures of the accompanying drawings, in
which like references indicate similar elements and in
which:

FIG. **1** illustrates an environment within which an
example smart playlist may be implemented, in accordance
with an example embodiment;

FIG. **2** is a network diagram illustrating architecture
within which a smart playlist may be utilized, in accordance
with an example embodiment;

FIG. **3** is a block diagram illustrating a smart playlist
system, in accordance with an example embodiment;

FIG. **4** is a flow chart illustrating a method for providing
a smart playlist to a viewer's client device, in accordance
with an example embodiment; and

FIG. **5** illustrates a diagrammatic representation of a
machine in the example form of a computer system within
which a set of instructions, for causing the machine to
perform any one or more of the methodologies discussed
herein, may be executed.

## DETAILED DESCRIPTION

The description that follows includes systems, methods,
techniques, instruction sequences, and computing machine
program products that embody illustrative embodiments of
the present invention. In the following description, for
purposes of explanation, numerous specific details are set
forth in order to provide an understanding of various
embodiments of the inventive subject matter. It will be
evident, however, to those skilled in the art that embodi-

**2**

ments of the inventive subject matter may be practiced
without these specific details. In general, well-known
instruction instances, protocols, structures, and techniques
have not been shown in detail.

A system is described to collect information from a great
number of viewers' client devices, determine a list of
popular content items based on the collected information,
customize the list for a particular viewer, and send that list
to the viewer's device. This approach to aiding a viewer in
making choices in the universe of viewable content may be
termed a smart playlist system. Example embodiments
described herein provide systems and methods to generate a
smart play list.

In one embodiment, a smart playlist system obtains from
viewers' client devices content-related information such as,
e.g., which programs are being currently viewed, which
programs are being recorded and scheduled to be recorded,
which content has been rated and the associated ratings, as
well as recommendations pertaining to programs, purchases
of various programs, etc. For the purposes of this description
the terms content, content item, show, and program will be
understood to denote viewable content. Data collected indis-
criminately from the entire accessible community of viewers
may be accumulated in a repository termed a global bucket.
Data from the global bucket may be analyzed to determine
programs that appear to be most popular at the time of the
analyzing, i.e., appear to be of heightened interest to view-
ers. A certain number of programs that have been determined
as most popular are compiled into a so-called hot list. The
hot list may be made available to viewer, e.g., by commu-
nicating the list to the viewers' client devices or providing
an access link that can be invoked from the users' devices.

Before a hot list is provided to a viewer, it may be
personalized for the viewer by determining how relevant the
items in the hot list are to that particular viewer and
presenting to the viewer only those programs that have been
determined to be of high relevance to the viewer. The
relevancy of a particular program to a particular viewer may
be determined by associating each item in the hot list with
a score based on the viewer's profile, on the viewer's content
viewing history and patterns, as well as based on informa-
tion collected from the client devices of a subset of viewers
who are members of the particular viewer's social network.

In one example embodiment, in addition to determining a
personalized hot list of content items, a smart playlist system
may trigger recording of a certain program as soon as the
program has been identified as a live program and of high
relevance to the viewer. For example, a viewer may not be
tuned into a channel broadcasting a particular live sports
event. If the smart playlist system determined that the live
sports event is of high relevance to the viewer, the smart
playlist system may trigger the recording of the live broad-
cast of the sports event on the viewer's client device (e.g.,
a set top box, a desktop computer, etc.) and also alerts the
user to the fact that she may be interested in the event being
currently broadcast on a certain channel. The viewer may
then ignore the alert. If the viewer, instead, tunes to the
suggested channel the viewer would not have missed the
beginning of the broadcast because the recording of the
program has been automatically triggered by an instruction
provided to the viewer's client device from the smart playlist
system. In one example, the high relevancy of the live
broadcast may have been determined based on the fact that
all of the viewer's social network contacts have either tuned
into the associated channel or have scheduled the recording
of the broadcast. In another example, the high relevancy of
the live broadcast may have been determined based on the

US 9,699,503 B2

3

viewer's profile or on the viewer's viewing history. An example smart playlist system may be implemented within architecture illustrated in FIG. 1.

FIG. 1 illustrates network architecture of an example interactive media environment 100 wherein some embodiments of the present invention may be deployed. The interactive media environment 100 includes a source system 102 that communicates data (e.g., media content data and interactive application data) via a distribution network or system 104 (e.g., the Internet, a mobile communication network, or any other network capable of communicating digital data) and a modulator box 106 to a receiver system 108. In one example embodiment, the interactive media environment 100 optionally includes a storage unit 110 (e.g., personal computer) that communicates stored data via a network 112 to the modulator box 106 which, in turn, communicates the stored data, media content data, and interactive application data to the receiver system 108. The modulator box 106, storage unit 110, and the receiver system 108 may be co-located in a user's home. Thus, in one embodiment, the modulator box 106 may combine media content data and interactive application data received from the remote source system 102 with a local stored data provided by the storage unit 110 provided at the user's home.

Turning first to the source system 102, an example headend system 114 operates to communicate the data as a broadcast transmission. To this end, the headend system 114 is shown to include one or more broadcast servers 116 and, optionally, one or more application servers 118. Each of the broadcast servers 116 may operate to receive, encode, packetize, multiplex, modulate, and broadcast data from various sources and of various types. While the example embodiment is described herein as transmitting data from the headend system 114 as a broadcast, it will be appreciated that the relevant data could also be unicast or multicast from the source system 102 via the distribution system 104 and modulator box 106 to the receiver system 108. In various embodiments, data could also be transmitted from the source system 102 via a network connection to the receiver system 108. Further, in other example embodiments the source system 102 may be modified to facilitate communications via the Internet, a mobile phone network, or any other network capable of communicating digital data.

Each application server 118, in one example embodiment, compiles and provides interactive data modules to the broadcast server 116. The interactive data modules may also include data that is utilized by an interactive television application. The application server 118 may also include multiplexing functionality to enable multiplexing of, for example, interactive television applications and associated data with audio and video signals received from various sources. The application server 118 may also have the capability to feed (e.g., stream) multiple interactive television applications to one or more broadcast servers 116 for distribution to the receiver system 108. To this end, each application server 118 may implement a so-called "carousel," whereby code and data modules are provided to a broadcast server 116 in a cyclic, repetitive manner for inclusion within a transmission from the headend system 114. In other embodiments, code may reside permanently in a set-top box (STB) 120 (e.g., the code may be stored in non-volatile memory of the STB 120), may be pushed of downloaded to the STB 120, or be provided to the STB 120 in any other manner. In one embodiment, the application server 118 provides a smart playlist mechanism to collect information from viewers, determine a list of popular con-

4

tent items, customizing the list for a particular user and sending that lit to the user's device. The smart playlist mechanism will be discussed by way of example in more detail in connection with FIGS. 2-4.

The headend system 114 is also shown, by way of example, to include one or more backend servers 122, which are coupled to the application servers 118 and to an input/output device 124 (e.g., a modem pool). Specifically, the I/O device 124 is coupled to receive data from the receiver system 108 via a network 126 (e.g., the Internet) and to provide this data to backend servers 122. The backend servers 122 may then provide the data, received from the receiver system 108, to the application servers 118 and the broadcast servers 116. Alternatively, data received from the receiver system 108 may be directly provided to the application servers 118.

Accordingly, the network 126 and the I/O device 126 may operate as a return channel whereby the receiver system 108 is provided with interactivity with the source system 102. Data provided to the headend system 114 via the return channel may include, merely for example, user input to an interactive media application executed at the receiver system 108 or data that is generated by the receiver system 108 and communicated to the source system 102. The return channel may also provide a channel whereby programs, targeted advertisements/commercials, and applications from the source system 102 are provided to the receiver system 108.

Within the source system 102, the headend system 114 is also shown optionally to receive data (e.g., content, code, and application data) from external sources. For example, the headend system 114 may be coupled to one or more content sources 128 and one or more application sources 130 via a network 132 (e.g., the Internet). For example, a content source 128 may be a provider of entertainment content (e.g., movie), a provider of real-time dynamic data (e.g., weather information), and the like. The application source 130 may be a provider of any interactive media application. For example, one or more application sources 130 may provide a TV media player application, electronic program guide and navigation applications, messaging and communication applications, information applications, and so forth. The application sources 130 may be configured to execute on different client devices (e.g., mobile phones, personal computer, STBs, or the like).

Turning now to the example distribution system 104, the distribution system 104 may, in one embodiment, support the broadcast distribution of data from the source system 102 to the receiver system 108. As shown, the distribution network or system 104 may comprise a satellite, cable, terrestrial or Digital Subscribers Line (DSL) network, or any other data communication network or combination of such networks.

The receiver system 108 is shown, in one example embodiment, to include the set-top box (STB) 120 that receives data (e.g., primary and secondary content streams) via the distribution system 104 and modulator box 106 and an input/output device 132 (e.g., modem) for return channel communications with the headend system 114. The receiver system 108 is also shown to include other optional external systems such as a user input device 134 (e.g., a keyboard, remote control, mouse etc.) and a display device 136, coupled to the set-top box 120, for the display of content received at the set-top box 120. In one example embodiment, the display device 136 may be a television set.

The modulator box 106, in one example embodiment, receives stored data from the storage unit 110 and a broadcast transmission from the source system 102. The modu-

US 9,699,503 B2

5

lator box **106** multiplexes the stored data into the broadcast transmission thereby generating a second transmission that is communicated to the receiving system **108**. It will, however, be appreciated that storage unit functionality is optional. The storage unit **110** may store data and, upon request, communicate the stored data to the modulator box **106** over the network **112** (e.g., Ethernet). The storage unit **110** may communicate the stored data in response to commands that are entered by a user from the set-top box **120** and communicated to the storage unit **110** over a link **138**.

It will be appreciated to one skilled in the art that one or more of the modules, applications, or the like of the modulator box **106**, the set-top box **120**, and the storage unit **110** may be combined or integrated. In general, components, protocols, structures, and techniques not directly related to functions of example embodiments have not been shown or discussed in detail. The description given herein simply provides a variety of example embodiments to aid the reader in an understanding of the systems and methods used herein. While the interactive media environment **100** is illustrated having a receiving system **108** including a set-top box **120**, it is noted that the receiving system **108** may comprise a mobile device or a personal computer coupled to a network for receiving media.

Smart playlist may be utilized beneficially in the context of a network environment. FIG. **1** illustrates an environment **100** within which an example smart playlist may be implemented. The environment **100** includes a set top box **110** in communication with an entertainment display device **120** and a control device **130**. The set-top box (STB) **110** may be a device that connects to a television and an external source of signal, turning the signal into content which can then be displayed on the television screen. In one example embodiment, the entertainment display device **120** is a television set, and the control device **130** is a remote control device that may be used for switching between television channels, for example. The set-top box **110** may be configured to include a system **112** to provide a smart playlist that may include features outlined above. The set-top box **110** may be configured to receive content from sources such as, e.g., an Ethernet cable, a satellite dish, a coaxial cable, a telephone line (including digital subscriber line (DSL) connections), Broadband over Power Line, as well as very high frequency (VHF) or ultra high frequency (UHF) antenna. Content, in this context, could mean any or all of video, audio, Internet web pages, interactive games, or other possibilities. As shown in FIG. **1**, the set-top box **110** is shown as having access to signal sources **140**, including broadcast programming **142**, video on demand programs **144**, as well as to local content **146** and Internet content **148**.

FIG. **2** is a network diagram illustrating architecture **200** within which a smart playlist may be utilized, in accordance with an example embodiment. The architecture **100** includes a client device **210** and a client device **220**, each configured to receive content from content sources **250** and to be in communication with a server system **240** via a communications network **230**. The client devices **210** and **220** may be set top boxes, desktop computers, mobile devices, etc. The communications network **230** may be a public network (e.g., the Internet, a wireless network, etc.) or a private network (e.g., a local area network (LAN), a wide area network (WAN), Intranet, etc.). The server **240** may include a smart playlist system **242** configured to collect information related to utilization of viewable content from viewers' client devices, to aggregate and customize the collected information, and to provide the resulting hot list to viewers personalized for each particular user, as was described above.

6

The client device **210** may be configured to include a smart playlist agent **212** that may be configured to cooperate with the smart playlist system **242** with respect to collecting information regarding viewable content accessed or referenced on the client device **210**. In some embodiments, the smart playlist system **242** may be configured to obtain information regarding viewable content accessed or referenced on a client device without the use of a smart playlist agent. As shown in FIG. **2**, the client devices **210** and **220** have access to signal sources **250**. The signal sources **250** include broadcast programming **252**, video on demand programs **254**, as well as to local content **256** and Internet content **258**. An example system to generate a smart playlist may be described with reference to FIG. **2**.

FIG. **3** illustrates an example system **300** to generate a smart playlist based on content utilization information collected from client devices of the entire community of users that can be accessed by the smart playlist system. The system **300** includes a collector module **310**, a hot list generator **320**, a customization module **340**, and a communications module **350**. The collector module **310** may be configured to obtain content utilization data from a plurality of client devices (e.g., the client devices **210** and **220** of FIG. **2**. The content utilization data for a viewer from the plurality of viewers may be indicative of the viewer's interest in respective content items. In one embodiment, the collector module **310** obtains content utilization data from a real time listener provided at a client device, e.g., the smart playlist agent **212** of FIG. **2**. The hot list generator **320** may be configured to generate a list of popular content items based on the obtained content utilization data.

The collector module **310** obtains content utilization information from all client devices accessible to the smart playlist system **300**. This information, collected from the entire universe of viewers that have diverse tastes, viewing habits, and content source preferences and that reflects content utilization of the entire viewing community, is stored, by a storing module **340**, in a repository termed a global bucket. The data from the global bucket is analyzed by the hot list generator **320** to determine those content items that are of most interest to the global community of viewers and assemble those content items into a list of popular items, a so-called hot list. In one embodiment, the hot list generator **320** may generate a hot list based on how many viewers are watching or recording a show, the duration of the watching, ratings and recommendations associated with the program, and so on. As the collector module **310** continuously obtains content utilization data from client devices, the hot list generator **320** may be configured to continuously update the hot list, e.g., once a day or based on any predetermined time period.

The customization module **330** may be configured to customize the hot list that is generated based on the information from the global bucket that reflect preferences of the entire community of viewers to target more closely the actual and projected preferences of a particular viewer (a target viewer) and generate a so-called customized playlist. The customizing may be based on the viewer's profile that may be stored at the application server **240** of FIG. **2**, as well as on the viewing history of the viewer and the viewing history of members of the viewer's social network. In one embodiment, the storing module **340** stores content utilization data for individual viewers in respective repositories termed personal buckets. A viewer's profile stored at the application server **240** may indicate that one or more other viewers are associated with the viewers as "friends" in terms of social networking. The storing module **340** stores content

US 9,699,503 B2

7

utilization data collected from client devices of the viewer's "friends" or social connections in a repository termed a social bucket. The customization module **330** may utilize data from the viewer's personal bucket and the viewer's social bucket to generate the customized playlist. The customization module **330** may be configured to periodically update the customized playlist, e.g., based on the changes in the hot list, based on the changes in the data stored in the personal bucket and the social bucket, as well as based on the changes in the viewer's profile.

In one embodiment, a customized playlist is generated by generating a score for each item from the list of popular content items and including items into in the customized playlist based on respective scores of the items from the list of popular content items. The scoring may be based on the viewer's preferences identified in the viewer's profile, based on data from the viewer's personal bucket and the viewer's social bucket. A content item from a category that is not indicated in the viewer's profile as being of interest to the viewer and that is not considered as being of interest to the viewer based on the viewing history of the viewer may still be assigned a high score by the customization module **330** based on the information from the viewers social bucket. For example, the customization module **330** may be configured to weigh heavily an indication that a certain content item is of high interest to a great number of the viewer's social contacts.

The communications module **350** may be configured to communicate the customized playlist to a client device of the target viewer. The communications module **350** may be configured to communicate to the client device an instruction to start recording of a live program identified in the customized playlist. The communications module **350** may also be configured to communicate to the client device an instruction to display an alert message regarding of a live program identified in the customized playlist. As mentioned above, a client device may be a set top box, a desktop computer, or a mobile device. Content items referenced in the hot list or in the customized playlist may be associated with a variety of content sources, such as, e.g., the Internet, video on demand, and live broadcast. Example operations performed by the system **400** may be described with reference to FIG. **4**.

FIG. **4** illustrates an example method **400** of providing a smart playlist. The method **400** may be performed in the context of media and entertainment, e.g., in the context of television entertainment. The method **400** may be performed by processing logic that may comprise hardware (e.g., dedicated logic, programmable logic, microcode, etc.), software (such as run on a general purpose computer system or a dedicated machine), or a combination of both. It will be noted, that, in an example embodiment, the processing logic may reside in any of the modules shown in FIG. **3**.

As shown in FIG. **4**, the method **400** commences with operation **410**, where the collector module **310** of FIG. **3** obtains content utilization data from a plurality of client devices associated with respective plurality of viewers. At operation **420**, the hot list generator **320** of FIG. **3** generates a list of popular content items based on the obtained content utilization data. At operation **430**, the customization module **330** of FIG. **3** generates a customized playlist for a target viewer from the plurality of viewers, based on the list of popular content items and a profile of the target viewer. At operation **440**, the communications module **340** of FIG. **3** communicates the customized playlist to a client device of the target viewer.

8

FIG. **5** shows a diagrammatic representation of machine in the example form of a computer system within which a set of instructions, for causing the machine to perform any one or more of the methodologies discussed herein, may be executed. In alternative embodiments, the machine operates as a standalone device or may be connected (e.g., networked) to other machines. In a networked deployment, the machine may operate in the capacity of a server or a client machine in server-client network environment, or as a peer machine in a peer-to-peer (or distributed) network environment. The machine may be a personal computer (PC), a tablet PC, a set-top box (STB), a Personal Digital Assistant (PDA), a cellular telephone, a web appliance, a network router, switch or bridge, or any machine capable of executing a set of instructions (sequential or otherwise) that specify actions to be taken by that machine. Further, while only a single machine is illustrated, the term "machine" shall also be taken to include any collection of machines that individually or jointly execute a set (or multiple sets) of instructions to perform any one or more of the methodologies discussed herein.

The example computer system **500** includes a processor **502** (e.g., a central processing unit (CPU), a graphics processing unit (GPU) or both), a main memory **504** and a static memory **506**, which communicate with each other via a bus **508**. The computer system **500** may further include a video display unit **510** (e.g., a liquid crystal display (LCD) or a cathode ray tube (CRT)). The computer system **500** also includes an alphanumeric input device **512** (e.g., a real or virtual keyboard), a viewer interface (UI) navigation device **514** (e.g., a remote control or a mouse), a disk drive unit **516**, a signal generation device **518** (e.g., a speaker) and a network interface device **520**.

The disk drive unit **516** includes a machine-readable medium **522** on which is stored one or more sets of instructions and data structures (e.g., software **524**) embodying or utilized by any one or more of the methodologies or functions described herein. The software **524** may also reside, completely or at least partially, within the main memory **504**, within the processor **502** during execution thereof by the computer system **500**, the main memory **504** and the processor **502** also constituting machine-readable media. The main memory **504** comprises storage locations that are addressable by the processor **502** for storing software program code. The memory may comprise a form of random access memory (RAM). Those skilled in the art will appreciate that other memory means, such as FLASH memory media, may also be used for storing the program instructions and data structures shown in the main memory **504**.

The software **524** may further be transmitted or received over a network **526** via the network interface device **520** utilizing any one of a number of well-known transfer protocols (e.g., HTTP).

While the machine-readable medium **522** is shown in an example embodiment to be a single medium, the term "machine-readable medium" may be taken to include a single medium or multiple media (e.g., a centralized or distributed database, and/or associated caches and servers) that store the one or more sets of instructions. The term "machine-readable medium" shall also be taken to include any medium (e.g., FLASH memory media) that is capable of storing, encoding or carrying a set of instructions for execution by the machine and that cause the machine to perform any one or more of the methodologies of the present invention, or that is capable of storing, encoding or carrying data structures utilized by or associated with such a set of instructions. The term "machine-readable medium" shall

US 9,699,503 B2

9

accordingly be taken to include, but not be limited to, solid-state memories, optical and magnetic media.

The embodiments described herein may be implemented in an operating environment comprising software installed on a computer, in hardware, or in a combination of software and hardware.

Thus, method and system to generate and update a smart playlist have been described. In the description above, for purposes of explanation, numerous specific details have been set forth in order to provide a thorough understanding of one example embodiment. It will be evident, however, to one skilled in the art that the present invention may be practiced without these specific details. It is to be noted that the delivery mechanism for the content for viewing may be via a satellite, cable, terrestrial broadcast, Internet, local storage, a local network, mobile telephony, or any other content distribution network. Accordingly, the viewing device need not be a television set but may be any display unit of any device (including portable devices). It will be noted that any references to television content will be understood to include any content available for viewing on an entertainment display device, such as a television screen. Such content may include television programming, as well as locally stored content, such as stored video files or digital images, as well as content accessible via the Internet. It will be noted that the term viewer may be understood broadly as any viewer of the system to navigate television content.

The invention claimed is:

1. A computer-implemented method comprising:
obtaining content utilization data from a plurality of client devices associated with a respective plurality of viewers, wherein the content utilization data for a viewer from the plurality of viewers is indicative of the viewer's interest in respective content items, and wherein the plurality of viewers comprises other viewers who are not identified as social connections of the viewer;
automatically generating, at a server computer system, a list of popular content items that are currently popular among the plurality of viewers based on the obtained content utilization data;
for a target viewer from the plurality of viewers, customizing the list of popular content items to generate a customized playlist, the customizing based on a viewing history of the target viewer and on a viewing history of viewers who are identified as social connections of the target viewer, wherein the customizing comprises:
generating a score for each item from the list of popular content items based on the viewing history of the target viewer and on the viewing history of the viewers who are identified as social connections of the target viewer; and
including items in the customized playlist based on the respective scores of the items from the list of popular content items; and
communicating the customized playlist to a client device of the target viewer.

2. The method of claim 1, wherein the customizing comprises selecting at least one of the popular content items for the customized playlist based on the viewing history of the viewers who are identified as social connections of the target viewer indicating a high level of interest in the at least one of the popular content items among the social connections of the target viewer while the viewing history of the target viewer indicates a low level of interest in the at least one of the popular content items by the target viewer.

3. The method of claim 1, wherein the communicating of the customized playlist to the client device of the target

10

viewer comprises communicating an instruction to start recording of a live program identified in the customized playlist.

4. The method of claim 1, wherein the communicating of the customized playlist to the client device of the target viewer comprises communicating an instruction to display an alert message regarding a live program identified in the customized playlist.

5. The method of claim 1, wherein the items in the customized playlist include at least one of a first item that identifies Internet content, a second item that identifies video on demand content, and a third item that identifies a live program.

6. The method of claim 1, wherein the client device comprises a set top box.

7. The method of claim 1, wherein the client device comprises a desktop computer.

8. The method of claim 1, wherein the client device comprises a mobile device.

9. A computer-implemented system comprising:
a collector module to obtain content utilization data from a plurality of client devices associated with a respective plurality of viewers, wherein the content utilization data for a viewer from the plurality of viewers is indicative of the viewer's interest in respective content items, and wherein the plurality of viewers comprises other viewers who are not identified as social connections of the viewer;
a hot list generator to generate a list of popular content items that are currently popular among the plurality of viewers based on the obtained content utilization data;
a customization module to generate a customized playlist for a target viewer from the plurality of viewers, the customizing based on the list of popular content items, a viewing history of the target viewer, and a viewing history of viewers who are identified as social connections of the target viewer, wherein the customization module is to:
generate a score for each item from the list of popular content items based on the viewing history of the target viewer and on the viewing history of the viewers who are identified as social connections of the target viewer; and
include items in the customized playlist based on respective scores of the items from the list of popular content items; and
a communications module to communicate the customized playlist to a client device of the target viewer.

10. The system of claim 9, wherein the customization module is to select at least one of the popular content items for the customized playlist based on the viewing history of the viewers who are identified as social connections of the target viewer indicating a high level of interest in the at least one of the popular content items among the social connections of the target viewer while the viewing history of the target viewer indicates a low level of interest in the at least one of the popular content items by the target viewer.

11. The system of claim 9, wherein the communications module is to communicate to the client device an instruction to start recording of a live program identified in the customized playlist.

12. The system of claim 9, wherein the communications module is to communicate to the client device an instruction to display an alert message regarding a live program identified in the customized playlist.

13. The system of claim 9 wherein the items in the customized playlist include at least one of a first item that

US 9,699,503 B2

11

identifies Internet content, a second item that identifies video on demand content, and a third item that identifies a live program.

**14**. The system of claim **9**, wherein the client device comprises a set top box.

**15**. The system of claim **9**, wherein the client device comprises a desktop computer or a mobile device.

**16**. A machine-readable non-transitory storage medium storing instructions that, when executed by one or ore processors of a machine, cause the machine to perform operations comprising:

obtaining content utilization data from a plurality of client devices associated with a respective plurality of viewers, wherein the content utilization data for a viewer from the plurality of viewers is indicative of the viewer's interest in respective content items, and wherein the plurality of viewers comprises other viewers who are not identified as social connections of the viewer;

generating a list of popular content items that are currently popular among the plurality of viewers based on the obtained content utilization data;

generating a customized playlist for a target viewer from the plurality of viewers, the customizing based on the

12

list of popular content items, a viewing history of the target viewer, and a viewing history of viewers who are identified as social connections of the target viewer, wherein the customizing comprises:

generating a score for each item from the list of popular content items based on the viewing history of the target viewer and on the viewing history of the viewers who are identified as social connections of the target viewer; and

including items in the customized playlist based on the respective scores of the items from the list of popular content items; and

communicating the customized playlist to a client device of the target viewer.

**17**. The method of claim **1**, the customizing of the list of popular content items also being based at least in part on a content category of interest to the target viewer.

**18**. The method of claim **1**, the obtained content utilization data indicating lengths of time during which the plurality of viewers have viewed a content item.

\* \* \* \* \*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.        : 9,699,503 B2                                    Page 1 of 1
APPLICATION NO.   : 12/877034
DATED             : July 4, 2017
INVENTOR(S)       : Fishman et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:


In the Claims

In Column 11, Line 9, in Claim 16, delete "ore" and insert --more-- therefor


Signed and Sealed this
Tenth Day of April, 2018

Andrei Iancu
*Director of the United States Patent and Trademark Office*

# Exhibit C

US007669212B2

(12) **United States Patent**　　(10) **Patent No.:**　　**US 7,669,212 B2**
Alao et al.　　　　　　　　　　　(45) **Date of Patent:**　　　**Feb. 23, 2010**

(54) **SERVICE PLATFORM SUITE MANAGEMENT SYSTEM**

(75) Inventors: **Rachad Alao**, Sunnyvale, CA (US); **Jose Henrard**, Paris (FR); **Alain Delpuch**, Paris la Defense cedex (FR); **Vincent Dureau**, Palo Alto, CA (US); **Vahid Koussari-Amin**, Los Altos, CA (US); **Adam Benson**, San Mateo, CA (US); **Nicholas Fishwick**, Mountain View, CA (US); **Waiman Lam**, Union City, CA (US); **Matthew Huntington**, Twickenham (GB)

(73) Assignee: **OpenTV, Inc.**, San Francisco, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1644 days.

(21) Appl. No.: **10/061,136**

(22) Filed: **Feb. 1, 2002**

(65) **Prior Publication Data**

US 2002/0147645 A1　　Oct. 10, 2002

**Related U.S. Application Data**

(60) Provisional application No. 60/265,986, filed on Feb. 2, 2001, provisional application No. 60/266,210, filed on Feb. 2, 2001, provisional application No. 60/267,876, filed on Feb. 9, 2001, provisional application No. 60/269,261, filed on Feb. 15, 2001, provisional application No. 60/279,543, filed on Mar. 28, 2001.

(51) **Int. Cl.**
**H04N 7/025** (2006.01)

(52) **U.S. Cl.** .............................. **725/32**; 725/9; 725/34; 725/35; 725/36

(58) **Field of Classification Search** ............. 725/34–36, 725/9, 14
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,870,562 A　2/1999　Butman et al.

(Continued)

FOREIGN PATENT DOCUMENTS

AU　　　　749581　　3/2000

(Continued)

OTHER PUBLICATIONS

Notice of the Reason for Refusal in Japanese Patent Application No. 2002-563106; Mailed Sep. 18, 2007.

(Continued)

*Primary Examiner*—Christopher Kelley
*Assistant Examiner*—Timothy R Newlin
(74) *Attorney, Agent, or Firm*—Rory D. Rankin; Meyertons Hood Kivlin Kowert & Goetzel, P.C.

(57)　　　**ABSTRACT**

The present invention provides a method and apparatus for managing the presentation and regulation of E-Commerce, content and service providers access in an interactive television environment comprising interactions between a server, a client, and a service provider. Components are provided for managing and completing a purchase or delivery of an item offered by a service provider. A purchase transaction uses client information comprising partial client information from the client and a list of purchased items. Upon receiving partial information from the client, the server retrieves corresponding additional related information within its database and transmits this retrieved data from the server, along with the list of purchased items to complete the transaction. Business Agents are provided for logging the transaction, creating an electronic receipt, logging patches, logging error events, and viewer logging. The invention further comprises a method for measuring audience behavior and response to particular events or programs and advertisements; and a method for adaptive delivery of advertisements to a client. Advertisements are scheduled according to an agreement and manifested into campaign rules and desired run times. A profile of a viewer that resides on the client device is used as the criteria for selection of a particular advertisement from a broadcast and for polling of audience viewing habits. The present invention further monitors the integrity and connectivity of the interactive television network and service providers.

**64 Claims, 14 Drawing Sheets**



US 7,669,212 B2

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,898,838 | A | 4/1999 | Wagner |
| 5,960,411 | A | 9/1999 | Hartman et al. |
| 6,128,653 | A | 10/2000 | del Val et al. |
| 6,131,163 | A | 10/2000 | Wiegel |
| 6,330,550 | B1 | 12/2001 | Brisebois et al. |
| 6,345,239 | B1 | 2/2002 | Bowman-Amuah |
| 6,385,647 | B1 | 5/2002 | Willis et al. |
| 6,385,693 | B1 | 5/2002 | Gerszberg et al. |
| 6,459,427 | B1 | 10/2002 | Mao et al. |
| 2002/0083441 | A1* | 6/2002 | Flickinger et al. ............ 725/32 |
| 2002/0083451 | A1* | 6/2002 | Gill et al. ...................... 725/46 |
| 2003/0110499 | A1* | 6/2003 | Knudson et al. ............ 725/42 |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| AU | 782015 | 7/2001 |
| EP | 0 722 249 | 2/1995 |
| EP | 1067792 | 1/2001 |
| WO | WO 98/00972 | 1/1998 |
| WO | WO 98/53581 | 11/1998 |
| WO | WO 99/04561 | 1/1999 |
| WO | WO 99/45702 | 9/1999 |
| WO | WO 99/52285 | 10/1999 |
| WO | WO 99/60789 | 11/1999 |
| WO | WO 99/66726 | 12/1999 |
| WO | WO 00/11869 | 3/2000 |
| WO | WO 00/18123 | 3/2000 |
| WO | WO 00/24192 | 4/2000 |
| WO | WO 00/62223 | 10/2000 |
| WO | WO 00/79798 | 12/2000 |
| WO | WO 01/06784 | 1/2001 |

### OTHER PUBLICATIONS

Patent Application Laid Open No. 2000-358005.

International Search Report; PCT/US 02/02725; Mailed Feb. 5, 2003.

Droitcourt J L: "Understanding How Interactive Television Set Top Box Works . . . and What it Will Mean to the Customer", International Broadcasting Convention, London, GB, vol. 413, pp. 382-394.

Evain J-P: "The Multimedia Home Platform", EBU Review-Technical, European Broadcasting Union. Brussels, BE, NR. 275, pp. 4-10.

Colaitis F et al: "MHEG and it's Profile for ITV Applications", IEE Colloquium on Interactive Television, IEE, London, GB, NR. 1995/159, pp. 3-1-3-8.

First Official Report for Australian Patent Application No. 2002/242036 dated Sep. 18, 2006.

* cited by examiner



FIG. 1A



**FIG. 1B**



FIG. 2



FIG. 3



FIG. 4



FIG. 5



**FIG. 6**



**FIG. 7**



*FIG. 8*



**FIG. 9**



FIG. 10



**FIG. 11**

FIG. 12

| File: | weather.dat | | | | | | |
|---|---|---|---|---|---|---|---|
| Last Updated: | 11/15/2001 20:26:32 | | | | | | |
| Status: | OUT OF DATE | | | | | | |
| Schedule: | Mon | Tues | Wed | Thur | Fri | Sat | Sun |
| 0:00 - 9:00 | 120mins | 120mins | 120mins | 120mins | 120mins | | |
| 12:00 | | | | | | | |
| 18:00 | 30mins | 30mins | 30mins | 30mins | 30mins | 480mins | 480mins |
| 21:00 | 120mins | 120mins | 120mins | 120mins | 120mins | | |

| File: | Stock_shares.dat | | | | | | |
|---|---|---|---|---|---|---|---|
| Last Updated: | 11/16/2001 15:30:12 | | | | | | |
| Status: | OKAY | | | | | | |
| Schedule: | Mon | Tues | Wed | Thur | Fri | Sat | Sun |
| 0:00 - 9:00 | | | | | | | |
| 12:00 | | | | | | | |
| 18:00 | 5mins | 5mins | 5mins | 5mins | 5mins | | |
| 21:00 | | | | | | | |

FIG. 13

US 7,669,212 B2

**1**

# SERVICE PLATFORM SUITE MANAGEMENT SYSTEM

## CROSS REFERENCED TO RELATED APPLICATIONS

This application claims priority from the USPTO provisional patent application entitled "A System for Adaptive Control of Access, Content and Scheduling For Interactive Television" filed on Feb. 2, 2001, Ser. No. 60/265,986 which is hereby incorporated herein by reference; USPTO provisional patent application entitled "A System for Adaptive Control of Access, Content and Scheduling For Interactive Television" filed on Feb. 2, 2001, Ser. No. 60/266,210 which is hereby incorporated herein by reference; USPTO provisional patent application entitled "A System for Adaptive Control of Access, Content and Scheduling For Interactive Television" filed on Feb. 9, 2001, Ser. No. 60/267,876 which is hereby incorporated herein by reference; and USPTO provisional patent application entitled "A System for Adaptive Control of Access, Content and Scheduling For Interactive Television" filed on Feb. 15, 2001, Ser. No. 60/269,261 which is hereby incorporated herein by reference; USPTO provisional patent application entitled "A System for Adaptive Control of Access, Content and Scheduling For Interactive Television" filed on Mar. 28, 2001, Ser. No. 60/279,543 which is hereby incorporated herein by reference.

## COPYRIGHT NOTICE

A portion of the disclosure of this patent document contains material (code listings and message listings) to which the claim of copyright protection is made. The copyright owner has no objection to the facsimile reproduction by any person of the patent document or the patent disclosure, as it appears in the U.S. Patent and Trademark Office file or records, but reserves all other rights whatsoever. Copyright 2001 OpenTV, Inc.

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention relates to managing a suite of services in a distributed computer system, and in particular managing an interactive television system suite of services provided to a group of client subscribers.

### 2. Summary of the Invention

Interactive television systems can be used to provide a wide variety of services to viewers. Interactive television systems are capable of delivering typical video program streams, interactive television applications, text and graphic images, web pages and other types of information. Interactive television systems are also capable of registering viewer actions or responses and can be used for such purposes as marketing, entertainment and education. Users or viewers may interact with the systems by ordering advertised products or services, competing against contestants in a game show, requesting specialized information regarding particular programs, or navigating through pages of information.

Typically, a broadcast service provider or network operator generates an interactive television signal for transmission to a viewer's television. The interactive television signal may include an interactive portion consisting of application code or control information, as well as an audio/video portion consisting of a television program or other informational displays. The broadcast service provider combines the audio/video and interactive portions into a single signal for trans-

**2**

mission to a receiver connected to the user's television. The signal is generally compressed prior to transmission and transmitted through typical broadcast channels, such as cable television (CATV) lines or direct satellite transmission systems.

Typically, the interactive functionality of the television is controlled by a set-top box connected to the television. The set-top box receives a broadcast signal transmitted by the broadcast service provider, separates the interactive portion from the audio-video portion and decompresses the respective portions of the signal. The set-top box uses the interactive information, for example, to execute an application while the audio/video information is transmitted to the television. The set-top box may combine the audio/video information with interactive graphics or audio generated by the interactive application prior to transmitting the information to the television. The interactive graphics and audio may present additional information to the viewer or may prompt the viewer for input. The set-top box may provide viewer input or other information to the broadcast service provider via a modem connection or cable.

In accordance with their aggregate nature, interactive television systems provide content from numerous service providers in various different communication protocols that must be understood by the client or viewer who receives the information from the broadcast service provider/network operator. Typically the client is a set top box with a processor possessing limited processing power. There is a need for an architecture that provides a comprehensive management solution for regulation of content, advertising and E-Commerce in an interactive television environment. There is also a need for a comprehensive architecture that provides adaptive control of access, content and scheduling in an interactive television environment. There is also a need for monitoring service provider and the platform connection of and content integrity provided to the interactive television system.

## SUMMARY OF THE INVENTION

The present invention provides Service Platform Suite, a method and apparatus for managing the presentation and regulation of E-Commerce, content and service providers access in a distributed computer system. In particular, the present invention operates in an interactive television environment comprising interactions between a server, a client, and a service provider, where the client is a viewer, consumer or purchaser, the service provider is the vendor, and the server facilitates the interaction between the client and the service provider. The present invention comprises a Service Platform Suite comprising components for managing and completing a purchase or delivery of an item offered by a service provider. A service provider can be either external or internal to the server. The invention supports three different scenarios for E-Commerce transactions. In a first scenario, referred to as the pass-through scenario, information is passed directly between a client and an external service provider. In a second scenario, referred to as the partial-host scenario, the server hosts a service catalog but passes the orders to the shops or services for payment and fulfillment of orders. In a third scenario, referred to as the full-host scenario, the server hosts the catalog and also processes the orders.

Preferably, the required information for a client to complete a transaction or make a purchase is stored in a server database. A partial record of this client information is stored on the client device to facilitate a transaction or purchase without compromising security. The client device can operate as a single viewer or multiple viewer device, wherein separate

US 7,669,212 B2

**3**

information is stored pertaining to each viewer. A purchase transaction begins when the client activates a transaction by, for example, pushing a button on a remote control device. At this moment, the required information may either be sent immediately or stored on the client device to be sent at a later time, if it is determined that network traffic is currently at a prohibitively high volume or the client is offline. The client transaction uses client information comprising partial client information from the client and a list of purchased items. Upon receiving partial information from the client, the server retrieves corresponding additional related information within its database and transmits this retrieved data from the server, along with the list of purchased items to complete the transaction. An advantage of the invention is the transparency of the cashier, function at the server during the transaction. The client interacts with the server minimally only to log on, if necessary, and to review an order and choose a form of payment. Thus, the interaction between the server database providing client information and the service provider is transparent to the user.

The central managing component for the transaction on the server is the Interactive Service Manager (ISM). The ISM comprises Business Agents which handle different aspects of the purchase transaction. Business Agents provide for logging the transaction, creating an electronic receipt, logging patches, logging error events, and viewer logging.

The invention further comprises a method for enabling interested parties to measure audience behavior and response to particular events or programs and advertisements. A quantitative profile is created of the client based upon the client's viewing activities and clicking activities in response to previously displayed advertisement banners or programs. This profile is stored on the client device. This information can be mined or pulled from the client device by the head end server for use in a statistical poll of viewer behavior. Statistical polls do not compromise the personal information relating to a data sample of viewer participants. Pulled information is compiled and stored on the head end server for access by ratings agencies having business agreements with the server. Further compilation of pulled information is also further compiled for internal reports.

The invention further comprises a method for adaptive delivery of advertisements to a client. The server provides an interface with a service provider to schedule an advertisement with the server. Advertisements are scheduled according to an agreement and manifested into campaign rules and desired run times. Advertisements are placed in a broadcast stream upon being filtered by criteria such as the campaign rules and agreed upon business rules. An advertising service provider can upload and remove advertisements on the server. When scheduled, a group of advertisements are transmitted to a broadcast stream, whereupon an advertisement is selected from this group for display to the viewer. A profile of a viewer that resides on the client device is used as the criteria for selection of a particular advertisement and for polling of audience viewing habits.

The Service Platform Manager of this invention further monitors the integrity and connection of the interactive television network. The platform monitor is a distributed software method with no central database required. The operator of the Service Platform Manager checks for connectivity at the machine level through ports, checks for operation on the process level of the activity of the server, and checks for file integrity on the data level to ensure, for example, the currency of a file. The operator of the Service Platform Manager can select or remove services provided from service providers from a list of items to be monitored. The Service Platform

**4**

Manager also creates statistical reports, and has an alarm system that can be set to automatically run a test at a given time or on a given schedule, as desired by the operator. In one embodiment of the invention, the Service Platform Manager is presented on a personal computer. In another embodiment, the Service Platform Manager operates over other digital interfaces, as in, for example, a cell phone, or a PDA. In another embodiment, the invention is provided on a computer readable medium, including any kind of computer memory known or unknown, comprising floppy disks, conventional hard disks, CD-ROMS, Flash ROMs, non-volatile ROM and RAM, on which instructions are stored that when executed cause a computer to implement the present invention.

BRIEF DESCRIPTION OF THE DRAWINGS

Other objects and advantages of the invention will become apparent upon reading the following detailed description and upon reference to the accompanying drawings in which:

FIG. 1A illustrates a high level Architecture Diagram for a preferred embodiment of the Service Platform of the present invention;

FIG. 1B illustrates an alternative embodiment of a high level Architecture Diagram for a preferred embodiment of the Service Platform of the present invention;

FIG. 2 is a more detailed description of the high level Architecture;

FIG. 3 is a more detailed description Architecture Diagram of FIG. 2;

FIG. 4 illustrates an example of a preferred embodiment of the Service Platform of the present invention;

FIG. 5 is an example of an alternative embodiment of the Service Platform of the present invention;

FIG. 6 illustrates a diagram of the Advertise architecture;

FIG. 7 illustrates a diagram of the architecture for Measure;

FIG. 8 illustrates a diagram of the architecture for Target;

FIG. 9 illustrates a diagram of the architecture for Account;

FIG. 10 shows a diagram of the architecture for Service Platform Manager;

FIG. 11 shows a software implementation of the Service Platform Manager;

FIG. 12 shows the Network Monitor page of the Service Platform Manager; and

FIG. 13 shows a shelf life for data monitoring.

DESCRIPTION OF PREFERRED EMBODIMENT

The following description describes several examples of preferred embodiments of the present invention.

Introduction

Account comprises five major components as follows: a Proxy component; an Application Server component; a Data Repository component; a Registration component; and an Administration component. The Proxy component is located in a communication link between the client device and the service provider's commerce server. The proxy component functions as a proxy server. Proxy intercepts messages transmitted between a client device and a service provider server. Proxy passes the message to the Application Server for processing (if necessary) and forwards the message to its original destination. Proxy is a bi-directional server, in that it can intercept both the requests or messages from the client and the responses from the server provider's server.

Messages are filtered by Proxy component so the Network Operator (NO) can control entitlement, that is, which client can send messages, which service provider can receive mes-

US 7,669,212 B2

**5**

sages and what kind of messages can be sent. Thus, the NO can provide a portal or a walled garden to control all the interactive services available to NO subscribers or clients.

The proxy component processes any message format, preferably, the message is ASCII based and the protocol is http. Account is built on top of the proxy component, which is transparent from both the client and the server provider standpoint, this makes the present invention unique in a sense that the insertion of the viewer data into the message is carried out transparently without affecting the original transaction steps.

The application server component comprises: an Interactive Service Manager; a Business Agents; and a Data Access Component. The Interactive Service Manager (ISM) is the key component of the Application server. The ISM looks at message headers to and from the client and server. When a message is being sent from the client to the service provider, the message headers (including the cookie headers) contain information to identify which application is sending the message (application identifier); which device is sending the message (device identifier); which viewer inside the household is sending the message (viewer nick name); the authentication PIN for the viewer; whether the message needs Account processing (processing flag); and what kind of processing is needed: synchronous processing or asynchronous processing (async flag). Based on the information provided in the message headers, the ISM performs the several tasks. Based on the information from the data repository, the ISM ensures that the application has permission to send messages (application identifier corresponding to an active application in the data repository—application; and entitlement); the device is allowed to send messages (device identifier corresponding to an non delinquent device in the data repository—device entitlement). If processing is not needed, the ISM returns the message back to the proxy component that forwards the message to its original destination. Otherwise, ISM continues processing the message. Distributed processing can also be employed here: the client device can scan the message first before sending it, and determines if the message does not contain any Account keywords, if not, the client or ISM sets the processing flag to 0. Also during the application development time, the application developer may know whether a message will contain any Account keywords, if not, then the processing bit can be set to 0. The parameters (including processing and async bits) can vary from message to message, so within one transaction session, the parameters can change from message to message.

There are two methods for asynchronous processing: First, Store and Forward asynchronous processing is used by the client device to reduce the peak load of the communication link between the client and the server. When the communication link is busy or when the client application is programmed to support store and forward, the client device stores the transaction request into either a transient memory (RAM) or persistent memory (flash, hard drive), and will forward the request to Account at a later time. This time delay can be a random parameter; a calculated parameter (based on the current time and point-to-point network parameters); or a combination of both.

Second, if the message is denoted as asynchronous (either by a flag in a message header or an application configuration parameter in the data repository), ISM places the message into a queue and returns a response to the proxy which will then send the response back to the client. The response notifies the client that the message has already been placed into a queue and the transaction outcome will be sent later (e.g. email, SMS, etc). Asynchronous message reduces the peak load to the service provider's servers as the message is cached

**6**

in Account before forwarding to the service provider. In addition, the cache is centralized in the Account thus it becomes unnecessary for each service provider to provide its own cache.

ISM scans the message and searches for Account special keywords. Each keyword corresponds to a special operation to be performed by Account. Each keyword has two parts: keyword itself and the parameters provided by the client. Some of the keywords are viewer's contact information (e.g. shipping and billing info); viewer's e-wallet information (e.g. credit card info); viewer's address book information (friend and family information including instant message buddy list); and transaction (e-receipt) information. The targets of the keyword operations are a data repository and the message itself. Each keyword corresponds to retrieving a piece of a record from the data repository, writing (or creating) a record into the data repository, or deleting a record from the repository. Additional actions corresponding to keywords may also be defined.

After ISM processes a keyword, ISM replaces the keyword with the record from the data repository; removes the keyword; and/or swaps the keyword with its parameter. In order to enable the NO to hide the viewer identity from the service provider and make sure that no viewer information is released without the permission of Account, Account employs the concept of a session identifier. The message between the proxy and the client contains information in the message headers to identify the device (device identifier) and the viewer (viewer nickname). The device identifier and viewer nickname are persistent data items that do not change unless changed by the client device or client device user. This information is removed by the proxy and replaced by a session identifier. The proxy component that accesses the device identifier is not available to the service provider or a service provider application to maintain the integrity of the secrecy of device identifier hidden from the service provider. This session identifier is transient, that is, it only valid within a transaction session, thus, the service provider is only able to use the session identifier to relate to messages corresponding to the same session. The session identifier becomes invalid in a different transaction session so the service provider is not able to use this transient session identifier to identify any viewer. The session identifier is generated by a functional output of the viewer identifier combined with an expiration parameter. This function is unknown to the service provider when only identifier Account or the NO know. Only the Account or the NO are able to resolve the session identifier back to the original viewer identifier. The functional output can be further encrypted to prevent hacking of the original viewer identifier randomly, but Account maintains a mapping table between the session identifier and the viewer identifier.

Furthermore, the session identifier prevents the application from recording the received viewer information and linking it with the device identifier. The device identifier is generated by a component outside the control of the application (e.g. the link or the conditional access component) and the application has no knowledge of this piece of information.

ISM regularly reads its configuration parameters from the data repository. The new data is read into a temporary location first without overwriting the original data and any new message will use the newly read data. The original data will be released once all the messages which used the original data have finished processing. By employing this mechanism, the configuration parameters of ISM can be updated on the fly without stopping the ISM. Business Agents are provided as supporting components to ISM, which each business agent performs some special business functions. The main business

US 7,669,212 B2

7

agent features are: Transaction (E-receipt) Business Agent also referred to as Transaction Manager (TM)).

TM facilitates a transaction by creating a transaction identifier for each new transaction. Each message within the same transaction session is tagged by the same transaction identifier. TM logs the details of each transaction comprising transaction date, amount, currency, status, and descriptions. With the appropriate keywords, the TM business agent retrieves e-receipts and details for a specific viewer from the data repository.

The Viewer Business Agent also referred to as the Viewer Manager (VM), with the appropriate keywords, VM retrieves, updates (or creates), or deletes a viewer's record. VM performs authentication (viewer entitlement) on the viewer by verifying the viewer nick name and the PIN matched the ones stored on the data repository. Logging and Error Business Agents log each message into the data repository for later data mining and reporting purposes. They also log the occurrence of each keyword into the data repository for later data mining and billing purposes.

Each Business Agent registers with ISM and notifies ISM what keywords it can handle. The notification can be either through initialization of the Business Agent during ISM start up time or through entries in the data repository. The ISM provides a table that maps each keyword to a set of Business Agents that can handle the keyword. The ISM scans a message, and once it finds a keyword, ISM calls the corresponding Business Agent(s) to process the keyword(s). The ISM and the Business Agents communicate with the data repository through the Data Access component. The DAC isolates the data repository from rest of the system so that if the data repository needs to be replaced by a different vendor or different technology (e.g. LDAP instead of Database), only the data access component (DAC) needs to be replaced without affecting the rest of the system.

DAC maintains a pool of data repository connections and uses this pool of connections optimally for its database operations. DAC interface with the ISM and Business Agents to perform data repository operations such as reading records, updating or creating records and deleting records. ISM and the Business Agents can interface with the DAC either synchronously or asynchronously. In synchronous DAC operation, the function call is processed at the calling time. In asynchronous DAC operation the function call is first put into a queue and processed later. This is different from the asynchronous message concept.

A data repository component stores essential information on which Account operates. Most of the information is stored on a data repository server connected to Account, but a portion of the information can be distributed and stored in the client to reduce input by the viewer. The information stored in the repository server can comprises: Viewer's related information (address info, e-wallet info, address book info); Transaction (e-receipt) related info (order date, amount, shop name, status, etc); ISM configuration parameters (logging level, etc); and Network, service provider, application and device information.

The information stored on the client can comprises: a list of viewers and the nicknames in the household; and a partial e-wallet information such as the alias of a credit card (e.g. issued bank name) or the last four digits of a credit card. This information can be used for commerce purposes by reducing the entries need to be entered by a viewer. Account also provides a registration component so that a viewer can register on line through the client device. This component enables a viewer to: create a profile and providing necessary info (e.g.

8

name, address, e-wallet etc) to the data repository; update viewer profile info; and review e-receipt (transaction) history.

The present invention enables Sharing Personal information. Once an individual is registered with a data repository they can decide to share their personal information. The owner of this information can subsequently grant privileges to this personal information. Privileges to this information include view, update and delete. Once this information is shared it can be used by multiple applications, such as transaction information for e-commerce activates. This shared information is accessed through the same "keyword process" mentioned in this embodiment.

For example, an address book can be shared. A viewer can grant access to their address book information, such as grandma's address and phone number. Once shared, this information can used by all viewers associated with the sharer's household or within a defined group of permitted users. For example, shared address book information would be useful in a flower shopping application. In this case a viewer who had purchased flowers, when prompted for delivery information, the flower purchase application would retrieve a list of personal addresses plus shared addresses from all the viewers in the household or all the permitted users of shared information. One would then choose an addressee for a delivery or ship to address. In this case, specifically grandma's address as it would most likely be a shared address by household members. An application is also provided that enables a viewer to setup and/or create an e-wallet containing personal information such as credit card number or bank account number. Once setup, the owner of this e-wallet can grant usage privileges to use this e-wallet information to enable other members of the household to use the credit card or bank account number. Once a viewer has placed an order with a shopping application, the viewer would be prompted for a series of confirmations, this would include e-wallet details that had been shared by another member of the household and their personal e-wallet details. The viewer would then select the e-wallet of their choice which would then be passed to the appropriate shop.

An Administration component is provided which enables the NO to control and configure Account operation; configure network, service provider and application parameters; to retrieve, modify or delete viewer information in the data repository; and to generate various reports related to the activities through the Account.

Turning now to FIG. 1A, the Service Platform Suite (SPS) 50 comprises a group of applications roughly divided into three categories, Content Conversion 104, Transaction Control/Business Functions 106 and Transport Conversion 108. The SPS enables Service Providers 100 to interact with a client 112 via a communication link 102 to the SPS 50. The SPS 50 in turn communicates with a client 112, e.g., a DCT 2000 Set Top Box (STB). The client 112 may be a STB, a digital assistant, a cellular phone, or any other communication device capable of communicating with the Service Platform Suite through communication link 110. The Content Conversion 104 and Transport Conversion 108 services provide the content and communication functions, and the Business Function services provide the Business Control functions for conducting transactions between services and clients via the SPS.

FIG. 1B shows a more general architecture than FIG. 1A. In FIG. 1B, Transaction Control/Business Functions 206 are distributed between the Service Platform Suite and the more powerful client 212, e.g., a DCT 5000 STB. For example, a more powerful client can perform some business functions (e.g. implement advertising campaign rules and advertising/

US 7,669,212 B2

9

business filters to select advertisements viewed) and select contents, which are more suitable to the client **212** (e.g., select an advertisement or program which fits the user profile). The functions are performed at the server for less powerful clients, e.g., DCT 2000 STB or cell hone.

The SPS Functions are expanded in FIG. **2**. As shown in FIG. **2**, Transport and Communication **214** comprises Content Conversion **204**, Business Agents **226**, and Transport Conversion **207**. Content Conversion **204** contains Content Filters **224**. The Transport Conversion **207** contains a Broadcast **234** stream communication function, a Load Balancer **236** function and a Point-to-Point (Pt-to-Pt) **232** communication function. The Business Functions **206** access Service Data **216**, Network Data **218**, User Data **220** and Business Rules **222**.

The functions of FIG. **2** are expanded in FIG. **3**. As shown in FIG. **3**, the Business Functions **206** comprise four major functional components: Service Manager **238**, Viewer Manager **240**, Transaction Manager **242**, and Advertisement Manager **244**. One example of a high-level operational flow for a preferred embodiment follows.

Referring to FIG. **3**, a Service Provider **200** negotiates with a network operator to offer a service to subscribers via the operator's SPS **50**. The network operator uses the Service Manager **238** to register the services and the negotiated business rules **222** (e.g. schedule, bandwidth requirements, provide some level of service access to viewer information) associated with the service. The Service Manager **238** stores Service data **216** (e.g. URL address, content). Based on the business rules **222** and Service Data **216**, Service Manager **238** communicates with the Broadcast Communication **234** function to retrieve the content from the content provider.

When the content is retrieved from the Service Provider **200**, it may be processed by the Content Conversion **204** and Content Filters **224** to convert the content into a form suitable for the client device **212**. The Broadcast **234** function converts the content into a form suitable for the broadcast **234** network. The converted content is received by the client **212** over broadcast link **241**. Client **212** and Service Provider **200** interact via Point-to-Point link **210** and Point-to-Point function **232**, which are part of Transport Conversion **207**. The Service Provider **200** comprise shopping, audio/video, gaming, voting, advertisement, messaging, or any other service.

Client **212** communicates through Point-to-Point **232** communication link to the SPS **50** and Service Provider **200**. Load Balancer **236** interacts with the Business Functions **206** to determine the optimal load distribution between the Broadcast **234** Communication link **211** and the Point-to-Point **232** Communication link **210**. The Business Agents **226** use business rules **222** to control the interaction and exchange of information between the Service **200** and the client **212**. For example, the network operator may choose to prevent Service Provider **200** access to user information. Service Provider **200** preferably pays a fee based on the Business Rules **222** and Service data **216** to access the user information.

Viewer Manager **240** stores client/user information in User Data **220**. Business Agents **226** control the flow of viewer information to the Service Provider **200**. Transaction Manager **242** records transactional information exchanged between the Service Provider **200** and Client **212**. Based on the Business Rules **222** and the User Data **220**, Advertising Manager **244** determines which advertisements and which type of advertisements will be presented to the client via Broadcast **234** link **241** and Point-to-Point **232** link **210**.

FIG. **4** illustrates another example of a preferred implementation of SPS **50**. Service Provider **200** provide shopping, chat, and other services either over the Internet or over

10

another network or communication channel accessible to the network operator. Using the SPS, the network operator (NO) accesses those services. Business Functions **206**, comprising Service Manager **238**, interact with Carousel Manager **254** to retrieve content from a Service Provider **200**. The carousel comprises a repeating stream of audio/video/interactive data broadcast to clients from the SPS **50**. Carousel Manager **254**, Transaction Manager **242** and Service Manager **238** control the content insertion and deletion from the broadcast carousel. Service content is retrieved, converted into a client suitable format by H2O **248**. H2O **248** is a possible implementation of Content Conversion **204** and Content Filter **224**. H2O converts HTML Content into Service Platform/Client readable content. The converted content is formatted into a data carousel and multiplexed by the Open Streamer **256** for broadcast to the client **212**. Client **212** interacts with the services and if necessary communicates with the SPS **50** and the Service Providers **200**. Point-to-Point communication goes through Service Gateway **246**. Load Balancer **236** interacts with Business Functions **206**, Carousel Manager **254**, and Service Gateway **246** to determine the optimal load between the Broadcast link **241** and the Point-to-Point Communication link **210**. Business Functions **206**, interact with the Business Agents **226** to control access and information exchange between the Service Providers **200** and client **212**.

FIG. **5** shows another alternative embodiment of the SPS in an environment where the client device possesses more processing capability, for example, when utilizing a Motorola DCT 5000 STB rather than a DCT 2000. Both Content Conversion (e.g. H2O) and the Point-to-Point Transport Conversion (Service Gateway/DAPT) are subsumed in the Client **212** processor. Thus, the client **212** can communicate with the Service Providers **200** directly. Business Functions **206** and other SPS components still perform their corresponding functions as previously described.

Service Gateway is the return-path enabling component of the Service Platform Suite. It connects STB clients with content provider backend systems. Messages are forwarded from STB clients to content provider backend systems using the standard Internet protocols including HTTP and SMTP. The Service Gateway uses protocol adapters to translate between the low-level communications protocol used by the set-top box and the higher-level Internet protocols. Service Gateway uses an efficient and lightweight protocol called DATP (DigitalTV Application Transfer Protocol) to transport message over the set-top box return path network. This saves valuable STB resources and enables low-end STB unable to support such a communication stack to interact with standard Internet applications servers. The return path networks can be, for example, the open Internet, a VPN (virtual private network) or closed WAN (wide area network).

SPS enables a NO to achieve a critical mass of a broad range of interactive services for the viewers, thereby enabling achieving regular and repeated use of services by viewers. Transaction-enabling services enables a NO to extend revenue opportunities available from interactive services. SPS enables management of the advertising inventory across all interactive services and targeted advertisements and enables many services (publishing, advertising, t-commerce and messaging) to be integrated into iTV applications. The features of SPS enable an NO to retain control of the customer relationship with the end viewers, leading to better customer services. Through order tracking, SPS enables network operators to offer an appropriate level of customer service to its viewers and content providers. The use of existing Internet standards

US 7,669,212 B2

**11**

enables SPS to use commodity infrastructure components. Using SPS, NO can centrally manage the interactive services offered over their network.

SPS enables content providers to rapidly develop and deploy new iTV applications at costs comparable to standard web development. SPS enables content providers to reuse existing Internet based infrastructure, processes and procedures for both publishing content and handling transactions. SPS enables real-time dynamic update of iTV applications, enabling content providers to provide applications with information that is accurate and up to date to seconds. At a basic level SPS enables content providers controlled access to viewer details including preferences and e-wallets. At an advanced level SPS enables content providers to benefit from business intelligence gained from viewer usage of all iTV applications. Content providers can use this to provide personalized services including features such as targeted promotions and recommendations.

SPS enables providing a consistent experience for viewers, making applications easier for viewers to use. Viewers can transact with the knowledge that their personal information and credit card details are secure. Unified and integrated communications enable viewers to communicate quickly and easily using email, chat, instant messaging or text messaging (SMS). Viewers can enjoy applications personalized to their requirements and profile, through defined preferences or transparent profiling. This leads to promotions, recommendations and advertising that are relevant to the viewer.

E-Commerce Support Scenarios

An overview of the application of the SPS of the present invention and a discussion of each of the functions depicted in each of the figures follows. One of the prime purposes of the SPS is to enable a network operator to provide and manage electronic commerce. Different E-Commerce scenarios are supported by the SPS, depending upon the network operator's and its selected services' requirements. The SPS enables flexibility in the operator's level of involvement in E-Commerce.

In each of the E-Commerce scenarios discussed below, the network operator controls the portal and decides what kind of shops and/or services can appear in the portal. The SPS has control on the flow of viewer information in all scenarios. The first E-Commerce scenario is referred to as the "pass through" scenario, in which the SPS is a middleman between the services and the client. The SPS does not host product catalogs offered by services (for example, a list of books and prices offered by a service) or handle orders (e.g., purchasing a book from the service via the SPS). The SPS only controls access to viewer information and logs service transactions. The second scenario is referred to as the "partial host" scenario in which the SPS hosts the service catalog but passes the orders to the shops or services for payment and fulfillment of orders. In a third scenario, referred to as the "full host" scenario, the operator hosts the catalog and processes orders.

The SPS **50** enables a network operator to support all three scenarios in one network simultaneously. Some services can choose to operate under the pass through scenario, some services can choose operate under the partial host or full host scenarios. The SPS supports all three E-Commerce scenarios simultaneously. For example, minimum commerce involvement is required of the operator in the pass-through scenario, where the SPS acts mainly as a conduit between service clients. However, even if the operator's involvement with commerce is minimal, it is often desirable that the network operator be able to answer a customer's calls. For example, the customer might be unable to determine from which service he purchased and will call the operator when a problem occurs. Thus, good customer relations dictate that the opera-

**12**

tor track orders, if only to redirect the viewer calls to the proper service to answer questions and solve problems with orders.

A second level of operator involvement is required in the partial-host scenario, which comprises E-Commerce enabling without fulfillment/payment operation. In this case, the Service Platform Suite enables the NO to build E-Commerce services (shopping, chat, movie orders, etc.), control the flow of service transactions, host a services products database, and provide an internal E-Commerce engine as a default solution. The SPS, however, does not process payment for and fulfillment of orders from the client to the service. The partial-host scenario enables E-Commerce enabled services to run their own custom E-Commerce infrastructure outside of the SPS and provide their own, custom service-created interface with their own E-Commerce engine.

The third level of operator involvement is required to support the full-host commerce capability, which is completely controlled by the SPS. In the full-host scenario, the SPS controls the service access to the network and to client or viewer information. The network operator performs portal administration comprising adding and removing services; changing service properties in the Service Data (store/shop/ service version, type of store/shop/service, type of product, bandwidth, scheduling, etc.) and updating service product offering catalogs.

The SPS also enables the NO to manage macro functions that operate across the various shops or services. For example, the SPS enables offering a list of stores/services, products offering page and a search capability across all the shops/services. The SPS also provides a mall directory function and a global product search engine across different shops. The SPS enables administration of the portal look and feel and provides extensive adaptive operator control of advertising space, content and scheduling. SPS viewer profiling enables adaptive advertising and content management. Adaptive management further comprises operational monitoring of traffic peaks and transmission failures.

The Service Platform Cache **138** also enables staging of content in Cache, that is delaying or checking service content broadcast before broadcast to clients. The Service Platform Transaction Manager records all transactions in the Transaction Database to ensure accurate operator revenue collections (even when the STB is turned off) and subscriber profiles in Viewer Profile **162** and Viewer Category **160** (viewer buying and viewing habits), which provides added value data to the network operator.

The SPS protects the operator's valuable subscriber profile database by requiring viewer information be given to service exclusively by the network operator, and under the network operator's control. To protect the subscriber's identity, an abstracted user identifier (i.e., session identifier) is transmitted to the service during the session that the service transmits transaction details to the SPS. The user identifier or session identifier is session specific. There can be more than one user identifier associated with a client device, as when different family members use the same STB. Each family member and the household STB can be individually assigned a viewer category, tracked and profiled by the Service Platform Viewer Manager. The Service Provider only knows the client or STB identifier through a session identifier. Only the network operator can resolve a session identifier into viewer information details (name, address, shipping information, client device hardware identifier, etc.) needed for fulfilling an order. Without the client device hardware identifier, Service Providers cannot contact the client device without going through the SPS. Thus, the client device hardware identifier is not

US 7,669,212 B2

13

revealed to the Service Provider. An exception can be made for a credit card number or other information, if the operator does not wish to perform credit card collections or other transactions. The capabilities of the SPS are selectable.

The transaction log is also useful for mining a client's viewing and transaction data for generating cumulative user profiles or used for more sophisticated profiling techniques such as collaborative filtering. Viewers or clients are placed in one or more categories (e.g., "sports fan", "chef-French") based on viewer user profile. Categories enhance the network operator's ability to perform adaptive targeted advertising and broadcasting based on long term and short-term viewing and buying trends of the viewer/client.

The SPS provides a Wallet function, which provides a checkout/purchase support function. The Wallet function is supported by the SPS, although selected shops or services may bypass the wallet function in favor of their own checkout procedure. The Wallet function records and accesses data regarding the viewer profile, viewer category, and transaction log. Thus, the Wallet minimizes typing or input of data by the user. This function is particularly useful when user is ordering via a TV remote control with limited data entry capacity. Typically, content for the Wallet function is a credit card number stripped out of 4 last digits, so that the user only has to complete the last 4 digits or the shipping address for confirmation.

Optionally, all user information is placed in the Wallet Function, hidden from the service. Wallet information exists in both the SPS and the client. The Wallet information on the SPS preferably contains as much information as possible, including client shipping address, client full credit card number, etc. The Wallet information in the STB may only contain partial information such as the last 4 digits of the credit card to remind the viewer which credit card on which a purchase was made. Partial information is stored in the STB for protection from untrusted persons using the STB and untrusted applications, which can access the STB data.

As linking occurs, such as, when a viewer's click triggers the call of an E-Commerce application or service, the SPS determines the subscriber's navigation location and records it in the Transaction Database **158**. The SPS also determines and records when the viewer followed a link to a store, or which program the viewer was watching when he/she made the decision to purchase (referred to as an "impulse buy"). The Transaction Database **158** enables the operator to store and provide a detailed context and purchase history to subscriber. Such storage of context and purchase history is also useful to improve subscriber profile and category information and which can generate additional revenue and/or become part of a channel deal with an E-Commerce provider.

The SPS publishes a service catalog (which can be HTML based). The SPS supports impulse buying and scheduling for support of E-Commerce. The SPS also provides a Store and Forward functionality, which enables management of transmission peaks for a large number of orders and reduces communication costs. Click-through interactive advertising is supported by the SPS support, since ordering a brochure is equivalent to a zero-money commercial transaction.

The default (and optional) E-Commerce engine provided by the SPS provides fast and easy E-Commerce shop page building; multi-shop hosting; catalog based E-Commerce (broadcast and on-line); impulse buying; built-in Email capability; dynamic/adaptive page generation to facilitate marketing campaigns (gifts, personalized promotions, welcome specials, etc.); personalized rules for catalog page building; real-time transaction support (e.g., ticketing); transaction control;

14

advertising campaign measurement reports; and synchronization with an Electronic Program Guide (EPG) for impulse-buying.

The SPS E-Commerce component increases network operator revenue per subscriber by enabling E-Commerce transactions from the TV. The Service Platform Suite increases and enhances the network operator's knowledge of its subscribers' viewing and buying habits for adaptively targeted marketing. The Service Platform Suite provides a valuable database of a "portal" or "walled-garden" of households' purchasing habits and preferences, accelerates development reduces the cost of deployment of E-Commerce enabled services by providing a productivity tool to rapidly create interactive E-Commerce shops and services.

The Service Platform Suite enables services to rely on their own internal staff to create an interactive TV presence and if necessary use the network operator's default commerce engine provided by the SPS, which is optimized for TV broadcast and interaction with the viewer. Thus, the SPS reduces operation costs (broadcast management, store and forward, etc.), thereby increasing the value or revenue generated by the operator's bandwidth.

The SPS enables a network operator to facilitate E-Commerce deployment on its own network and to capture a share of the E-Commerce revenues. The SPS Wallet function enables the NO to manage credit, impose spending limits and enable micro-payments. Services may interact with the Service Manager and Viewer Manager to provide a group of services from which the NO via SPS chooses to present to clients based on viewer profiles and categories. The NO may conversely reveal its subscriber profile to a service provider to request specialized viewer targeted offerings and advertisements to subscribers.

The SPS provides catalog broadcast publishing and on-line transaction execution with external E-Commerce platforms. The SPS also provides a centralized transaction log for operator use. The SPS provided E-Commerce engine provides a SKU repository; product offering catalog creation and administration tools; catalog search engines; shopping cart functionality; order repository and management functions; order fulfillment and administration; product inventory tracking and administration; adaptive pricing and promotion management; E-Commerce business scenario building; dynamic marketing management; and business reporting (viewer category/profile purchasing viewing trends) and viewer management access when authorized by the Business Rules.

The SPS enables dynamic, adaptive content synchronized with video, such as special offers triggered by video events. The Store and Forward function for viewer orders helps alleviate and control transaction peaks, such as when an advertisement runs and a large number of clients respond with an order or inquiry. The Service Platform Suite also enables services to access viewer orders when the viewer/client is off line. The Service Platform Suite also enables viewer on-line catalog browsing; user profile management; content targeting according to profiling; and targeted Email, based on user profiles and categories. The Service Platform Suite provides functionality for billing, payment processing and clearing; and encryption and security. The components comprising the SPS and how they interact to manage the interactive television environment in a preferred embodiment will now be described in more detail.

As shown in FIG. **4**, the Service Manager **238** enables the NO to control and administer the services offered by the service providers. In particular, the Service Manager **238** enables the NO to register services, initiate services, manage services, and terminate services. The Service Manager **238**

US 7,669,212 B2

15

schedules and provides access to bandwidth (broad cast and point-to-point) occupied by the services. The Service Manager **238** caches, hosts and manages service provided content and monitor services for billing purposes.

The Service Manager **238** interacts with Broadcast, Content Filter, and Platform Business Agents parameters **226**. The Service Manager **238** performs Service Control (service start and stop) for multiple network multiplexes and headends. The Service Manager **238** manages Content Providers for security control and implementation of service provider contracts in the form of creation and enforcement of business rules for viewer transactions and controlling access to viewer/client information. The Service Manager **238** also provides Broadcast Scheduling, Bandwidth Management, and Content Management comprising service/client versioning, self-service service registration, commissioning and deployment of workflow, Content Provider Billing and reconciliation.

As shown in FIG. **4**, the Transaction Manager **242** logs and manages transactions in the Transaction Database. These transactions range from purchases and advertisement responses, to service content requests. The Transaction Manager **242** enables network operators to track, query, and modify the transaction database to respond to customer requests regarding transactions. The Transaction Manager **242** also enables the NO to bill the service providers for the amount of transactions happening between the services and the NO subscriber client base. Transaction Manager **242** interacts with external payment services to perform monetary transactions. Transaction Manager **242** also provides an interface to both external and internal commerce engines to provide access to viewer/client order information. Transaction Manager **242** enables orders to be cached in client devices for Store and Forward operations or Cached in the Transaction Manager **242** for batch processing.

The Transaction Manager **242** also performs Session Management via onetime, transaction-related session identifiers. The Transaction Manager **242** performs Asynchronous Transaction Handling and Transaction Storage which enables a scalable solution to Services. Such asynchronous batch processing eliminates the necessity of services having a transaction infrastructure for simple functions (e.g., polls and quizzes). The Transaction Manger **242** also performs Order Status Management comprising Order capture, Content Provider Updates, Viewer access applications, and messaging or URL links to the service provider. The Transaction Manager **242** also provides Affinity Schemes, Payment on dispatch, and Transaction Based Content Provider Billing.

As shown in FIG. **4**, the Viewer Manager **252** manages subscriber/user registration **264**, preference, and profile information **262**. Viewer Manager **252** enables users to register and record personal information in a database. The personal information comprises viewing patterns, promotional preferences, personal, wallet and demographic information, etc. Based on this recorded information and the user's activities, the Viewer Manager **252** generates profile information to categorize the user and produce targeted services, content and advertisements to suit the users profile **262** and expected preferences and needs. The Viewer Manager **252** also performs centralized updating of service and viewer parameters.

The SPS enables network operators to control access to the viewer database and enable only those service providers who have a prior contract or agreement with the network operator to access privileged information (e.g., credit card numbers, viewer's actual name, home address, telephone number, social security number, physical address of client device, client device hardware identifier etc.). For distributed functions, that is, when the client has sufficient processing power

16

and storage, the Viewer Manager **252** enables access to personal and profile information stored on the client devices and enables the client devices to select user-preferred content. Clients select user-preferred content via business filters in the client device (e.g., STB).

The Viewer Manager **252** provides Household/Subscriber/ STB (or other client device) identification and authentication in support of the Service Gateway and Parental Control functions. The Viewer Manager **252** supports Multiple Viewer identification and Registration authentication at a single STB through nicknames and personal identification numbers. The viewer identifier preferably is derived from the client device identifier number(s). The Viewer Manager **252** performs household and individual viewer profiling through logging, generation, and matchmaking linked to observed cumulative TV viewing and purchasing habits. The Viewer Manager **252** supports distributed data capture and storage between the SPS and the STB, and supports bi-directional synchronization. The Viewer Manager **252** enables distributed profile usage between all SPS applications and provides synchronisation with an external SMS/CRM.

The Viewer Manager **252** enables multiple viewer registrations for a single STB or client device using abstract viewer identifiers comprising nickname, full name and PIN Storage in the STB or other client device. Business Agents **226** enforce transactional business rules for interaction between service providers and viewers. Based on business rules, which are defined by the network operators and based on agreements with the service providers, the Business Agents **226** control transactions and service provider access to user information. Business Agents **226** can include, replace and delete viewer information during a transaction.

Business Agents **226** create sessions between subscribers and service providers. Business Agents **226** control access to viewer information details and manipulate viewer information by inclusion, replacement and removal of viewer information presented to Service Providers. The Business Agents **226** provide default values and control access to user information. The Business Agents **226** also perform Transaction Logging, Messaging Logging, Load/Transaction Monitoring.

Account enables the NO not the retailer or service provider, to own a direct relations with its subscribers and viewers. The client is identified to a service provider by the session identifier generated by the SPS service gateway when a client signs on. The client hardware identifier, which would enable a service provider to identify a hardware device and contact the user directly, is not revealed to the service provider. A client hardware identifier is retrieved from the native transport level of the client device and stored in table for cross reference between session identifiers utilized during transactions between an SPS and the client hardware identifier. A viewer or subscriber registers once with the NO and their account information is stored in an Open TV Account database controlled by the NO. The viewer can access any retail services or service providers available on the SPS without providing his/her account information, because the NO already has the account information stored in SPS and can easily insert all necessary information into the transaction. A retailer, however, can only obtain client information through a business agreement with the NO granting access to particular information.

Commercial transactions that occur through the use of the interactive television set are referred to herein as television commerce or T-commerce. An example, a T-commerce transaction processed under a preferred embodiment of Account can be described as follows: 1) A client device user registers

US 7,669,212 B2

**17**

with an account by providing names, addresses, and e-wallet information discussed above. The client also chooses a user name and a PIN, to be used later for authentication purposes; 2) A hardware identification may also be used during authentication; 3) The client interacts with a T-commerce application or service provider by adding products to a shopping cart. The client enters his/her user name and PIN to check out; 4) the T-commerce application connects to the Account function of the present invention. Account, which uses a client identifier and the user name to uniquely identify the viewer inside its database. The PIN is used to authenticate the viewer; 5) the T-commerce application sends the shopping cart information through the account to the retailer of service provider. The account inserts client information into the transaction to enable the retailer or service provider to identify the client and to receive essential client information such as credit card number and shipping address; 6) The T-commerce retailer or service provider receives the order, performs shipping and handling costs, tax and total cost calculation and sends the result back to the client; 7) the client reviews the cost information and confirms the order and the retailer sends a confirmation number back to the client; 8) for every transaction, the account inserts a transaction ID to track all the messages which belong to the same transaction session; 9) Account also provides different types of logging capability to assist the NO for customer service and data mining; 10) In addition, e-receipt information such as order description and order cost is required to be sent by either the retailer or the T-commerce application, so that Account provides an e-receipt record for future customer inquiries and transaction records.

Keywords facilitate data interchange during an E-commerce or other type of transaction. Transactions are completed through passing of and action upon these keywords. Keywords perform many functions comprising writing data into a data repository, logging data, swapping a keyword with its data parameter or value, creating a value for a keyword, deleting contents of a data repository, and patching a keyword with its actual value. Patching occurs when a keyword is replaced in a line with a corresponding value from a data repository. Keywords enable client authentication and identification, updating a database, logging transactions, tracking sessions, and sending error messages.

As an example, a generalized keyword has the form _O_<keyword_name>(param**1**, param**2**, . . . paramN), where the keyword_name specifies the function of the keyword and the last letter of the keyword_name is one of the letters P, R, S, C, W, or D, and represents the corresponding actions Patch, Remove, Swap, Create, Write, or Delete. The param can be textual content or can be a number representing a sequence value in a list. A blank value for param represents a first, or default, value. For example, the keyword_O_vBlnP( ) requests a patch of the last name of the person billed for a purchase. Upon receiving this keyword, Account patches, for example, the line MyShop_BilltoLast Name=_O_vBlnP( ) to become MyShop_BilltoLast Name=Smith, where Smith is the first in a list of billing last names in the client profile within the data repository. Keywords relating to a purchase item comprise tags that are used toward an electronic receipt. Some examples of tags are Order cost, Order currency, Order descriptions, Order status, and Order status URL.

The present invention provides server-side keywords for account transactions therein providing support for a Viewer Address Book, e-Wallet keywords, e-receipt keywords, e-receipt transaction keywords, and error keywords and other SPS functions.

**18**

The Viewer Address Book feature enables a viewer to register his/her friend's names and addresses into the Open TV Account data repository. Any authorized application can inquire into a viewer's address book from the Open TV Account and use that information for transaction purposes. For example, a T-commerce application may enable a viewer to pick an entry from his/her address book and send the purchased items to this address. The e-Wallet functions enables the viewer to store multiple credit card numbers as well as billing information in the Open TV Account data repository. E-receipt keywords are used by Account for logging the details of a transaction. The data is used later for customer service and billing purpose.

The NO associates a keyword with a unique transaction ID, generated by Account, to track transaction sessions uniformly across all retailers and all client devices known to the SPS. When Account encounters an error, such as an incorrect authorization code, it sends an HTTP response to the client to signal the error and the corresponding action. Since Account works with multi-platform clients simultaneously, the actual error response is a configured parameter in Account, enabling Account to send an error response in HTML, XML, or even name-value format to the client.

Transactions are based on HTML name value pairs, and are issued using HTTP for easy integration with existing Internet application servers. The use of HTTP is achieved either directly from the set-top box using an embedded HTTP communication stack or via the Service Gateway and the client device compatible transport communication protocol, DATP.

The Transaction Gadget Kit is provided that comprises a series of transaction gadgets. A gadget is a function or method that executes on the SPS. A set of gadgets are provided and additional gadgets can be created and specified by the service providers, clients and the NO. A Table gadget, for example, provides in-memory storage and management for a rectangular table viewed as a sequence of records (or rows) storing a set of named columns. The Table gadget works in conjunction with the Table Presentation gadget. The Table Presentation gadget is dedicated to the presentation of a subset of the columns and rows of a Table gadget content. Exchanges to or from the table are performed one record at a time via a set of smart variables whose names match the column names. Refresh of any linked Table Presentation gadget is automatically triggered whenever the Table content is updated. Support is also provided to load/save the whole table at once to and from a smart variable.

SmartVariable gadget enables access to a smart variable. Smart variables enable the SPS applications to store values but also to trigger functionality based on those values. For example, a smart variable can hold the quantity a viewer has specified when making a purchase. This value can be accessed when creating a transaction order, but is also to be used to update an on-screen display of the quantity. Smart variables can hold both numeric and textual values. Numeric values can be integers, floats, and numeric expressions. A SmartListener gadget monitors updates of a set of smart variables. If one of the smart variables changes, then a handler will be triggered. An HTTPRequest gadget provides the ability to format and submit a HTTP request to a remote HTTP server. This can be via the EN2 HTTP extension or via the service gateway using DATP. A QueryString gadget formats and parses URL encoded query strings (name value pairs). The contents of a query string can either be formatted or exploded from/into a set of smart variables.

A SmartEval gadget re-evaluates an arithmetic expression whenever one of its smart variable operands changes. Smart-Compare gadget monitors a smart variable and compares its

US 7,669,212 B2

**19**

value to a constant value whenever changed. One of two handlers will be invoked depending on the result of the comparison. The comparison can be greater than, less than, equal, not equal to, etc. The handlers are called based on whether the comparison is true or false. The PINChecker gadget provides an interface for conditional access (CA) PIN checking. In a preferred embodiment, it integrates with an embedded CA parental control PIN. The result of the check is placed in a smart variable. A CreditCardChecker performs checks on credit card information within the set-top box. The result of the check is placed in a smart variable.

TextInput gadget supports input of text from a set-top box remote control or infrared keyboard. The input is placed in a smart variable. A Dynamic Text gadget provides dynamic caption tracking of the value of a smart variable. This gadget provides dynamic update of the text displayed within a set-top box. A SmartLanguage gadget provides an interface for determining the language that should be used by an application.

DATP gadget is a library that supports access to the service gateway using DATP. DATPLink gadget is a link to the service gateway DATP library. The state of the connection is held in a smart variable.

StationControl gadget supports control of the video and audio streams and switching to a new service. A ShapeAnim gadget provides animation of basic shapes and bitmaps.

A purchase transaction begins when a client sends a message to the server comprising session identifier associated with a cookie and keywords for the purchase. The SPS associates session identifiers and cookies in a cookie to session ID table. The order message is sent by the set-top box application to the content provider, the SPS intercepts the message, patches viewer details to the messages by replacing placeholders within the order parameters (i.e. providing credit card number), logs the order details and forwards the message to the content provider application server. The application server processes the order and returns the confirmation to the set-top box. The SPS intercepts the response, updates the order log to reflect the confirmation and forwards it to the set-top box. In reality, commercial transactions of this type are likely to be more complicated and involve more messages between the set-top box application and the application server. The SPS is able to monitor the state of the order over multiple exchanges. The set-top box application may fetch some information directly from the service platform manager such as payment card details from the SPS e-wallet.

As an option, the client can purchase directly from the service provider. However, purchasing through the Account server enables the client to provide minimal information at the moment of purchase and if the STB is operating in a single user mode, a viewer is already logged on and does not need to identify himself. In a multi-user mode (as in a family with many viewers), the viewer logs on to the system in order to correctly identify himself. The present invention's use of keywords speeds the transaction and enables a transparency to the transaction from the client's perspective and from the service provider's perspective, such that the viewer does not need to visit another site to, for example, retrieve credit card information, or to conclude a purchase as in for example, Microsoft Passport. This client information is transparently provided by the keywords, that is, the user is unaware of the interaction.

A high-level diagram of the account is illustrated in FIG. **9**. Account comprises five major components: Interactive Service Manager (ISM) (**901**), Proxy component (**903**), Parser (**905**), Business Agents (**907**), and one or more Data Repositories (**909**), such as Relational Database, LDAP, Activer Directory, etc. ISM enables the NO to do several things. The

**20**

NO can set the level of accessibility to client data of each interactive service provider. Secondly, the NO can set the level of patching of client data for each service to enable patching-type billing, or billing by review of the patch history. Third the NO can capture e-receipts for each service to enable e-receipt billing. Fourth, the NO can set the level of logging for each service to enable the client data to be used for customer relation purposes. Fifth, the NO can also set the asynchronous requirements for store and forward messaging for each service. Sixth, the NO can set the authentication requirements for each service.

Account provides different types of logging for both transaction management purposes and to enable a billing structure with expanded capabilities. Additional logging types, such as e-receipt logging and patch logging, provide the NO options on charging service providers. E-receipt logging logs the transaction variables, including tags (i.e. order description), whenever they appear in the message to enable a service provider to be billed according to the transaction outcome (e.g., the purchase of a TV set). In Patch Logging, the account logs the occurrences of each patching for each service provider to enable billing of a service provider according to the types and numbers of patches that have occurred for the service.

Asynchronous messaging capabilities (such as Store and Forward) enable tasks that do not need synchronous response (e.g. logging into a database) to be performed asynchronously to reduce peak message transfer load. In doing this, asynchronous messaging improves message processing time by storing transaction messages for transmission later.

Business Agents are provided in two separate components: Data Access Components (DAC) and Business Logic. Business Logic handles specific business requirements, i.e., handling client records, while DAC is dedicated to accessing data repositories. Also, flexible Business Agent architecture enable external Business Agents to be added easily. As an example, a NO creates and provides their own tags and keywords and easily enables a Business Agent to handle those tags and keywords.

A high level description of the functions of Account follows. The Proxy component (**903**) receives a HTTP request from a client. This request comprises cookies and keywords for a transaction. For each request, the Proxy component packages the requests into a buffer object and passes it to ISM. The ISM first calls Entitlement Manager (EM) (**910**) to verify the permission of the source and destination. Then, the ISM determines whether the request is synchronous or asynchronous from the OTVFlag Field in the header cookie/session identifier of the message. If the request is synchronous, the ISM sends the request to the Parser (**905**) directly. If the request is asynchronous, the ISM puts the request into a MS Queue Components (QC) (**913**) for asynchronous processing and sends a pre-generated response back to the client. The Parser thus either receives the request through a synchronous call or through the Queue Components Player. The Parser also receives a table which contains the permitted tags and the "Business Agent" COM objects which can handle those tags. Whenever the ISM encounters one of the tags, it calls the appropriate "Business Agent" COM object to perform the actual function. There are a number of built-in "Business Agents" to perform critical functions such as Log Writer (**921**), E-receipt Writer (**922**), Patch Writer (**923**), Viewer Profiler (**924**), and Error Handler. An External Business Agent (**925**) can be added by registering itself and any new "tags" it can handle with the ISM. Each Business Agent calls its corresponding Data Access Component (DAC) to talk to the appropriate Data Sources.

US 7,669,212 B2

21

The Proxy Component is implemented as two parts: the IIS filter and the IIS extension. IIS filter is called whenever a request is issued from a client to the proxy. The URL is then patched by the IIS filter to call the IIS extension. The IIS Extension recreates the request, stores the request in a buffer, packages the buffer into a COM interface, and passes it to the ISM which implements the interface.

The ISM accesses a list of all the active applications. It also has access to a black list of the subscribers which are prohibited from subscribing to any SPS service, as well as Default Logging level and E-receipt logging level. For each service registered with the SPS, ISM provides the following service specific data: Service ID, status (active or non-active), list of domain names associated with the service provider, permitted keywords associated with the service provider, default languages associated with the service provider, billing requirements (patching billing or e-receipt), and logging levels.

The ISM comprises the following components: EM (**910**), Asynchronous Decision Component (**912**), and Registry component (**914**). The EM (**910**) is the first component that processes the request/response. Entitlement Manager functions like a gatekeeper to determine whether a source is entitled to send the message and whether the destination is entitled to receive the message. It makes use of the following information to either accept or reject the message: a list of all the active services, critical info associated with each service (i.e. status, domain name, permitted keywords, etc.), and a black list of subscribers.

The Asynchronous Decision Component (ADC) (**912**) of the ISM, based on the status of an OTVFlag field in the session identifier/cookie header of the incoming HTTP request, determines whether the request is queued or not. If the request is synchronous, the ADC calls the Parser directly. If the request is asynchronous, it will place the request into a MS Queue Component (QC) and return a response to the client to notify the success or failure of placing the request into the QC.

Registry Component comprises an adopted registration scheme enabling a Business Agent to register itself with the ISM. The registration information comprises the name of the Business Agent and its ProgID name, and the keywords that the Business Agent can handle. In a preferred embodiment, a Business Agent is implemented as follows: in the initialization phase of the ISM, the Business Agent needs to create an instance of each of the Business Agent's COM objects. During this creation phase, the ISM can inquire the set of keywords that each Business Agent can handle. The ISM then stores the information into a table and passes this information to the Parser.

Parser (**905**) is the central component to parse and modify a message. Parser receives the following information from the ISM: a set of permitted keywords and for each keyword, the Business Agent COM object which can handle the keyword, and the logging level for Log Writer and E-receipt Writer. The Parser parses the message for the keywords and calls the corresponding Business Agent to handle the keyword. As mentioned, parser receives synchronous messages through synchronous function calls or asynchronous messages through the QC player. Once the parser begins processing the message it treats the message as if it was received synchronously and performs all the action at once. For any asynchronous message, the Parser first processes the message for the keywords, then sends the message through HTTP to its URL without returning to the Proxy because the original connection in the Proxy has been closed due to the pre-generated response to the client. So the Parser sends the message without relying on the Proxy.

22

Each Business Agent is an individual component to handle a specific business function. Open TV Account has a set of built-in Business Agents to handle functions like logging, viewer profiling, error handling, etc. A NO is enabled to plug in External Business Agents to handle specific message keywords and the corresponding business functions that it defines.

Each Business Agent is divided into two separate components: Business Logic and Data Access Component (DAC). DAC is a component inside a Business Agent to write-retrieve data to/from the Data Repository on behalf of the Business Agent. The concept of separating the data access portion into a dedicated DAC is to enable the account to easily adapt to work with different schema and different number and type of Data Repositories. There are two DACs for Account. One is the ISM DAC (**931**) and the other one is the Viewer Profiler DAC (**932**). The ISM DAC is responsible for interfacing with ISM and all the Business Agents except Viewer Profiler. The Viewer DAC is responsible for interfacing with Viewer Profiler BA only. Separate DACs enable for an exposed Viewer DAC API, so that a different Viewer Profiler DAC can be easily swapped in to work with a different Viewer data repository, such as LDAP.

The Log Writer component supports four levels of logging and logs according to the level set in the ISM. There is also a global Logging Level that can be set by the SPS but the Service Level Logging takes precedence over the global Logging Levels. The Log Writer is implemented asynchronously using MS QC to reduce the waiting time of writing to the database. Caution should be used to prevent logging from happening too early. For example, a Transaction ID should be generated before Logging occurs.

The E-Receipt Writer component is responsible for logging the client order tags into the database. These order tags are used as an electronic receipt (order summary) for both the service and the client. The NO can use this information to bill a service according to the amount recorded in the e-receipt, provide customer service support to answer order inquires from the subscribers, and generate an order history for each subscriber. In a preferred embodiment, E-Receipt Writer is implemented using MS QC to reduce waiting time.

Patch Writer is responsible for logging the patching that occurs for each message, for example, when patching a credit card number into a transaction message. Patch Writer enables the NO to bill a service according to the amount and type of patching that have occurred for that service. Input for Patch Writer are all tags that have been patched along with cookie information. In a preferred embodiment, this is implemented using MS QC as an asynchronous component.

Error Writer is responsible for logging error situations into the database. An error occurs for at least one of: Source or Destination entitlement failure, Viewer authentication failure, Request patching on non-permitted tags, and HTTP errors. In a preferred embodiment, Error Writer is implemented using MS QC as an asynchronous component.

Viewer Profiler is responsible for reading/writing viewer profile information comprising viewer address information, viewer e-wallet information, viewer contact list information, and viewer order history based on the transaction variables. In the beginning of processing a message, Viewer Profiler reads the viewer record into its cache. At the end of the processing, Viewer Profiler releases the cache.

No Business Agents retain any state information from message to message. Business Agents are all stateless components, which are preferably to be initialized with the message parameters in the beginning of a message.

US 7,669,212 B2

23

Open TV Account is engineered to enable a NO to add his/her own tags and the corresponding Business Agents to handle those keywords that may be used by the NO for his/her own business functions. For example, a NO may require a special keyword to be included in any transaction that results from an advertisement through a TV commercial. To be plugged into Account, an external Business Agent must register itself to the ISM. Registration requires adding the Business Agents COM (ProgID) into the registry of the ISM COM object. When the ISM initializes, it creates an instance of each of the Business Agent COM object that it needs to interface with. It then inquires at each Business Agent COM object what keywords the COM object can handle and stores the mapping between the keywords and the Business Agent COM into a table (Keyword Handling Table). The ISM passes the message, the permitted tags for the service and the Keyword Handling Table to the Parser. When the Parser encounters a keyword, it calls the corresponding business Agent COM object according to the Keyword Handling Table. This also enables a keyword to be handled by multiple Business Agent COM objects and the objects are called in the order that the Business Agents registered into the ISM registry.

Account enables a NO to increase revenue per subscriber by keeping tight control of its subscriber's information, and to record various logs enabling different type of billing for individual service and for its customer relationship management. These logs can also be used for data mining purpose.

The Advertising Manager (AM) enables NO to control the content and schedules of the advertisements being delivered to the viewers. The AM provides a matchmaker component to enable network operators to set up advertising campaign rules to target different advertisements from different services. The AM also targets users with different profiles. The AM tracks user responses to the advertisements, generates reports and creates new campaign rules based on the reports. Thus, the SPS enables the provision of adaptive advertising based on feed back from client/user responses, time of day, available programming, available advertising, available advertising space, viewer preferences and profiles. The AM provides an interface with both the broadcast and point-to-point links, which enables complimentary advertising interaction between the two delivery channels. For example, a broadcast (push) advertisement can trigger a point-to-point connection to the advertising service via the SPS so that the user can buy the product or get more information related to the product. A broadcast advertisement can also be placed in the point-to-point content to inform a user of the availability of broadcast services (e.g., an infomercial).

The AM provides the NO with administration of advertising inventory and advertisement assets. The inventory will be limited to a set of standard sizes and standard media types—stills (bmp, jpeg, or mpeg), animation, sounds, and links. The AM also performs Advertisement Impression Tracking; impression tracking may be actual, sampled or estimated depending on the network infrastructure; impression details may be obtained via STB polling or piggybacking. The AM performs STB capture, store and forward, server handling, and storing and reporting. Impression tracking, polling and view counts are considered as feed back in adaptive advertising.

The AM performs user Click Tracking; and Self Service Advertising definition/Advertising Sales comprising size, content, category, and automatic size checking/detection and usage restrictions such as service, time of day, day of week, and advertising period. The AM performs Automated/Self Service Advertising Spot/Space definition; page tagging by service and type, and by category. The AM performs STB-

24

based matchmaking, Server based/Broadcast matchmaking and redirection of advertising over the most point-to-point or broadcast for time sensitive advertising serving/matching, head end location and service.

The AM performs Broadcast Advertisement serving to online content and controls micro-site scheduling with a link to Service Manager. Broadcast Carousels are generated by the SPS using Service Manager, H2O, Carousel Manager and Open Streamer. The generation of the carousels are guided by the service rules in the Service Manager database, by product updates triggered by the merchants and by an event scheduler. The viewer profile and categories are used to select products and advertising to be presented to the viewer/client. In some instances, several products or advertising segments (ads) are broadcast to the viewer or client (pushed, i.e., sent without a request from the viewer) to the STB or client. Business filters associated with the viewer, preferably located in a smart STB (e.g., Motorola DCT 5000) are used to select the best ad for the viewer. For example, during a cooking show, the SPS may schedule a group of cooking advertisements for broadcast to viewers. This group of advertisements may comprise cooking ads on Italian, French, Indian and German cuisine. The business filter associated with or located in the STB or client will select with type of cuisine advertisement to present to the client or viewer. One viewer may see a French cooking advertisement while another viewer may see the Indian cooking advertisement.

Advertising Campaign management makes use of viewer data mining and analytic systems in order to propose the best selection of products, advertisements and timing for broadcast. The SPS provides rule based systems to create 'smart' advertising campaigns. The campaigns are adaptive based on user preferences, profiles, buying and viewing habits, and demographics. Based on information coming from the Advertisement Content database, Campaign Rules database, Service Manager, and Carousel Manager, the AM decides the best products to present to the viewer. It triggers the Carousel Manager to rebuild the broadcast catalog. The AM also interfaces with the Business Agents to propose advertising contents presented to the viewer while the viewer is on line.

The present invention provides targeting technology to present the right product depending on user basic profile, type of goods, and context (page, time). The present invention also provides 'prediction' technology for analysing previous orders/requests to guess what the viewer might be interested in. Those technologies use a mixture of statistics and rule based system for intelligent 'guessing'.

The SPS enables reuse of Web Commerce infrastructure. The SPS replaces the 'usual' HTML templates with TV friendly format. The Business Agents receive the order requests from the STB or client through the Service Gateway. As the Service Gateway queues messages (to manage peaks), some orders might be received by the Business Agents with a delay (preferably orders that do not need any form of confirmation would use this scheme). The Business Agents add viewer information to orders. The amount and type of the viewer information provided in a order/message is guided by business rules depending on the service/retail agreement. As communications are exchanges between services and viewers/clients the information will be sent to either separate carousels with a single carousel per transport streams or merged into the existing application carousels.

Orders then may proceed, if desired through a 'credit card clearance' function provided by the SPS. As confirmations are sent back from the retailers, the orders are sent real-time back to the user; sent via Email to the user; or made available on-demand through some form of customer care application.

US 7,669,212 B2

**25**

The SPS provides Offline Viewer Identification, which enables a viewer to be identified or authenticated without the need for an online viewer connection to be established. This ensures that the connection delay (e.g., 10-40 seconds) can be placed at the most appropriate place within the purchase process. This also enables viewer identification within Store and Forward situations. This function enables communications and completion of orders/operations with an STB or other client device that is intermittently on and off.

The Offline Order Form function enables the SPS to provide T-Commerce services for a viewer to be able to add items to an order form (shopping cart) without being online. The Store and Forward function is important for achieving greater scalability. Store and Forward may be either forwarding in off peak hours or simply spreading the load over a given time period after a transaction has been initiated. The full Store and Forward solution is integrated with the "Navigator", EPG or Control Task so that responses can be forwarded from any channel at any time. Store and Forward can be used for enhanced E-Commerce, T-Commerce transactions. The offline viewer authentication enables offline payment selection. Offline payment selection is provided by the Service Platform Suite to improve the purchase process and to enable use of the Store and Forward function with T-Commerce/E-Commerce.

Advertisement tools traverse all SPS applications. Every SPS application is able to offer advertisement space and banners. The AM provides a central registration point for all applications to enable access to advertisement feeds for all applications. From the advertisement manager's operator point of view, the AM enables associated images, and links to services (applications, TV channels), mini-sites, to schedule the advertisement and report them for audit.

The AM enables advertisers to create campaigns tailored to specific viewer groups or programs and to watch the results through HTML tools. The repository component saves/manages the advertising campaign (rules, schedules, properties and assets). The Campaign Manager prepares the advertisements to be sent. The Campaign Manager provides rules associated with campaign and feedback from the reporting to decide which advertisements are sent to which viewer and when.

The 'Delivery' component sends the campaign of advertisement chosen by the campaign manager using Open Streamer broadcast or a point-to-point communication link. Open Streamer packages advertisements as N Service Platform carousels, one per transport stream, optimizing the bandwidth usage. STB client applications are broadcast with an advertisement library. This library performs Campaign acquisition, Matchmaking, Tracking and Reporting. The campaign acquisition client component runs in parallel with the client application, watching for the campaign carousel, caching information, and pre-fetching assets. The matchmaking client components evaluate each advertising campaign with local parameters (type of page displayed, user information, number of times campaign was ran, etc.) and accesses the best advertisements for display.

Advertise supports viewer tracking capabilities (Measure) and viewer profiling (Target), adjusting subsequent future deliveries of advertisements based on actual impressions, HTML support, targeting of advertisement by date and time, and extension to support spot-on solutions for video advertisements.

An illustration of the Advertise Architecture is shown in FIG. **6**. Advertise operates across four tiers of a broadcast platform. A first tier is referred to herein as a Management Tier (**600**) and comprises a Web Application Server (**602**).

**26**

The Web Application Server (**602**) stores information received from the sales representatives from different advertisement entities (advertisement agencies, Coca-Cola, P&G, etc.) into an Advertise Database (**604**). All users (administrators, advertisement sales people, ad operation staff, etc.) access the system by web GUI applications over secure sessions. The Web Application Server provides a web-based interface for media sales representatives and comprises a Campaign Planning Module, an Inventory Forecasting Module, an Ad Catalog Module, a Reporting Module, a Billing Module, a Sales Cycle Management Module, and a Security Module. The Campaign Planning Module structures and manages campaigns in order to target advertising banners with specific interactive applications. The Inventory Forecasting Module gives a quick and accurate snapshot of available inventory of advertisements, projected campaign delivery, schedules and progress. The Ad Catalog Module views, manages and stores thousands of banner ads, together with contacts and names of agencies and advertisers. The Reporting Module enables reports to be generated in real-time for general campaign delivery status and performance reviews. The Billing Module integrates easily with existing billing systems to facilitate a turnkey integration and to ensure minimal interruption to the existing operator architecture. The Sales Cycle Management Module helps operator media sales representatives to view inventory, enter insertion orders, and speed the sales cycle. The Security Module establishes varying levels of security and access as well as specific permission rights for all users (advertisers/agencies, administrator operators, traffic & billing, advertisement sales, etc.) of the system.

A second tier is referred to herein as the Scheduling tier (**610**) and comprises a Head End Scheduler (HES) (**612**) and an ITV Content Delivery Server (**614**). The HES schedules banner advertisements to fill advertisement space/bandwidth available, ensuring required impressions are reached from the targeted applications while adhering to the campaign rules. The advertisement available information, information on the number of subscribers watching in a specific time frame, and sold advertising spots are all fed into the HES (**612**), which creates a high level delivery plan stored in the Advertise Database (**604**). When queried for what ads to display next, the Real Time Server of the iTV Content Delivery Server (**614**) reads the delivery plan on the Advertise Database and returns a list of advertisements for the application to display next. Advertisements are chosen based on constraints such as advertisement priority, advertisement weight, minimum advertisement display time, backfill Boolean, intra-spot-session frequency cap, intra-application-session frequency cap, industry exclusions, overall frequency cap, minimum rotation interval, advertisement spec, advertisement type, and advertisement target. An advertisement of higher priority will always be displayed before one with a lower priority, advertisement weight enable advertisements within the same priority level to be displayed based on a random number and a bias based on weight. As an example of advertisement weight, ad #4 has a weight of 0.9 and ad #5 has a weight of 0.1. Therefore, the Scheduler will order ad #4 ahead of #5 90% of the time; and order #5 ahead of #4 10% of the time.

Backfill Boolean identifies the advertisement as low value and only to be used when no other ads are in the queue. Frequency caps limit the number of advertisement displays. The intra-spot-session frequency cap limits the number of times an advertisement can be displayed within a particular spot. The intra-application-session frequency cap limits the number of times an advertisement can be displayed while the current application is running. The overall frequency cap

US 7,669,212 B2

**27**

limits the number of times an advertisement can be displayed across all applications and all launches of a particular application. Some applications have an industry type to keep certain ad types out. Industry exclusions enable, for example, a Domino's application to display auto advertisements, but not fast food advertisements. Minimum advertisement display time sets a minimum amount of time that an ad should be displayed. The minimum-rotation-interval sets a minimum of ads that must be displayed before this ad is eligible for redisplay within the same spot. Advertisement Spec and Advertisement Type match compatibility of the advertisement with the size and the format (MPEG, jpeg, etc.) of the application. Advertisement Target matches, for example, demographics of the advertisement.

A third tier is referred to herein as the Broadcast tier (**620**) and comprises an Advertisement Insertion Engine (**622**). The Advertisement Insertion Engine requests advertisements, for example, banner ads from the iTV Content Delivery Server (**614**) and inserts advertisements into a broadcast stream of advertisement-enabled applications. The advertisement can be any form such as video or audio insert into or replace any currently displayed image or active audio track. An advertisement is sent from the Ad Insertion Engine (**622**) to the Carousel Manager, and the advertisement is then broadcast by necessary medium (satellite, transmitter, cable, etc.) to be received by the client, e.g. a set top box. The advertisement is then displayed and viewed by the client. Advertisements are requested regularly to provide rotation at the required frequency. The advertisement delivery component is independent from the advertisement server component to enable flexible migration to a future HTML-compliant ad delivery module.

We now describe the data flow of an advertisement cycle. At the Management tier, a sales agent uses the advertisement operations section web interface to enter information on the advertisement, target application, date range, and the number of desired impressions. Each targeting attempt triggers the Head End Scheduler (**612**) to run a quick simulation of available space versus requested impressions to see if the required impression can be fulfilled. Upon success, a set of campaign related records are created in the reserved state until business agreements are verified, at which point the status is changed to active. The attachment file is uploaded from the advertiser operator's personal computer to the content server. Scheduler runs periodically and assigns priorities and weights to advertisements. The Scheduler implements a set of highly optimized and extremely complex scheduling algorithms to ensure the best possible attempt at ensuring accurate and smooth delivery of advertising campaigns. A delivery plan is written for each advertisement. The advertisement insertion engine sends an XML-coded ad group request via HTTP to the Content Delivery Server (**614**) when it is time to rotate an advertisement group. The advertisement insertion engine uses the ad meta data in the ad group response to get the ads from the content server and then reformats them for inclusion into the flow file of the application. When the Content Delivery Server includes an ad in an ad group response for a specific available, it writes a record into the database indicating an advertisement broadcast.

A positive response to the banner advertisement or at the user's request might trigger a partial or whole replacement of the currently executing image/audio data, for a "commercial". Ad Gadget enables insertion of imagery and audio data currently being displayed and/or heard at a client device. A fourth tier is referred to herein as the Client Tier (**630**) and comprises an Ad Gadget Kit (**634**), Target (**636**), and Measure (**638**). Advertisements are sent to Target, which selects adver-

**28**

tisements that match a viewer profile residing on the client STB. Selected advertisements are transferred to the Ad Gadget Kit, and displayed to the viewer. The Ad Gadget Kit enables applications to display a rotation of advertisements with click-through capabilities. The viewer may interact with the advertisement by clicking on an item in the advertisement. Measure (**638**) samples viewer activity for items of interest to advertisers, i.e. click-through rate (the rate a viewer proactively responds to an advertisement impression), purchase rate, and impression counting, which assess the effectiveness of advertising. As shown in FIG. **6**, results of Measure (**638**) are sent to the Advertisement Database (**604**).

The architecture of the Measure is shown in FIG. **7**. On the client side, Measure (**706**) runs on a client device, e.g. set top box, and compiles data from the Log File Collector Gadgets (**704**). The Log File Collector Gadgets collects raw zap data (what channels are being tuned in) and log data (what has been purchased). Data can be sampled in a sample model, where the STB chooses to record over a given time period, or on an absolute model. The log file can be pre-processed on the STB, but most of the processing is done on a server. Locally, data of the activity log is stored in a flash file system. Stored details are preferably compressed to reduce flash storage requirement. Different logging models have different flash file requirements. A forward library resides on the STB and is used as inclusion in a resident application to cause forwarding of activity log to the server. Forwarding comprises random elements to spread forwarding within a time window. Information is sent from the Measure function on the STB to the Service Gateway (**708**), which passes the data to a TV Measurement Server (**710**) on the Head End tier.

On the server side, activity logs are collected by an application server and stored in a database. Activity logs are stored in an uncompressed form to enable easy analysis and manipulation. An API to the database enables access to activity logs by third party systems (**714**), i.e. TV measurement firms. A range of basic reports provides analysis of the activity logs, taking into account the sample used and providing interpolated results. The percentage of STBs sampled can be as small as 1% and suitably represent the entire population. In a preferred embodiment of the invention, data is collected anonymously from the STBs. As another option, Measure and Profile are both deployed, enabling a household profile to be reported with the activity log. In a preferred embodiment, the methodology of processing and analysis of the log file is that used by TV measurement firms (e.g., Nielsen). Other process and analysis methods can be used. Processing occurs on the server in order to provide continuous TV ratings on TV programming and interactive applications. Continuously tracked data shows daily television viewership by television set, enabling clearer analysis of ratings for broadcast and cable television programs and interactive applications usage. Individual client response is stored in profile on the set-top box, and general populace viewing habits are stored at the Head End Server. A preferred embodiment of the invention uses commercial software from Predictive Networks.

FIG. **8** shows an architectural diagram of the Target. The Target is an STB-based software, the intent of which is to profile and target client viewers with advertisement. The Target operates across the Head End tier, the Broadcast tier, and the Client Tier. On the Head End, advertisements are categorized via a set of class schemes. TV and entertainment industry supply meta-data, as do local channels, EPG, and interactive applications. On the Broadcasting Tier, a 'universal' description of the advertisements is placed in the profile of the data.

US 7,669,212 B2

29

Client Tier as shown in FIG. **8**, provides a small resident profile (Target Profile) in the STB that acts as a filter for all incoming targeted ads or T-commerce initiatives arriving at the STB. The Client Tier comprises a Log File Collector Gadget (**801**) for activity capture and profile update, and a Gadget for real-time profiling (**803**), as well as the Target Profile (**805**). The nature of the resident profile depends on the technology used. In a preferred embodiment, using software from Predictive Networks, the profile is made up of approximately 140 variables. The Log File Collector Gadgets (**801**), residing on the client device, captures zap data (what channel is being tuned in) and log data (what has been purchased). The Collector Gadgets is used in common with the Measure (**638**) and the Target (**636**). A core-profiling algorithm (**803**) enables updating the Target Profile (**805**) according to Log File results in real time using the collected data. Profile resides entirely on the STB and filters incoming targeted advertisements or T-commerce initiatives. Having a profile reside on the local STB controls access to the profile. When a request for an advertisement is made, advertisement are selected from the broadcast stream according to matches between the Target profile and the 'universal' profile of the advertisement.

Turning now to FIG. **10**, the SPS comprises distributed method enabling an administrator to track the integrity and connectivity of one or more SPS systems, and data streams from external servers, timeliness of file data, etc. FIG. **10** shows a typical connection between external servers, SPS servers, broadcast equipment, and clients.

Service Providers **1001**, with services such as Commerce 2K, FetchMail, FTP services, etc. connect through a firewall to the Internet. External Service Providers shown as **1003**, include such services as AccuWeather, CableSoft, GIST, Reuters Etc. These services provide multiplexed files, data, and Instant Messenger services to the SPS and are also available via the Internet. Information from these Service Providers are sent to the Server Equipment **1005**, which also interacts with clients via the broadcast equipment **1007**.

The SPS works as a distributed computer system over several different tier levels and does not require a central database. Every service (e.g. Reuters) is responsible for its own status, schedule initialization files, configuration files, etc. Monitoring systems connect at the SPS service providers (**1011**), at the owner broadcast equipment (**1015**), and at the broadcast stream tier (**1017**). The outlined SPS alerts the NO when there is a hardware failure, when there is a data service failure (ftp/http/email, etc.), when a back channel has failed, when a scheduled data update fails, or when a scheduled MUX update fails. A monitor connected to the external servers can monitor those files resident on the system, such as Accu-Weather, Reuters, FetchMail, etc. The For broadcast services, SPM monitors items sent to the clients, such as weather, news, streams, as well as the Service Gateway and local applications such as Merger and FTP agents.

SPM monitors all the SPS streams. If any broadcast equipment fails, this monitor will flag it as a non-compliant or missing stream. The SPS also checks services to ensure that they are running. Also, the SPS checks the validity and timeliness of data, especially important with data that is transient. For example, stock prices would update every 15 minutes, while weather updates at least daily. If not, an error is generated.

The SPS enables monitoring from any terminal connected to the system. The SPM comprise other features such as a continuous monitoring of services, SNMP, audible alerts, pager alerts, email alerts, plug-in monitoring agents (e.g.,

30

SGW), remote access via browsers, summary screen and detailed maps of the network, and monitoring of servers and services.

A typical software console is shown in FIG. **11**. Software comprises a Network Monitor page, which is optionally viewable from Summary view, Top view, and Log view. The administrator can choose to monitor Application Servers, the Broadcast Head End, and Data Providers, monitoring for integrity, timeliness and status of the files.

The present invention provides a large range of quality services has been demonstrated to increase subscriber satisfaction, reduce churn and increase revenue per subscriber. Such positive results can be only be achieved, however, if the subscriber can access these ITV services reliably, 24 hours a day, 365 days per year. Monitoring the integrity of ITV services has different requirements from the monitoring of traditional television transmission. Thus, in order to monitor the integrity of ITV services and efficiently diagnose problems, the entire chain of production and distribution of the ITV content must be monitored. This chain of production and distribution includes data collection points, where external databases (e.g. weather, news, stock) are accessed on a periodic basis, service assembly points, where data (e.g. weather data) is merged with templates (weather navigation pages) to create the final service, broadcast points, where the services are injected into the HFC network and on-line servers, where orders (e.g. Pizza) are collected and personal data (e.g. email) is delivered to individual users.

All components of the production and distribution chain are monitored by Service Platform Monitoring equipment that when dispatched sends alarms to the relevant parties, including third party service providers (e.g. weather), OpenTV (e.g. games) or the network operator (e.g. multiplexers). SNMP is used wherever possible, but preferably not by itself. Public Interface monitoring is used whenever SNMP is not available and in tandem with SNMP when it is. The Public Interface monitoring that is employed is all TCP/IP based. Known services administer known ports (example FTP: port **21**) and regular test transactions on these ports provide a method for determining that the associated service is still up-and running.

This type of monitoring is very useful when one has dependencies of external service providers; in this situation it is most likely that SNMP monitoring will simply not be available. Public Interface monitoring is also useful in conjunction with SNMP for ensuring integrity of connectivity and detection of catastrophic events—when Traps simply do not get raised. SNMP MIBS are also regularly interrogated for minimum system requirements, for example disk space on Staging Areas.

The ETR290 Live Stream Analyzer is preferably used to ensure that all Portal Streams which are expected to be broadcast are present and being broadcast at the acceptable quality. Once the application streams have left the Broad Cast servers there are still many things that can go wrong in the Multiple System Operator's or Network Operator's equipment. With no monitoring access to that equipment the ETR290 Analyzer is the last monitoring gate detecting all potential software, hardware, configuration and multiplexing problems.

The Return Path or back Channel is essential in the infrastructure to the Portal and the artery for revenue models. Thus the failure of the Return Path infrastructure can severely impact the portal's integrity. To monitor this a COM object Pings ranges of STB in viewers homes on a regular basis. Multiple sets of ranges ensure coverage of the hierarchical cable infrastructure.

US 7,669,212 B2

**31**

A more subtle but equally important dependency for the Portal is its data sources and TV applications. If the application's data, or the application itself, is required to be updated at regular intervals, then the failure to do this will impact the Portal's integrity. A piece of data is associated with a Data Schedule. The Data Schedule as shown in FIG. **13**, dictates the 'Shelf-Life' of a piece data according to periods of time. Thus at any point in time a piece of data has an associated shelf life, that changes according to the time of day, day of week, week of year. Therefore, the integrity of data is no longer just dependent on it adhering to a predefined syntax. A piece of data, or service, losses integrity if it exceeds its current shelf life. Data integrity has a new temporal component to compliment the existing syntactic component.

To monitor these dependencies the present invention provides an SNMP enabled schedule monitor (Schedule Integrity Monitor). Any form of data or application file has one or more associated schedules that the application or data must adhere to. Failure to be updated/refreshed according to the schedules raises SNMP traps to the monitoring equipment. Data failures are treated as seriously as application failures, as both impact the integrity of the Portal and consequently viewer usage. All monitoring information and reporting is accessed through Web interfaces. This allows for the most flexible access to the data. With minimal extra cost monitoring stations can installed literally anywhere in the world.

Network Monitor page is shown in FIG. **12**. Column headings indicate items of interest, such as name of service, type of services, number of polls, percent responded, percent missed, down-time, period, number of alerts, average decay, maximum delay, and minimum delay. As an example, the CD Merger service of HMB_News indicates having been polled 9 times; with 77.78% received responses and 22.22% missed responses. The down time is 0 seconds and there are no known alerts. The average delay is 246 msec, with a minimum delay of 0 msec, and a maximum delay of 1046 msec. Clicking with a mouse on the HMB_News link enables the administrator to view a screen for the service types exclusive to HMB_News.

Portal Platform Administration enables an administrator to change the types of services that are monitored. Names of Services, as well as their status, are detailed in a table shown on a page entitled Server Details. Clicking on a checkbox associated with a service selects the service for administering. The administrator also has the ability to add a host, remove a host, obtain an event report, obtain a statistics report, observe settings, reset counters, or choose from among other tools of the system.

At a given rate, the monitor checks the status of external servers by sending a test through a TCP/IP port and obtaining a response. If there is no response, then the administrator is alerted to a possible break in communication lines.

The administrator can maintain and monitor data integrity by setting alarms in case a file (data file, MUX file, configuration file, executable file) becomes older than a specified time. For example, a currently used AccuWeather file must be updated every 15 minutes. Alarms can be set once for a file that is due only one time, or on a periodic basis for data that is time-sensitive, such as weather, horoscope, stock prices, etc. The administrator creates the desired alarm schedule.

The SPS further compiles a series of test results over a given time period into a report enabling a statistical analysis of the status of file updates. An advantage of such a report is that the administrator can be assured that a service provider is keeping up with terms of a given contract.

The front-end page is displayed to the administer through a display device. Such a device can be Internet Explorer on a PC or on a laptop, on a cell phone, PDA, or any other com-

**32**

patible device. The software can monitor across operating system platforms with one system operating in for example, Microsoft WindowsNT and another system operating on Unix.

By clicking on a service, the administrator can call up a Service Schedule Monitor page. A typical such page will display file name, moment of last update, status, and schedule. As an example, a file name is "accu_weather.dat", file status can be "Out of Date", or "Okay". A scheduling grid for this file comprises seven columns labeled on day per column and several rows representing blocks of time during the day. A number, labeled in minutes, found inside this grid indicates the frequency at which said file is updated. As an example, in a column labeled "Mon" and in a row labeled "9:00", a time listing of 120 minutes would indicate that the "accu_weather.dat" file is updated every two hours.

The present invention has been in an example of an iTV system, but may well be embodied in a distributed computer system. In another embodiment, the present invention comprises a computer-read medium, e.g., ROM, RAM, CDROM, flash, or any other memory now known or unknown, containing instructions that when executed cause the computer to implement the invention.

What is claimed is:

**1**. A method for managing an interactive television system comprising:

accessing a campaign rule at a server, wherein the campaign rule specifies which one or more advertisements of a plurality of advertisements are to be delivered to a target, said target comprising at least one client device;

selecting one or more advertisements at the server based on the campaign rule for delivery to the target;

sending the selected advertisement to the client device;

deciding in a business filter at the client device, whether to store the selected one or more advertisements on the client device

receiving a client device user response to the selected one or more advertisements at a rule generating component of the server, wherein the rule generating component is configured to;

apply one or more rules to the user response to predict further user interests; and

generate a new campaign rule based on the predicted further user interests;

based on the new campaign rule, the server selecting a new advertisement to be delivered to the target; and

the server triggering a delivery manager to deliver the new advertisement to the target.

**2**. The method of claim **1**, further comprising:

measuring client device user responses to the selected one or more advertisements;

storing in a user information database user profile information based on the client device user responses; and

using the user profile information to predict further user interests.

**3**. The method of claim **1**, further comprising:

selecting the one or more advertisements based on the number of client device users watching.

**4**. The method of claim **1**, further comprising:

selecting the one or more advertisements at the server based on a specified time frame.

**5**. The method of claim **1**, further comprising:

accessing a delivery plan to obtain a list of advertisements to send next.

**6**. The method of claim **1**, further comprising:

selecting the one or more advertisements based on at least one of advertisement priority, weight, minimum display

US 7,669,212 B2

33

time, back fill Boolean, intra-spot-session frequency cap, intra-application frequency cap, industry exclusion, overall frequency cap, and minimum rotation interval.

**7**. The method of claim **1**, further comprising:

determining the target based on user profile, type of service and context.

**8**. The method of claim **2**, further comprising:

generating the campaign rule based on associating a specified advertisement with a specified service.

**9**. The method of claim **2**, further comprising:

generating a report based on the user response.

**10**. The method of claim **2**, further comprising:

building a product catalog for presentation to the target based on the user response.

**11**. The method of claim **1** further comprising:

sending a business filter to at least one client device.

**12**. The method of claim **2**, further comprising:

measuring the user response in a client device gadget.

**13**. The method of claim **2**, further comprising:

processing at the server, the user response to generate at least one of a new campaign rule, a new campaign and a new product catalog.

**14**. The method of claim **2**, further comprising:

measuring click through rate, purchase rate and impressions.

**15**. The method of claim **1**, further comprising:

sending the one or more advertisements to a client device gadget for rendering.

**16**. The method of claim **1**, further comprising:

simulating a target attempt to determine if an advertising campaign can be fulfilled before sending the one or more advertisements.

**17**. The method of claim **1**, the one or more advertisements further comprising at least one of a video, imagery and audio data.

**18**. The method of claim **1**, the one or more advertisements further comprising at least one of an entertainment program and an interactive game.

**19**. The method of claim **1**, the one or more advertisements further comprising audio data.

**20**. The method of claim **1**, further comprising selecting the advertisement based on requested impressions.

**21**. The method of claim **1**, further comprising using a mixture of the one or more rules and statistics of measurements of a plurality of client device user responses to predict further user interests.

**22**. The method of claim **6**, wherein said selecting is further based at least in part on advertisement type and target type.

**23**. A computer readable medium containing instructions that when executed by a computer cause the computer to:

access a campaign rule at a server, wherein the campaign rule specifies which one or more advertisements of a plurality of advertisements are to be delivered to a target, said target comprising at least one client device

select one or more advertisements at the server based on the campaign rule for delivery to the target;

send the selected advertisement to the client device;

decide in a business filter at the client device, whether to store the selected advertisement on the client device;

receive a client device user response to the selected one or more advertisement at a rule generating component of the server, wherein the rule generating component is configured to:

apply one or more rules to the user response to predict further user interests; and

generate a new campaign rule based on the predicted further user interests; based on the new campaign rule

34

cause the server to select a new advertisement to be delivered to the target; and

cause the server to trigger a delivery manager to deliver the new advertisement to the target.

**24**. The medium of claim **23**, further comprising instructions that cause the computer to:

measure client device user responses to the one or more advertisement;

build a new campaign rule based on the client device user response;

select an advertisement based on the new campaign rule and

send the advertisement based on the new campaign rule to the target

store in a user information database, user profile information based on the client device user responses; and

use the user profile information to predict further user interests.

**25**. The medium of claim **23**, further comprising instructions that cause the computer to:

select the one or more advertisements based on requested impressions.

**26**. The medium of claim **23**, further comprising instructions that cause the computer to:

select the one or more advertisements based on the number of client device users watching.

**27**. The medium of claim **23**, further comprising instructions that cause the computer to:

select the one or more advertisements at the server based on a specified time frame.

**28**. The medium of claim **23**, further comprising instructions that cause the computer to:

access a delivery plan to obtain a list of advertisements to send next.

**29**. The medium of claim **23**, further comprising instructions that cause the computer to:

select the one or more advertisements based on at least one of advertisement priority, weight, minimum display time, back fill Boolean, intra-spot-session frequency cap, intra-application frequency cap, industry exclusion, overall frequency cap, and minimum rotation interval.

**30**. The medium of claim **23**, further comprising instructions that cause the computer to:

determine the target based on user profile, type of service and context.

**31**. The medium of claim **24**, further comprising instructions that cause the computer to:

generate the campaign rule based on associating a specified advertisement with a specified service.

**32**. The medium of claim **24**, further comprising instructions that cause the computer to:

generate a report based on the user response.

**33**. The medium of claim **24**, further comprising instructions that cause the computer to:

build a product catalog for presentation to the target based on the user response.

**34**. The medium of claim **23**, further comprising instructions that cause the computer to:

sending a business filter to at least one client device.

**35**. The medium of claim **24**, further comprising instructions that cause the computer to:

measuring the user response in a client device gadget.

**36**. The medium of claim **24**, further comprising instructions that cause the computer to:

process at the server, the user response to generate at least one of a new campaign rule, a new campaign and a new product catalog.

US 7,669,212 B2

35

**37**. The medium of claim **24**, further comprising instructions that cause the computer to:

measure click through rate, purchase rate and impressions.

**38**. The medium of claim **23**, further comprising instructions that cause the computer to:

send the one or more advertisements to a client device gadget for rendering.

**39**. The medium of claim **23**, further comprising instructions that cause the computer to:

simulate a target attempt to determine if an advertising campaign can be fulfilled before sending the one or more advertisements.

**40**. The medium of claim **23**, the one or more advertisements further comprising at least one of a video, imagery and audio data.

**41**. The medium of claim **23**, the one or more advertisements further comprising at least one of an entertainment program and an interactive game.

**42**. The medium of claim **23**, the one or more advertisements further comprising audio data.

**43**. The medium of claim **23**, further comprising instructions that cause the computer to use a mixture of the one or more rules and statistics of measurements of a plurality of client device user responses to predict further user interests.

**44**. A service platform for use in an interactive television system, the service platform comprising:

an advertising manager; and

a delivery manager;

wherein the advertising manager is configured to:

access a campaign rule, wherein the campaign rule specifies which one or more advertisements of a plurality of advertisements are to be delivered to a target, said target comprising at least one client device;

based on the campaign rule, select one or more advertisements for delivery to the target;

send the selected one or more advertisements to the delivery manager for delivery to the client device;

apply one or more rules to a client device user response to the selected one or more advertisements to predict further user interests;

generate a new campaign rule based on the predicted further user interests;

based on the new campaign rule, select a new advertisement to be delivered to the target; and

trigger the delivery manager to include the new advertisement in the one or more advertisements for delivery to the target.

**45**. The service platform of claim **44**, further comprising a viewer manager, wherein the viewer manager is configured to:

measure client device user responses to the selected one or more advertisements; and

store in a user information database, user profile information based on the client device user responses; and

wherein the advertising manager is further configured to:

retrieve user profile information from the user information database; and

use the retrieved user profile information to predict further user interests.

**46**. The service platform of claim **44**, wherein the advertising manager is further configured to use a mixture of the one or more rules and statistics of measurements of a plurality of client device user responses to predict further user interests.

36

**47**. The service platform of claim **44**, wherein the advertising manager is further configured to select the one or more advertisements based on the number of client device users watching.

**48**. The service platform of claim **44**, wherein the advertising manager is further configured to select the advertisement based on a specified time frame.

**49**. The service platform of claim **44**, wherein the advertising manager is further configured to access a delivery plan to obtain a list of advertisements to send next.

**50**. The service platform of claim **44**, wherein the advertising manager is further configured to select the advertisement based on at least one of advertisement priority, weight, minimum display time, back fill Boolean, intra-spot-session frequency cap, intra-application frequency cap, industry exclusion, overall frequency cap, and minimum rotation interval.

**51**. The service platform of claim **44**, wherein the advertising manager is further configured to determine the target based on user profile, type of service and context.

**52**. The service platform of claim **44**, wherein the advertising manager is further configured to generate the campaign rule based on associating a specified advertisement with a specified service.

**53**. The service platform of claim **44**, wherein the viewer manager is further configured to generate a report based on the user response.

**54**. The service platform of claim **44**, wherein the delivery manager is further configured to building a product catalog for presentation to the target based on the user response.

**55**. The service platform of claim **44**, wherein the service platform is further configured to send a business filter to at least one client device.

**56**. The service platform of claim **44**, wherein the client device is configured to measure the user response in a client device gadget.

**57**. The service platform of claim **44**, wherein the advertising manager is further configured to process the user response to generate at least one of a new campaign rule, a new campaign, and a new product catalog.

**58**. The service platform of claim **44**, wherein the viewer manager is further configured to measure click through rate, purchase rate, and impressions.

**59**. The service platform of claim **44**, wherein the delivery manager is further configured to send the advertisement to a client device gadget for rendering.

**60**. The service platform of claim **44**, wherein the advertising manager is further configured to simulate an attempt by a target to determine if an advertising campaign can be fulfilled before triggering the delivery manager.

**61**. The service platform of claim **44**, at least one of the one or more advertisements further comprising at least one of a video, imagery, and audio data.

**62**. The service platform of claim **44**, at least one of the one or more advertisements further comprising at least one of an entertainment program and an interactive game.

**63**. The service platform of claim **44**, at least one of the one or more advertisements further comprising audio data.

**64**. The service platform of claim of claim **44**, wherein the advertising manager is further configured to select the one or more advertisements based on requested impressions.

\* \* \* \* \*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.           : 7,669,212 B2                                                    Page 1 of  1
APPLICATION NO.  : 10/061136
DATED                   : February 23, 2010
INVENTOR(S)       : Alao et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

**In the Claims:**

Claim 1, col. 32, line 36, please insert --;-- after "device".

Claim 2, col. 32, line 52, please insert --,-- after "database" before "user".

Claim 23, col. 33, line 54, please insert --;-- after "device".

Claim 23, col. 33, line 67, please insert --,-- after "rule".

Claim 24, col. 34, line 11, please insert --;-- after "rule".

Signed and Sealed this

Third Day of August, 2010

David J. Kappos
*Director of the United States Patent and Trademark Office*

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO.         : 7,669,212 B2                                    Page 1 of 1
APPLICATION NO. : 10/061136
DATED                  : February 23, 2010
INVENTOR(S)       : Alao et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the Title Page:

The first or sole Notice should read --

Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 2214 days.

Signed and Sealed this

Seventh Day of December, 2010

David J. Kappos
*Director of the United States Patent and Trademark Office*

# Exhibit D

Case 1:24-cv-01301-CFC   Document 1-1   Filed 11/27/24   Page 72 of 212 PageID #:
181

US007055169B2

(12) **United States Patent**
Delpuch et al.

(10) **Patent No.:**     **US 7,055,169 B2**
(45) **Date of Patent:**        **May 30, 2006**

(54) **SUPPORTING COMMON INTERACTIVE TELEVISION FUNCTIONALITY THROUGH PRESENTATION ENGINE SYNTAX**

(75) Inventors: **Alain Delpuch**, Les Essarts le Roi (FR); **James Whitledge**, Naperville, IL (US); **Jean-Rene Menand**, Los Altos, CA (US); **Emmanuel Barbier**, Paris (FR); **Kevin Hausman**, Naperville, IL (US); **Debra Hensgen**, Redwood City, CA (US); **Dongmin Su**, Santa Clara, CA (US)

(73) Assignee: **OpenTV, Inc.**, San Francisco, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 160 days.

(21) Appl. No.: **10/419,621**

(22) Filed: **Apr. 21, 2003**
(Under 37 CFR 1.47)

(65) **Prior Publication Data**

US 2004/0139480 A1      Jul. 15, 2004

**Related U.S. Application Data**

(60) Provisional application No. 60/373,883, filed on Apr. 19, 2002.

(51) **Int. Cl.**
*H04N 7/173*       (2006.01)
*H04N 7/16*        (2006.01)
(52) **U.S. Cl.** ........................ **725/100**; 725/91; 725/138; 725/139
(58) **Field of Classification Search** .................. 725/91, 725/100, 109, 112, 135, 139; 709/217, 223, 709/225, 226, 231; 710/48, 266
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,790,198 A      8/1998  Roop et al.
6,184,878 B1     2/2001  Alonso et al.

(Continued)

FOREIGN PATENT DOCUMENTS

EP        0 839 599 A2     4/1998

(Continued)

OTHER PUBLICATIONS

"CSS3 Module: The Box Model"; W3C Working Draft, Jul. 26, 2001; This version: http://www.w3.org/TR/2001/WD-css3-box-20010726; Latest version: http://www.w3.org/TR/css3-box; Editor: Bert Bos; Copyright © 2001 W3C® (MIT, INRIA, Keio); pp. 1-104.

*Primary Examiner*—Kieu-Oanh Bui
(74) *Attorney, Agent, or Firm*—Meyertons Hood Kivlin Kowert & Goetzel, P.C.; Rory D. Rankin

(57)        **ABSTRACT**

A method and mechanism for enabling the creation and/or control of interactive television content using declarative-like directives such as HTML, scripting languages, or other languages. A a centrally located proxy server is configured to receive, transcode and convey transcoded web based content to client devices. Upon detecting directives which indicate particular resources required for a presentation are prerequisites, the proxy server conveys signals to a client device that these particular resources are prerequisites. In response to receiving the conveyed signals, the client device may take actions to prefetch these resources. The client device is further configured to prohibit initiation of the presentation until the prerequisite resources are acquired.

**23 Claims, 5 Drawing Sheets**



**US 7,055,169 B2**

Page 2

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,188,401 | B1 | 2/2001 | Peyer |
| 6,345,307 | B1 | 2/2002 | Booth |
| 6,415,303 | B1 | 7/2002 | Meier et al. |
| 6,539,359 | B1 | 3/2003 | Ladd et al. |
| 2002/0010798 | A1* | 1/2002 | Ben-Shaul et al. ......... 709/247 |
| 2002/0088011 | A1* | 7/2002 | Lamkin et al. ............. 725/142 |
| 2002/0194219 | A1* | 12/2002 | Bradley et al. ............. 707/506 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| GB | 2 332 803 | 6/1999 |
| WO | WO 02/17639 A2 | 2/2002 |

* cited by examiner



FIG. 1



FIG. 2



FIG. 3

U.S. Patent          May 30, 2006          Sheet 4 of 5          US 7,055,169 B2



FIG. 4

**U.S. Patent**      May 30, 2006      Sheet 5 of 5      US 7,055,169 B2



FIG. 5

US 7,055,169 B2

**1**

## SUPPORTING COMMON INTERACTIVE TELEVISION FUNCTIONALITY THROUGH PRESENTATION ENGINE SYNTAX

Priority of provisional application No. 60/373,883, filed on Apr. 19, 2002 is claimed under 35 U.S.C. §§ 119(a)–(e)

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The invention relates generally to interactive television systems and more particularly to a system and method for creating and controlling interactive television content.

2. Description of Related Art

Interactive television systems provide a means to deliver interactive content as well as ordinary television audio and video to a large number of subscribers. Programs broadcast by these systems may incorporate television audio and video, still images, text, interactive graphics and applications, and many other components. They may also provide a number of services, such as commerce via the television, electronic program guides (EPGs), video-on-demand, and other interactive applications to viewers. The interactive content of the interactive television signal may therefore include application code, data associated with the audio and video, control signals, raw data and many other types of information. This information can be combined into a single signal or several signals for transmission to a receiver connected to the viewer's television or the provider can include only a subset of the information.

The interactive functionality of the television is generally controlled by an integrated receiver/decoder (IRD) or similar mechanism, frequently incorporated into a set-top box, connected to the television. The IRD receives the signal provided by a broadcast service provider or system operator and separates the interactive portion from the audio-video portion. The IRD uses the interactive information to, for example, execute an application while the audio-video information is transmitted to the television. The IRD may combine the audio-video information with interactive graphics or audio generated by the interactive application prior to transmitting the information to the television.

Interactive content such as application code or information relating to television programs may be broadcast in a cyclical or repeating format. The pieces of information which are broadcast in this manner form what may be referred to as a "carousel." A carousel may include multiple modules of data, including a directory module which indicates the particular modules which correspond to a given application. Frequently, a single carousel is transported as a contiguous data stream. However, it is also possible to multiplex two or more carousels in a single data stream. As an alternative to using a carousel format, some systems may utilize a return path to request and/or receive interactive content.

Broadcast systems may transmit information in a carousel format in order to allow receivers in the system to selectively obtain particular pieces of information in the carousel without requiring a return path from the receivers to the server. If a particular receiver needs a particular piece of information, it can simply wait until the next time that piece of information is broadcast, and then extract the information from the broadcast data stream. By employing carousels to broadcast information, the system may eliminate the need to connect each of the receivers with a server and further eliminate the need for the server to process individual requests for information.

**2**

The pieces of information, or data objects, in a carousel may be intended to be combined in a single object data stream to form a program. This program may also contain streaming data such as audio or video. For example, an interactive television game show may combine television audio and video with interactive content such as application code which allows users to answer questions. Another example would be a news program which combines audio and video with application code that inserts current stock prices in a banner at the bottom of the screen. Typically, each program is associated with a corresponding channel and, when a channel containing a particular program is selected by the interactive television receiver, the data which is being broadcast on that channel is downloaded and the program is started.

As television receivers become more sophisticated, and include the ability to access a wider range of data and resources, efforts have been made to develop mechanisms to handle these additional resources. For example, the DVB MHP 1.1 specification and DAVIC 1.4.1 Part 9 specification define a URL scheme to access broadcast services. Since DAVIC broadcast networks carry Service Information (SI) that contains globally unique parameters for locating the services in a broadcast network, their URL scheme is able to address services in a physical network independent manner.

Unfortunately, such schemes may not work on ATSC networks or other networks that define different or even proprietary signaling formats. Therefore, a new more flexible scheme is desired.

### SUMMARY OF THE INVENTION

A method and mechanism are described which enable content authors to use directives, such as HTML, scripting languages, or other languages, with television extensions to create and/or control interactive television content. The method and mechanism may be utilized with digitally recorded programs as well as with live broadcasts.

In one embodiment, a device in an interactive television system is configured to receive one or more directives provided by a content author which describe or otherwise indicate an audio and/or video presentation. Included among these directives are one or more directives which indicate that a particular subset of resources required for the presentation are deemed prerequisites. In response to detecting these directives, the providing of the presentation is withheld until the prerequisite resources are obtained.

In one embodiment, the directives are received by a centrally located proxy server which may be configured to receive, transcode and convey transcoded web based content to client devices. Upon detecting directives which indicate prerequisite resources for a presentation, the proxy server separately conveys to the client devices signals, or some other indication, that these resources are prerequisites. In response, the client device receiving the conveyed signals may take actions to prefetch these resources.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a diagram of one embodiment of a broadcast television system.

FIG. **2** is a diagram of one embodiment of a headend.

FIG. **3** is a block diagram of one embodiment of a client device.

FIG. **4** is a diagram of one embodiment of a television system.

US 7,055,169 B2

**3**

FIG. **5** illustrates one embodiment of a method utilizing prerequisite directives.

DETAILED DESCRIPTION

0. System Overview

Referring to FIG. **1**, one embodiment of a television system **100** is shown. In the embodiment shown, receiving devices **30** are coupled to several sources of programming and/or interactive content. Each of receiving devices **30** may comprise any suitable device, such as a set-top box (STB), a television (TV), a video cassette recorder (VCR), a digital video recorder (DVR), a personal digital assistant (PDA), a personal computer (PC), a video game console, or a mobile/cell phone.

Included in the embodiment of FIG. **1** is a broadcast station **16** coupled to receiver(s) **30** via a transmission medium **17** and back channel **26**. In addition, receiver(s) **30** are coupled to a source **18** and source **19** via a network **20**. Further, broadcast station **16** is coupled to a remote source **13**, and Internet **60**. In the embodiment shown, broadcast station **16** includes sources **14** and **15** and transmitter **22**. Transmission medium **17** may comprise a satellite based system **23**, a cable based system **24**, a terrestrial or multiple multi-point distribution service (MMDS) based system **25**, a combination of these systems, or some other suitable system of transmission.

In the embodiment of FIG. **1**, broadcast station **16** may include a variety of sources of content **14**, **15**, and **60** to be utilized and conveyed by transmitter **22**. Content sources **14** and **15** may include databases, application servers, other audio/video sources, or other data sources. In one embodiment, content may be created at a source **14** which may include an authoring station configured to create such content. An authoring station may include a computer workstation configured with software which aids in the development of interactive content. An authoring station may be part of broadcast station **16** in which case the conveyance of the created content may be through a local computing network, or similar configuration. Alternatively, an authoring station may be remotely located **13** from broadcast station **16**. In an embodiment where authoring station is not directly coupled to broadcast station **16**, the content created by a source **13** may be conveyed to broadcast station **16** via Internet, broadcast, cable, etc. In some cases, content created by at a remote location **13** may first be transferred to a storage medium, such as a CD-RW, DVD, or flash memory device, and transported to broadcast station **16** via more conventional means where it may be stored in a database or other storage device.

Subsequent to its creation, content from sources **13**, **14**, and **60** may be delivered to receiver(s) **30** through a broadcast transmission network. This network consists essentially of broadcast station **16** which assembles the content from sources **13**, **14**, **15** and **60** and processes the content as appropriate (e.g., digitizes, compresses, packetizes), and a transmission network **17** which receives the content **40** from broadcast station **16** and conveys it **42** to receiving device(s) **30**. In one embodiment, broadcast station **16** includes software and/or hardware which is configured to process the content conveyed by sources **13**, **14**, **15** and **60** as described above. A second delivery mechanism may include a direct point-to-point connection **138** between receiver(s) **30** and source **18** which may be some type of server. This connection **138** may be made via an ordinary telephone line, cable, wireless, or otherwise. A third delivery mechanism may also

**4**

be a point-to-point connection **136**, but transmission of the content from a source **19** to receiver(s) **30** is made via one or more shared networks (e.g., over the Internet).

FIG. **1** also illustrates broadcast station **16** may be optionally coupled to source **18** and/or source **19**. Such a coupling may enable broadcast station **16** to work cooperatively with source **18** or source **19** in conveying content to receiver(s) **30**. Also illustrated in FIG. **1** is a back channel (or return path) **26** by which receiver(s) **30** may convey to and/or receive data from broadcast station **16**. Back channel **26** may comprise a telephone line, cable, wireless, or other connection.

One delivery mechanism, the direct point-to-point connection to a source of content, may comprise communication via an ordinary telephone line. This type of connection is typically initiated by the receiver(s) **30** to convey information to, or retrieve information from, a data server. Another delivery mechanism, the point-to-point connection through one or more networks, may comprise a typical connection between nodes on the Internet. Because data may be routed through many different shared networks in this case, it may be read, stored and written many times as it is transmitted from source **19** to receiver(s) **30**. The third delivery mechanism may include a satellite, cable or terrestrial broadcast network **17**. Information may be transmitted from and to receiver(s) **30** both in real time or store and forward.

In one embodiment, broadcast station **16** further includes a proxy server **21** which is configured to transcode received content to a format compatible with one or more of client devices **30**. For example, proxy **21** may receive web based content including directives written in HTML, JavaScript™ (JavaScript is a trademark of Sun Microsystems, Inc), CSS, or other languages, and transcode the received content to a format compatible with clients **30**. In alternative embodiment, clients may be configured to directly process such directives. In such a case, proxy **21** may be configured to perform certain types of preprocessing of the content prior to conveyance to the clients.

Turning now to FIG. **2**, an overview of one embodiment of a broadcast station (head-end) **16** is shown. The broadcast station **16** of FIG. **2** includes an application server **250** and a database **230** which may contain previously created interactive content. Also shown in FIG. **2** is a source **13** of content (e.g., the Internet) which is external to broadcast station **16** and coupled to broadcast station **16**. Database **230**, server **250**, Internet **60**, and source **13** are coupled to a content processing mechanism **200** which is configured to process the content received and convey the processed content to a multiplexor **220**. In the exemplary embodiment of FIG. **2**, proxy server **21** includes server **250** and processing mechanism **200**.

In one embodiment, content processing mechanism **200** comprises a computer coupled to receive and convey content from source **13**, database **230**, or server **250**. Processing mechanism **200** is configured to convey the processed content to multiplexor **220**. Multiplexor is also coupled to receive audio/video signals **240**. Multiplexor **220** multiplexes the received signals and conveys the multiplexed signal to network communications operator **17** where it is subsequently conveyed to a receiving device. As noted above, proxy **21** may be configured to process received content prior to conveying the content to client devices. For example, proxy **21** may be configured to receive requests from clients for web based content, obtain the requested content, and transcode the received content to an alternate format prior to conveyance to the requesting client. Finally,

US 7,055,169 B2

5

in addition to the above, broadcast station **16** includes a return data processor **210** coupled to back channel **26**. In one embodiment, return data processor **210** may comprise a modem which receives data for further processing within broadcast station **16**.

While the above description describes a source of interactive content as being at a broadcast station **16**, in an alternative embodiment database **230** and content processing mechanism **200** may reside at the location of a network communications operator **17**. An example of such an alternative embodiment may be a cable station which inserts interactive content into a broadcast signal prior to transmission. Numerous such alternatives are possible and are contemplated.

Turning now to FIG. **3**, one embodiment of a receiving/ initiating device **1012**, hereinafter referred to as a "client" is shown. While FIG. **3** illustrates the client **1012** in the form of a set top box **1012**, client **1012** may comprise other devices as well. Generally speaking, client **1012** is configured to receive a first signal **1070**, such as a broadcast signal, and convey a second signal **1080**, such as to a display or recording device. While in the embodiment shown, client **1012** is shown coupled to an external mass storage device **1018**, such storage may be internal to the client **1012** itself. Client **1012** includes a control unit **1030**, front end **1026**, return channel **1038**, transport stage **1028**, and AV stage **1034**. Also represented in FIG. **3** is a memory **1080** which includes OS and/or middleware **1044**, message processing engine **1036**, and applications **1042**. Also shown is an I/O interface **1040** and conditional access (CA) module(s) **1032**. I/O interface **1040** may be configured to detect user interaction via a remote control, keyboard, or other device. Control unit **1030** may comprise a microprocessor, memory (e.g., RAM), and other components which are necessary to perform ordinary general purpose computing.

In one embodiment, applications **1042**, OS/middleware **1044**, CA module(s) **1032**, and message processing engine **1036** comprise code which may be stored in a memory device of set-top box **1012**. Additionally, CA module(s) **1032** may comprise system software configured to control access to particular programs or services which are accessible by set-top box **1012**. While message processing engine **1036** is shown as program code which may be stored in memory **1090** and executed by control unit **1030**, it is understood that other embodiments are possible and are contemplated. For example, message processing engine **1036** may comprise circuitry or a combination of hardware and software. For example, message processing engine **1036** may comprise a processing device executing program instructions. Further, message processing engine **1036** may be configured as an external device which may be coupled to a receiving unit. For example, such an external device may comprise an expansion module which is configured to add message processing functionality to a preexisting device.

Generally speaking, client **1012** is operable to receive and decompress signals which may include digital data. The decompressed signals may be converted into analog signals such as PAL, SECAM, or NTSC format signals for television display, or may be in digital format for use by a digital television display. As shown in FIG. **3**, client **1012** includes front end circuitry **1026** operable to receive audio, video, and other data from a received signal **1070**. The received signal **1070** is fed into the client **1012** at the front end **1026**, which may comprise an analog to digital (A/D) converter and tuner/demodulators (not shown). Front end **1026** may select and pass a particular frequency, demodulate it, and

6

convert analog signals to a digital format. While analog data may be converted to digital data, as noted above a received signal may comprise digital data which may require no such conversion. The digitized output may then be conveyed to a transport stage **1028** which further processes the data, conveying a portion of the data to an audio-visual (AV) stage **1034** for display and another portion to control processor **1030**. In addition, CA module **1032** may receive data from transport stage **1028** and may conditionally convey a descrambled or other signal to AV stage **1034**. Signaling and control information may also be included in the broadcast along with the audio-video data and may be manipulated by software within the client **1012**.

Audio-video signals and program control signals received by the client **1012** may include television programs, metadata, and menu selections accessible by a viewer through a user interface, as well as applications that may be executed. A viewer may control the client **1012** in a variety of ways, including through an infrared remote control unit, a control panel on the client, or a device that is used to choose from a menu displayed on the television screen. Selections and entries made by the viewer may be intended for one or more of several applications that are executing on the client. As mentioned above, broadcast signals **1070** are received via front end **1026** and are filtered by transport stage **1028**. Unicast or multicast signals may generally be received via return channel **1038**. Applications **1042** which execute on the client **1012** may arrive there in a variety of ways. For example, applications may be received via a broadcast signal **1070**, via the return channel resource interface **1038**, or via storage device **1018**. Applications received via storage device **1018** may have been shipped originally with the client **1012** or may have been downloaded previously from another source and stored on storage **1018**.

In one embodiment, client **1012** may be configured as a digital set top box for use with a satellite receiver or satellite integrated decoder/receiver that is capable of decoding MPEG video, audio, and data. For example, client **1012** may be configured to receive digital video channels that support broadband communications using Quadrature Amplitude Modulation (QAM), Quadrature Phase Shift Keying (QPSK), Coded Orthogonal Frequency Division Multiplexing (COFDM), or 8-vestigial side band (VSB), and to control channels for two-way signaling and messaging. The digital channels may carry compressed and encoded multiprogram MPEG (Motion Picture Expert Group) transport streams. Transport stage **1028** extracts the desired program from the transport stream and separates the audio, video, and data components, which are routed to devices that process the streams, such as one or more audio decoders, one or more video decoders, and optionally to RAM (or other form of memory) or a hard drive. It is to be understood that the client **1012** and storage device **1018** (as well as any data and signals from the broadcast service provider) may be configured to accommodate analog, digital, or both analog and digital data. For storage of received analog data, conversion to digital format may be performed.

Storage device **1018** is optionally coupled to the client **1012** and may be configured to store video, audio, executable code, metadata, and other data. Storage device **1018** may be internal to client **1012** or connected externally (e.g., through an IEEE 1394–1995 connection) with either a permanent connection or a removable connection. Further, storage device **1018** may comprise any suitable type of storage, such as a hard disk drive, a recordable DVD drive, magnetic tape, optical disk, magneto-optical disk, flash memory, or solid state memory. In addition, more than one

US 7,055,169 B2

**7**

storage device such as device **1018** may be attached to the client **1012**. The client **1012** and/or storage device **1018** may further be incorporated into a television set. Executable data, such as program instructions, which is stored within storage device **1018** may be retrieved and executed. In one embodiment, retrieved data may be executed or otherwise utilized in synchronization with other applications or received signals, for example corresponding to a game show, commercial, or Internet based on-line game. Alternatively, retrieved data may be executed or utilized independently, such as for video-on-demand, banking, e-mail, a web browser, or an electronic program guide (EPG).

It is to be understood that the client **1012** and system **100** described herein are intended to be exemplary only. Broadcast network system **100** and client **1012** may be different than described herein without departing from the scope of the invention. Further, various components depicted in the client **1012** of FIG. **3** may be combined, such as the placement of the integration of storage device **1018** within client **1012**. Numerous alternatives are possible and are contemplated.

1. Application Model and Life Cycle

Generally speaking, an interactive television application may start in either a maximized state or a minimized state, depending upon how it is authored. Signaling in the directory may indicate to the system whether the application is starting in the minimized state or the maximized state. From a system's perspective, the difference between the minimized state and the maximized state is that applications which are in the minimized state may not receive a notification when a viewer presses keys. Alternatively, when in a maximized state, applications may present a filter to the system that tells the system to notify them when keys designated in the filter are pressed. While not necessarily required, an application executing in a minimized state typically reduces its usage of resources. For example, it may present an icon on the screen rather than extended graphics.

In addition to the above, an application running in either a minimized state or a maximized state may be suspended. Upon suspension, an application is not generally notified, but rather no cpu time is allocated to the application. At the termination of the suspension, an application returns to the state it was in prior to suspension. In either case, the system may invoke a function in the application to notify that application that it had been suspended so that it may take any actions necessary to ensure internal consistency.

Applications may terminate normally or may be asked by the system to terminate, for example, if a new application appears in the broadcast stream. Because an application may be in a state where termination would be disruptive to the viewer, the application may deny a request to terminate immediately. For example, a viewer may be in the middle of an online transaction to purchase an advertised product. When an application does terminate, the system is notified so that it can determine, typically working together with the network-provided control task, which application to execute next.

Transitions between states may be responses to a variety of stimuli including broadcast signaling, viewer button presses, and decisions made by the system or the applications themselves. As noted above, the initial state of an application may be determined by broadcast signaling. A button press may be used to cause an application to move from the minimized state to the maximized state. The application itself may decide when to transition to the terminated state and when to transition to the minimized

**8**

state. The system may suspend an application in order to execute another application. Further, broadcast signaling can cause the system to request that an application exit.

While the life cycle defined above may represent a default life cycle, modifications to the life cycle may be provided by calls in a network provider control task. For example, one need not even load an application until the viewer responds with an appropriate button selection in response to the presentation of an icon. Further, the above life cycle may generally correspond to a model in which only a single application is executable at a time. However, in order to support multiple applications concurrently, the application model and life cycle definition may be more complex. For example, priorities may be signaled so that the implementation may determine which applications may execute in the event that the hardware is not capable of supporting all of the signaled applications simultaneously.

Applications developed for use in interactive television systems may generally include programming code similar to that of programming languages such as C, C++, etc. However, with the proliferation of the World Wide Web (Web), and the desire to take advantage of Web and Web like resources in interactive television systems, the use of other languages such as HTML and the Javascript™ (JS) language may be useful. However, while the use of HTML applications may be desired, the life cycle of HTML applications in an interactive television environment may be complicated by several factors.

First, HTML/JS content may be more dynamic than persistent. For example, in a current interactive television environment, an application may be configured to only execute code or use data that is packaged within the carousel in the same directory as the first program module. Hence, for security reasons the directory contents may clearly define the application boundary and the permissions signaled within the directory may be applied to the entire contents of the directory. However, HTML/JS content may refer to other content (e.g., via a link) that is to be acquired from some location other than the carousel and the content that is referred to may replace the initial content. It is not clear that it is safe in this case to apply the same security permissions to such replacing content. Therefore, due to this dynamic nature, it is more difficult to define an "application boundary."

Second, even when a product does not support multiple concurrent applications and restricts the application to only that content carried within the same directory in the carousel, there may be life cycle issues that affect the way that a content author designs the HTML/JS content. For example, if it is determined that the broadcaster can signal that an application may quit, it may be useful to invoke a handler written by the content author to respond to such an event. Similarly, there may be other states which might best be handled by an application-specific handler. For example, if the viewer is in the middle of a transaction involving an application, that application may wish to delay its termination until the transaction completes. Therefore, an application may be notified by the system when a broadcaster signals a new application available in the broadcast. In one embodiment, the application may be notified via an event, such as the O_exit event identified below. An application that determines that it does not want to exit immediately may extend its life by calling a defined event function such preventDefault( ).

US 7,055,169 B2

**9**                                                                                          **10**

```
O__exit
    Bubbles        : yes      -- (see DOM event model)
    Cancelable     : yes
    context info : the reason for exiting.
```

## 2. Tuning and Stream Selection

In one embodiment, two different ways for broadcast signal tuning and stream selection are provided. The first uses a markup language, such as HTML, and assumes that the content author has sufficient a priori knowledge as described below. The second uses a scripting language such as Javascript, does not assume the same a priori knowledge, and is generic enough to be applicable to stream selection from a local hard drive or VOD. Both make use of a new URL defined here known as the "broadcast:" URL. First, the URL which is used in both methods is described.

## URL which can be Used for Tuning and Stream Selection

In some broadcast environments, such as MPEG based environment, it may be possible to associate a globally (or at least network) unique identifier with a broadcast stream. Use of such a unique identifier within a URL scheme may allow the unique identification of resources within that stream. A syntax of a broadcast Url scheme is provided below. Generally speaking, this scheme may provide a general mechanism for identifying broadcast resources in a manner that is network independent and platform independent. This scheme may work with digitally recorded programs as well as with live broadcasts.

The following is a formal syntax, in BNF like grammar, for a "broadcast:" URL. In the following, note that rules are separated from definitions by an equal "=", "|" is used to designate alternatives, literals are quoted with " ", parentheses "(" and ")" are used to group elements, optional elements are enclosed in "[" and "]" brackets, and elements may be preceded with <n>* to designate n or more repetitions of the following element where n defaults to 0.

```
broadcast_url          = broadcast__scheme ":" [ broadcast__hier__part ]
broadcast_scheme       = "broadcast"
broadcast__hier__part  = broadcast__net__path | broadcast__abs__path
broadcast__net__path   = "//" service__address [ component__list ]
                         [ broadcast__abs__path ]
service__address       = channel__name | "current"
channel__name          = *( domainlabel "." ) toplabel
domainlabel            = alphanum | alphanum *( alphanum | "-" )
                         alphanum
toplabel               = alpha | alpha *( alphanum | "-" ) alphanum
alphanum               = (may be as defined in RFC 2396)
alpha                  = (may be as defined in RFC 2396)
component__list        = ";" component *( "," component )
component              = stream__selector
stream__selector       = stream__type "=" stream__id
stream__type           = "video" | "audio" | "data" | "subtitle" |
                         "teletext"
stream__id             = 1*alphanum | "default" | "current" | "none"
broadcast__abs__path   = "/" path__segments
path__segments         = (may be as defined in RFC 2396)
```

Given the above definition, one example of a summary of usage may be represented:

broadcast: {//<service_address>{; <component_list>}}

Where service_address is defined as follows:

```
service__address ::= channel__name|current
where:
channel__name specifies a DNS-style name that uniquely identifies the
channel.
current    specifies the service currently selected.
```

The component_list is a comma-separated list identifying specific components in the stream and may be defined as follows:

```
component__list    ::=    component *("," component)
component          ::=    stream__type "=" (track__tag|"default")|
stream__type       ::=    "video"|"audio"|...
```

A track_tag may be defined as an ASCII string of arbitrary length, typically between 1 and 4 bytes. A track_tag of "0" is equivalent to the default component of the specified stream type. For example, the URL "broadcast://tfl.fr; video=0, audio=eng" identifies the default video stream and the English audio stream on the channel named "tfl.fr".

## A/V MIME Types Associated with the Broadcast: Url

While the following discussion primarily describes the semantics associated with video and audio stream types, other stream types are permitted within the URL and are discussed in the section entitled "Obtaining Applications and Data" below. In either case, in one embodiment, the following events may be dispatched during a service selection.

| Stream Selection Events | |
|---|---|
| Click | The selection occurred as a result of a click event. Default action is to request the specified service. Note that this event is generally a user-input event. |
| Load | If the request succeeds, a load event will be dispatched. Normally such an event is dispatched after the URL is finished loading, but indefinite video and audio streams would never finish loading. Hence, it is appropriate to dispense this event once processing of the requested audio and video streams has been successfully initiated through all of the hardware involved in the processing pipe. |
| Error | If the request is denied or otherwise invalid an error event is dispatched. |
| Abort | If the user aborts the request before the load event is dispatched, an abort event is dispatched. |
| Unload | If the request replaces an existing target an unload event is dispatched. |

When no component list is specified, the MIME type corresponding to the broadcast: URL may be application/mpeg.service and this type may correspond to a service as defined an MPEG standard. Hence, such a MIME type would contain not only video, audio, and subtitles, but also the data that is multiplexed on the same service with them, e.g., html and/or other applications.

When a video component is specified, the MIME type corresponding to the broadcast: URL is video/mpeg. Similarly, when an audio component is specified, the MIME type corresponding to the broadcast: URL is audio/mpeg.

US 7,055,169 B2

**11**

As shown in the examples below, it is possible to refer to multiple elementary streams in a single URL. If the streams referred to include only a single video stream and a single audio stream which is synchronized with that video stream, then the resulting streams will be considered to be of type video/mpeg; otherwise, the type of the multiple streams will be type application/mpeg.service.

### EXAMPLES

This section explains the meaning of several example URLs, which, in some cases, if used as in the complete example shown in the next section, could result in tuning and/or stream selection.

Broadcast:
   Identifies the currently tuned service_address and component_list for the primary pipe (see JS Tuning and Stream Selection below). This usage is similar to "tv:" in the DASE specification and "dvb://current.av" in the MHP specification. So, for example, this may be used within an HTML element to re-size and re-locate the currently playing video.

broadcast://cnn.com
   Identifies the CNN TV channel and all of its component streams. This form of the URL can be used to request that the TV tuner switch channels. This URL in a service selection context causes the automatic selection of the default streams. That is, when used in a service selection context, the user-agent will (if the application is appropriately authorized) tune to the new channel and automatically select the default video stream, select the default audio stream (based on the preferred language), select the default sub-titles and teletext if identified in the user's current preferences, and select the default data carousel.

broadcast://cnn.com;audio=eng
   Identifies the CNN TV channel and explicitly selects only the English audio stream. Documents use this form of the URL to explicitly reference a specific elementary stream.

broadcast://current;audio=eng,video=current
   Selects the English audio stream on the current service. This URL allows the author to switch the current audio stream without explicitly knowing the current service address, and without changing the currently selected video stream.

2.1 HTML Tuning and Stream Selection
   When the content author has knowledge of the DNS name that corresponds to a given channel, they may use HTML to cause tuning to that channel. For example, the following HTML allows the HTML document to present a link, "my_link", which requests the tuner to select a new service.
      <A ID="my_link" HREF="broadcast://cnn.com">Click Me</A>

If the request is authorized and resolves to a valid channel_name, then the HTML document will be unloaded and replaced with a TV media handler playing the default video and audio streams associated with the cnn.com service.

   In one embodiment, HTML applications may permit the use of URLs that reference MPEG video or audio streams or MPEG-2 services as illustrated in the following HTML elements and CSS attributes. If use of the URLs result in component selection from the currently tuned service, only the Load, Error, or Abort events could occur.

**12**

|  | HTML element | | |
|---|---|---|---|
| Attribute | video/mpeg | audio/mpeg | application/mpeg.service |
| background-image | yes |  | yes |
| background-video | yes |  | yes |
| a.href | yes | yes | yes |
| img.src | yes | yes | yes |
| input.src | yes | yes | yes |
| object.data | yes | yes | yes |

In Addition, URLs may cause service selection when referenced via the location object in a scripting document object model as described below or when used as a parameter in a "goto" dialog.

2.2 JavaScript Tuning and Stream Selection
   A second way to enable signal tuning and stream selection utilizes a scripting language such as JavaScript to allow the content developer to explicitly control virtual pipes that exist between sources of audio and video (e.g., tuner, local hard drive) and their destinations (e.g., screen, local hard drive). This section describes how a JavaScript programmer can exert fine-grained control over not only which streams are chosen for display, but also which streams may be recorded onto a hard drive and the speed and direction with which recorded streams are displayed.

   An abstraction, known as a pipe, may be used used to embody the association between the source of a stream (e.g., a tuner or a file containing a recording on a hard drive) and the ultimate destination (e.g., the display or a file on the hard drive), including, for example, any resources that are required between the source and destination (e.g., Conditional Access hardware, I/O buffers).

   When receiver software boots up, a set (or array) of pipes may be defined. In one embodiment, this array of pipes represents all of the possible connections between stream sources and destinations that may be represented on a particular hardware platform. Other embodiments may represent fewer than all possible connections. Because these are abstractions, it is possible to have a defined pipe without having all of the hardware which is required by the pipe currently allocated to that particular pipe. A defined pipe where less than all of the hardware has been allocated to it is said to be in an "unrealized" state. A pipe is "realized" when all required hardware has been allocated to that pipe.

The programmer may use the defined pipes array to:
   select a pipe
   set the source of a pipe
   set the destination of a pipe if it is a file
   control the speed of a pipe, if the source is thus controllable, and also be able to set the location when such is possible
   select the components of a stream that will be sent to the destination
   add or remove event listeners
   and request that a new pipe be started for recording purposes.

In addition, the programmer may determine which pipe is being used for a given image by using the id which is associated with that image. For example, if there is an HTML snippet included that states
   <img id="foo"src="tv:cnn.com">

US 7,055,169 B2

**13**

then, the JS programmer may refer to foo.pipe and invoke any of the methods which are described below and may read/write the values in the attributes as permitted by the definition below.

The Pipes Collection and the Tvpipe Object

Object Model Reference:
    [window].navigator.tv.pipes[i]
    [window].navigator.tv.pipes.primary

The pipes array above is a collection of TvPipe objects as described below. The primary object is a reference to a pipe object that can be settable or gettable in javascript. The TvPipe object has the following properties, methods, and collections.

The TVPipe Object

| Properties: | | |
|---|---|---|
| name | String that identifies this pipe in the pipes[] array. (Read-only) | |
| src | URL corresponding to the current channel (read/write) | |
| | -- may correspond to either a file: or broadcast: url | |
| realized | "true" \| "false" (read-only) | |
| status | "connected" \| "connecting" \| "disconnected" \| "disconnecting" -- (read-only) | |
| destination | only if pipe is currently being used for recording (read/write) | |
| | -- url corresponding to file: | |
| type | "record" \| "display" (read-only) | |
| position | unsigned int (read/write) | |
| | -- # of ms into the event | |
| speed | int | (read/write) |
| | | -- 100 is normal speed |
| | | -- 0 is still |
| | | -- 500 is 5 times normal speed |
| | | -- −100 is normal speed, backwards |
| | | -- −500 is 5 times normal speed, backwards |
| | | -- 50 is half speed, forwards, etc. |
| event_info | name-value pairs about the current event (read-only) | |
| Collections: | | |
| Components[] | array of component objects (see TvComponent below) | |
| | indicating those which are currently selected | |
| Methods: | | |
| record(uri) | Starts the recording to the file named in the uri if sufficient resources exist. | |
| addEventListener( ) | | |
| removeEventListener( ) | | |
| dispatchEvent( ) | | |

The TvComponent Object

A TvComponent object represents a data stream which may be carrying video, audio, interactive data, subtitles, or other content types.

Object Model Reference:
    [window].navigator.tv.pipes[i].components[i]

| Properties: | |
|---|---|
| name | String that represents the name (i.e., the value of the track_tag) of the component (read-only) |
| selected | "true" \| "false" (read/write) |
| | -- boolean indicating that this component has been selected |
| type | "audio"\|"video"\|"data"\|"subtitles"\|"teletext" ... (read-only) |

3. Controlling the Display and Playing of Video, Graphics, and Audio in HTML/JS

    This section describes how graphics may be positioned and sized on top of video, how the video itself can be

**14**

positioned and sized, and how the audio can be controlled. Transparency between the graphics plane and the video plane, palette-based color, and the MPEG I-Frame are discussed here as well.

    In one embodiment, a receiver may be configured to support multiple graphics and video layers. In such an embodiment, there may be a bottommost layer that is used to display video and an interactive layer (OSD) on top of that which is used to display text and graphics. Rendering of video, both stills (e.g., I-frames) and in-motion video, may be supported by a hardware MPEG decoder.

    In addition to the above, an extension may support a layer on top of the OSD layer called the subtitle layer. A further extension may be used to support a multi-plane graphics layer. In one embodiment, this layer may lie logically between the bottommost layer and the interactive layer. This multi-plane graphics layer may be used to display still pictures such as JPEG, MPEG, or other images. Included below is a discussion of support for images in the multi-plane graphics layer.

3.1 Color and Transparency

    Various models exist for specifying how color information is represented. For example, a "color space" is a model for representing color in terms of intensity values. Examples of color spaces include RGB which is commonly used for computer displays, CMYK which is used for color printers, and YUV which is traditionally used for television.

    The number of bits used to define a pixel's color may be referred to as its bit-depth. True color, sometimes referred to as 24-bit color, is the specification of the color of a pixel on a display screen using a 24-bit value. By using 24-bits to specify color, up to 16,777,216 colors are possible. Display systems vary in their ability to support color. For example, some color display systems offer a 32-bit color mode. In a 32-bit color display system, the extra byte, called the alpha channel, may be used for control and special effects information.

US 7,055,169 B2

**15**

Because lower end set-top boxes may not have sufficient memory to support true color, palette-based models may be used. With a palette based model, the color of a pixel is represented by an index into a color palette. In such a model, content authors may define their own color palettes containing colors of their own choosing. The actual colors in a palette are typically represented as 48-bit numbers with the first three of those numbers representing the actual color and the fourth of the numbers representing the amount of transparency in the color.

In a system where there is sufficient memory to support true color, multiple applications can share the screen with little or no problem because the fixed color palette is large enough to accommodate the multiple different hues required by each application. However, in a system where the number of colors supportable is limited, if multiple applications sharing the screen declare their own color palette, the viewer experience can be disturbing.

Often devices where graphics overlay video (such as less expensive set-top boxes) have palettes with limited built-in transparency models. Two common models where transparency is limited include the following:

    a. Only a single non-opaque element in the palette is supported. For example, that element could be completely transparent, or it could be pink that is 50% transparent, etc. In either case all other elements must be opaque.

    b. A single element in the palette that can be an semi-transparent or completely transparent is supported. All other elements in the palette can be either completely opaque or have a particular, fixed amount of transparency. For example, a palette that can hold n colors could contain a single color that is 30% transparent, m (m>1) colors that are 50% transparent—in this case the remaining n−(m+1) colors must be either 50% transparent or completely opaque. In other words, there cannot be 3 non-opaque colors in a palette all having a different level of transparency.

In order to maximize the availability of the transparency values for the author's use, a system may be defined that allows an author to specify a region, including both its location and dimensions, within that they want to contain overlay graphics. Were the author not able to specify this region, they would have to "waste" (the) one transparent color by painting the area outside of the graphics region with the (sometimes only) transparent color available in the palette. (This also reduces the amount of space required to store the On-screen display graphics.) Subsequently, the an application may be configured to dynamically change its region (even when that application is transcoded prior to broadcasting).

Fixed-Variable Palette

In one embodiment, a combination fixed-variable palette may be used where the variable components are specified by the application. The first m of n colors may be chosen to be fixed with the 0th color being fully transparent. For example, in a 256 color palette where there are 8 bits available for color, the first 188 colors may be as specified in an existing or proposed standard, such as the DVB MHP color palette. The remaining 68 colors may be taken from colors specified by the color palette accompanying the image. In one embodiment, these 68 colors may be selected from the first 68 colors specified in the image palette. Therefore, an application content designer should ensure that the most important colors are placed first in the palette.

**16**

If it is necessary to support multiple applications, each of which brings its own color palette, then the system may choose to place into the palette a mixture of the first colors in each of the application/image specific palettes. Similarly, any time it is expected that multiple images will be sharing the screen, the author of those applications may get best results by using only the fixed colors in one of the images or the same palette for both of the images.

Transparency between the graphics and video plane may be important in interactive television, as the viewer often wants to be able to see the video that is running under the interactive text or images. In one embodiment, the Porter-Duff SRC composition rules may be used for composing graphics with each other. Generally, the underlying video is opaque, hence the video shows through the graphics when they are transparent. The Porter-Duff SRC rule is relatively easy to compute because the transparency of one object over the top of another chooses the alpha (transparency) value of the object on top as the transparency of the composed objects. While in some cases this result may appear somewhat un-natural looking, graphic artists are accustomed to planning their layout with this rule in mind.

Because it may be computationally complex to compute the resulting alpha value, set-top boxes may be permitted to approximate the SRC-Over rule using the SRC rule (unless the object on top is completely transparent, in which case, the pixel values for the transparent object should not be applied). In one embodiment, HTML applications may specify a particular default composition rule, such as SRC-Over. However, in those cases in which a set-top box does not have sufficient computational power to compute the SRC-Over composition, an approximation of the SRC-Over rule may be used (e.g., using the Porter-Duff SRC rule.)

3.1.1 The Clut Property

The palette format discussed below allows images whose colors are specified using an index into a palette to also specify per-pixel transparency values through the use of an alpha channel. However, for other images, backgrounds, etc., another method may be required for specifying the transparency. Therefore, new properties which allow the specification of these alpha values is described in the subsection below entitled "Alpha Properties."

An application author may specify that a particular palette (often referred to as a color lookup table or "clut" for short) may be useful in rendering objects in the body of an HTML page. This palette could be used in one of several ways. For example, in a vertical network the author may specify both a palette and the colors of objects using only that palette because they know that all receivers have similar color capabilities.

Alternatively, when the author expects that their application may be used in a network that includes receivers of varying capabilities, this palette may serve as a hint as to the best colors to use. In either case the author may specify a color palette by using the 'clut' property documented below.

| 'clut' | |
|---|---|
| Value | : <url>| none |
| Initial | : selected default |
| Applies to | : body |
| Inherited | : yes |
| Percentage Values | : N/A |
| Media type | : tv |

US 7,055,169 B2

**17**

The <url> value above may be used to identify the location of the actual palette. If no <url> value is specified, or there is no 'clut' property in the style sheet or inline, a default palette may be used.

In the table which follows, one embodiment of a palette format is presented. In one embodiment, the MIME type associated with a url that contains a palette in the format defined by the table below may be "application/clut," with an extension of ".clt". In addition, user agents and HTML applications may accept cluts in the format used by "png" images. The types of these cluts may be the same as entire png images.

Usage Example (Using Inline Style):

    <BODY style="http://cnn.com/demoClut.clt">

Format of palettes of type application/clut:

| PaletteResource( ) { | No. of bits | Identifier | Notes |
|---|---|---|---|
| color_model | 8 | uimsbf | The value of 1 for the color model may be used to indicate RGB, whereas the value 2 is used to indicate YUV. |
| nb_colors | 16 | uimsbf | The value in nb_colors is the number of colors in the palette. |
| first_color | 8 | uimsbf | The purpose of the first_color value is to allow multiple resources, each specifying their own palette, in the color space. |
| for (i=0; i<n; i++) { | | | The first, second, and third amounts (amt_first, etc.) refer to the amount of RGB or YUV, depending upon the value of color_model. The value in alpha (amt_transparency) represents transparency with 0 being transparent and 255 being opaque. |
| amt_first | 8 | uimsbf | |
| amt_second | 8 | uimsbf | |
| amt_third | 8 | uimsbf | |
| amt_transparency | 8 | uimsbf | |
| } | | | |
| } | | | |

**3.1.2 Alpha Properties**

Use of an application-specific palette allows an author to specify the alpha channel corresponding to a particular index. Below is one embodiment illustrating how alpha properties may be specified.

| 'alpha' | | |
|---|---|---|
| Value | : | <hexadecimal-integer> | <percentage> | <normalized-number> |
| Initial | : | #FF |
| Applies to | : | All elements |
| Inherited | : | yes |
| Percentage Values | : | percent opacity |
| Media type | : | tv |

**18**

Usage Example:

    <EM color=#008080 style="alpha:#C0">

In one embodiment, the value #FF is fully opaque and the value #00 is fully transparent. The normalized-number may range between 0.0 (fully transparent) and 1.0 (fully opaque). Similarly, 0% may indicate full transparency and 100% fully opaque. These same terms may be used with similar meanings in the additional properties illustrated below.

| 'background-alpha' | |
|---|---|
| Value: <hexadecimal-integer> | <percentage> | <normalized-number> | |
| Initial: | #FF |
| Applies to: | All elements |
| Inherited: | no |
| Percentage Values: | percent opacity |
| Media type: | tv |

Usage Example:

    <BODY style="background: black; background-alpha: #00">

| 'border-alpha' | |
|---|---|
| Value: <hexadecimal-integer> | <percentage> | <normalized-number> | |
| Initial: | #FF |
| Applies to: | All elements |
| Inherited: | no |
| Percentage Values: | percent opacity |
| Media type: | tv |
| 'border-top-alpha' | |
| Value: <hexadecimal-integer> | <percentage> | <normalized-number> | |
| Initial: | #FF |
| Applies to: | All elements |
| Inherited: | no |
| Percentage Values: | percent opacity |
| Media type: | tv |
| 'border-bottom-alpha' | |
| Value: <hexadecimal-integer> | <percentage> | <normalized-number> | |
| Initial: | #FF |
| Applies to: | All elements |
| Inherited: | no |
| Percentage Values: | percent opacity |
| Media type: | tv |
| 'border-left-alpha' | |
| Value: <hexadecimal-integer> | <percentage> | <normalized-number> | |
| Initial: | #FF |
| Applies to: | All elements |
| Inherited: | no |
| Percentage Values: | percent opacity |
| Media type: | tv |

US 7,055,169 B2

**19**

-continued

| 'border-right-alpha' | |
|---|---|
| Value: <hexadecimal-integer> | <percentage> | | |
| <normalized-number> | |
| Initial: | #FF |
| Applies to: | All elements |
| Inherited: | no |
| Percentage Values: | percent opacity |
| Media type: | tv |
| 'outline-alpha' | |
| Value: <hexadecimal-integer> | <percentage> | | |
| <normalized-number> | |
| Initial: | #FF |
| Applies to: | All elements |
| Inherited: | no |
| Percentage Values: | percent opacity |
| Media type: | tv |

3.2 Positioning of Graphics on Top of Video

An HTML developer may use Cascading Style Sheets (CSS) to specify relative or absolute positioning of graphics on top of video. Additionally, CSS may be used to specify other characteristics as well, such as a border, associated with the visual appearance of a graphic or text block.

In one embodiment, the size of the OSD may be defined as the size of the block (div) whose name has been defined to be "osd." If there are no such blocks, the size may be the size of the first division in a top level window. Where a set-top box cannot create an OSD of exactly that size, the closest available size to the specified size may be used. The examples below illustrate how graphics may be positioned relative to background video. The resulting display for each of the examples is the same, given the assumptions stated below in the descriptions.

In this first example, the background is set to a broadcast video via a url by using a background-image attribute. In this case it is assumed that the application has been granted the tuning privilege and therefore the tuner is tuned to the station carrying the Family-Videos network and the default video and audio is displayed.

First Example of Positioning images on top of video

```
<html>
<head>
<title>example</title>
</head>
<body style="background-image: url(broadcast://family-videos.com)">
<div style="position: absolute; left: 200px; top: 80px; color=gray; border:
thin solid red">
<div style="position: absolute; left: 10px; top: 10px; font-size=18pt;
    line-height=120%; color=yellow; border: thin solid yellow;
    background-alpha: #01; compose-rule: src">
<p>Nicolas a 18 mois
</div>
<img src="pict.gif">
</div>
</body>
</html>
```

In the second example, it is assumed that the television has already been tuned to the Family-Videos network.

Second Example of Positioning images on top of video

```
<html>
<head>
<title>example</title>
```

**20**

-continued

Second Example of Positioning images on top of video

```
</head>
<body style="background-image: url(broadcast://current); ">
<div style="position: absolute; left: 200px; top: 80px; color=gray; border:
thin solid red">
<div style="position: absolute; left: 10px; top: 10px; font-size=18pt; line-
    height=120%; color=yellow; border: thin solid yellow;
    background-alpha: #01; compose-rule: src">
<p>Nicolas a 18 mois
</div>
<img src="pict.gif">
</div>
</body>
</html>
```

In the third example, it is once again assumed that the television has already been tuned to the Family-Videos network and a transparent color for the background is explicitly selected (though this would be the default anyway).

Third Example of Positioning images on top of video

```
<html>
<head>
<title>example</title>
</head>
<body style=" background-color: transparent">
<div style="position: absolute; left: 200px; top: 80px; color=gray; border:
    thin solid red">
<div style="position: absolute; left: 10px; top: 10px; font-size=18pt;
    line-height=120%; color=yellow; border: thin solid yellow;
    background-alpha: #01; compose-rule: src">
<p>Nicolas a 18 mois
</div>
<img src="pict.gif">
</div>
</body>
</html>
```

The fourth example shows that the background need not be specified at all, assuming again that the television has already been tuned to the Family-Videos network.

Fourth Example of Positioning images on top of video

```
<html>
<head>
<title>example</title>
</head>
<div style="position: absolute; left: 200px; top: 80px; color=gray; border:
    thin solid red">
<div style="position: absolute; left: 10px; top: 10px; font-size=18pt;
    line-height=120%; color=yellow; border: thin solid yellow;
    background-alpha: #01; compose-rule: src">
<p>Nicolas a 18 mois
</div>
<img src="pict.gif">
</div>
</body>
</html>
```

Some set-top boxes may lack the resources to to simultaneously play video and display a full OSD at the same time. Therefore, to account for this possiblity, an HTML application on one of these boxes may not attempt to interpret any

US 7,055,169 B2

**21**

content on those boxes unless a META element, as shown below, is used to indicate that the content was designed specifically for these boxes.

Header Meta-data:

<META name="tv-use" content="full-screen">

3.3 When to Render Graphics

When rendering graphics as they are downloaded, it sometimes makes sense to delay displaying to the viewer until at least a subset of the resources, which have been deemed as essential by the content creator, have been downloaded. In one embodiment, a content creator may label the essential subset of resources by identifying them using a directive such as a "prerequisite" meta-data header. For example, the following indicates that no rendering for the page may occur prior to acquiring "background.mpg"

<META    name="prerequisite"    content="http://www.cnn.com/background.mpg">

In addition to indicating that certain resources may be required prior to rendering, a content author may further control the rendering through the use of a render-policy and/or render-timeout properties as described below.

render-policy: progressive |layoutcomplete | loadComplete

Applies to: Body

Initial: progressive

Inherited: no

Percentage: N/A

The progressive rendering policy indicates that displaying can start as soon as the essential resources (those marked as prerequisites in meta-data headers) have been acquired. With this policy, as resources are acquired, they are incorporated into the rendered and displayed graphics.

The layoutComplete rendering policy indicates that the rendered image may not be displayed until the software has acquired sufficient information to determine the complete on-screen layout and has acquired those resources labeled as prerequisites. This policy prevents objects from appearing to move around as the rendered graphics incrementally appear onscreen.

The loadComplete rendering policy indicates that the graphics may not be displayed until all resources that will be used for rendering the display have been downloaded. The only difference between the loadComplete rendering policy and labeling all resources as prerequisites, is that in the first case the OnLoad event will have been delivered to the appropriate handler, if any, prior to rendering, and hence may affect the rendered view.

In certain circumstances the specified rendering policy may not be possible, i.e., if a prerequisite resource has been removed from the carousel and acquisition via a modem has been denied by the viewer. In one embodiment, if no timeout for this loading has been specified, then the timeout may default to an indicated value (15s) as shown in the render-timeout property below. If a timeout occurs, and at least all of the prerequisite resources have been acquired, what is available for the new page may be displayed, independent of the specified rendering policy. If some of the prerequisite resources have not been acquired, then it may be preferable, if possible, for the display to show the previous page, if any. If this is not possible, then either an error message may appear or the box may render and display those resources which it has been able to acquire.

**22**

| render-timeout | none | <time> |
| Initial | 15s |

In any case, while the box is acquiring the resources for the new page, it may be preferable to continue to display the old page, and, if possible, allow the viewer to interact with the old page.

Scene Transitions

In one embodiment, all user agents may be required to comply with the following two requirements:

if the element which contains the video neither moves nor changes size during a transition from one page to another, there will be no video glitch; and

if the size or location of an element containing video does change during a transition from one page to another, the changes in video and graphics will be closely synchronized with one another.

3.4 Video Positioning and Resizing

In addition to considering video as being a virtual underlying plane, the content author may place video boxes within html content by using "broadcast:" as the "src", or as the source of "data" of an HTML element, for which location and/or size are specified. In particular, the location can be specified through the use of CSS.

The examples below demonstrate how a "broadcast:" url may be used in an IMG or OBJECT element to request a particular scaling size.

<IMG height=300 width=400 style="position:absolute; left:200px; top:80px" src="broadcast://current ">
<OBJECT height=300 width=400 data="broadcast://current "></OBJECT>

Both of the examples above request that the currently tuned channel (identified by the url, "broadcast:") be scaled to the size of 300 by 400. The first example also demonstrates how CSS properties can be used to position the resulting video box. Although the actual size and position of the video may be partly determined by the capabilities of both the set-top box and the drivers supplied for given hardware, applications should attempt to position and scale the video as specified by the content author.

3.5 Support for MPEG Stills

HTML applications may also support the displaying of still images, such as MPEG I-Frames, in either the video plane or in the multi-plane graphics layer. Because set-top boxes frequently have special purpose hardware for efficient rendering of MPEG, MPEG images are particularly appropriate for the television environment. MPEG I-frames may be recognized by the MIME type of image/mpeg and will have an extension of mpg.

The following example demonstrates the use of an MPEG I-Frame.

<html>
<head>
<title>example</title>

US 7,055,169 B2

**23**

-continued

```
</head>
    <body style="background-image:url(http://pepsi.com/pepsi-
    ad.mpg)">
</body>
</html>
```

### 3.6 Control of Audio

This section deals with playing of audio from memory and controlling the audio stream after it has been selected. The CSS aural properties can be used to control the audio stream and audio being played from memory. Aural style sheets allow content developers to control the volume, allow the presentation of audio icons (cues), and even allow the developer to control spatial properties and mixing. These style sheets may further support the volume properties, the pause properties, and the mixing properties. HTML itself provides a way to specify an audio element using the <object> tag. There are currently a few events defined on this element: onlayoutcomplete, onmouseenter, onmouseleave, onreadystatechange.

Although CSS provides a way to support volume control, a Javascript object may be used to implement 'mute.' The reason for this requirement is that the object needs to remember the previous volume setting, so that when the sound it turned back on, it will immediately be set back to the volume to which it was set prior to muting.

### 4. Obtaining Non-AV Resources

Applications and data may be obtained from sources including broadcast or point-to-point (e.g., over a return channel via modem). In one embodiment, HTML applications may provide access to broadcast resources via the broadcast: URL protocol, as well as those that are cached within a broadcast http: protocol (bhttp). Access via the broadcast: protocol is as described above. For the bhttp protocol, whose client-side behavior is as described below, the client side treats the broadcast stream as a cache.

### 4.1 Access to Broadcast Resources

#### 4.1.1 Access Via the Broadcast: URL Protocol

The HTML/JS content developer may access non-AV broadcast resources using the broadcast: protocol in a way that is similar to the way they use the broadcast: protocol to access AV resources.

An Informal Description of the Scheme for Non-AV Resources

The description here differs from that provided in the previous section in that path_segments have been added to allow specification of particular data streams.

broadcast: {//<service_address>{; <component_list>}}{/ <path_segments>}

A service_address is defined as follows:

```
service_address ::= channel_name | current
where:
channel_name    specifies a DNS-style name that uniquely identifies the
                channel,
and
current         specifies the service currently selected.
```

**24**

As stated in the previous section, the component_list is a comma-separated list selecting specific components in the stream. The component_list is defined as follows:

```
component_list    ::= component *( "," component )
component    ::=  stream_type "=" ( track_tag | "default" | "current" |
                 "none")
stream_type  ::=  "video" | "audio" | "data" | "subtitle" | "teletext"
```

The presence of path_segments in a URL indicates that it references a specific module in the data carousel associated with the service_address. For example, the URL "broadcast://tf1.fr/background.png" refers to the background.png module on the default data carousel.

### EXAMPLES

broadcast:/background.png
    Load the module background.png from the default data carousel on the current service.

broadcast://current;data=htp0/
    Select the data carousel with track_tag "htp0", examine the directory module and load the "default" module in that directory (e.g., index.htm).

Some applications may require the ability to load a specific module within a data carousel. For example, the following HTML loads the background.png module from the default data carousel and uses it as a background image.
<BODY background="broadcast:/background.png">

During a carousel request, typical HTML events which may be dispatched include.
    Load If the request succeeded, a load event is dispatched after the URL is finished loading.
    Error If the request is denied or otherwise invalid an error event is dispatched.
    Abort If the user aborts the request before it complete, an abort event is dispatched.

Resident applications (such as a control task, or EPG) may require the ability to automatically launch an application during service selection. In these instances a URL of the form

broadcast://cnn.com; data—htp0/

informs a browser to automatically execute the default module on a specific data carousel.

Note: The default module may be selected by checking the specified directory for the following modules. The first module name that exists is automatically loaded.
    BHTTP
    Index.htp
    Index.htm

A simpler URL of the form "broadcast:/" informs the browser to automatically execute the default module in the default carousel of the currently selected service.

#### 4.1.2 Access Via the Http: URL Scheme and the Broadcast Carousel

In one embodiment, HTML pages may use "http:" URLs to load resources from the carousel. In particular, the HTTP cache may be enhanced to automatically cache HTTP entities from the data carousel. Therefore, the http: URL handler will be able to load HTTP entities directly from the HTTP

US 7,055,169 B2

25

26

cache without opening an HTTP connection to the origin server. Hence, HTML pages that use an "http:" URL to reference HTTP entities may not notice any difference between resources retrieved from the broadcast and those retrieved using the client/server HTTP URL protocol.

One embodiment of such a model is illustrated in FIG. 4. In the example of FIG. 4, the Head End 402 is acting as a proxy, is responsible for fetching data from the Origin Server 410 which has been requested by the carousel manager 420 (through as many hops as needed), and for placing the proper cache headers according to HTTP syntax and semantics (based upon expires header). The set-top-box 404 may then populate its cache from the carousel. The Expires entity-header field may gives the date/time after which the response is considered stale.

In response to detecting an http url, the client-side may first check its local cache. If the requested data is not found in the cache, the client may check the current carousel if any, possibly retrieving data from the carousel. Alternatively, it may send an HTTP request for the specified URL.

In order to allow proper cache behavior, the carousel may provide expiration dates and other cache control information in HTTP headers. For example, such information may include:

1. Cache-Control (HTTP 1.1) header information that specifies the maximum amount of time that a particular page may be considered to be fresh.

2. In a response to either the head-end or the client, the origin server may add the following headers in order to allow efficient and accurate caching:

   expires, indicating the data/time after which the page may be considered stale;

   last-modified, indicating the last time the data was modified at the origin server; and

   ETag (HTTP 1.1) data, for use with conditional requests, that provides a value indicative of the current page (e.g., some generation number or checksum).

3. Conditional get requests that require the set-top-box to verify either the last-modified value or the ETag value will result in an appropriate request to the origin server, which may return the Not Modified status code if the data is still valid. However, the set-top box may be configured to "believe" the expiration time provided in a header. Note that the server-side may modify the actual expiration time from the value to which it was set by the Origin Server.

It is noted that since network congestion can delay a response, revalidation of data which becomes obsolete during transit could result in an infinite loop. Consequently, HTTP 1.1 specifies that a response may not be revalidated in order to avoid infinite loops. This rule may be followed whether the data comes from the carousel or directly from the origin server.

4.1.3 Relative URLs

The use of relative URLs, which specify neither "http:" nor "broadcast:", may work with either protocol. In one embodiment, relative URLs may be automatically translated to one containing the same prefix that was used to obtain the page which contained the reference. Therefore, if a page was obtained using the "broadcast:" URL, then all relative references within that page may also be obtained using the "broadcast:" URL. Because it is possible that initial pages of an application may be downloaded via "broadcast:", it is possible to author applications which never explicitly specify either "broadcast:" or "http:" yet will perform correctly.

4.2 Modem Control

In Europe, and elsewhere, local communications are still expensive and it might be necessary to warn the user and perhaps display the communication price. While it may be up to the system to actually open and close connections, it may be useful for the application to notify the system when it is finished with a system. Also, in many networks, it is common for different applications to require connections to different phone numbers, rather than to a single phone number associated with a particular Internet Service Provider (ISP). In such systems it is common for the different numbers to be associated with a single modem bank with the different numbers being used for accounting and other information. Hence, the HTML/JS application needs to notify the system when it finishes using a connection and needs to be able to request a connection, providing appropriate parameters. Therefore, various embodiments may support the following methods on the navigator.modem object.

navigator.modem.disconnect( )

   indicates to the system that the application has finished using the connection. There may be no events associated with completion.

   If an application invokes the following method:

navigator.modem.connect(string parameter, int ms_timeout),

the string parameter could contain, for example, a phone number to which the system may connect. The ms_timeout parameter may be used to indicate how long (e.g., in milliseconds) the system may try to connect. The 'modem' object may be configured to

   provide the connection status as a read-only property.

The system may automatically generate connection events when something happens on the modem. Examples of such connection events include: success, failure, and disconnect_occurred.

4.3 Caching Hints—Pre-Requisite, Link, and Prefetch

There are at least two important clues that may be present within an HTML application to aid the HTML/JS client-side application in determining which resources have higher caching priority. The two clues are represented by the pre-requisite meta data in the header and the link style which is used to indicate which pages, though not needed immediately, may soon be requested by the application.

Pre-Requisite Meta Header

As explained above and illustrated below, all resources which are labeled as a pre-requisite must generally be available prior to rendering the corresponding page for presentation.

   <META    name="prerequisite"content="http://www.cnn.com/background.mpg">

Consequently, pre-requisite resources may be identified and given a higher priority for caching.

Using the Link Data for Pre-Fetching

In addition to the above, a link element, which may appear in the <head> portion of a page, indicates resources that may be desired by the viewer of the current page. Therefore, resources listed in this element are also good candidates for pre-fetching into the cache.

However, certain caveats must be observed. For example, if a CSS document is listed in the link element, it is possible that it may be applied to the current document rather than to a document which would be cached for later use. In order to

**27**

avoid such a possibility, a new value, prefetch, is introduced for the rel attribute. If a resource is indicated in a link statement in the head, and it is identified as having a prefetch relationship, then the set-top box may determine that it is a good candidate for caching.

`<link rel="prefetch">`

### 4.4 An Event that Indicates that a URL was Updated

One of the advantages of interactive television is that the viewer's presentation can be updated in real-time. For example, if there is a new goal scored on a soccer game, the viewer may want to receive an update even though they are watching a movie. Such an update can be broadcast by changing the content corresponding to a URL. This section describes how applications can be notified when the content corresponding to a URL changes, using a URLEvent.

The target of a UrlEvent generated by the user agent is determined by the user agent according to the following rules:

1. If the URL whose status has changed is identified as the attribute's value of the corresponding node type as listed in the table below, then the UrlEvent is delivered by the user agent to the corresponding node.
2. If the URL whose status has changed is the url for the page itself, then the UrlEvent will be delivered to the body.

| Attribute | Corresponding Node |
|---|---|
| background | Body |
| src | Image |
| data | Object |
| href | Link |
| src | Input |
| src | Frame |
| src | IFrame |

Attributes

url of type DOMString, readonly
    Identifies the URL from which the event was generated.

Methods

initUrlEvent
    The initUrlEvent method is used to initialize the value of a UrlEvent created through
    the DocumentEvent interface.
    Parameters
    typeArg of type DOMString
        Specifies the event type.
    canBubbleArg of type boolean
        Specifies whether or not the event can bubble.
    cancelableArg of type boolean
        Specifies whether or not the event's default action can be prevented.
    urlArg of type DOMString
        Specifies the Event's url.

The different types of UrlEvents that can occur are:

URLInserted
    The URLInserted event occurs when a URL is added to the carousel.
    Bubbles: Yes, Cancelable:No, Context Info: url

**28**

URLUpdated
    The URLUpdated event occurs when a new version of an URL is created on the carousel.
    Bubbles: Yes, Cancelable: Yes, Context Info: url
URLRemoved
    The URLRemoved event occurs when a URL is removed from the data carousel.
    Bubbles: Yes, Cancelable: No, Context Info: url

The default action in the case of URLUpdated (which can be cancelled by calling preventDefault( )) is to reload the content of the associated url). There is no default action for URLInserted or URLRemoved.

Also, note, that it is guaranteed that the events will be delivered in a top-down order; hence, if the body changes, then the event representing the update of the url associated with the body will be delivered prior to delivering any events concerning urls referred to by the body.

Note that the above event can be signaled in the carousel by carrying a delta directory that indicates differences between the last directory and the current directory. That way, an implementation need not download the entire content before it knows whether the app is going to use it or not—it need only find out that there's a new version available.

The Cache Object

Introduction to Dynamic Cache Hints

Since typically the amount of information that can be presented on a television screen is substantially less than contained in a page that is typically viewed on a PC, an author creating content for television will most often spread the same amount of information over multiple pages. Hence, the viewer will typically "scroll" between pages, and their navigation through a page can be a good indicator of which resources will be needed next. An author making use of such information by conveying hints based upon this navigation to the user agent can enable much better performance on lower end clients.

A Host Cache Interface

The cache interface supports two methods, prefetch and remove. The prefetch method specifies both the URL associated with the resource to be prefetched as well as a priority indicating how likely it is that the viewer will need that resource.

The cache priority value is a non-negative integer. The author can use a cache priority value of 0 to indicate that the referenced content is useful, but that the author may be unsure of its likelihood of use in comparison with other items that they are requesting to be cached. The author can use a cache priority value of 1 to indicate the belief that caching the specified resource is very important. A very large value for the priority indicates that a resource will likely not be used (hence informing the user agent that it may reclaim the memory currently used to hold the URL's associated resource in cases where it is needed).

The remove method may be used to remove a cached copy of the resource associated with the URL argument. Since it is to be removed from the cache, and not just invalidated, the system will not waste resources re-validating the entry. Note that invoking the remove method is different from assigning a very large integer as the cache priority value in that assigning such a large integer value only makes the space used to store that resource more available for garbage collecting and/or to hold high priority resources.

US 7,055,169 B2

29

Interface cache {
void prefetch(in DOMString URL, in short priority);
void remove (in DOMString URL);
};

Binding of the Cache Interface to Script

The Cache Object, which implements the cache interface above, is accessible as a property of the Navigator (Navigator::cache).

    Object cache

    The cache obect has the following methods:

      prefetch(URLArg, priorityArg)—This method does not return a value.

      The URLArg is of type String.

      The priorityArg is of type Number.

      Remove(URLArg)—This method does not return a value.

      The URLArg is of type String.

The farPrefetch Method

Sometimes the size of the resources needed for a given application is very large, and, in this case, it is often true that many of the resources, e.g., fonts, are actually sharable with other applications on different services. When such is the case, the shared resources are often bundled together and transmitted on a single service. Hence, there is a need for an application to be able to obtain resources from another service, which will usually require temporarily changing the tuner to a different frequency and/or at least choosing a different service that is carried on that frequency, caching the resources from that other service, and tuning back to the original service. Another example use case for this scenario is the case where a viewer wants to download mail or chat information or a game, then interact with the downloaded data while watching video that is broadcast on a different service from the downloaded data.

In one embodiment, the following JS method is provided to permit an application to tune to a different service and download information from that service, then automatically come back to the original service:

    void navigator.cache.farPrefetch(carouselUrl, ArrayOfUrlsToLoad, functionToCallWhenDone)

Where the carouselURL is identified via the tvx: protocol.

The following actions may occur asynchronously when this function is called. First, the permission of the application is checked to ensure that it is allowed to change the service. If this request is permitted, the specified service is tuned, all urls requested are cached, then the tuner/demuxer re-selects the previous service, and the functionToCall-WhenDone is invoked. This call may be guaranteed not to cause a kill event to be generated for the application that requested the farPrefetch.

Event Defining Result of farPrefetch Method

The following event may be delivered to the cache object after the farPrefetch completes. The detail value indicates whether all requested resources were obtained or not. That is, in one embodiment, if less than all of the requested resources are obtained, then the farPrefetch may be considered to have failed. The content author should note that they are responsible for requesting all required resources when a farPrefetch is done.

detail read-only property is a Number.

The detail property has the value: 1 for success,
    NaN failure.

30

The CacheEvent object has the following method:

    initCacheEvent(typeArg, canBubbleArg, cancelableArg, detailArg)

      This method is used to initialize the value of a CacheEvent created through

      the DocumentEvent interface. This method may only be called before the CacheEvent has been dispatched.

The different types of cache events that can be dispatched to navigator.cache are:

    FarPrefetchStatus—This event notifies that a farPrefetch( ) request has completed.

| | |
|---|---|
| Bubbles: | No |
| Cancelable: | No |
| Context Info: | detail |

The Interaction Channel

HTML/JS applications may use the modem(s) attached to and/or present within a set-top box to interface with the interaction channel. Two types of modems are considered, an always-on modem (e.g., cable DOCSIS) and a use-time-only modem (e.g., POTS), either or both of which may be accessible from a given set-top box.

Two different uses of interaction channel have proven useful in interactive television. One use, which is also commonly found in PC applications, is the use of modems to send and/or receive a substantial amount of data. Since a substantial amount of data will be exchanged, the overhead of establishing a connection such as that associated with PPP is insignificant. A different use, however, has proven to be a source of major revenue generation for pay television operators: the capability to call a premium phone number, optionally exchange a few bytes, and hang up. The amount of time required to establish a PPP link in this second type of usage is therefore excessive, and, hence, undesirable.

In addition to the issue of use as described above, also important is the degree of control that an application may exercise over a modem connection. In one embodiment, if an application has not explicitly opened a link, the application may automatically open a link (e.g., using a network-dependent connection string), or use an existing open link, when access to content corresponding to an "http:" url is required by the application.

In order to permit developers to exercise control over high level protocols, such as PPP, the links structure described below may be provided. Further, to allow applications direct access to raw data where high level protocols cause too much overhead, and to allow those applications to dial premium phone numbers through dialup modems, the modem structure described below may be provided.

The Links Structure

The links structure defined below may be used to (1) explicitly control when connections are opened and closed, and (2) specify connection attributes. It also provides methods that allow an application to determine attributes of the link.

A user application may be configured to always select a best link (often designated by the network) and specify that as the default link ([window].navigator.tv.links.default below). In such a case, the author need not always search for a link with particular attributes. However, should an appli-

US 7,055,169 B2

**31**

cation author determine that they seek a particular type of link, they may directly access the links array ([window].navigator.tv.links[i] below).

---

Object Model Reference:
[window].navigator.tv.links[i]
[window].navigator.tv.links.default

---

The links array is a collection of objects of type TVLink as defined below. Also, the links.default is of type TVLink.

The type property allows the content author to determine the type of link. While the first three types are named according to the standardized protocol that they support, the fourth type refers to a particular product that supports a more lightweight protocol in lower end boxes.

The status property allows an application to determine the current status of the link and the always_on property allows the application to determine whether the link is persistent. If the link is connected and not always on, the application can determine the amount of time that the link has been connected by using the time property.

It is typical in pay television networks for the networks themselves to require the connection attributes to be specified in a network-formatted way. That is, one network may require the application to specify the entire phone number, while another network will only permit an application to specify an index into an array of network-supplied phone numbers, and still a third network may not allow specification of the phone number at all, but only of the username and password. Therefore, the format of the connection string attribute associated with the connect request is network-dependent.

The TVLink object is defined as follows.

---

Properties:
| | | |
|---|---|---|
| type | "PPP" \| "DVB-RC" \| "DOCSIS" \| "OTV__Gateway" (read-only) | |
| status | "connected" \| "connecting" \| "disconnected" \| "disconnecting" | |
| (read-only) | | |
| always__on | "True" \| "False" | |
| time | int -- # seconds connected (0 if not in "connected" state) | |
| name | String a unique property associated with this link. | |

---

Methods:

open(attributes, timeout)—

This method returns a Number: 1 for OK, −1 if the link that was specified does not exist, −2 if the link is already open, and −4 if permission to open this existing link is denied.

Note that although this call may fail immediately, the actual connection is asynchronous with the requester being notified via a LinkUp event when the connection has been successfully made. (or by a LinkDown event should the request fail)

The attributes parameter is String that contains the connection attributes as determined by the content author in consultation with the network (must at least know network-specified format)

The timeout parameter is Number that contains time-out (in seconds).

**32**

close( )

This method returns a Number: 1 for OK, NaN for failure

This method may also be asynchronous.

addEventListener(type, listener, useCapture)
removeEventListener(type, listener, useCapture)
dispatchEvent(evt)

—These methods are the basic methods of the DOM level **2** EventTarget interface.

Events:

The LinkUp and LinkDown events are of type LinkEvent. The LinkEvent object has all of the properties of the Event interface plus the following additional property: detail read-only property is a Number.

Where the detail property has the value:

1 for normal disconnect,

2 for line was dropped (by other side),

3 time-out occurred,

NaN other failure

The LinkEvent object has the following method:

initLinkEvent(typeArg, canBubbleArg, cancelableArg, detailArg)

This method is used to initialize the value of a LinkEvent created through

The DocumentEvent interface. This method may only be called before the LinkEvent has been dispatched.

The different types of link events that can be dispatched to navigator.modem are:

LinkUp

This event notifies that a basic modem connection has been established.

---

| | |
|---|---|
| Bubbles: | No |
| Cancelable: | No |
| Context Info: | none |

---

LinkDown

This event notifies that the modem has been disconnected.

---

| | |
|---|---|
| Bubbles: | No |
| Cancelable: | No |
| Context Info: | detail |

---

The Modem Structure

The modem structure defined below is used for access to raw data. For example, this structure is useful when an application simply wants to dial a premium phone number, make a connection, and hang up. It can also be used when only a few bytes of information need to be exchanged, and, in such a situation, the higher level protocols required by the links structure above carry too much overhead for such a use.

Object Model Reference:
[window].navigator.modem

The modem object has the following methods:

connect(tel, timeout)

This method returns a Number: 1 for OK, −1 for parameter error, −7 modem is use, NaN other failure.

The tel parameter is type String that contains telephone number.

US 7,055,169 B2

33

The timeout parameter is Number that contains time-out (in seconds).

disconnect( )
This method returns a Number: 1 for OK, NaN for failure

sendData(data, timeout)
This method returns a Number: 1 for OK, −1 for parameter error, −2 not connected, NaN other failure.
The data parameter is type String that contains a sequence of byte values 0–255.
The timeout parameter is Number that contains time-out (in seconds).

receiveData( )
This method returns a String that contains the available data (empty string if no data available).

addEventListener(type, listener, useCapture)
removeEventListener(type, listener, useCapture)
dispatchEvent(evt)
These methods are the basic methods of the DOM level 2 EventTarget interface.

The ModemEvent object has all the properties of the Event interface plus the following additional properties:

| detail | read-only property is a Number. |
|---|---|
| The detail property has the value: | >0 for the number of bytes sent, |
| | −2 for line was dropped (by other side), |
| | −3 time-out occurred, |
| | NaN other failure. |

The ModemEvent object has the following method:
initModemEvent(typeArg, canBubbleArg, cacelableArg, detailArg)
This method is used to initialize the value of a Mode-mEvent created through the DocumentEvent interface. This method may only be called before the Mode-mEvent has been dispatched.

The different types of modem events that can be dispatched to navigator.modem are:

ModemConnect
This event notifies that a basic modem connection has been established.

| Bubbles: | No |
|---|---|
| Cancelable: | No |
| Context Info: | none |

ModemDisconnect
This event notifies that the modem has been discon-nected.

| Bubbles: | No |
|---|---|
| Cancelable: | No |
| Context Info: | detail |

The detail property has the value:
−1 for normal disconnect,
−2 for line was dropped (by other side),
−3 time-out occured,
NaN other failure (e.g., authenication error).

ModemReceiveData

34

| Context Info: | detail |
|---|---|

The detail property contains the number of data bytes available to receive.

ModemSentData
This event notifies that a basic modem connection sent some data.

| Bubbles: | No |
|---|---|
| Cancelable: | No |
| Context Info: | detail |

5. User Interaction

5.1 Navigation

Focus & Focus Highlight

CSS2 provides a number of ways to control how to highlight focused elements. For example, CSS2 provides three pseudo-classes related to focus navigation: ":hover", ":active", and ":focus". In addition to these pseudo-classes, the html 'tabindex' attribute for input and anchor elements may also be utilized to support navigation. The purpose of this attribute is to allow the viewer to "tab" around the rendered page prior to selecting an element. The value assigned to the tabindex attribute determines the order in which the elements are visited upon tabbing.

Certain interactive television standards provide "nav-x" properties to support navigation using the arrow keys (DOM_VK_UP, DOM_VK_DOWN, DOM_VK_LEFT, and DOM_VK_RIGHT). In particular, both DVB MHP and Association of Radio Industries and Businesses (ARIB) define similar, though not identical, "nav-index", "nav-right", "nav-left", "nav-up" and "nav-down" properties. In both of those specifications, the "nav-index" property is used to associate unique integer values with particular elements as follows.

| 'nav-index' | | |
|---|---|---|
| Value: | <integer> | none | |
| Initial: | none | |
| Applies to: | All elements that can get focus | |
| Inherited: | no | |
| Percentage Values: | N/A | |
| Media type: | | tv |

Because elements with associated "nav-index" properties have associated unique integer values, the content author may then use the set of properties to control navigation between elements.
nav-up
nav-down
nav-left, and
nav-right

There are several differences between DVB-MHP's defi-nition of these properties and the definition provided by ARIB. DVB-MHP permits the use of this property to control navigation between frames by allowing the content author to specify a frame along with an element index to which to transition when the viewer presses the corresponding arrow key. It seems appropriate in high-end receivers to permit

US 7,055,169 B2

35

navigation between frames using this property, although it is not expected to be an issue in low to mid-size receivers.

Another difference between DVB-MHP's definition of these properties and the definition assigned by ARIB is the behavior specified to occur when the content author does not provide one or more of these properties for various elements. ARIB indicates that if a particular property is not specified for an element, then pressing an arrow key when focused on that element results in no movement of focus. The result of applying this rule to elements for which none of these properties, except the nav-index, have been specified is that one can never navigate out of those elements, if indeed one can navigate to those elements. Additionally, if no nav-index property has been specified for an element, then it is not possible to navigate to that element. DVB-MHP specifies a different default behavior wherein if one of the properties is not specified, then navigation via the arrow keys defaults to the pre-defined user agent behavior.

In one embodiment, if navigational direction is not explicitly controlled, the middleware (similar to the user agent) uses its default behavior for navigation. When the default behavior is not the behavior desired by the content author for a particular move, they may add directives for explicit control to override the undesirable behavior. In this manner, content authors are not required to explicitly re-define all of the behavior that they already find acceptable/desirable. Therefore the default behavior is more closely aligned with the behavior of DVB-MHP. The difference is to allow explicit specification of both "none" and "default" user agent behavior.

| 'nav-up' | | |
|---|---|---|
| Value: | <integer> \| none \| default | |
| Initial: | default | |
| Applies to: | All elements that can get focus | |
| Inherited: | no | |
| Percentage Values: | N/A | |
| Media type: | tv | |
| 'nav-left' | | |
| Value: | <integer> \| none \| default | |
| Initial: | default | |
| Applies to: | All elements that can get focus | |
| Inherited: | no | |
| Percentage Values: | N/A | |
| Media type: | tv | |
| 'nav-down' | | |
| Value: | <integer> \| none \| default | |
| Initial: | default | |
| Applies to: | All elements that can get focus | |
| Inherited: | no | |
| Percentage Values: | N/A | |
| Media type: | tv | |
| 'nav-right' | | |
| Value: | <integer> \| none \| default | |
| Initial: | default | |
| Applies to: | All elements that can get focus | |
| Inherited: | no | |
| Percentage Values: | N/A | |
| Media type: | tv | |

Usage Example:

<FORM    action="http://somesite.com/prog/adduser"method="post"><P>

First name:  <INPUT style="nav-index:100; nav-up:105; nav-down:101 "type="text"name="firstname"><BR>

Last name:  <INPUT style="nav-index:101; nav-up:100; nav-down:102"type="text" name="lastname"><BR>

email: <INPUT style="nav-index:102; nav-down:103; nav-up:101"type="text"name="email"><BR>

36

<INPUT style="nav-index:103; nav-down:104; nav-up:102"type="radio"name="gender"value="Male">Male<BR>

<INPUT style="nav-index:104; nav-down:105; nav-up:103"type="radio" name="gender"value="Female">Female<BR>

<INPUT style="nav-index:105; nav-up:104; nav-down:100"type="submit"    value="Send"><INPUT type="reset">

</P>

</FORM>

A content developer requiring additional control over navigation may specify key event handlers using Javascript.

5.2 Virtual Keyboard Control

The following CSS property may be used for controlling the automated appearance of a keyboard. This property may be specified on a per-element basis for text, password, and text area elements. Hence, if an application is aware that a particular form element is a zip code for example, and hence entering numbers via the remote control is easier, that may be specified.

| "virtual-keyboard" | | |
|---|---|---|
| Value: | disable \| enable \| auto | |
| Initial: | enable | |
| Applies to: | all input elements | |
| | Inherited: | no |
| Percentage Values: | N/A | |
| Media type: | tv | |

The value "disable" means that the virtual keyboard is not available when the viewer wants to enter data into the area, i.e., they may enter numbers via the remote control instead. The value "auto" means that when the element to which the property applies receives focus, the virtual keyboard will automatically be presented to the viewer. The value "enable" means that the virtual keyboard will automatically be presented to the viewer when the viewer selects the element to which the property applies. If the viewer's user preferences have indicated that there is an alternate preferred non-virtual keyboard available, then the virtual keyboard may not be displayed even if the value has been set to enable or auto.

An example demonstrating how application writers could prevent the virtual keyboard from appearing for a password type element is:

Input[typ=passwd]{virtual-keyboard:disable}

Similarly, if the user preference indicates that the remote control may be used as a numeric speller, as with a cell phone, then no virtual keyboard will automatically appear. Alternatively, the network operator may specify a system preference if it knows that all viewers will have access to a physical keyboard or a cell phone.

5.3 Key Input

Applications may specify sets of keys for which they request notification by the system when they are in a maximized state. Generally, though not necessarily, they may not receive notification when they are in a minimized state. Notification of certain of the sets of keys will be provided to applications solely on the basis that they requested them.

However, for other keys, the network-supplied task may be queried as to whether or not the application may be presented with the keys that it has requested. Hence, it is possible that applications may not be notified of all key presses to which they have subscribed. HTML applications

US 7,055,169 B2

37

may specify which keys they wish to receive notification by stipulating sets of key groups shown in the key-list property below. If the system grants the key group request, then notification of the key press is given only to the requesting application and will not be delivered to other (native) applications in the system.

For example, an application may know that a viewer may only be entering digits between 1 and 8, yet wants to be forgiving enough so that if the viewer may enter a 0 or a 9, the channel will not change. In this case, the application can request notification of all of the numeric keys, ignoring anything except the digits between 1 and 8. It is possible that in some networks there will be a pre-defined set of keys that all pages which do not specify otherwise, will receive.

5.4 Key-list Property

HTML type applications may add a CSS property called Key-list that indicates for which key presses an application may be notified. This property may apply to the body element. A content provider wishing more control can use the appropriate javascript to implement more fine-grained control, making use of the on-focus event. All pages using the same style sheet will share the same definition of keys, in which the application is interested. This is a comma-separated list of key-groups (such as navigation, selection, information, numeric, color, alpha, etc). Note that included included below is the reserved_set in the initial value for key-list even though these keys are typically not explicitly so marked on a typical remote control. Therefore, even though they're in the initial set, there may be no way for a viewer to use these keys. An application writer is therefore advised to exercise care when requesting that the viewer press these keys (e.g., have a fallback available in the event that these keys are not available to a particular viewer.)

"key-list"
| | | |
|---|---|---|
| Value | : | <key-group> + | none |
| Initial | : | scroll_set, navigation_set, selection_set, numeric_set, punctuation_set, alpha_upper_set, alpha_lower_set, reserved_set |
| Applies to | : | body element |
| Inherited | : | no |
| Percentage Values | : | N/A |
| Media type | : | tv |

Where key groups may be:

| KEY GROUP | KEYS |
|---|---|
| user_information_set | HELP, INFO |
| scroll_set | HOME, PAGE_UP, PAGE_DOWN, END |
| navigation_set | LEFT_ARROW, RIGHT_ARROW, DOWN_ARROW, UP_ARROW |
| selection_set | CANCEL, ENTER, UNDO |
| vcr_control_set | STOP, PLAY, PAUSE, RECORD and SINGLE_STEP_FORWARD, SINGLE_STEP_REVERSE, FAST_FORWARD, FAST_REVERSE |
| edition_set | CUT, COPY, PASTE |
| teletext_set | MIXING, MAGNIFY, CONTENT, REVEAL |
| color_set | RED, GREEN, BLUE, YELLOW |
| numeric_set | 0 to 9 |
| Punctuation_set | all non-alphanumeric codes in (0x20 to 0x7f) |

38

-continued

| KEY GROUP | KEYS |
|---|---|
| alpha_upper_set | all alphabetic codes in (0x41 to 0x5a) |
| alpha_lower_set | all alphabetic codes in (0x61 to 0x7a) |
| network_set | all codes in (0x0080 to 0x8f) |
| manufacturer_set | all codes in (0x0090 to 0x97) |
| Extended_set | all ISO-LATIN codes in (0x00a0 to 0xff) |
| sound_set | VOLUME_DOWN, VOLUME_UP, MUTE_AUDIO |
| station_set | CHANNEL_UP, CHANNEL_DOWN, PREVIOUS_CHANNEL, RADIO_TOGGLE, TV_TOGGLE |
| reserved_set | TAB, BACKSPACE, RETURN |

Usage Example:

<BODY style="key-list: selection_set, navigation_set">

5.5 Key Codes

There are generally two major groups of key events.

The first contains the textEvent event. The textEvent event indicates that text information has been entered, either in the form of printable characters or non-printable text information such as modifier keys. These textEvent events are sometimes, but not necessarily, accompanied by the events of a second major groups of key events—keydown and keyup.

TextEvent

This event indicates that text information has been entered. The text information entered can originate from a variety of sources. It could, for example, be a character resulting from a keypress. It could also be a string resulting from an input method.

The keydown and keyup events comprise the second group of key events. These events are fired to indicate the physical motion of the keys on the character generation device. Depending on the input system being used, textEvent events may or may not be generated for each pair of keydown and keyup events.

Keydown

The keydown event occurs when a key is pressed down.

Keyup

The keyup event occurs when a key is released.

All these events may share the following attributes:

US 7,055,169 B2

39                                                                                                40

```
TextEvent, keydown, keyup:
    bubbles: yes
    cancelable: yes
    context info: 0
    context outputString: output generated by the key event or null.
    context keyVal: Unicode character generated by the key event, or 0.
    context virtkeyVal:
                        virtual key code generated by the key event if the key
                        event has not a Unicode value, or DOM_VK_UNDEFINED. Here is
                        the list of virtual key codes:
                        const unsigned long DOM_VK_UNDEFINED = 0x0;
                        const unsigned long DOM_VK_RIGHT_ALT = 0x01;
                        const unsigned long DOM_VK_LEFT_ALT = 0x02;
                        const unsigned long DOM_VK_LEFT_CONTROL = 0x03;
                        const unsigned long DOM_VK_RIGHT_CONTROL = 0x04;
                        const unsigned long DOM_VK_LEFT_SHIFT = 0x05;
                        const unsigned long DOM_VK_RIGHT_SHIFT = 0x06;
                        const unsigned long DOM_VK_LEFT_META = 0x07;
                        const unsigned long DOM_VK_RIGHT_META = 0x08;
                        const unsigned long DOM_VK_CAPS_LOCK = 0x09;
                        const unsigned long DOM_VK_DELETE = 0x0A;
                        const unsigned long DOM_VK_END = 0x0B;
                        const unsigned long DOM_VK_ENTER = 0x0C;
                        const unsigned long DOM_VK_ESCAPE = 0x0D;
                        const unsigned long DOM_VK_HOME = 0x0E;
                        const unsigned long DOM_VK_INSERT = 0x0F;
                        const unsigned long DOM_VK_NUM_LOCK = 0x10;
                        const unsigned long DOM_VK_PAUSE = 0x11;
                        const unsigned long DOM_VK_PRINTSCREEN = 0x12;
                        const unsigned long DOM_VK_SCROLL_LOCK = 0x13;
                        const unsigned long DOM_VK_LEFT = 0x14;
                        const unsigned long DOM_VK_RIGHT = 0x15;
                        const unsigned long DOM_VK_UP = 0x16;
                        const unsigned long DOM_VK_DOWN = 0x17;
                        const unsigned long DOM_VK_PAGE_DOWN = 0x18;
                        const unsigned long DOM_VK_PAGE_UP = 0x19;
                        const unsigned long DOM_VK_F1 = 0x1A;
                        const unsigned long DOM_VK_F2 = 0x1B;
                        const unsigned long DOM_VK_F3 = 0x1C;
                        const unsigned long DOM_VK_F4 = 0x1D;
                        const unsigned long DOM_VK_F5 = 0x1E;
                        const unsigned long DOM_VK_F6 = 0x1F;
                        const unsigned long DOM_VK_F7 = 0x20;
                        const unsigned long DOM_VK_F8 = 0x21;
                        const unsigned long DOM_VK_F9 = 0x22;
                        const unsigned long DOM_VK_F10 = 0x23;
                        const unsigned long DOM_VK_F11 = 0x24;
                        const unsigned long DOM_VK_F12 = 0x25;
                        const unsigned long DOM_VK_F13 = 0x26;
                        const unsigned long DOM_VK_F14 = 0x27;
                        const unsigned long DOM_VK_F15 = 0x28;
                        const unsigned long DOM_VK_F16 = 0x29;
                        const unsigned long DOM_VK_F17 = 0x2A;
                        const unsigned long DOM_VK_F18 = 0x2B;
                        const unsigned long DOM_VK_F19 = 0x2C;
                        const unsigned long DOM_VK_F20 = 0x2D;
                        const unsigned long DOM_VK_F21 = 0x2E;
                        const unsigned long DOM_VK_F22 = 0x2F;
                        const unsigned long DOM_VK_F23 = 0x30;
                        const unsigned long DOM_VK_F24 = 0x31;
                        const unsigned long DOM_VK_RC_POWER = 0x32;
                        const unsigned long DOM_VK_RC_TV = 0x33;
                        const unsigned long DOM_VK_RC_SET_UP = 0x34;
                        const unsigned long DOM_VK_RC_INFO = 0x35;
                        const unsigned long DOM_VK_RC_RADIO = 0X36;
                        const unsigned long DOM_VK_RC_NAV = 0x37;
                        const unsigned long DOM_VK_RC_PIP = 0x38;
                        const unsigned long DOM_VK_RC_MENU = 0x39;
                        const unsigned long DOM_VK_RC_TEXT = 0x3A;
                        const unsigned long DOM_VK_RC_HELP = 0x3B;
                        const unsigned long DOM_VK_RC_SELECT = 0x3C;
                        const unsigned long DOM_VK_RC_EXIT = 0x3D;
                        const unsigned long DOM_VK_RC_GUIDE = 0x3E;
                        const unsigned long DOM_VK_RC_RED = 0x3F;
                        const unsigned long DOM_VK_RC_GREEN = 0x40;
                        const unsigned long DOM_VK_RC_YELLOW = 0x41;
                        const unsigned long DOM_VK_RC_BLUE = 0x42;
                        const unsigned long DOM_VK_RC_CHANNEL_UP = 0x43;
                        const unsigned long DOM_VK_RC_CHANNEL_DOWN = 0x44;
```

US 7,055,169 B2

41

42

-continued

```
            const unsigned long DOM_VK_RC_VOLUME_UP = 0x45;
            const unsigned long DOM_VK_RC_VOLUME_DOWN = 0x46;
            const unsigned long DOM_VK_RC_MUTE = 0x47;
            const unsigned long DOM_VK_RC_INFO = 0x48;
            const unsigned long DOM_VK_RC_CANCEL = 0x49;
            const unsigned long DOM_VK_RC_UNDO = 0x4A;
            const unsigned long DOM_VK_RC_STOP = 0x4B;
            const unsigned long DOM_VK_RC_PAUSE = 0x4C;
            const unsigned long DOM_VK_RC_RESUME = 0x4D;
            const unsigned long DOM_VK_RC_SINGLE_STEP_FORWARD = 0x4E;
            const unsigned long DOM_VK_RC_SINGLE_STEP_REVERSE = 0x4F;
            const unsigned long DOM_VK_RC_FAST_FORWARD = 0x50;
            const unsigned long DOM_VK_RC_FAST_REVERSE = 0x51;
            const unsigned long DOM_VK_RC_CUT = 0x52;
            const unsigned long DOM_VK_RC_COPY = 0x53;
            const unsigned long DOM_VK_RC_PASTE = 0x54;
            const unsigned long DOM_VK_RC_MIXING = 0x55;
            const unsigned long DOM_VK_RC_MAGNIFY = 0x56;
            const unsigned long DOM_VK_RC_CONTENT = 0x57;
            const unsigned long DOM_VK_RC_REVEAL = 0x58;
            const unsigned long DOM_VK_RC_VCR = 0x59;
            const unsigned long DOM_VK_RC_SATELLITE_DEL = 0x5A;
            const unsigned long DOM_VK_RC_CABLE_DEL = 0x5B;
            const unsigned long DOM_VK_RC_TERR_DEL = 0x5C;
            const unsigned long DOM_VK_RC_DISPLAY_CLOCK = 0x5D;
            const unsigned long DOM_VK_RC_SET_CLOCK = 0x5E;
            const unsigned long DOM_VK_RC_COLOR_UP = 0x5F;
            const unsigned long DOM_VK_RC_COLOR_DOWN = 0x60;
            const unsigned long DOM_VK_RC_BRIGHT_UP = 0x61;
            const unsigned long DOM_VK_RC_BRIGHT_DOWN = 0x62;
            const unsigned long DOM_VK_RC_CONTRAST_UP = 0x63;
            const unsigned long DOM_VK_RC_CONTRAST_DOWN = 0x64;
            const unsigned long DOM_VK_RC_PREVIOUS_CHANNEL = 0x65;
            const unsigned long DOM_VK_RC_PREFERENCES = 0x66;
            const unsigned long DOM_VK_RC_PARENTAL_CONTROL = 0x67;
            const unsigned long DOM_VK_RC_BOX_OFFICE = 0x68;
            const unsigned long DOM_VK_RC_PURCHASE = 0x69;
            const unsigned long DOM_VK_RC_PPV_SERVICES = 0x6A;
            const unsigned long DOM_VK_RC_GO_ONLINE = 0x6B;
            const unsigned long DOM_VK_RC_EXIT_APP = 0X6C;
            const unsigned long DOM_VK_RC_SHOW_INTERACTIVE = 0x6D;
            const unsigned long DOM_VK_RC_RECORD = 0x6E;
context inputGenerated:
            false if the key event does not generate any visible
            output, such as the use of a function key or the
            combination of certain modifier keys used in
            conjunction with another key, true if the key event
            normally causes visible output. The value of
            inputGenerated does not guarantee the creation of a
            character, as the event may be canceled.
Context numPad:
            If the number pad was used to generate the key event
            the value is true, otherwise the value is false.
```

While the codes above, and this data structure, are similar to those defined in DOM-Level 3 Key code definitions. Codes have been added for the remote control. These new codes have been named DOM_VK_RC_ . . . (RC for remote control). In one embodiment, the keys on a keyboard which are labeled like these would generate these keys. Also, DOM_VK_HOME has been declared above in lieu of an RC_RIGHT, LEFT, RC_HOME, etc. Other keys are possible and are contemplated.

Key event methods
checkModifier

    The CheckModifier method returns true or false, depending on whether a single modifier key is associated with a KeyEvent. The list of keys below represents the allowable modifier parameters for this method.
DOM_VK_LEFT_ALT

-continued

```
            DOM_VK_RIGHT_ALT
            DOM_VK_LEFT_CONTROL
            DOM_VK_RIGHT_CONTROL
            DOM_VK_LEFT_SHIFT
            DOM_VK_RIGHT_SHIFT
            DOM_VK_META
Parameters
            modifier of type unsigned long The modifier which the
            user wishes to query.
Return Value
            Boolean      The status of the modifier represented
                         as a boolean
No Exceptions
```

5.6 Event Handlers

    In addition to the Document Object Model (DOM) Level 2 listeners, Key events may be directed to legacy key

US 7,055,169 B2

**43**

handlers: onKeyDown, onKeyPress, onKeyUp, plus onFocus, onBlur, onChange and onClick, onSubmit.

6. Security

Two types of security which may be required in a receiver include:

   (1) protection for html resources, including both document resources as well as cookies; and

   (2) protected access to receiver resources such as the tuner or modem.

Policies that govern the application of the various security mechanisms may be set by the network and/or by the receiver manufacturer and viewers themselves.

6.1 Protection For Html Resources

Same Origin Mechanism

   The same origin policy may be defined in order to restrict one resource's capability to access other resources in such a way as to leave the viewer vulnerable. In particular, when one resource attempts to access one of the object properties shown in the table below, a same origin check is made.

   In one embodiment, the first step of a same origin check it so determine whether the object being referenced was created by the same context as the currently running script. If so, the access is permitted. Otherwise, additional information may be examined to determine whether the url of the accessing document has the same origin as the object being accessed. If the origin is the same, then the access may be permitted; otherwise, the access may be denied.

   Two documents may be said to have the same origin if the following elements of the "protocol://host" (where host includes the optional port) are identical:

   the protocol,

   the host, and

   the port.

If any of these values differ, then the access may be denied. It may be assumed that any data that is acquired via the broadcast: is acquired on the same port.

| Object | Property | Access Type | Checked |
|---|---|---|---|
| window | All except location (see below), frames, parent, and top | Read | yes |
| | All except location (see below) | Write | yes |
| (window.)location | All | Read | yes |
| | href | Write | yes |
| | protocol | Write | yes |
| | toString | (method) | yes |

Mechanism and Rules for Changing the Origin

   It is often the case that a single organization may provide multiple servers, but may wish to allow certain documents provided from particular ones of these servers to access certain other documents provided from different ones of these servers. One mechanism to allow such sharing includes permitting a document to change its (document.) domain property. However, such changes may be restricted. For example, in one embodiment, it may only change its domain to a proper suffix of its current domain. That is, www.xyz.com may be changed to xyz.com, but not to abc.com. Additionally, at least one period may be required

**44**

to remain in the new name, so, for example, xyz.com could not be shortened at all. Consequently, if the origins of two different resources were originally www.xyz.com and intranet.xyz.com, both would have to change their domain in order for access to be allowed.

   There may be a problem with the mechanism for changing the origin which relates to internationalization. The fact that this mechanism could be easily abused on servers outside the U.S. could open up the resource to all kinds of security attacks. Another potential problem is the granularity of this rule. Two resources from the same domain may not be able to provide mutual access only to one another without permitting other resources in that domain the same access. This problem may be exacerbated by the mechanism that allows resources to change their domain.

   One technique that would permit finer granularity of sharing uses a mechanism called a credential. In one embodiment, a credential is a signed statement from one party granting access to one (or more) of its resources to another party. The statement is a formatted chunk of data identifying the grantor, the grantee, the resource to which access is being granted, the permitted actions on that resource (i.e., read, write, or another property), and optionally a date until which that access is being permitted. The credential may be accompanied by a certificate chain, the leaf certificate in the chain identifying the grantor and providing their public key and the root certificate of the chain being identical to one of the root certificates in the receiver.

6.2 Protecting Access to Receiver Resources

   Networks often prefer to control access to certain hardware and software receiver resources. Those resources that may be granted to HTML applications which are acquired via the broadcast are enumerated below. The authorization process for granting these privileges to broadcast applications is described in later.

   While applications which are obtained directly from the web may be prohibited from executing privileged operations, a special application, configured by or for the network operator known as the UI may access all of the privileged core operations.

   In addition to the above, the network may be allowed to specify that certain of the operations below might be allowed to all apps, no matter where they're obtained from. Also, a network may be allowed to furnish domain-name/ set-of-privileges pairs.

Privileged Core Operations

   The following is a list of operations that may be permitted only when permission to access them is signaled as explained in the next section.

   Download modules from the broadcast

   Download modules from any source

   Switch tracks

   Switch programs (services)

   Connect to a remote server (via a phone or cable modem)

   Make any arbitrary connection

   Allow some modules not to be signed (the directory and initial modules must always be signed)

   Allow the application to become resident in the receiver

   Create or modify the service list

   Use the service list

   Request the viewer sign the data that they are providing for transmission

   Request the viewer approve access to restricted files and/or phone numbers

US 7,055,169 B2

<table>
<tr><td>45</td><td>46</td></tr>
</table>

Change some default settings (exactly which settings can be modified depends upon the other privileges granted to the application)

Inform the system that it need not clean (non osd) memory after execution

Inform the system that it need not clean the osd memory after execution

Change the EIT cache window

Release cache reserved for EIT

Arbitrate between conflicting event broker requests

Allocating Receiver Privileges

In one embodiment, a directory module includes a corresponding per-application set of privileges that are requested. This directory module must contain a request for this set of privileges along with the producer's certificate and must be signed with the producer's private key. The producer's certificate is signed using the network's private key. The producer's certificate states the maximum privileges that may be granted to any application under that producer. Hence, an application will only be granted a privilege if it is in its per-application set of privileges and it is among the set of maximum privileges that may be granted to any application associated with that producer. In addition to the signature, security is enhanced by requiring the signed directory to contain an accurate hash value corresponding to at least the initial code segment, and optionally to other code and data segments used by the application.

As stated above, all receiver privileges listed above may be granted to the special process known as UI. Additionally, privileges for applications received over the broadcast may be allocated in the same manner as they are allocated for core broadcast applications. Finally, applications received via the return channel may not be granted any receiver privileges. The set of privileges granted to a broadcast application or the UI application are known as its maximum set. Unless the application indicates otherwise using the methods described in the next section, its maximum set of privileges is equal to its current working set of privileges. Applications can set their current working set to a subset of their associated maximum set of privileges using the methods described below.

Least Privileged Mode

Using the methods described in this section, an application can execute in least-privileged mode. This is actually a much more secure mode which ensures that prior to using a privilege, an application specifically states that it is going to use that privilege. One advantage of this mode is that a content author cannot accidentally use a privilege that a network too freely grants. Using this mode, therefore, an application does not obtain more privileges than the network or receiver allows (known as the maximum set), but rather carefully manipulates a working set of privileges that are always a strict subset of that maximum set.

In order to support this mode, two new objects are required in the DOM: (1) the security object and (2) the privilegeManager object. The security object (of class "Security") is accessed through the "security" property of the global object (i.e., the window object). The security object's purpose currently is to contain a property, "privilegeManager", that allows access to the privilegeManager object (class "PrivilegeManager").

The privilegeManager object has four methods: enablePrivilege, disablePrivilege, revertPrivilege, and removePrivilege. These methods allow a script to manipulate privileges.

enablePrivilege Enables a privilege for the duration of the current function.

disablePrivilege Disables a privilege for the duration of the current function.

revertPrivilege Allows a script to revert a privilege to the state that it was in before the current function was called.

removePrivilege Allows a script to remove a privilege from its maximum set. (It is also removed from the working set if enabled.)

Each of these functions returns either true or false depending on whether the operation was successful. Note: when a function returns, any privileges enabled by that function may be automatically reverted to the state they were in at the point when the function was called. When a script attempts to perform a privileged operation without the necessary privilege enabled, an appropriate TBD exception will be thrown. If the exception is not caught, an error dialog box may be displayed before aborting the script.

Additional HTML-specific Privileges

There are a set of privileges which are HTML-specific and mostly may be restricted to a subset of the broadcast html applications. A set of flags may be reserved to be used for additional restricted operations. In one embodiment, HTML applications may use one of these flags to indicate whether an application will be granted all of the following privileges. (That is, if the flag is set, the broadcast HTML application will be granted all of the privileges below and if it is not set, that application will be granted none of the privileges below.)

Script can override the same origin policy, and read properties in another frame that was loaded from a different domain

Script can override the same origin policy, and change properties in another frame that was loaded from a different domain.

Script can query user preferences from the HTML Application only uim object.

Script can create, change, and save user preferences from the HTML application only uim object.

Script may submit a form to a mailto: URL

Script may manipulate cookies when and if a more extensive cookie management system is added

Script is granted the union of the runtime code extension privileges defined in both ATSC DASE 1 and DVB MHP 1.1.

Whether these privileges are granted to a broadcast application or not may determined using the same mechanism as described in the section entitled "Allocating Receiver Privileges". As above, these privileges may always granted to the special UI application and/or never granted to applications that are not broadcast.

7. Toward a Declarative Approach to Authoring for Show-stoppers and Prefetch Priorities

Early programming languages were generally very procedural requiring a programmer to tell the computer how to carry out the program in detail. As the examples show, the trend has been towards languages where you specify what to do, but not how. Such languages may be said to be more declarative. Generally speaking, a declarative language is one in which you specify what you want, and not how to get it. Such languages may be particularly useful in providing higher level interfaces to underlying complex systems. For example, HTML may allow you to specify what is to appear on a page, but not how it is to be laid out. Another example is SQL where you specify what you want out of a database

US 7,055,169 B2

**47**

query, but do not give code for the looping and testing needed to produce it. It is noted that the discussion herein is not strictly limited to declarative languages per se. Rather, HTML, JavaScript, CSS, and other such languages and constructs are contemplated. In one embodiment, languages and constructs which are commonly used in creating and manipulating Web content are contemplated. In any such case, the declarations or other statements used in the creation and/or manipulation of resources and content in this document may be generally referred to as "directives".

Background

This section (1) describes the showstopper and prefetch requirements; (2) identifies how such information may be carried in both DASE and DVB-MHP; and (3) proposes ways in which authors may indicate both showstopper and prefetch resources within their XHTML documents.

Although details of a transcoding implementation are not described, those skilled in the art may ascertain that the initial values assigned for showstopper and prefetch resources may be automatically translated to existing DASE/DVB-MHP facilities for transport.

Showstopper and Prefetch Requirements

The content creator often wishes to use multiple resources in constructing a scene or presentation and may consider the acquisition of a subset of these resources to be essential before displaying to the viewer. That is, they may prefer that the old scene should continue to be displayed until at least the essential resources have been received and decoded. These essential resources may be referred to as showstoppers because creators do not want anything displayed until at least these essential resources are available. Further, if these resources never become available, the content creator may prefer that nothing be displayed. In addition, marking these resources as essential may enable the broadcast stream to be more easily packaged together to enhance performance.

In general, performance may be enhanced by intelligent pre-fetching of resources. In particular, remarkable performance improvements may be possible when the pre-fetching priorities can be dynamically modified depending upon viewer interaction. Therefore, it is desirable to allow content authors to stipulate both essential resources as well as (dynamically modifiable) prefetch prioritization.

FIG. **5** illustrates one embodiment of a method for prefetching prerequisite resources. In the example shown, a centrally located proxy performs preprocessing or transcoding of content which is requested by a client or otherwise destined for a client. When the proxy receives content including presentation directives (block **502**), the proxy may scan the content for directives which indicate certain content is deemed a prerequisite for the presentation. If no such directives are detected (decision block **504**), then the directives (or signals and/or data corresponding to the presentation directives) are conveyed to the client (block **16**) and the presentation may be initiated (block **518**).

On the other hand, if such prerequisites directives are detected by the proxy, the proxy may immediately convey an indication to the client (block **506**) that these identified resources are considered prerequisites. Upon receiving this indication, the client may then determine whether or not is currently has the identified prerequisite resources (decision block **508**). If the client does not have these resources, the client may then take any actions necessary to prefetch the prerequisite resources (block **510**). Subsequently, or concurrently, the proxy may convey the remaining presentation content or directives to the client (block **512**). Once the

**48**

client has obtained the prerequisite resources (decision block **514**), presentation of the content corresponding to the prerequisite resources is permitted.

It is to be understood that numerous alternatives are possible. For example, in an alternative embodiment, there is not proxy as described. Rather, the client is configured to process resources and content directly. In such an embodiment, the client may be configured to first scan received content for prerequisite directives. Alternatively, the prerequisite directives may be processed as received. Other embodiments are possible and are contemplated.

Support within DASE and DVB MHP

Currently neither DASE's DAE nor MHP's DVB-HTML provides a facility that allows content authors to identify showstoppers or prefetch prioritization. However, they do provide facilities which may be utilized for transporting such information.

Support within DASE

There is explicit support for identifying the initial static priority of resources within an application in DASE's root entity DTD. This support is in the form of the definition of a priority value for a cache item that is associated with a preload attribute. It perhaps in DASE Level 2, to enhance the root entity DTD so that it includes support for showstopper identification; that is, one possible embodiment would be to add an attribute called showstopper.

Prior to such addition, of course, DDE-2 could recommend the use of x-dde2-showstopper as a non-standardized attribute value. Elements identifying the showstoppers and initial pre-fetch priorities could be automatically formulated from the HTML enhancements proposed in the following section and, therefore, would be available to the receiver as soon as the application enters the initialized state. It would not be necessary to modify the prefetch priorities in the root element in response to user interaction, so this very minor enhancement, along with the authoring proposal below, would suffice for fully supporting prefetch and showstopper requirements in the DASE DAE.

Support within DVB-MHP

DVB-MHP provides an optional descriptor, known as the pre-fetch descriptor, within the AIT. As with the DASE root element preload attribute, this descriptor could be automatically generated from the HTML enhancements proposed below. The showstopper resources could be accommodated one of several ways; either by adding a new AIT descriptor for showstopper resources or, alternatively, by setting the priority of showstopper resources to the highest possible value (**100**).

Proposal for Authoring

Showstoppers

Content authors may desire that there exist a way to identify those resources such that if they are not obtained by a receiver, displaying should be delayed.

Minimal Proposal

It is proposed that DDE may define a profile for DDE specific META name/value pairs. Among those pairs would be the name "prerequisite", with the value being the target URI of the essential resource. An example of this name/value pair would be the one below which indicates that "background.mpg" is an essential resource that needs to be acquired and processed by the receiver prior to displaying the application's initial content.

&lt;META     name="prerequisite"content="http://www.cnn.com/background.mpg"&gt;

US 7,055,169 B2

**49**

Prefetch Prioritization

As mentioned earlier, content authors may wish to provide a hint concerning both broadcast parameters as well as caching behavior by indicating that it may be desirable to initially prefetch certain resources, independent of whether those resources are considered as essential or prerequisite resources as defined above. It is not necessary that the author-supplied initial prefetch prioritization is identical to the prioritization that is eventually carried in the corresponding signaling file (i.e., the DASE root element or the MHP prefetch descriptor). However, content developers are typically not very good at choosing from among too many different priorities. (Absolute numerical priorities, such as a value between 1 and 100 are often better chosen by more complicated metrics that account for the size of the resource, expected size of cache, rate of transmission of the broadcast stream, etc.)

Therefore, as proposed herein, the content author may be permitted to identify whether or not it is desirable for a receiver to prefetch a particular resource. For example, the content author may identify resources to be prefetched using the 1 ink element in the <head> of the initial document and by defining a new value "prefetch" for the rel attribute of this element. Since there may be several resources that the author would recommend for prefetching, they may indicate a prefetch priority as well. For example, they may order these multiple resources so that the first ones have higher priority than latter ones.

As the DOM allows dynamic modification of the list of link resources at runtime, e.g., based upon user interaction, modified link resources may serve as a hint to the receiver concerning dynamically changing priorities. However, it may also be useful to permit the content author to not only dynamically control prefetch priorities, but also to indicate that the use of a resource is imminent so that the terminal may wish to "precreate" the resource (e.g., allocate resources such as memory, and decode) instead of simply prefetching that resource. In order to permit the content author to accomplish this, a cache object may be used that implements both a prefetch( ) as well as a precreate( ) method.

8. Extended Uniform Resource Identifiers for Television Broadcasts

The use of W3C standards for authoring interactive television content that is to be carried with digital television signals has begun to increase significantly. RFC 2838 (Uniform Resource Identifiers for Television Broadcasts) addressed the need to reference television broadcast streams as a whole; this section extends the description contained therein to include the ability to reference particular substreams and non-video resources that may also be carried in the broadcast stream. In addition to being useful directly within existing client set-top box or television implementations, the scheme described herein may be mapped to proposed transport-specific television schemes, e.g., dvb, ocap, and arib. The purpose of such mapping is to allow a content developer to author their content using the URI described herein, while permitting automatic (or manual) transcoding to one or more of the other proposed schemes.

Extended Television Uniform Resource Identifier (URI)

The basic structure of the extended television URI is:
tvx:<service-address>[<track-list>][<abs-path>]

where

<service-address> is a description of the data source, which may correspond to the DNS-style identifiers defined for "tv:" in RFC 2838. The optional

**50**

<track-list> can specify audio, video, subtitle, teletext, or data substreams within the stream emanating from the service-address. The

<abs-path> can be used to identify individual resources within a substream, or, since its syntax is quite flexible, can be further defined by various of the transport-specific URIs.

Current Channel

The current channel can be specified as
tvx://current

This URI refers to whichever television broadcast is currently being accessed by the referring object. This definition differs from the "tv:" definition, as it is specific to the referring object. This difference is necessary because set-top boxes containing multiple tuners, decoders, etc. are becoming more commonplace.

This "current" broadcast may contain multiple audios (e.g., different languages), multiple videos (e.g., different camera angles), and different types of data. However, this URI refers to only those sub-streams that are being used by the destination associated with the referring object. For example, if there are both English and German sub-titles available, but the display associated with the object referencing this URI is only showing the German sub-titles (i.e., is not showing the English sub-titles), then the English sub-titles would not be part of tvx://current.

Syntax (BNF) for Extended Television URIs

The following is an example of a formal specification for the extended television URIs:

| | |
|---|---|
| tvx_uri | = "tvx:" [tvx_hier_part] |
| tvx_hier_part | = tvx_net_path | tvx_abs_path |
| tvx_net_path | = "//" service_addr [comp_list] [tvx_abs_path] |
| service_addr | = broadcast | "current" |
| comp_list | = ";" component *("," component ) |
| component | = stream_selector |
| stream_selector | = stream_type "=" stream_id |
| stream_type | = "video" | "audio" | "data" | "subtitle" | "teletext" |
| stream_id | = 1*alphanum | "default" | "current" | "none" |
| tvx_abs _path | = "/" path_segments |
| where: | |
| broadcast | may be as defined in RFC2838) |
| path_segments | may be as defined in RFC 2396 |
| alphanum | may be as defined in RFC 2396 |

Semantics for Extended Television URIs

This section defines the meaning of the various forms of the extended television URIs.

Service Address Alone

The substream referenced by a service address alone may consist of video, audio, teletext, subtitle, and data streams. Data streams may contain executable code in addition to data used by that code or data used by a resident application. In addition, there may be more than one stream of each type in the referenced substream. For example, tvx://bcd.com may contain 2 video streams, 4 audio streams, one teletext stream, one subtitle stream, and five data streams. Which streams are "displayed" by the object referencing this URI can depend upon many factors. If the viewer has selected a default setting which indicates a preference concerning whether or not teletext and/or subtitles are displayed, then that preference may be used to determine whether these streams are displayed. Additionally a viewer may indicate a preferred audio language.

US 7,055,169 B2

51

The broadcasting network may use signaling to indicate the default video stream, and, for example, in the case of DVB MHP, may indicate that particular applications should be downloaded and executed. If the receiver has the ability to decode at least one video stream and one audio stream concurrently, then in one embodiment at least one of each will be decoded when a tvx URI of this form is specified. Further, the viewer may be provided with controls which enable them to "mute" the audio or video. If the viewer has not muted a stream, but also has not selected a preference, and the network has not indicated a preference, then any one of the corresponding streams may be decoded and displayed.

As stated above, while a URI of the form "tvx://current" may also be used, referencing this URI does not generally change which streams are being decoded (and presented).

Specifying Components

The content author can reference particular substreams within the stream using this URI. For example, "tvx://bcd.com;audio=eng" may refer to an English audio substream. Also, more than one stream may be referenced using this form of URI. For example, "tvx://bcd.com; video=catcher;audio=eng" may be used to refer to a video which is shot from behind a baseball catcher along with the English audio. It is expected that the content author may have appropriate tools by which they can either set a "track tag" (e.g., catcher, eng) to correspond to a particular substream, or that a set of track tags may be determined by a standard or by a video producer, for example.

In one embdodiment, there are two special keywords that may be used as track tags which are defined in this document: "current" and "default." The "current" track tag indicates the substream that is currently being displayed. For example, if the viewer is currently watching a movie and is listening to the French audio, their audio may be changed to English without affecting the video through the use of the following URI: "tvx://current;video=current;audio=eng" (providing that the track tag "eng" had been associated with the audio).

The "default" keyword may be used to refer to the default as defined by the viewer, author, receiver, content author or some combination, as per a particular specification and/or instantiation. That is, in some vertical networks, the network operator may have the authority to set a default preference and in other networks, it may be up to the viewer.

Path Segments

Path segments may be used to identify a resource within a particular component. For example, "tvx://bcd.com; data=novice/game/chess/move3" may refer to the resource game/chess/move3 which is carried in the data substream with the track tag of novice.

Additional meanings may be assigned to the path segments when the various transport-specific television URIs are mapped to this URI. However, until they are so defined, path segments shall only be meaningful when the component type is data.

Various embodiments may further include receiving, sending or storing instructions and/or data implemented in accordance with the foregoing description upon a carrier medium. Generally speaking, a carrier medium may include transmission media or signals used in broadcast systems and otherwise such as electrical, electromagnetic, or digital signals, conveyed via a communication medium such as network and/or a wireless link. For example, a network operator may convey signals which describe program instructions via a broadcast system. A carrier medium may also include storage media or memory media such as mag-

52

netic or optical media, e.g., disk or CD-ROM, volatile or non-volatile media such as RAM (e.g. SDRAM, RDRAM, SRAM, etc.), ROM, etc.

It is to be understood that the above embodiments are intended to be exemplary only. Numerous alternative configurations are possible and are contemplated.

What is claimed is:

1. A method comprising:

receiving one or more directives, wherein said directives are indicative of an audio, video and/or graphic presentation which requires a set of resources;

determining whether said one or more directives includes a prerequisite directive which indicates that acciuisition of a subset of said set of resources is a prerequisite for initiating the presentation;

initiating said presentation, in response to determining the one or more directives do not include said prerequisite directive; and

prohibiting initiation of said presentation until said subset of resources are acquired, in response to determining the one or more directives include said prerequisite directive.

2. The method of claim 1, wherein said prerequisite directive comprises one or more directives selected from the group consisting of: a markup language, a scripting language, and a style sheet.

3. The method of claim 2, wherein said one or more directives are received by a proxy server in an interactive television system.

4. The method of claim 3, wherein said determining is performed by said proxy server, and wherein said method further comprises said proxy server conveying signals indicative of said subset of resources to a remote client device.

5. The method of claim 4, further comprising said client device acquiring said subset of resources in response to detecting said signals.

6. The method of claim 5, wherein said subset comprises streaming audio and/or video, and wherein acquisition of the streaming audio and/or video comprises configuring hardware resources within said client device.

7. The method of claim 5, wherein acquisition of the subset of resources comprises the client device initiating requests for remotely located resources to be conveyed to said client device.

8. The method of claim 1, further comprising enhancing a root entity in DTD to add a showstopper attribute indicative of prerequisite resources.

9. The method of claim 1, further comprising using a label within a Declarative Data Essence standard as an attribute to indicate a prerequisite resource.

10. The method of claim 1, further comprising enhancing DVB-MHP by adding a showstopper AIT descriptor indicative of prerequisite resources.

11. The method of claim 1, further comprising defining a META name/value pair, wherein said name is indicative that said corresponding value is a prerequisite resource.

12. The method of claim 1, wherein said prohibiting is in further response to detecting a corresponding time for expiration has not yet expired, and wherein said method further comprises allowing the presenting of said presentation in response to detecting said time for expiration has expired.

13. An interactive television system comprising:

a remote proxy server configured to:

receive one or more directives, wherein said directives are indicative of an audio, video and/or graphic presentation which requires a set of resources;

US 7,055,169 B2

53

determine whether said one or more directives includes
a prerequisite directive which indicates that acquisition of a subset of said set of resources is a prerequisite for initiating the presentation;

convey first signals which identify said subset of resources to a remote client device, in response to determining the one or more directives include said prerequisite directive; and

convey second signals which correspond to said one or more directives;

a client device configured to:

receive said first signals;

receive said second signals; and

prohibit initiation of said presentation until said subset of resources are acquired, in response to detecting said first signals.

**14**. The system of claim **13**, wherein said prerequisite directive comprises one or more directives selected from the group consisting of: a markup language, a scripting language, and a style sheet.

**15**. The system of claim **14**, wherein acquiring said subset of resources comprises said client device configuring hardware resources within said client device.

**16**. The system of claim **14**, wherein acquiring said subset of resources comprises initiating requests for remotely located resources to be conveyed to said client device.

**17**. The system of claim **13**, further comprising enhancing a root entity in DTD by adding a showstopper attribute indicative of prerequisite resources.

**18**. The system of claim **13**, wherein said directives include the use of a showstopper attribute indicative of prerequisite resources.

**19**. The system of claim **13**, wherein said server is configured to detect a DVB-MHP showstopper AIT descriptor indicative of prerequisite resources.

**20**. The system of claim **13**, wherein said directives define a META name/value pair, wherein said name is indicative that said corresponding value is a prerequisite resource.

**21**. The system of claim **13**, wherein said device is configured to prohibit said initiation in further response to detecting a corresponding time for expiration has not yet

54

expired, and wherein said device is further configured to allow the presenting of said presentation in response to detecting said time for expiration has expired.

**22**. A client device in an interactive television system, said device comprising:

a receiver configured to receive signals corresponding to directives which are indicative of an audio, video and/or graphic presentation requiring a set of resources; and

a processing unit coupled to said receiver, wherein said processing unit is configured to:

determine whether said one or more directives includes a prerequisite directive which indicates that acquisition of a subset of said set of resources is a prerequisite for initiating the presentation;

initiate said presentation, in response to determining the one or more directives do not include said prerequisite directive; and

prohibit initiation of said presentation until said subset of resources are acquired, in response to determining the one or more directives include said prerequisite directive.

**23**. A computer readable medium comprising program instructions executable by a computer to:

receive directives which are indicative of an audio, video and/or graphic presentation which requires a set of resources;

determine whether said one or more directives includes a prerequisite directive which indicates that acquisition of a subset of said set of resources is a prerequisite for the presentation;

initiate said presentation, in response to determining the one or more directives do not include said prerequisite directive; and

prohibit the presenting of said presentation until said subset of resources are acquired, in response to determining the one or more directives include said prerequisite directive.

* * * * *

# Exhibit E

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 15/637,561 | 06/29/2017 | Alex Fishman | 2050.171US2 | 8149 |

44367          7590          11/26/2018
SCHWEGMAN LUNDBERG & WOESSNER/OPEN TV
P.O. BOX 2938
MINNEAPOLIS, MN 55402-0938

| EXAMINER |
|---|
| TRINH, TUNG THANH |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2421 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 11/26/2018 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

SLW@blackhillsip.com
uspto@slwip.com

PTOL-90A (Rev. 04/07)

| *Office Action Summary* | **Application No.**<br>15/637,561 | **Applicant(s)**<br>Fishman et al. |
|---|---|---|
| | **Examiner**<br>TUNG T TRINH | **Art Unit**<br>2421 | **AIA Status**<br>No |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☑ Responsive to communication(s) filed on <u>07/23/2018</u>.
    ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2a)☑ This action is **FINAL.**    2b)☐ This action is non-final.

3)☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

4)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims***

5)  ☑ Claim(s) <u>1-20</u> is/are pending in the application.
    5a) Of the above claim(s) _____ is/are withdrawn from consideration.

6)  ☐ Claim(s) _____ is/are allowed.

7)  ☑ Claim(s) <u>1-20</u> is/are rejected.

8)  ☐ Claim(s) _____ is/are objected to.

9)  ☐ Claim(s) _____ are subject to restriction and/or election requirement

* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to **PPHfeedback@uspto.gov.**

**Application Papers**

10)☐ The specification is objected to by the Examiner.

11)☐ The drawing(s) filed on _____ is/are:  a)☐ accepted or  b)☐ objected to by the Examiner.
    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
  **Certified copies:**
    a)☐ All   b)☐ Some**   c)☐ None of the:
    1.☐ Certified copies of the priority documents have been received.
    2.☐ Certified copies of the priority documents have been received in Application No. _____.
    3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☑ Notice of References Cited (PTO-892)

2) ☑ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b)
Paper No(s)/Mail Date _____.

3) ☐ Interview Summary (PTO-413)
Paper No(s)/Mail Date _____.

4) ☐ Other: _____.

Application/Control Number: 15/637,561                                          Page 2
Art Unit: 2421

## DETAILED ACTION

### *Notice of Pre-AIA Status*

The present application is being examined under the pre-AIA first to invent

provisions.

### *Miscellaneous*

Claims 1-2, 4-8 and 14-10 are amended.

Claims 1-20 are currently pending.

This application is a CON of 12/877,034 09/07/2010 or US Patent No. 9,699,503.

### *Response to Arguments*

Regarding double patenting rejection, Applicant stated in remarks that a Terminal

Disclaimer to US Patent 9,699,303 was enclosed. However, the Terminal Disclaimer is

not on files, therefore the 101 rejection is maintained.

Regarding 101 rejection, the rejection indicates that claimed invention is a

**combination of known concepts of abstract ideas** identified in precedent court

cases. Applicant analyzed and applied the court cases individually to the claimed

invention; therefore the examiner includes interpretation of abstract ideas based on the

Application/Control Number: 15/637,561                                         Page 3
Art Unit: 2421

court cases "**Intellectual Ventures I LLC v. Capital One**" and **Bascom** for "Subject

Matter Eligibility Test for Products and Processes" in 101 rejection below:


### *Claim Rejections - 35 USC § 101*

35 U.S.C. 101 reads as follows:

Whoever invents or discovers any new and useful process, machine, manufacture, or
composition of matter, or any new and useful improvement thereof, may obtain a patent
therefor, subject to the conditions and requirements of this title.


**Claims 1-20 are rejected under 35 U.S.C. 101** because the claimed invention is

not directed to statutory subject matter. Based on Supreme Court precedent, to be

patent eligible under 35 U.S.C. 101, a statutory method/process claim must (1) be tied

to a particular machine or apparatus or (2) transform a particular article into a different

state or thing (see at least Gottschalkv. Benson, 409 U.S. 70 (1972); Diamond v. Diehr,

450 U.S. 192 (1981); Parker v. Flook, 437 U.S. 589 n.9 (1978); and Cochrane v.

Deener, 94 U.S. 780, 788 (1876)). Furthermore, the Supreme Court held that the use of

a particular machine or transformation of an article must impose meaningful limits on

the claim's scope to impart patentability (Benson, 409 U.S. 71-72). The involvement of

the machine or transformation must not merely be insignificant extra-solution activity

(Flook, 437 U.S. 590). Also see In re Bilski, No. 2007-1130, _F.3d_, 2008 WL4757.


The claims are directed to a judicial exception (i.e., a law of nature, a natural

phenomenon, or an abstract ideas) without significantly more. In general the claims are

directed abstract ideas of accessing database information (content, viewer and social

network), generating a list of popular content, customizing the list to generate a playlist

for individual user, and sending the playlist to display on user device (the playlist is a

subset of video content items in the database, the items are not modified nor

transformed by the above processes); the abstract ideas are identified by the court case

**Intellectual Ventures I LLC v. Capital One** and **Bascom Global Internet Services,**

**INC v. AT&T Mobility LLC.**

   *Subject Matter Eligibility Test for Product and Processes:*

   **Step 1** (Yes), claimed invention of claims 1, 14 and 20 are directed to a process,

a system and a product respectively.

   **Step 2A** (Yes), the claimed invention are clearly focused on concepts relating to

tracking or organizing information including "tailoring content based on information

about the user" (**Intellectual Ventures I LLC v. Capital One)** and "filtering content"

(**BASCOM**, customizing filtering content of network account based on schemes or

elements).

   Interpretation the steps of claim 1:

"accessing a database to obtain content utilization data … wherein the plurality of

viewers comprises a second viewer who is not identified as a social connection of the

first viewer" are known concepts of abstract ideas "collecting, recognizing certain data

within the collected data set, and storing that recognized data" (**Intellectual Ventures I**

**LLC v. Capital One**);

   "automatically generating … a list of popular content items that are currently

popular among the plurality of viewers based on the content utilization data" are known

concepts of abstract ideas "collecting, recognizing certain data within the collected data

set, and storing that recognized data" (**Intellectual Ventures I LLC v. Capital One**) or

Application/Control Number: 15/637,561                                          Page 5
Art Unit: 2421

"filtering content based on user account information" (**Bascom Global Internet**

**Services, INC v. AT&T Mobility LLC**, p 6-9);

  "customizing … the list of popular content items to generate a customized playlist

… comprises" are known concepts of abstract ideas "collecting, recognizing certain

data within the collected data set, and storing that recognized data" (**Intellectual**

**Ventures I LLC v. Capital One**) or "filtering content based on user account information"

(**Bascom Global Internet Services, INC v. AT&T Mobility LLC**, p 6-9)

  "generating a score for each item from the list of popular content items based on

the profile data of the first viewer" are known concepts of abstract ideas "filtering content

based on user account information" (**Bascom Global Internet Services, INC v. AT&T**

**Mobility LLC,** filtering schemes and elements by score is well known in the art);

  "including items in the playlist based on at least some of the scores of the items

from the list of popular content items" are known concepts of abstract ideas "filtering

content based on user account information" (**Bascom Global Internet Services, INC v.**

**AT&T Mobility LLC,** filtering schemes and elements by score is well known in the art);

and

  "based on the generating of the playlist, automatically sending .. perform an

operation for an item of the items included in the playlist" are known concepts of

abstract ideas "collecting, recognizing certain data within the collected data set, and

storing that recognized data" (**Intellectual Ventures I LLC v. Capital One,** pages 11-13

claim 21 manipulating data in the display interface)

  **Step 2B** (No), the claimed invention is implement as in fig. 1, which is a

conventional system of video distribution, the claimed invention is implemented as

Application/Control Number: 15/637,561                                          Page 6
Art Unit: 2421

software applications at server and STB. The claims further do not include additional elements that are sufficient to amount to significantly more than the judicial exception because the claims do not go beyond requiring the gathering, organizing/manipulating/analysis, and display of available information in a particular filed, stating those functions in general terms, without limiting them to technical means for performing the functions that are arguably an advance over conventional computer and network technology. Limiting the claims to the particular technological environment of media asset recommending is, without more, insufficient to transform them into patent-eligible applications of the abstract idea at their core (**see Alice, 134 S. Ct. at 2358; Mayo, 132 S. Ct. at 1294; Bilski v. Kappos, 561 U.S. 593**).  Merely selecting information, by content or source, for collection, analysis, and display does nothing significant to differentiate a process from ordinary mental processes, whose implicit exclusion from § 101 undergirds the information-based category of abstract ideas.

Inquiry then must turn to any requirements for *how* the desired result is achieved. In the instant application, the claims' invocation of an input device and control circuitry do not transform the claimed subject matter into patent-eligible applications. The claims are implemented in fig. 1, the claims at issue do not require any non-conventional computer, network, or display components, or even a "non-conventional and non-generic arrangement of known, conventional pieces," but merely call for performance of the claimed information collection, organize/manipulate/analysis, and display functions "on a set of generic computer components" and display devices (**Bascom, 2016 WL 3514158, at *6-7**).

### *Double Patenting*

The nonstatutory double patenting rejection is based on a judicially created doctrine grounded in public policy (a policy reflected in the statute) so as to prevent the unjustified or improper timewise extension of the "right to exclude" granted by a patent and to prevent possible harassment by multiple assignees. A nonstatutory double patenting rejection is appropriate where the conflicting claims are not identical, but at least one examined application claim is not patentably distinct from the reference claim(s) because the examined application claim is either anticipated by, or would have been obvious over, the reference claim(s). See, e.g., *In re Berg*, 140 F.3d 1428, 46 USPQ2d 1226 (Fed. Cir. 1998); *In re Goodman*, 11 F.3d 1046, 29 USPQ2d 2010 (Fed. Cir. 1993); *In re Longi*, 759 F.2d 887, 225 USPQ 645 (Fed. Cir. 1985); *In re Van Ornum*, 686 F.2d 937, 214 USPQ 761 (CCPA 1982); *In re Vogel*, 422 F.2d 438, 164 USPQ 619 (CCPA 1970); *In re Thorington*, 418 F.2d 528, 163 USPQ 644 (CCPA 1969).

A timely filed terminal disclaimer in compliance with 37 CFR 1.321(c) or 1.321(d) may be used to overcome an actual or provisional rejection based on nonstatutory double patenting provided the reference application or patent either is shown to be commonly owned with the examined application, or claims an invention made as a result of activities undertaken within the scope of a joint research agreement. See MPEP § 717.02 for applications subject to examination under the first inventor to file provisions of the AIA as explained in MPEP § 2159.  See MPEP §§ 706.02(l)(1) - 706.02(l)(3) for applications not subject to examination under the first inventor to file provisions of the AIA. A terminal disclaimer must be signed in compliance with 37 CFR 1.321(b).

Application/Control Number: 15/637,561                                                    Page 8
Art Unit: 2421

The USPTO Internet website contains terminal disclaimer forms which may be used. Please visit www.uspto.gov/patent/patents-forms. The filing date of the application in which the form is filed determines what form (e.g., PTO/SB/25, PTO/SB/26, PTO/AIA/25, or PTO/AIA/26) should be used. A web-based eTerminal Disclaimer may be filled out completely online using web-screens. An eTerminal Disclaimer that meets all requirements is auto-processed and approved immediately upon submission. For more information about eTerminal Disclaimers, refer to www.uspto.gov/patents/process/file/efs/guidance/eTD-info-I.jsp.

It is also noticed that the examiner tried to contact Applicant for discussion of filing terminal disclaimer without success.

**Claims 1-20 are rejected on the ground of nonstatutory double patenting** as being unpatentable over **claims 1-11 and 16-18** of U.S. Patent No. 9,699,503 (or parent application 12/877,034). Although the claims at issue are not identical, they are not patentably distinct from each other because claimed invention of independent claim 1 is broader and combination of claims 1, 2, 3 and 5 has similar features of claim 1 of U.S. Patent No. 9,699,503. It is also known in the art that profile is including viewing history.

| Instant Application: | US Patent No. 9,699,503: |
|---|---|
| **Claims 1, 14 and 20**. (Currently Amended) A computer-implemented method comprising: | **Claims 1, 9 and 16**. A computer-implemented method comprising: |

Application/Control Number: 15/637,561                                    Page 9
Art Unit: 2421

| | |
|---|---|
| accessing a database to obtain content utilization data of a plurality of client devices, each client device associated with a respective viewer of a plurality of viewers, wherein the content utilization data for a first viewer from the plurality of viewers is indicative of an interest of the first viewer in respective content items, and wherein the plurality of viewers comprises a second viewer who is not identified as a social connection of the first viewer; | obtaining content utilization data from a plurality of client devices associated with a respective plurality of viewers, wherein the content utilization data for a viewer from the plurality of viewers is indicative of the viewer's interest in respective content items, and wherein the plurality of viewers comprises other viewers who are not identified as social connections of the viewer; |
| automatically generating, by a computer system, a list of popular content items that are currently popular among the plurality of viewers based on the content utilization data; | automatically generating, at a server computer system, a list of popular content items that are currently popular among the plurality of viewers based on the obtained content utilization data; |
| customizing, by the computer system, the list of popular content items to generate a playlist, the customizing based on profile | for a target viewer from the plurality of viewers, customizing the list of popular content items to generate a customized |

Application/Control Number: 15/637,561                                      Page 10
Art Unit: 2421

| | |
|---|---|
| data of the first viewer, wherein the customizing is performed by the computer system and comprises: | playlist, the customizing based on a viewing history of the target viewer and on a viewing history of viewers who are identified as social connections of the target viewer, wherein the customizing comprises: |
| generating a score for each item from the list of popular content items based on the profile data of the first viewer; and | generating a score for each item from the list of popular content items based on the viewing history of the target viewer and on the viewing history of the viewers who are identified as social connections of the target viewer; and |
| including items in the playlist based on at least some of the scores of the items from the list of popular content items. | including items in the customized playlist based on the respective scores of the items from the list of popular content items; and |
| based on the generating of the playlist, automatically sending, by the computer system, to a client device of the first viewer, an instruction that causes the | communicating the customized playlist to a client device of the target viewer. (*the additional elements are conventional operation of a playlist*) |

Application/Control Number: 15/637,561                                    Page 11
Art Unit: 2421

| | |
|---|---|
| client device to perform an operation for an items included in the playlist. | |
| **Claim 2**. The method of claim 1, wherein the customizing the list of popular content items to generate the playlist is further based on viewing history data of at least one viewer who is identified in social connection data as a social connection of the first viewer. | **Claim 1**…for a target viewer from the plurality of viewers, customizing the list of popular content items to generate a customized playlist, the customizing based on a viewing history of the target viewer and on a viewing history of viewers who are identified as social connections of the target viewer, wherein the customizing comprises … |
| **Claim 3**.  The method of claim 2, wherein the generating of the score for each item from the list of popular content items is further based on the viewing history data of the at least one viewer who is identified in the social connection data as a social connection of the first viewer. | **Claim 1**…generating a score for each item from the list of popular content items based on the viewing history of the target viewer and on the viewing history of the viewers who are identified as social connections of the target viewer... |

Application/Control Number: 15/637,561                                    Page 12
Art Unit: 2421

| | |
|---|---|
| **Claim 5**. The method of claim 1, further comprising: communicating the playlist to a client device of the first viewer. | **Claim 1**… communicating the customized playlist to a client device of the target viewer. |
| **Claim 4**. The method of claim 3, wherein the customizing comprises selecting at least one of the popular content items for the playlist based on the viewing history data of the at least one viewer who is identified in the social connection data as a social connection of the first viewer indicating a high level of interest in the at least one of the popular content items while viewing history data of the first viewer indicates a low level of interest in the at least one of the popular content items by the first viewer. | **Claim 2**. The method of claim 1, wherein the customizing comprises selecting at least one of the popular content items for the customized playlist based on the viewing history of the viewers who are identified as social connections of the target viewer indicating a high level of interest in the at least one of the popular content items among the social connections of the target viewer while the viewing history of the target viewer indicates a low level of interest in the at least one of the popular content items by the target viewer. |
| **Claim 6**. The method of claim 5, wherein the sending of the instruction that causes the client device to perform the operation | **Claim 3**. The method of claim 1, wherein the communicating of the customized playlist to the client device of the target |

Application/Control Number: 15/637,561                                    Page 13
Art Unit: 2421

| | |
|---|---|
| for the item of the items included in the playlist comprises sending an instruction that causes initiation of recording of a live program identified in the playlist. | viewer comprises communicating an instruction to start recording of a live program identified in the customized playlist. |
| **Claim 7**. The method of claim 5, wherein the sending of the instruction that causes the client device to perform the operation for the item of the items included in the playlist comprises sending an instruction that causes display of an alert message regarding a live program identified in the playlist. | **Claim 4**. The method of claim 1, wherein the communicating of the customized playlist to the client device of the target viewer comprises communicating an instruction to display an alert message regarding a live program identified in the customized playlist. |
| **Claim 8**. The method of claim 1, wherein the items in the playlist include at least one of a first item that identifies Internet content, a second item that identifies video on demand content, and a third item that identifies a live program. | **Claim 5**. The method of claim 1, wherein the items in the customized playlist include at least one of a first item that identifies Internet content, a second item that identifies video on demand content, and a third item that identifies a live program. |

Application/Control Number: 15/637,561                                          Page 14
Art Unit: 2421

| | |
|---|---|
| **Claim 9**.  The method of claim 1, wherein the client device comprises a set top box. | **Claim 6**. The method of claim 1, wherein the client device comprises a set top box. |
| **Claim 10**. The method of claim 1, wherein the client device comprises a desktop computer. | **Claim 7**. The method of claim 1, wherein the client device comprises a desktop computer. |
| **Claim 11**. The method of claim 1, wherein the client device comprises a mobile device. | **Claim 8**. The method of claim 1, wherein the client device comprises a mobile device. |
| **Claim 12**. The method of claim 1, wherein the customizing of the list of popular content items is also based at least in part on a content category of interest to the first viewer. | **Claim 17**. The method of claim 1, the customizing of the list of popular content items also being based at least in part on a content category of interest to the target viewer. |
| **Claim 13**. The method of claim 1, wherein the content utilization data indicates lengths of time during which the plurality of viewers have viewed a content item. | **Claim 18**. The method of claim 1, the obtained content utilization data indicating lengths of time during which the plurality of viewers have viewed a content item. |

Application/Control Number: 15/637,561                                      Page 15
Art Unit: 2421

| **Claim 15**. The system of claim 14, wherein the generating of the playlist is further based on viewing history data of at least one viewer who is identified in social connection data as a social connection of the first viewer. | **Claim 9**…a customization module to generate a customized playlist for a target viewer from the plurality of viewers, the customizing based on the list of popular content items, a viewing history of the target viewer, and a viewing history of viewers who are identified as social connections of the target viewer… |
| --- | --- |
| **Claim 16**. The system of claim 15, wherein the generating of the score for each item from the list of popular content items is further based on viewing history data of the at least one viewer who is identified in social connection data as social connections of the first viewer. | **Claim 9**…generate a score for each item from the list of popular content items based on the viewing history of the target viewer and on the viewing history of the viewers who are identified as social connections of the target viewer… |
| **Claim 18**. The system of claim 14, wherein the operations further comprise: communicating the playlist to a client device of the first viewer. | **Claim 9**… a communications module to communicate the customized playlist to a client device of the target viewer. |

Application/Control Number: 15/637,561                                    Page 16
Art Unit: 2421

| | |
|---|---|
| **Claim 17**. The system of claim 15, wherein the customization operations further comprise selecting at least one of the popular content items for the playlist based on viewing history data of the at least one viewer who is identified in social connection data as social connections of the first viewer indicating a high level of interest in the at least one of the popular content items while viewing history data of the first viewer indicates a low level of interest in the at least one of the popular content items by the first viewer. | **Claim 10**. The system of claim 9, wherein the customization module is to select at least one of the popular content items for the customized playlist based on the viewing history of the viewers who are identified as social connections of the target viewer indicating a high level of interest in the at least one of the popular content items among the social connections of the target viewer while the viewing history of the target viewer indicates a low level of interest in the at least one of the popular content items by the target viewer. |
| **Claim 19**. The system of claim 18, wherein the operations further comprise communicating to the client device of the first viewer an instruction that causes initiation of recording of a live program identified in the customized playlist. | **Claim 11**. The system of claim 9, wherein the communications module is to communicate to the client device an instruction to start recording of a live program identified in the customized playlist. |

Application/Control Number: 15/637,561                                          Page 17
Art Unit: 2421

### *Conclusion*

**THIS ACTION IS MADE FINAL.**  Applicant is reminded of the extension of time

policy as set forth in 37 CFR 1.136(a).

A shortened statutory period for reply to this final action is set to expire THREE

MONTHS from the mailing date of this action.  In the event a first reply is filed within

TWO MONTHS of the mailing date of this final action and the advisory action is not

mailed until after the end of the THREE-MONTH shortened statutory period, then the

shortened statutory period will expire on the date the advisory action is mailed, and any

extension fee pursuant to 37 CFR 1.136(a) will be calculated from the mailing date of

the advisory action.  In no event, however, will the statutory period for reply expire later

than SIX MONTHS from the mailing date of this final action.

/TUNG T TRINH/
Examiner, Art Unit 2421

/NATHAN J FLYNN/
Supervisory Patent Examiner, Art Unit 2421

# Exhibit F

S/N 15/637,561                                                                    PATENT

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

| | | |
|---|---|---|
| Inventors: | Alex Fishman *et al.* | Examiner: Tung Thanh Trinh |
| Application No.: | 15/637,561 | Group Art Unit: 2421 |
| Filed: | June 29, 2017 | Docket No.: 2050.171US2 |
| Confirmation No.: 8149 | | |
| Title: | SMART PLAYLIST | |

**AMENDMENT & RESPONSE UNDER 37 C.F.R. § 1.116**

Mail Stop AF
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450


      Applicant has received the Final Office Action dated November 26, 2018. Please consider the following remarks.

## IN THE CLAIMS

No amendments are made to the claims herein. The currently pending set of claims is reproduced below, for reference.

1.      (Previously Presented) A computer-implemented method comprising:

accessing a database to obtain content utilization data of a plurality of client devices, each client device associated with a respective viewer of a plurality of viewers, wherein the content utilization data for a first viewer from the plurality of viewers is indicative of an interest of the first viewer in respective content items, and wherein the plurality of viewers comprises a second viewer who is not identified as a social connection of the first viewer;

automatically generating, by a computer system, a list of popular content items that are currently popular among the plurality of viewers based on the content utilization data;

customizing, by the computer system, the list of popular content items to generate a playlist, the customizing based on profile data of the first viewer , wherein the customizing is performed by the computer system and comprises:

generating a score for each item from the list of popular content items based on the profile data of the first viewer; and

including items in the playlist based on at least some of the scores of the items from the list of popular content items; and

based on the generating of the playlist, automatically sending, by the computer system, to a client device of the first viewer, an instruction that causes the client device to perform an operation for an item of the items included in the playlist.

2.      (Previously Presented) The method of claim 1, wherein the customizing of the list of popular content items to generate the playlist is further based on viewing history data of at least one viewer who is identified in social connection data as a social connection of the first viewer.

3.      (Previously Presented) The method of claim 2, wherein the generating of the score for each item from the list of popular content items is further based on the viewing history data of the at least one viewer who is identified in the social connection data as a social connection of the first viewer.

4.      (Previously Presented) The method of claim 2, wherein the customizing comprises selecting at least one of the popular content items for the playlist based on the viewing history data of the at least one viewer who is identified in the social connection data as a social connection of the first viewer indicating a high level of interest in the at least one of the popular content items while viewing history data of the first viewer indicates a low level of interest in the at least one of the popular content items by the first viewer.

5.      (Previously Presented) The method of claim 1, further comprising:
        communicating the playlist to a client device of the first viewer.

6.      (Previously Presented) The method of claim 1, wherein the sending of the instruction that causes the client device to perform the operation for the item of the items included in the playlist comprises sending an instruction that causes initiation of recording of a live program identified in the playlist.

7.      (Previously Presented) The method of claim 1, wherein the sending of the instruction that causes the client device to perform the operation for the item of the items included in the playlist comprises sending an instruction that causes display of an alert message regarding a live program identified in the playlist.

8.      (Previously Presented) The method of claim 1, wherein the items in the playlist include at least one of a first item that identifies Internet content, a second item that identifies video on demand content, and a third item that identifies a live program.

9.      (Previously Presented) The method of claim 1, wherein the client device comprises a set top box.

10.     (Previously Presented) The method of claim 1, wherein the client device comprises a desktop computer.

11.    (Previously Presented) The method of claim 1, wherein the client device comprises a mobile device.

12.    (Previously Presented) The method of claim 1, wherein the customizing of the list of popular content items is also based at least in part on a content category of interest to the first viewer.

13.    (Previously Presented) The method of claim 1, wherein the content utilization data indicates lengths of time during which the plurality of viewers have viewed a content item.

14.    (Previously Presented) A system comprising:

a memory that stores instructions; and

one or more processors configured by the instructions to perform operations comprising:

accessing a database to obtain content utilization data of a plurality of client devices associated with a plurality of viewers, wherein the content utilization data for a first viewer from the plurality of viewers is indicative of an interest of the first viewer in respective content items, and wherein the plurality of viewers comprises a second viewer who is not identified as social connections of the viewer;

automatically generating a list of popular content items that are currently popular among the plurality of viewers based on the content utilization data;

generating a playlist by performing customization operations comprising:

generating a score for each item from the list of popular content items based on a profile of the first viewer; and

including items in the playlist based on respective scores of the items from the list of popular content items; and

based on the generating of the playlist, automatically sending, to a client device of the first viewer, an instruction that causes the client device to perform an operation for an item of the items included in the playlist.

15.    (Previously Presented) The system of claim 14, wherein the generating of the playlist is further based on viewing history data of at least one viewer who is identified in social connection data as a social connection of the first viewer.

16.    (Previously Presented) The system of claim 15, wherein the generating of the score for each item from the list of popular content items is further based on viewing history data of the at least one viewer who is identified in social connection data as social connections of the first viewer.

17.    (Previously Presented) The system of claim 15, wherein the customization operations further comprise selecting at least one of the popular content items for the playlist based on viewing history data of the at least one viewer who is identified in social connection data as social connections of the first viewer indicating a high level of interest in the at least one of the popular content items while viewing history data of the first viewer indicates a low level of interest in the at least one of the popular content items by the first viewer.

18.    (Previously Presented) The system of claim 14, wherein the operations further comprise: communicating the playlist to a client device of the first viewer.

19.    (Previously Presented) The system of claim 14, wherein the sending of the instruction that causes the client device to perform the operation for the item of the items included in the playlist comprises sending an instruction that causes initiation of recording of a live program identified in the playlist.

20.    (Previously Presented) A machine-readable non-transitory storage medium storing instructions that, when executed by one or more processors of a machine, cause the machine to perform operations comprising:

accessing a database to obtain content utilization data of a plurality of client devices, each client device associated with a respective viewer of a plurality of viewers, wherein the content utilization data for a first viewer of the plurality of viewers is indicative of an interest of the first viewer in respective content items, and wherein the plurality of viewers comprises a second viewer

**AMENDMENT AND RESPONSE UNDER 37 C.F.R. § 1.116**    **Page 6**
Application Number: 15/637,561    Dkt: 2050.171US2
Filing Date: June 29, 2017
Title: SMART PLAYLIST

who is not identified as a social connection of the viewer;

automatically generating a list of popular content items that are currently popular among the plurality of viewers based on the content utilization data;

generating a playlist , the generating of the playlist being based on the list of popular content items and profile data of the first viewer, wherein the generating of the playlist comprises:

generating a score for each item from the list of popular content items based on the profile data of the first viewer; and

including items in the playlist based on at least some of the scores of the items from the list of popular content items; and

based on the generating of the playlist, automatically sending, to a client device of the first viewer, an instruction that causes the client device to perform an operation for an item of the items included in the playlist.

## REMARKS

This responds to the Final Office Action dated November 26, 2018.

No claims are amended, canceled, or added herein.  As a result, claims 1-20 remain pending in this application.

### *Incomplete Office Action under MPEP 707.07(f)*

The Office Action maintains the rejections of claims 1-20 without including a response to the arguments presented in the Response filed July 23, 2018.  Specifically, Applicant asserted that the claims are not directed to an abstract idea because "the causing of the client machine to perform an operation for a content item based on generating playlist data is something unconventional."[1] The Office Action does not address this argument.  Accordingly, per MPEP 707.07(f), the rejection is incomplete and withdrawal of the Finality of the Office Action is respectfully requested.

### *Double Patenting Rejection*

Claims 1-20 were rejected on the ground of nonstatutory double patenting as being unpatentable over claims 1-11 and 16-18 of U.S. Patent No. 9,699,503.

Applicant does not admit that the present claims are obvious in view of U.S. Patent No. 9,699,503.  Furthermore, the claims can change during prosecution before allowance.  Accordingly, a terminal disclaimer is not filed herewith, but will be considered when the claims are found to be in condition for allowance.

### *The Rejection of Claims Under §101*

Claims 1-20 stand rejected under 35 U.S.C. § 101 as allegedly being directed to non-statutory subject matter.  In particular, the Office Action alleges that "the claims are directed to abstract ideas of accessing database information (content, viewer and social network), generating a list of popular content, customizing the list to generate a playlist for individual user, and sending the playlist to display on user device (the playlist is a subset of video content items in the database, the items are not modified or transformed by the above processes)."[2]  Additionally, the Office Action

---

[1] Response of July 23, 2018 at 10.
[2] Office Action at 3-4.

AMENDMENT AND RESPONSE UNDER 37 C.F.R. § 1.116                                        **Page 8**
Application Number: 15/637,561                                                          Dkt: 2050.171US2
Filing Date: June 29, 2017
Title: SMART PLAYLIST

alleges that the claims "do not include additional elements that are sufficient to amount to significantly more than the judicial exception because the claims do not go beyond requiring the gathering, organizing/manipulating/analysis, and display of available information in a particular filed, stating those functions in general terms, without limiting them to technical means for performing the functions that are arguably an advance over conventional computer and network technology."[3]

Claims 1-20 Are Patent-Eligible at Step 2A Under the PTO's New Guidance

Under the guidance published in the Federal Register on January 7, 2019, a claim should be found to be "directed to" an abstract idea at Step 2A of the *Mayo* test **only** if the claim recites a judicial exception **and** "is not integrated into a practical application." Here, the claims recite data-gathering steps such as "accessing a database to obtain content utilization data" and data-manipulation steps such as "automatically generating … a list of popular content items … based on the content utilization data." Nonetheless, these steps are integrated into a practical application that "causes the client device to perform an operation for an item of the items included in the playlist." Accordingly, all claims should be found to be patent-eligible at Step 2A, using the new guidance.

Claims 6 and 19 Are Patent-Eligible at Step 2A Under the PTO's New Guidance

Additionally, the dependent claims further detail the practical application. Accordingly, even if the examiner maintains that the independent claims should be found patent-ineligible under the new guidance, some dependent claims should be found to be patent-eligible at Step 2A. For example, each of claims 6 and 19 recites "sending an instruction that causes the client device to perform the operation … comprises sending an instruction that causes initiation of recording of a live program identified in the playlist." Thus, claims 6 and 19 are directed to a practical application of controlling a client device to record live programs, not merely to the gathering and processing of data and should be found to be patent-eligible at Step 2A, using the new guidance.

---

[3] *Id.* at 6.

Claims 1-20 Are Patent-Eligible at Step 2B

Evaluation of the claims under *Mayo* step 2B shows that the claims are patent-eligible.  The Examiner asserts that the claims do not include elements that amount to significantly more than the judicial exception because "the claims do not go beyond requiring the gathering and analysis of available information in a particular field, stating those functions in general terms."[4]  Applicant respectfully submits that these statements are insufficient to support the conclusion the Examiner has drawn.

In *DDR Holdings*, the Federal Circuit held that a claim that was possibly directed to an abstract idea related to retaining website visitors from being diverted from a host's website to an advertiser's web site were nevertheless patentable because "the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks."[5]  The Court held that, unlike in *Ultramercial*, the claim does not generically recite use of the Internet to perform a business practice, but instead recites a specific way to automate the creation of a composite web page by an outsource provider that incorporates elements from multiple sources in order to solve a problem faced by websites on the Internet.[6]  Therefore, the court held that the claim is patent eligible.[7]  Applicant notes that this was so even though the invention was implemented using a standard computer operating using standard computer operations.

The claims at issue here solve a technological problem of, for example, processing content utilization data of a plurality of client devices associated with a plurality of viewers to generate playlist data for a specific viewer and, based on generating the playlist data, automatically sending an instruction that causes a client device to perform an operation.  This is a problem rooted in computer technology and arising particularly in the realm of computer networks and automation.  The claims are directed to a solution to this problem.  Rather than attempt to solve a problem that existed outside the realm of computer technology, the claims in fact solve a problem that only exists in the realm of computer technology.  This is precisely the type of claim ruled to be patentable subject matter in *DDR Holdings*.

---

[4] Office Action at 6.
[5] *DDR Holdings, LLC v. Hotels.com, L.P.*, Case No. 2013-1505 (Fed. Cir. Dec. 5, 2014) at 20.
[6] *Id.* at 23.
[7] *Id.*

In addition, the causing of the client machine to perform an operation for a content item based on generating playlist data is something unconventional.  Typically, playlist data is merely sent to a client device.  In contrast, claim 1, for example, recites "based on the generating of the playlist, automatically sending, by the computer system, to a client device of the first viewer, an instruction that causes the client device to perform an operation for an item of the items included in the playlist."  Thus, just like *DDR Holdings*, the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks that includes "a result that overrides the routine and conventional sequence of events."

Further, claim 1 has the result of one device (e.g., the computer system) causing a change in the function of another device (e.g., the client device), which has not been shown to be conventional activity.  Therefore, for the above reasons, assuming, *arguendo,* that independent claim 1 is directed to an abstract idea, independent claim 1 is nevertheless directed to a ***patent-eligible*** abstract idea.

Each of independent claims 14 and 20 recites elements similar or analogous to independent claim 1; therefore, these other independent claims are eligible for patent protection for the same reasons as independent claim 1.  Accordingly, for the above reasons, it is respectfully requested that the Examiner withdraw the rejection of all claims under 35 U.S.C. § 101.

**AMENDMENT AND RESPONSE UNDER 37 C.F.R. § 1.116**
Application Number: 15/637,561
Filing Date: June 29, 2017
Title: SMART PLAYLIST

**Page 11**
Dkt: 2050.171US2

## CONCLUSION

It is respectfully submitted that the claims are in condition for allowance, and notification to that effect is earnestly requested.  The Examiner is invited to telephone the undersigned at (408) 660-2987 to facilitate prosecution of this application.

If necessary, please charge any additional fees or deficiencies, or credit any overpayments to Deposit Account No. 19-0743.


Respectfully submitted,

SCHWEGMAN LUNDBERG & WOESSNER, P.A.
P.O. Box 2938
Minneapolis, MN 55402-0938
(408) 660-2987


Date   January 22, 2019          By _____

Domenico L. Ipponto
Reg. No. 66,058

# Exhibit G

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# NOTICE OF ALLOWANCE AND FEE(S) DUE

| | | |
|---|---|---|
| 44367 | 7590 | 04/18/2019 |

SCHWEGMAN LUNDBERG & WOESSNER/OPEN TV
P.O. BOX 2938
MINNEAPOLIS, MN 55402-0938

| EXAMINER |
|---|
| TRINH, TUNG THANH |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2421 | |

DATE MAILED: 04/18/2019

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 15/637,561 | 06/29/2017 | Alex Fishman | 2050.171US2 | 8149 |

TITLE OF INVENTION: SMART PLAYLIST

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | UNDISCOUNTED | $1000 | $0.00 | $0.00 | $1000 | 07/18/2019 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. PROSECUTION ON THE MERITS IS CLOSED.** THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS. THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON PETITION BY THE APPLICANT. SEE 37 CFR 1.313 AND MPEP 1308.

**THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN THREE MONTHS** FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. **THIS STATUTORY PERIOD CANNOT BE EXTENDED.** SEE 35 U.S.C. 151. THE ISSUE FEE DUE INDICATED ABOVE DOES NOT REFLECT A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE IN THIS APPLICATION. IF AN ISSUE FEE HAS PREVIOUSLY BEEN PAID IN THIS APPLICATION (AS SHOWN ABOVE), THE RETURN OF PART B OF THIS FORM WILL BE CONSIDERED A REQUEST TO REAPPLY THE PREVIOUSLY PAID ISSUE FEE TOWARD THE ISSUE FEE NOW DUE.

**HOW TO REPLY TO THIS NOTICE:**

I. Review the ENTITY STATUS shown above. If the ENTITY STATUS is shown as SMALL or MICRO, verify whether entitlement to that entity status still applies.

If the ENTITY STATUS is the same as shown above, pay the TOTAL FEE(S) DUE shown above.

If the ENTITY STATUS is changed from that shown above, on PART B - FEE(S) TRANSMITTAL, complete section number 5 titled "Change in Entity Status (from status indicated above)".

For purposes of this notice, small entity fees are 1/2 the amount of undiscounted fees, and micro entity fees are 1/2 the amount of small entity fees.

II. PART B - FEE(S) TRANSMITTAL, or its equivalent, must be completed and returned to the United States Patent and Trademark Office (USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be completed and an extra copy of the form should be submitted. If an equivalent of Part B is filed, a request to reapply a previously paid issue fee must be clearly made, and delays in processing may occur due to the difficulty in recognizing the paper as an equivalent of Part B.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Maintenance fees are due in utility patents issuing on applications filed on or after Dec. 12, 1980. It is patentee's responsibility to ensure timely payment of maintenance fees when due. More information is available at www.uspto.gov/PatentMaintenanceFees.**

Page 1 of 3

PTOL-85 (Rev. 02/11)

**PART B - FEE(S) TRANSMITTAL**

Complete and send this form, together with applicable fee(s), by mail or fax, or via EFS-Web.

| By mail, send to: | Mail Stop ISSUE FEE<br>Commissioner for Patents<br>P.O. Box 1450<br>Alexandria, Virginia 22313-1450 | By fax, send to: | (571)-273-2885 |

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

44367    7590    04/18/2019

SCHWEGMAN LUNDBERG & WOESSNER/OPEN TV
P.O. BOX 2938
MINNEAPOLIS, MN 55402-0938

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**

I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being transmitted to the USPTO via EFS-Web or by facsimile to (571) 273-2885, on the date below.

| | (Typed or printed name) |
| | (Signature) |
| | (Date) |

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 15/637,561 | 06/29/2017 | Alex Fishman | 2050.171US2 | 8149 |

TITLE OF INVENTION: SMART PLAYLIST

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | UNDISCOUNTED | $1000 | $0.00 | $0.00 | $1000 | 07/18/2019 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| TRINH, TUNG THANH | 2421 | 725-058000 |

**1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).**

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-09 or more recent) attached. **Use of a Customer Number is required.**

**2.** For printing on the patent front page, list
(1) The names of up to 3 registered patent attorneys or agents OR, alternatively,
(2) The name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 _____
2 _____
3 _____

**3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT** (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document must have been previously recorded, or filed for recordation, as set forth in 37 CFR 3.11 and 37 CFR 3.81(a). Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE    (B) RESIDENCE: (CITY and STATE OR COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent) : ☐ Individual ☐ Corporation or other private group entity ☐ Government

4a. Fees submitted: ☐Issue Fee ☐Publication Fee (if required) ☐Advance Order - # of Copies _____

4b. Method of Payment: *(Please first reapply any previously paid fee shown above)*

☐ Electronic Payment via EFS-Web ☐ Enclosed check ☐ Non-electronic payment by credit card (Attach form PTO-2038)

☐ The Director is hereby authorized to charge the required fee(s), any deficiency, or credit any overpayment to Deposit Account No. _____

**5. Change in Entity Status** (from status indicated above)

☐ Applicant certifying micro entity status. See 37 CFR 1.29

☐ Applicant asserting small entity status. See 37 CFR 1.27

☐ Applicant changing to regular undiscounted fee status.

NOTE: Absent a valid certification of Micro Entity Status (see forms PTO/SB/15A and 15B), issue fee payment in the micro entity amount will not be accepted at the risk of application abandonment.
NOTE: If the application was previously under micro entity status, checking this box will be taken to be a notification of loss of entitlement to micro entity status.
NOTE: Checking this box will be taken to be a notification of loss of entitlement to small or micro entity status, as applicable.

NOTE: This form must be signed in accordance with 37 CFR 1.31 and 1.33. See 37 CFR 1.4 for signature requirements and certifications.

Authorized Signature _____    Date _____

Typed or printed name _____    Registration No. _____

Page 2 of 3

PTOL-85 Part B (08-18) Approved for use through 01/31/2020    OMB 0651-0033    U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 15/637,561 | 06/29/2017 | Alex Fishman | 2050.171US2 | 8149 |

44367        7590        04/18/2019
SCHWEGMAN LUNDBERG & WOESSNER/OPEN TV
P.O. BOX 2938
MINNEAPOLIS, MN 55402-0938

| EXAMINER |
|---|
| TRINH, TUNG THANH |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2421 | |

DATE MAILED: 04/18/2019

## Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
(Applications filed on or after May 29, 2000)

The Office has discontinued providing a Patent Term Adjustment (PTA) calculation with the Notice of Allowance.

Section 1(h)(2) of the AIA Technical Corrections Act amended 35 U.S.C. 154(b)(3)(B)(i) to eliminate the requirement that the Office provide a patent term adjustment determination with the notice of allowance. See Revisions to Patent Term Adjustment, 78 Fed. Reg. 19416, 19417 (Apr. 1, 2013). Therefore, the Office is no longer providing an initial patent term adjustment determination with the notice of allowance. The Office will continue to provide a patent term adjustment determination with the Issue Notification Letter that is mailed to applicant approximately three weeks prior to the issue date of the patent, and will include the patent term adjustment on the patent. Any request for reconsideration of the patent term adjustment determination (or reinstatement of patent term adjustment) should follow the process outlined in 37 CFR 1.705.

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at 1-(888)-786-0101 or (571)-272-4200.

PTOL-85 (Rev. 02/11)

## OMB Clearance and PRA Burden Statement for PTOL-85 Part B

The Paperwork Reduction Act (PRA) of 1995 requires Federal agencies to obtain Office of Management and Budget approval before requesting most types of information from the public. When OMB approves an agency request to collect information from the public, OMB (i) provides a valid OMB Control Number and expiration date for the agency to display on the instrument that will be used to collect the information and (ii) requires the agency to inform the public about the OMB Control Number's legal significance in accordance with 5 CFR 1320.5(b).

The information collected by PTOL-85 Part B is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 30 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450. Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## Privacy Act Statement

**The Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b) (2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.

2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the individual has requested assistance from the Member with respect to the subject matter of the record.

4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.

9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

| *Notice of Allowability* | Application No. 15/637,561 | Applicant(s) Fishman et al. | |
|---|---|---|---|
| | Examiner TUNG T TRINH | Art Unit 2421 | AIA (FITF) Status No |

**-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--**

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☑ This communication is responsive to <u>communication filed 03/26/2019</u>.
   ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

3. ☑ The allowed claim(s) is/are <u>1-20</u>. As a result of the allowed claim(s), you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see **http://www.uspto.gov/patents/init_events/pph/index.jsp** or send an inquiry to **PPHfeedback@uspto.gov.**

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   **Certified copies:**
   a) ☐ All     b) ☐ Some     *c) ☐ None of the:
      1. ☐ Certified copies of the priority documents have been received.
      2. ☐ Certified copies of the priority documents have been received in Application No. _____ .
      3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).
   * Certified copies not received: _____ .

   Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file areply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application.
   **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ CORRECTED DRAWINGS (as "replacement sheets") must be submitted.
   ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____ .
   **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**
1. ☑ Notice of References Cited (PTO-892)
2. ☑ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date _____
3. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material _____ .
4. ☐ Interview Summary (PTO-413), Paper No./Mail Date. _____ .

5. ☐ Examiner's Amendment/Comment
6. ☑ Examiner's Statement of Reasons for Allowance
7. ☐ Other _____ .

| /TUNG T TRINH/ Examiner, Art Unit 2421 | /NATHAN J FLYNN/ Supervisory Patent Examiner, Art Unit 2421 |
|---|---|

Application/Control Number: 15/637,561                                                    Page 2
Art Unit: 2421

## DETAILED ACTION

### *Notice of Pre-AIA or AIA Status*

The present application is being examined under the pre-AIA first to invent

provisions.

### *Allowable Subject Matter*

The following is an examiner's statement of reasons for allowance: based on the

board's decision on 01/03/2017 of parent application 12/877034 (US Patent 9,699,503),

Terminal Disclaimer filed 03/26/2019, and the 2019 Revised Patent Subject Matter

Eligibility Guidance.

Chen (US Patent 8,666,979) teaches building user profile based on user online

messages, generating candidate set, assigning score to each candidate and selecting

popular content based on score for recommendation (fig. 1-3, different sequential step-

order to the claimed invention).

Olague (US 2009/0060469) teaches selecting popular content based on minimal

count threshold of viewers for recording (fig. 16-19).

Chien (US 2008/0301118) teaches recommending content based on calculated

content scores from user preferences (fig. 1-8).

Claims 1-20 are allowed.

Any comments considered necessary by applicant must be submitted no later

than the payment of the issue fee and, to avoid processing delays, should preferably

Application/Control Number: 15/637,561                                   Page 3
Art Unit: 2421

accompany the issue fee.  Such submissions should be clearly labeled "Comments on

Statement of Reasons for Allowance."


## *Conclusion*


Any inquiry concerning this communication or earlier communications from the

examiner should be directed to TUNG THANH TRINH whose telephone number is

(571)270-1296.  The examiner can normally be reached on 549 M to F, 10am-9pm.

Examiner interviews are available via telephone, in-person, and video

conferencing using a USPTO supplied web-based collaboration tool. To schedule an

interview, applicant is encouraged to use the USPTO Automated Interview Request

(AIR) at http://www.uspto.gov/interviewpractice.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Nathan Flynn can be reached on 571-272-1951.  The fax phone number for

the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a

Application/Control Number: 15/637,561                                    Page 4
Art Unit: 2421

USPTO Customer Service Representative or access to the automated information

system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/TUNG T TRINH/
Examiner, Art Unit 2421

/NATHAN J FLYNN/
Supervisory Patent Examiner, Art Unit 2421

# Exhibit H

U~NITED~ S~TATES~ P~ATENT AND~ T~RADEMARK~ O~FFICE~

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 12/877,034 | 09/07/2010 | Alex Fishman | 2050.171US1 | 2435 |

44367        7590        01/03/2017
SCHWEGMAN LUNDBERG & WOESSNER/OPEN TV
P.O. BOX 2938
MINNEAPOLIS, MN 55402-0938

| EXAMINER |
|---|
| TRINH, TUNG THANH |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2427 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 01/03/2017 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

uspto@slwip.com
SLW@blackhillsip.com

PTOL-90A (Rev. 04/07)

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

*Ex parte* ALEX FISHMAN and CRX K. CHAI[1]

_____

Appeal 2016-001868
Application 12/877,034
Technology Center 2400

_____

Before ALLEN R. MacDONALD, MICHAEL M. BARRY, and
AARON W. MOORE, *Administrative Patent Judges*.

BARRY, *Administrative Patent Judge*.


DECISION ON APPEAL


Appellants appeal under 35 U.S.C. § 134(a) from the Examiner's
Final Rejection of claims 1, 3–11, 13–20, 22, and 23, which constitute all the
claims pending in this application.  Claims 2 and 12 have been cancelled.
We have jurisdiction under 35 U.S.C. § 6(b).

We AFFIRM-IN-PART.

_____

[1] Appellants identify the real party in interest as OpenTV, Inc.  (App. Br. 2.)

Appeal 2016-001868
Application 12/877,034

*Introduction*

Appellants state their "application relates to the fields of media and entertainment and specifically to a smart playlist system." (Spec. 1.)

CLAIMED SUBJECT MATTER

Claim 1 is illustrative:

1.    A computer-implemented method comprising:

obtaining content utilization data from a plurality of client devices associated with a respective plurality of viewers, wherein the content utilization data for a viewer from the plurality of viewers is indicative of the viewer's interest in respective content items, and wherein the plurality of viewers comprises other viewers who are not identified as social connections of the viewer;

automatically generating, at a server computer system, a list of popular content items that are currently popular among the plurality of viewers based on the obtained content utilization data;

for a target viewer from the plurality of viewers, customizing the list of popular content items to generate a customized playlist, the customizing based on a viewing history of the target viewer and on a viewing history of viewers who are identified as social connections of the target viewer; and

communicating the customized play list to a client device of the target viewer.

(App. Br. 17 (Claims App'x).)

*References and Rejections*

Claims 1, 3–5, 7–11, 13–15, 17–20, 22, and 23 stand rejected under 35 U.S.C. § 103(a) as obvious over Conradt et al. (US 2009/0100469 A1; Apr. 16, 2009) ("Conradt") and Dunk et al. (US 2011/0060649 A1; Mar. 10, 2011) ("Dunk"). (Final Act. 4–9.)

Appeal 2016-001868
Application 12/877,034

Claims 6 and 16 stand rejected under 35 U.S.C. § 103(a) as obvious over Conradt, Dunk, and Logan et al. (US 2003/0093790 A1; May 15, 2003) ("Logan").  (Final Act. 10.)

ANALYSIS

Based on Appellants' arguments, the issues before us are whether the Examiner errs in rejecting claims 1, 3, and 4 under 35 U.S.C. § 103(a).  (*See* App. Br. 9–16.)

*Claim 1*

Appellants argue the Examiner errs by finding Conradt and Dunk teach or suggest claim 1's requirement of collecting "viewing history of viewers who are identified as social connections of the target viewer." (App. Br. 10–11.)  Appellants contend that while Dunk states its "media service provider 16 may be configured to collect subscriber information (e.g. statistics about the viewing habits of each user or a group of users) for use in determining the relevance between particular media content and particular users" (¶ 39), "Dunk does not explicitly indicate that a group includes 'viewers who are identified as social connections of the target viewer,' as recited."  (App. Br. 10.)

We find this unpersuasive.  "A reference must be considered for everything it teaches by way of technology and is not limited to the particular invention it is describing and attempting to protect.  On the issue of obviousness, the combined teachings of the prior art as a whole must be considered."  *EWP Corp. v. Reliance Universal Inc.*, 755 F.2d 898, 907 (Fed. Cir. 1985) (emphasis omitted).  Here, the Examiner's rejection specifically identifies it is the *combination* of Conradt and Dunk that teach "the customizing based on a viewing history of the target viewer <u>and on a</u>

3

Appeal 2016-001868
Application 12/877,034

<u>viewing history of viewers who are identified as social connections of the</u> <u>target viewer</u>." (*See* Final Act 6 (citing Conradt Fig. 2, ¶ 50; Dunk Abstract, Figs. 1–3, ¶¶ 39, 47–48, 189–190, and 193).)

The Examiner finds, and we agree, that "Conradt teaches generating a media content recommendation for a user based on the compiled media content data for associated users in a social network" and "Dunk teaches providing media content based on relevance between content and [a] user in a social network." (Ans. 2–3 (citing Conradt Fig. 2, Abstract, ¶¶ 37, 46–50; Dunk Fig. 3, Abstract, ¶ 20).) Dunk's Figure 3 (described in ¶¶ 52–60) illustrates a relevance engine 50 coupled to a database 52 that contains metadata such as "preferences indicated by the users" and information to define "clusters or groups of users" (¶ 58). Figure 3 further shows a social network integrator 54 coupled to database 52 for obtaining information such as user profiles, friends, expressed likes and dislikes, etc. from social networking applications 56 (Facebook, MySpace, etc.), which it can use "to generate additional user metadata" (¶ 59). In view of these teachings, we find Appellants' characterization of groups in Dunk as "having nothing to do with social connections" (App. Br. 11) unpersuasive. An ordinarily skilled artisan would have understood to the contrary in view of Figure 3 and its associated description.

Appellants also argue the Examiner errs by finding Conradt and Dunk teach or suggest claim 1's requirement of compiling data for a plurality of viewers "wherein the plurality of viewers comprises other viewers who are not identified as social connections of the viewer." (App. Br. 11–12.) Appellants contend "Conradt appears to only take into consideration data regarding other viewers within a viewer's social network." (*Id.* at 11.)

Appeal 2016-001868
Application 12/877,034

This is unpersuasive.  The Examiner finds, and we agree, that Conradt teaches collecting content utilization data from multiple device users, not all of which may be in a social network of a particular viewer.  (Final Act. 4–5 (citing Conradt Fig. 1, ¶¶ 20, 33–34, and 49–50); Ans. 3–4 (additionally citing Conradt Fig. 2, ¶¶ 37, 41–43).)  For example, Conradt states "[t]he service manager 132 can . . . form social networks based on the communications data collected from various client devices" (¶ 34).  In an embodiment for doing so, "the users can be associated based on a threshold" (*id.*).  Because some users may not reach the threshold, this teaches collecting the content utilization data from multiple users, with only a subset of them being in the same social network.[2]  Accordingly, we agree that Conradt teaches claim 1's "obtaining content utilization data from . . . a plurality of viewers . . . compris[ing] other viewers who are not identified as social connections of the viewer," as recited by claim 1.  (*See* Ans. 3–4.)

Appellants further argue the Examiner errs in rejecting claim 1 because:

> Neither Conradt, nor Dunk, nor any combination thereof discloses generating a list of popular contents items based on viewers that are not associated via a social network, and then customizing that list for a target viewer based on the viewing history of the target viewer and the viewing history of the viewers identified as social connections of the target viewer . . . .

(App. Br. 12.)

We find this argument unpersuasive because the claim only requires that the plurality of users for which utilization data is obtained "comprises"

---

[2] We also note, as discussed below, the claim does not require that the data from the non-social network users be used in generating the list of popular content items.

Appeal 2016-001868
Application 12/877,034

viewers who are not identified as social connections of the viewer, not that it is limited to such users.  We agree with the Examiner that Conradt generates a list of items (those popular in a social network), that are popular among a plurality of viewers (among a plurality that includes both those in the social network and those who did not meet the threshold), where the list is "based on" the social network data, which is part of the obtained content utilization data.

Appellants also argue in reply that the Examiner errs by finding there would have been motivation to combine Conradt and Dunk, contending that "stating that all references are in the same field of endeavor is not a motivation to combine."  (Reply Br. 7.)  We do not consider this argument, which Appellants could have raised in the Appeal Brief, allowing the Examiner to respond.  *See* 37 C.F.R. § 41.41(b)(2).  We note that although Appellants' reply argument responds to a statement in the Answer, the rejection includes a similar statement to explain the combination of Dunk with Conradt.  (*See* Final Act. 6 ("However, in the same field of endeavor, Dunk discloses . . . .").)

Accordingly, we sustain the rejection of claim 1.  We also sustain the rejection of claims 5–11, 15–20, 22, and 23, for which Appellants present no substantive[3] arguments separate from claim 1.

_____

[3] Although Appellants do additionally assert that claims 5–11, 15–20, 22, and 23 "are allowable for the particular limitations recited therein" (App. Br. 13), such a contention, without more, fails to constitute an argument on the merits.  *See* 37 C.F.R. 41.37(c)(iv) (2012) ("A statement which merely points out what a claim recites will not be considered an argument for separate patentability of the claim.").

Appeal 2016-001868
Application 12/877,034

*Claim 3*

Claim 3 depends from claim 1 and requires, *inter alia*, "wherein the customizing comprises selecting at least one of the popular content items for the customized playlist based on the viewing history of the viewers who are identified as social connections of the target viewer." (App. Br. 17 (Claims App'x).)

In arguing the Examiner errs, Appellants state "[t]he Final Office Action asserts that 'Dunk discloses the relevance engine 50 determining relevance content for user based on *ranking in social network* (Fig. 3 p. 4 para[0058]: p. 8 para [0126]-[0129])." (App. Br. 13–14 (citing Final Act. 7 (emphasis added by Appellants)).) Our review of the record does not find Appellant's quoted assertion in the Final Rejection from which this appeal is taken; instead, we find the rejection relies on the combination of Conradt and Dunk for teaching the requirements of claim 3. (*See* Final Act. 6–7 (citing Conradt Fig. 2, ¶¶ 46–50; Dunk Figs. 1–3, ¶¶ 8, 17, 39, 58–59, 126–27, and 132).)

Because Appellants do not address the merits of the pending rejection based on the Examiner's findings that the combination of Conradt and Dunk teach the added requirements of claim 3 (*see* App. Br. 13–14), we sustain its rejection. We also sustain the rejection of claim 13, which Appellants argue together with claim 3.

*Claim 4*

Claim 4 depends from claim 1 and recites, *inter alia*, "generating a score for each item from the list of popular content items based on the viewing history of the target viewer and on the viewing history of the viewers who are identified as social connections of the target viewer."

7

Appeal 2016-001868
Application 12/877,034

(App. Br. 17 (Claims App'x).)  The Examiner finds the combination of Conradt's "number of communications between particular users as score and priority based on the number to display content in social network recommendation [sic]" and Dunk's "ranking or ratings . . . based on user feedbacks and engagements or viewing history" teaches claim 4's requirements.  (Final Act. 7–8 (citing Conradt ¶¶ 35, 37; Dunk ¶¶ 126–32).)

Appellants argue the Examiner errs because neither Conradt's number of communications between users nor Dunk's rankings or ratings teach generating a score based on viewing history, as recited.  (App. Br. 14–15.) The Examiner responds by finding "Dunk discloses the relevant content for [a] user [is] based on ranking in the social network; the 'like' or 'bad' is based on a particular user viewing history about that type of media content even if the ranking content is not viewed by the particular user."  (Ans. 5.) Appellants reply that Examiner has failed to show the cited references teach or suggest the recited "viewing history of a particular user" (i.e., the recited "target viewer") used for generating a score.  (Reply Br. 10–11.)

We agree with Appellants.  Accordingly, we do not sustain the rejection of claim 4.  For the same reasons, we also do not sustain the rejection of claim 14, which includes similar limitations and stands rejected on the same basis as claim 4, and which Appellants argue together with claim 4.

Appeal 2016-001868
Application 12/877,034

## DECISION

For the above reasons, we affirm the rejection of claims 1, 3, 5–11, 13, 15–20, 22, and 23, and reverse the rejection of claims 4 and 14.

No time period for taking any subsequent action in connection with this appeal may be extended under 37 C.F.R. § 1.136(a)(1)(iv).  *See* 37 C.F.R. § 41.50(f).

## AFFIRMED-IN-PART

| | | |
|---|---|---|
| **REQUEST FOR CONTINUED EXAMINATION (RCE) TRANSMITTAL** | *Application Number* | 12/877,034 |
| | *Filing Date* | September 7, 2010 |
| | *First Named Inventor* | Alex Fishman |
| | *Confirmation Number* | 2435 |
| | *Group Art Unit* | 2427 |
| | *Examiner Name* | Tung Trinh |
| | *Attorney Docket Number* | 2050.171US1 |
| | *Customer No.* | 44367 |

This is a Request for Continued Examination (RCE) under 37 C.F.R § 1.114 of the above-identified application entitled <u>SMART PLAYLIST</u>

1. Submission required under 37 C.F.R. § 1.114:

    <u>X</u>   Request to Reopen Prosecution under 37 C.F.R. § 41.50 (8 pages) is enclosed.

    <u>X</u>   Information Disclosure Statement (2 pages), Form 1449 (2 pages), and copies of cited documents (29).

2. Fees

    <u>X</u>   Authorization to charge deposit account 19-0743 in the amount of $1700.00 to pay the subsequent RCE filing fee required under 37 C.F.R. § 1.17(e)(2).

**The Commissioner is hereby authorized to charge any additional fees or credit overpayment to Deposit Account No. 19-0743.**

<u>SCHWEGMAN LUNDBERG & WOESSNER, P.A.</u>          By: _____

                                                    Kyle J. Way
                                                    Reg. No. 45,549

REQUEST TO REOPEN PROSECUTION UNDER 37 C.F.R. § 41.50                                        Page 7
Serial Number: 12/877,034                                                                    Dkt: 2050.171US1
Filing Date: September 7, 2010
Title: SMART PLAYLIST

## REMARKS

This communication responds to the Decision on Appeal dated January 3, 2017.  The undersigned has amended claims 1, 11, and 20 for clarity and to advance prosecution.  Unless otherwise stated herein, amendments to the claims have been made to clarify meaning, correct typographical errors, provide proper antecedent basis, or provide consistent terminology, and not for reasons related to patentability.  The amendments are fully supported by the application, as filed, such as at claims 4 and 14.  Thus, no new matter has been added.

No claims are added herein.  Claims 2, 12, and 21 were cancelled previously, and claims 4 and 14 are cancelled herein.  As a result, claims 1, 3, 5-11, 13, 15-20, 22, and 23 are now pending in this application.

### *The Rejection of Claims Under § 103*

Claims 1, 3-5, 7-11, 13-15, 17-20, 22, and 23 were previously rejected under 35 U.S.C. § 103(a) as allegedly being obvious over U.S. Patent Application Publication No. 2009/0100469 (Conradt) in view of U.S. Patent Application Publication No. 2011/0060649 (Dunk).[1]

Claims 6 and 16 were previously rejected under 35 U.S.C. § 103(a) as allegedly being obvious over Conradt in view of Dunk and U.S. Patent Application Publication No. 2003/0093790 (Logan).[2]

In the Decision on Appeal, the Board affirmed the rejection of claims 1, 3, 5-11, 13, 15-20, 22, and 23, and reversed the rejection of claims 4 and 14.[3]  In view of the Decision, the undersigned has amended independent claim 1 to incorporate the subject matter of claim 4, has amended independent claim 11 to incorporate the subject matter of claim 14 (which corresponds to the subject matter of claim 4), and has amended independent claim 20 to incorporate similar subject matter.  In view of at least the claim amendments presented herein, the undersigned respectfully submits that independent claims 1, 11, and 20 are allowable in view of Conradt, Dunk, and Logan.

Claims 3, 5-10, 22, and 23 depend from independent claim 1, and claims 13 and 15-19 depend from independent claim 11, thus incorporating the limitations of their corresponding

---

[1] See Decision on Appeal at 2.
[2] See id. at 7.
[3] See id. at 9.

independent claims. Thus, the undersigned respectfully submits that claims 3, 5-10, 13, 15-19, 22, and 23 are allowable in view of the cited references for at least the reasons set forth above in support of claims 1 and 11.

Claims 4 and 14 are cancelled herein. Thus, the rejections as they pertain to these claims are obviated in view of their cancellation.

Therefore, in view of at least the foregoing remarks, the undersigned respectfully requests reconsideration and withdrawal of the 35 U.S.C. § 103(a) rejections of claims 1, 3-11, 13-20, 22, and 23.

## CONCLUSION

The undersigned respectfully submits that the claims are in condition for allowance, and notification to that effect is earnestly requested. The Examiner is invited to telephone the undersigned at (612) 371-2196 to facilitate prosecution of this application.

If necessary, please charge any additional fees or deficiencies, or credit any overpayments, to Deposit Account No. 19-0743.

Respectfully submitted,

SCHWEGMAN LUNDBERG & WOESSNER, P.A.
P.O. Box 2938
Minneapolis, MN  55402--0938
(612) 371-2196

Date ___March 3, 2017___    By _____
                              Kyle J. Way
                              Reg. No. 45,549

## IN THE CLAIMS

Please amend the claims as follows:

1.      (Currently Amended) A computer-implemented method comprising:

obtaining content utilization data from a plurality of client devices associated with a respective plurality of viewers, wherein the content utilization data for a viewer from the plurality of viewers is indicative of the viewer's interest in respective content items, and wherein the plurality of viewers comprises other viewers who are not identified as social connections of the viewer;

automatically generating, at a server computer system, a list of popular content items that are currently popular among the plurality of viewers based on the obtained content utilization data;

for a target viewer from the plurality of viewers, customizing the list of popular content items to generate a customized playlist, the customizing based on a viewing history of the target viewer and on a viewing history of viewers who are identified as social connections of the target viewer, wherein the customizing comprises:

generating a score for each item from the list of popular content items based on the viewing history of the target viewer and on the viewing history of the viewers who are identified as social connections of the target viewer; and

including items in the customized playlist based on the respective scores of the items from the list of popular content items; and

communicating the customized playlist to a client device of the target viewer.

2.      (Cancelled)

3.      (Previously Presented) The method of claim 1, wherein the customizing comprises selecting at least one of the popular content items for the customized playlist based on the viewing history of the viewers who are identified as social connections of the target viewer indicating a high level of interest in the at least one of the popular content items among the social

connections of the target viewer while the viewing history of the target viewer indicates a low level of interest in the at least one of the popular content items by the target viewer.

4.      (Cancelled)

5.      (Original) The method of claim 1, wherein the communicating of the customized playlist to the client device of the target viewer comprises communicating an instruction to start recording of a live program identified in the customized playlist.

6.      (Previously Presented) The method of claim 1, wherein the communicating of the customized playlist to the client device of the target viewer comprises communicating an instruction to display an alert message regarding a live program identified in the customized playlist.

7.      (Previously Presented) The method of claim 1, wherein the items in the customized playlist include at least one of a first item that identifies Internet content, a second item that identifies video on demand content, and a third item that identifies a live program.

8.      (Previously Presented) The method of claim 1, wherein the client device comprises a set top box.

9.      (Previously Presented) The method of claim 1, wherein the client device comprises a desktop computer.

10.      (Previously Presented) The method of claim 1, wherein the client device comprises a mobile device.

11.      (Currently Amended) A computer-implemented system comprising:
        a collector module to obtain content utilization data from a plurality of client devices associated with a respective plurality of viewers, wherein the content utilization data for a viewer

from the plurality of viewers is indicative of the viewer's interest in respective content items, and wherein the plurality of viewers comprises other viewers who are not identified as social connections of the viewer;

a hot list generator to generate a list of popular content items that are currently popular among the plurality of viewers based on the obtained content utilization data;

a customization module to generate a customized playlist for a target viewer from the plurality of viewers, the customizing based on the list of popular content items, a viewing history of the target viewer, and a viewing history of viewers who are identified as social connections of the target viewer, wherein the customization module is to:

generate a score for each item from the list of popular content items based on the viewing history of the target viewer and on the viewing history of the viewers who are identified as social connections of the target viewer; and

include items in the customized playlist based on respective scores of the items from the list of popular content items; and

a communications module to communicate the customized playlist to a client device of the target viewer.

12.    (Cancelled)

13.    (Previously Presented) The system of claim 11, wherein the customization module is to select at least one of the popular content items for the customized playlist based on the viewing history of the viewers who are identified as social connections of the target viewer indicating a high level of interest in the at least one of the popular content items among the social connections of the target viewer while the viewing history of the target viewer indicates a low level of interest in the at least one of the popular content items by the target viewer.

14.    (Cancelled)

15.    (Original) The system of claim 11, wherein the communications module is to communicate to the client device an instruction to start recording of a live program identified in

the customized playlist.

16.    (Previously Presented) The system of claim 11, wherein the communications module is to communicate to the client device an instruction to display an alert message regarding a live program identified in the customized playlist.

17.    (Previously Presented) The system of claim 11 wherein the items in the customized playlist include at least one of a first item that identifies Internet content, a second item that identifies video on demand content , and a third item that identifies a live program.

18.    (Previously Presented) The system of claim 11, wherein the client device comprises a set top box.

19.    (Previously Presented) The system of claim 11, wherein the client device comprises a desktop computer or a mobile device.

20.    (Currently Amended) A machine-readable non-transitory storage medium <u>storing instructions that, when executed by one or more processors of a machine,</u> ~~having instruction data to~~ cause [[a]] <u>the</u> machine to perform operations comprising:

obtaining content utilization data from a plurality of client devices associated with a respective plurality of viewers, wherein the content utilization data for a viewer from the plurality of viewers is indicative of the viewer's interest in respective content items, and wherein the plurality of viewers comprises other viewers who are not identified as social connections of the viewer;

generating a list of popular content items that are currently popular among the plurality of viewers based on the obtained content utilization data;

generating a customized playlist for a target viewer from the plurality of viewers, the customizing based on the list of popular content items, a viewing history of the target viewer, and a viewing history of viewers who are identified as social connections of the target viewer<u>, wherein the customizing comprises:</u>

generating a score for each item from the list of popular content items based on the viewing history of the target viewer and on the viewing history of the viewers who are identified as social connections of the target viewer; and

including items in the customized playlist based on the respective scores of the items from the list of popular content items; and

communicating the customized playlist to a client device of the target viewer.

21.    (Cancelled)

22.    (Previously Presented) The method of claim 1, the customizing of the list of popular content items also being based at least in part on a content category of interest to the target viewer.

23.    (Previously Presented) The method of claim 1, the obtained content utilization data indicating lengths of time during which the plurality of viewers have viewed a content item.

<u>S/N 12/877,034</u>                                                                    <u>PATENT</u>

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| Inventors: Alex Fishman et al. | Examiner: Tung Trinh |
| Serial No.:  12/877,034 | Group Art Unit: 2427 |
| Filed:  September 7, 2010 | Docket No.: 2050.171US1 |
| Customer No.:  44367 | Confirmation No.: 2435 |
| Title:   SMART PLAYLIST | |

## REQUEST TO REOPEN PROSECUTION UNDER 37 C.F.R. § 41.50

Mail Stop RCE
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

In response to the Decision on Appeal dated January 3, 2017, please consider the amendments and remarks contained herein.  The undersigned respectfully requests that prosecution of this application be reopened.  In addition, the undersigned submits a Request for Continued Examination that is accompanied with this request.

UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# NOTICE OF ALLOWANCE AND FEE(S) DUE

44367        7590        03/29/2017

SCHWEGMAN LUNDBERG & WOESSNER/OPEN TV
P.O. BOX 2938
MINNEAPOLIS, MN 55402-0938

| EXAMINER |
|---|
| TRINH, TUNG THANH |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2427 | |

DATE MAILED: 03/29/2017

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 12/877,034 | 09/07/2010 | Alex Fishman | 2050.171US1 | 2435 |

TITLE OF INVENTION: SMART PLAYLIST

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | UNDISCOUNTED | $960 | $0 | $0 | $960 | 06/29/2017 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. PROSECUTION ON THE MERITS IS CLOSED.** THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS. THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON PETITION BY THE APPLICANT. SEE 37 CFR 1.313 AND MPEP 1308.

**THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN THREE MONTHS FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. THIS STATUTORY PERIOD CANNOT BE EXTENDED.** SEE 35 U.S.C. 151. THE ISSUE FEE DUE INDICATED ABOVE DOES NOT REFLECT A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE IN THIS APPLICATION. IF AN ISSUE FEE HAS PREVIOUSLY BEEN PAID IN THIS APPLICATION (AS SHOWN ABOVE), THE RETURN OF PART B OF THIS FORM WILL BE CONSIDERED A REQUEST TO REAPPLY THE PREVIOUSLY PAID ISSUE FEE TOWARD THE ISSUE FEE NOW DUE.

**HOW TO REPLY TO THIS NOTICE:**

I. Review the ENTITY STATUS shown above. If the ENTITY STATUS is shown as SMALL or MICRO, verify whether entitlement to that entity status still applies.

If the ENTITY STATUS is the same as shown above, pay the TOTAL FEE(S) DUE shown above.

If the ENTITY STATUS is changed from that shown above, on PART B - FEE(S) TRANSMITTAL, complete section number 5 titled "Change in Entity Status (from status indicated above)".

For purposes of this notice, small entity fees are 1/2 the amount of undiscounted fees, and micro entity fees are 1/2 the amount of small entity fees.

II. PART B - FEE(S) TRANSMITTAL, or its equivalent, must be completed and returned to the United States Patent and Trademark Office (USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be completed and an extra copy of the form should be submitted. If an equivalent of Part B is filed, a request to reapply a previously paid issue fee must be clearly made, and delays in processing may occur due to the difficulty in recognizing the paper as an equivalent of Part B.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Utility patents issuing on applications filed on or after Dec. 12, 1980 may require payment of maintenance fees. It is patentee's responsibility to ensure timely payment of maintenance fees when due.**

PTOL-85 (Rev. 02/11)

# PART B - FEE(S) TRANSMITTAL

**Complete and send this form, together with applicable fee(s), to:** __Mail__

Mail Stop ISSUE FEE
**Commissioner for Patents**
**P.O. Box 1450**
**Alexandria, Virginia 22313-1450**

**or** __Fax__   **(571)-273-2885**

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

44367          7590          03/29/2017

SCHWEGMAN LUNDBERG & WOESSNER/OPEN TV
P.O. BOX 2938
MINNEAPOLIS, MN 55402-0938

**Certificate of Mailing or Transmission**
I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being facsimile transmitted to the USPTO (571) 273-2885, on the date indicated below.

| | |
|---|---|
| | (Depositor's name) |
| | (Signature) |
| | (Date) |

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 12/877,034 | 09/07/2010 | Alex Fishman | 2050.171US1 | 2435 |

TITLE OF INVENTION: SMART PLAYLIST

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | UNDISCOUNTED | $960 | $0 | $0 | $960 | 06/29/2017 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| TRINH, TUNG THANH | 2427 | 725-058000 |

1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).
☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.
☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-02 or more recent) attached. **Use of a Customer Number is required.**

2. For printing on the patent front page, list
(1) The names of up to 3 registered patent attorneys or agents OR, alternatively,
(2) The name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 _____
2 _____
3 _____

3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document has been filed for recordation as set forth in 37 CFR 3.11. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE                    (B) RESIDENCE: (CITY and STATE OR COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent) : ☐ Individual  ☐ Corporation or other private group entity  ☐ Government

4a. The following fee(s) are submitted:
☐ Issue Fee
☐ Publication Fee (No small entity discount permitted)
☐ Advance Order - # of Copies _____

4b. Payment of Fee(s): **(Please first reapply any previously paid issue fee shown above)**
☐ A check is enclosed.
☐ Payment by credit card. Form PTO-2038 is attached.
☐ The director is hereby authorized to charge the required fee(s), any deficiency, or credits any overpayment, to Deposit Account Number _____ (enclose an extra copy of this form).

5. **Change in Entity Status** (from status indicated above)
☐ Applicant certifying micro entity status. See 37 CFR 1.29
☐ Applicant asserting small entity status. See 37 CFR 1.27
☐ Applicant changing to regular undiscounted fee status.

NOTE: Absent a valid certification of Micro Entity Status (see forms PTO/SB/15A and 15B), issue fee payment in the micro entity amount will not be accepted at the risk of application abandonment.
NOTE: If the application was previously under micro entity status, checking this box will be taken to be a notification of loss of entitlement to micro entity status.
NOTE: Checking this box will be taken to be a notification of loss of entitlement to small or micro entity status, as applicable.

NOTE: This form must be signed in accordance with 37 CFR 1.31 and 1.33. See 37 CFR 1.4 for signature requirements and certifications.

Authorized Signature _____    Date _____

Typed or printed name _____    Registration No. _____

Page 2 of 3

PTOL-85 Part B (10-13) Approved for use through 10/31/2013.          OMB 0651-0033          U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE



U̲NITED S̲TATES P̲ATENT AND T̲RADEMARK O̲FFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 12/877,034 | 09/07/2010 | Alex Fishman | 2050.171US1 | 2435 |

44367          7590          03/29/2017

SCHWEGMAN LUNDBERG & WOESSNER/OPEN TV
P.O. BOX 2938
MINNEAPOLIS, MN 55402-0938

| EXAMINER |
|---|
| TRINH, TUNG THANH |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2427 | |

DATE MAILED: 03/29/2017

## Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
### (Applications filed on or after May 29, 2000)

The Office has discontinued providing a Patent Term Adjustment (PTA) calculation with the Notice of Allowance.

Section 1(h)(2) of the AIA Technical Corrections Act amended 35 U.S.C. 154(b)(3)(B)(i) to eliminate the requirement that the Office provide a patent term adjustment determination with the notice of allowance. See Revisions to Patent Term Adjustment, 78 Fed. Reg. 19416, 19417 (Apr. 1, 2013). Therefore, the Office is no longer providing an initial patent term adjustment determination with the notice of allowance. The Office will continue to provide a patent term adjustment determination with the Issue Notification Letter that is mailed to applicant approximately three weeks prior to the issue date of the patent, and will include the patent term adjustment on the patent. Any request for reconsideration of the patent term adjustment determination (or reinstatement of patent term adjustment) should follow the process outlined in 37 CFR 1.705.

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at 1-(888)-786-0101 or (571)-272-4200.

PTOL-85 (Rev. 02/11)

## OMB Clearance and PRA Burden Statement for PTOL-85 Part B

The Paperwork Reduction Act (PRA) of 1995 requires Federal agencies to obtain Office of Management and Budget approval before requesting most types of information from the public. When OMB approves an agency request to collect information from the public, OMB (i) provides a valid OMB Control Number and expiration date for the agency to display on the instrument that will be used to collect the information and (ii) requires the agency to inform the public about the OMB Control Number's legal significance in accordance with 5 CFR 1320.5(b).

The information collected by PTOL-85 Part B is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450. Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## Privacy Act Statement

**The Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

| *Notice of Allowability* | Application No. 12/877,034 | Applicant(s) FISHMAN ET AL. | |
|---|---|---|---|
| | Examiner TUNG T. TRINH | Art Unit 2427 | AIA (First Inventor to File) Status No |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☒ This communication is responsive to *03/03/2017*.
   ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

3. ☒ The allowed claim(s) is/are *1,3,5-11,13,15-20,22 and 23*. As a result of the allowed claim(s), you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov.

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   **Certified copies:**
   a) ☐ All   b) ☐ Some   *c) ☐ None of the:
   1. ☐ Certified copies of the priority documents have been received.
   2. ☐ Certified copies of the priority documents have been received in Application No. _____ .
   3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).
   * Certified copies not received: _____.

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application.
**THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ CORRECTED DRAWINGS ( as "replacement sheets") must be submitted.
   ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____.
   **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**
1. ☒ Notice of References Cited (PTO-892)
2. ☒ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date _____.
3. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material
4. ☐ Interview Summary (PTO-413), Paper No./Mail Date _____.

5. ☐ Examiner's Amendment/Comment
6. ☒ Examiner's Statement of Reasons for Allowance
7. ☐ Other _____.

/NATHAN FLYNN/
Supervisory Patent Examiner, Art Unit 2421

Application/Control Number: 12/877,034                                    Page 2
Art Unit: 2427

The present application is being examined under the pre-AIA first to invent provisions.

### DETAILED ACTION

#### *Continued Examination Under 37 CFR 1.114*

A request for continued examination under 37 CFR 1.114 was filed in this application after a decision by the Patent Trial and Appeal Board, but before the filing of a Notice of Appeal to the Court of Appeals for the Federal Circuit or the commencement of a civil action. Since this application is eligible for continued examination under 37 CFR 1.114 and the fee set forth in 37 CFR 1.17(e) has been timely paid, the appeal has been withdrawn pursuant to 37 CFR 1.114 and prosecution in this application has been reopened pursuant to 37 CFR 1.114. Applicant's submission filed on 03/03/2017 has been entered.

#### *Allowable Subject Matter*

The following is an examiner's statement of reasons for allowance: based on the board's decision on 01/03/2017.

Claims 1, 3, 5-11, 13, 15-20, 22 and 23 are allowed.

Any comments considered necessary by applicant must be submitted no later than the payment of the issue fee and, to avoid processing delays, should preferably accompany the issue fee.  Such submissions should be clearly labeled "Comments on Statement of Reasons for Allowance."

Application/Control Number: 12/877,034                                        Page 3
Art Unit: 2427

### *Conclusion*

Any inquiry concerning this communication or earlier communications from the examiner should be directed to TUNG T. TRINH whose telephone number is (571)270-1296.  The examiner can normally be reached on Mon-Friday 7:30am-5:00pm EST (alt Friday).

Examiner interviews are available via telephone, in-person, and video conferencing using a USPTO supplied web-based collaboration tool. To schedule an interview, applicant is encouraged to use the USPTO Automated Interview Request (AIR) at http://www.uspto.gov/interviewpractice.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Nathan Flynn can be reached on (571)272-1915.  The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system.  Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service Representative or access to the automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

Application/Control Number: 12/877,034                                          Page 4
Art Unit: 2427


/T. T. T./
Examiner, Art Unit 2427

/NATHAN FLYNN/
Supervisory Patent Examiner, Art Unit 2421

# Exhibit I

Doc code: RCE
Doc description: Request for Continued Examination (RCE)

PTO/SB/30EFS (07-09)
Approved for use through 07/31/2012. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

# REQUEST FOR CONTINUED EXAMINATION(RCE)TRANSMITTAL
## (Submitted Only via EFS-Web)

| Application Number | 10/061,136 | Filing Date | 2002-02-01 | Docket Number (if applicable) | 5266-08205 | Art Unit | 2623 |
| First Named Inventor | Alao | | | Examiner Name | Newlin, Timothy R. | | |

**This is a Request for Continued Examination (RCE) under 37 CFR 1.114 of the above-identified application.**
Request for Continued Examination (RCE) practice under 37 CFR 1.114 does not apply to any utility or plant application filed prior to June 8, 1995, or to any design application. The Instruction Sheet for this form is located at WWW.USPTO.GOV

## SUBMISSION REQUIRED UNDER 37 CFR 1.114

Note: If the RCE is proper, any previously filed unentered amendments and amendments enclosed with the RCE will be entered in the order in which they were filed unless applicant instructs otherwise. If applicant does not wish to have any previously filed unentered amendment(s) entered, applicant must request non-entry of such amendment(s).

☐ Previously submitted. If a final Office action is outstanding, any amendments filed after the final Office action may be considered as a submission even if this box is not checked.

    ☐ Consider the arguments in the Appeal Brief or Reply Brief previously filed on _____

    ☐ Other _____

☒ Enclosed

    ☒ Amendment/Reply

    ☐ Information Disclosure Statement (IDS)

    ☐ Affidavit(s)/ Declaration(s)

    ☐ Other

## MISCELLANEOUS

☐ Suspension of action on the above-identified application is requested under 37 CFR 1.103(c) for a period of months _____
(Period of suspension shall not exceed 3 months; Fee under 37 CFR 1.17(i) required)

☐ Other _____

## FEES

**The RCE fee under 37 CFR 1.17(e) is required by 37 CFR 1.114 when the RCE is filed.**
☒ The Director is hereby authorized to charge any underpayment of fees, or credit any overpayments, to Deposit Account No _____

## SIGNATURE OF APPLICANT, ATTORNEY, OR AGENT REQUIRED

☒ Patent Practitioner Signature
☐ Applicant Signature

EFS - Web 2.1.15

Doc code: RCEX

Doc description: Request for Continued Examination (RCE)

PTO/SB/30EFS (07-09)
Approved for use through 07/31/2012. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Signature of Registered U.S. Patent Practitioner | | | |
|---|---|---|---|
| Signature | /Rory D. Rankin/ | Date (YYYY-MM-DD) | 2009-08-02 |
| Name | Rory D. Rankin | Registration Number | 47884 |

This collection of information is required by 37 CFR 1.114. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450.

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

# Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1.    The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these records.

2.    A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3.    A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4.    A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5.    A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6.    A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7.    A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8.    A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9.    A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

Application Serial No. 10/061,136 - Filed February 1, 2002

## IN THE CLAIMS

Please amend claims 1-4, 6, 15-19, 54- 58, 60, and 69-73, and add new claims 109-132 as indicated below.

1.    (Currently Amended) A method for managing an interactive television system comprising:

accessing a campaign rule at a server, wherein the campaign rule specifies which one or more advertisements of a plurality of advertisements are to be delivered to a target, said target comprising at least one client device;

selecting ~~an~~ one or more advertisement~~s~~ at the server based on the campaign rule for delivery to ~~a~~ the target, ~~said target comprising at least one client device~~;

sending the selected advertisement to the client device; ~~and~~

deciding in a business filter at the client device, whether to store the selected one or more advertisement~~s~~ on the client device;

~~receiving a client device user response to the selected one or more advertisements at a rule generating component of the server, wherein the rule generating component is configured to:~~

~~apply one or more rules to the user response to predict further user interests; and generate a new campaign rule based on the predicted further user interests;~~

~~based on the new campaign rule, the server selecting a new advertisement to be delivered to the target; and~~

~~the server triggering a delivery manager to deliver the new advertisement to the target~~.

2.    (Currently Amended) The method of claim 1, further comprising:

measuring ~~the~~ client device user response~~s~~ to the selected one or more advertisement~~s~~;

~~building a new campaign rule based on the client device user response;~~

~~selecting an advertisement based on the new campaign rule; and~~

~~sending the advertisement based on the new campaign rule to the target~~

Application Serial No. 10/061,136 - Filed February 1, 2002

storing in a user information database, user profile information based on the client device user responses; and

using the user profile information to predict further user interests.

3.      (Currently Amended) The method of claim 1, further comprising:

selecting the one or more advertisements based on the number of client device users watching.

4.      (Currently Amended) The method of claim 1, further comprising:

selecting the one or more advertisements at the server based on a specified time frame.

5.      (Original) The method of claim 1, further comprising:

accessing a delivery plan to obtain a list of advertisements to send next.

6.      (Currently Amended) The method of claim 1, further comprising:

selecting the one or more advertisements based on at least one of advertisement priority, weight, minimum display time, back fill Boolean, intra-spot-session frequency cap, intra-application frequency cap, industry exclusion, overall frequency cap, and minimum rotation interval, advertisement type and target type.

7.      (Original) The method of claim 1, further comprising:

determining the target based on user profile, type of service and context.

8.      (Original) The method of claim 2, further comprising:

generating the campaign rule based on associating a specified advertisement with a specified service.

9.      (Original) The method of claim 2, further comprising:

Application Serial No. 10/061,136 - Filed February 1, 2002

generating a report based on the user response.

10.    (Original) The method of claim 2, further comprising:

building a product catalog for presentation to the target based on the user response.

11.    (Original) The method of claim 1 further comprising:

sending a business filter to at least one client device.

12.    (Original) The method of claim 2, further comprising:

measuring the user response in a client device gadget.

13.    (Original) The method of claim 2, further comprising:

processing at the server, the user response to generate at least one of a new campaign

rule, a new campaign and a new product catalog.

14.    (Original) The method of claim 2, further comprising:

measuring click through rate, purchase rate and impressions.

15.    (Currently Amended) The method of claim 1, further comprising:

sending the one or more advertisements to a client device gadget for rendering.

16.    (Currently Amended) The method of claim 1, further comprising:

simulating a target attempt to determine if an advertising campaign can be fulfilled before

sending the one or more advertisements.

17.    (Currently Amended) The method of claim 1, the one or more advertisements further

comprising at least one of a video, imagery and audio data.

Application Serial No. 10/061,136 - Filed February 1, 2002

18.    (Currently Amended) The method of claim 1, the ~~one or more~~ advertisements further comprising at least one of an entertainment program and an interactive game.

19.    (Currently Amended) The method of claim 1, the ~~one or more~~ advertisements further comprising audio data.

20.    (Withdrawn) A method for managing services in an interactive television system comprising:
determining entitlement to perform a transaction on an interactive television system for at least one of a client device, a service provider, a client device user and a service provider application; and
providing permission to perform the transaction based on the entitlement.

21.    (Withdrawn) The method of claim 20, further comprising:
transmitting a message having an intended recipient and containing a keyword, to a server between the client device and the service provider;
performing an operation at the server on at least one of the message and a data repository based on the keyword; and
forwarding the message from the server to the intended recipient.

22.    (Withdrawn) The method of claim 21 further comprising:
logging transaction data for the message; and generating at least one of a patch bill or an e-receipt bill.

23.    (Withdrawn) The method of claim 20 further comprising:
setting at least one of data access level, patching level, logging level, synchronous message condition and asynchronous message condition for the service provider within the interactive television system.

Application Serial No. 10/061,136 - Filed February 1, 2002

24.    (Withdrawn) The method of claim 23 further comprising:

setting the at least one of data access level, patching level, logging level, synchronous message condition and asynchronous message condition for the service provider in an individual message.

25.    (Withdrawn) The method of claim 20 further comprising:

receiving a message from a client to a service provider in a server component, the message further comprising a persistent viewer identifier;

replacing the persistent viewer identifier with a transient session identifier; and forwarding the message to the service provider.

26.    (Withdrawn) The method of claim 25 further comprising:

generating the session identifier based on a persistent viewer identifier; and hiding the persistent viewer identifier from the service provider.

27.    (Withdrawn) The method of claim 26, further comprising:

generating the session identifier based on the client device identifier and the client device user nick name

28.    (Withdrawn) The method of claim 27, further comprising:

the client device identifier is inserted by the client device into a message before the message is sent to the service provider

29.    (Withdrawn) The method of claim 20, further comprising:

receiving the message at the server from the client device;

determining synchronous and asynchronous service provider message characteristics for the message from the client device to the service provider; and

Application Serial No. 10/061,136 - Filed February 1, 2002

if the service provider message requirement allows asynchronous messages, sending a response to the client device from the server and storing the message in a queue at the server for transmission to the service provider at a later time, else if the service provider message requirement requires synchronous messaging, sending the client device message to a parser for immediate processing and transmission to the service provider.

30. (Withdrawn)  The method of claim 21, further comprising:
storing a message in the client device for transmission to the service provider at a different time.

31. (Withdrawn) The method of claim 21, further comprising:
storing a table of permitted keywords and business agent objects which handle the permitted keywords.

32. (Withdrawn) The method of claim 31, further comprising:
determining a business agent for keyword; and
passing the keyword to the business agent.

33. (Withdrawn) The method of claim 31, further comprising:
registering the business agent objects with the server comprising name, program identifier and permitted keywords.

34. (Withdrawn) The method of claim 20, further comprising:
storing for each application provided by the service provider a list of permitted keywords allowed.

35. (Withdrawn) The method of claim 34, further comprising:
loading the list of permitted keywords for an application when a message is received

Application Serial No. 10/061,136 - Filed February 1, 2002

from that application.

36.    (Withdrawn) The method of claim 35, further comprising:

scanning the message for a keyword;

passing the permitted keyword to a business agent; and

rejecting at least one of the keyword and the message, if the keyword is not in the list of

permitted keywords.

37.    (Withdrawn) The method of claim 20 further comprising:

accessing a table of characteristics for at least one of viewer information transaction

information, configuration parameters, network information, service provider

information, service provider application information and device information.

38.    (Withdrawn) The method of claim 37, further comprising:

storing a portion of the information in the client device.

39.    (Withdrawn) The method of claim 38, further comprising:

sending a portion of the information from the client device to the server in a message;

and

combining the portion of information received at the server with the information in the

table at the server and forwarding the combined information to the intended recipient.

40.    (Withdrawn) The method of claim 20, further comprising:

allowing a client device user to record personal information on the data repository.

41.    (Withdrawn) The method of claim 40, further comprising:

sharing personal information on the data repository with other users in at least one of a

permitted user group, the same household and the same client device.

Application Serial No. 10/061,136 - Filed February 1, 2002

42.    (Withdrawn) The method of claim 41, further comprising:

performing an operation on the message based on the shared information from the data repository.

43.    (Withdrawn) The method claim 20, further comprising:

monitoring connectivity of a component connected to the interactive television system; and

monitoring the integrity of data provided by a service in the interactive television system.

44.    (Withdrawn) The method of claim 43, further comprising:

monitoring the timeliness of a data provided to the interactive television system.

45.    (Withdrawn) The method of claim 43, further comprising:

operating over different tier levels.

46.    (Withdrawn) The method of claim 45, wherein the method does not require a central database.

47.    (Withdrawn) The method of claim 43, further comprising:

monitoring a connection for at least one of a service provider, broadcast equipment and broadcast stream tier.

48.    (Withdrawn) The method of claim 43, further comprising:

generating an alert upon at least one of a hardware failure, a data service failure, a back channel failure, a scheduled update failure, and a scheduled MUX update failure.

49.    (Withdrawn) The method of claim 43 further comprising:

generating a detailed map of at least one of the monitored component and the monitored service.

50.     (Withdrawn) The method of claim 49, further comprising:

generating at least one of a summary view, a top view and a log view.

51.     (Withdrawn) The method of claim 50, further comprising:

monitoring at least one of application server, broadcast head end and service provider.

52.     (Withdrawn) The method of claim 43, further comprising:

displaying at least one of service, type of service, number of polls, percent responded, percent missed, down-time, period, number of alerts, average delay, maximum delay and minimum delay.

53.     (Withdrawn) The method of claim 43, further comprising;

monitoring the status of an external server by sending a test to the external server; and generating an alert if there is no response from the external server to the test.

54.     (Currently Amended) A computer readable medium containing instructions that when executed by a computer cause the computer to:

access a campaign rule at a server, wherein the campaign rule specifies which one or more advertisements of a plurality of advertisements are to be delivered to a target, said target comprising at least one client device;

select an one or more advertisements at the server based on the campaign rule for delivery to a the target, said target comprising at least one client device;

send the selected advertisement to the client device; and

decide in a business filter at the client device, whether to store the selected advertisement on the client device;

Application Serial No. 10/061,136 - Filed February 1, 2002

~~receive a client device user response to the selected one or more advertisements at a rule~~
~~generating component of the server, wherein the rule generating component is~~
~~configured to:~~
~~apply one or more rules to the user response to predict further user interests; and~~
~~generate a new campaign rule based on the predicted further user interests;~~
~~based on the new campaign rule, cause the server to select a new advertisement to be~~
~~delivered to the target; and~~
~~cause the server to trigger a delivery manager to deliver the new advertisement to the~~
~~target~~.

55. (Currently Amended) The medium of claim 54, further comprising instructions that cause the computer to:

measure ~~the~~ client device user responses to the ~~one or more~~ advertisement;

~~build a new campaign rule based on the client device user response;~~

~~select an advertisement based on the new campaign rule; and~~

~~send the advertisement based on the new campaign rule to the target~~

store in a user information database, user profile information based on the client device
user responses; and

use the user profile information to predict further user interests.

56. (Currently Amended) The medium of claim 54, further comprising instructions that cause the computer to:

select the ~~one or more~~ advertisements based on requested impressions.

57. (Currently Amended) The medium of claim 54, further comprising instructions that cause the computer to:

select the ~~one or more~~ advertisements based on the number of client device users watching.

Application Serial No. 10/061,136 - Filed February 1, 2002

58.    (Currently Amended) The medium of claim 54, further comprising instructions that cause the computer to:

select the ~~one or more~~ advertisements at the server based on a specified time frame.

59.    (Original) The medium of claim 54, further comprising instructions that cause the computer to:

access a delivery plan to obtain a list of advertisements to send next.

60.    (Currently Amended) The medium of claim 54, further comprising instructions that cause the computer to:

select the ~~one or more~~ advertisements based on at least one of advertisement priority, weight, minimum display time, back fill Boolean, intra-spot-session frequency cap, intra-application frequency cap, industry exclusion, overall frequency cap, and minimum rotation interval~~, advertisement type and target type~~.

61.    (Original) The medium of claim 54, further comprising instructions that cause the computer to:

determine the target based on user profile, type of service and context.

62.    (Original) The medium of claim 55, further comprising instructions that cause the computer to:

generate the campaign rule based on associating a specified advertisement with a specified service.

63.    (Original) The medium of claim 55, further comprising instructions that cause the computer to:

generate a report based on the user response.

Application Serial No. 10/061,136 - Filed February 1, 2002

64.    (Original) The medium of claim 55, further comprising instructions that cause the computer to:

build a product catalog for presentation to the target based on the user response.

65.    (Original) The medium of claim 54, further comprising instructions that cause the computer to:

sending a business filter to at least one client device.

66.    (Original) The medium of claim 55, further comprising instructions that cause the computer to:

measuring the user response in a client device gadget.

67.    (Original) The medium of claim 55, further comprising instructions that cause the computer to:

process at the server, the user response to generate at least one of a new campaign rule, a new campaign and a new product catalog.

68.    (Original) The medium of claim 55, further comprising instructions that cause the computer to:

measure click through rate, purchase rate and impressions.

69.    (Currently Amended) The medium of claim 54, further comprising instructions that cause the computer to:

send the one or more advertisements to a client device gadget for rendering.

70.    (Currently Amended) The medium of claim 54, further comprising instructions that cause the computer to:

simulate a target attempt to determine if an advertising campaign can be fulfilled before sending the ~~one or more~~ advertisement~~s~~.

71.    (Currently Amended) The medium of claim 54, the ~~one or more~~ advertisement~~s~~ further comprising at least one of a video, imagery and audio data.

72.    (Currently Amended) The medium of claim 54, the ~~one or more~~ advertisement~~s~~ further comprising at least one of an entertainment program and an interactive game.

73.    (Currently Amended) The medium of claim 54, the ~~one or more~~ advertisement~~s~~ further comprising audio data.

74.    (Withdrawn) A computer readable medium containing instructions that when executed by a computer cause the computer to:
determine entitlement to perform a transaction on an interactive television system for at least one of a client device, a service provider, a client device user and a service provider application; and
provide permission to perform the transaction based on the entitlement.

75.    (Withdrawn) The medium of claim 74, further comprising instructions that cause the computer to:
transmit a message having an intended recipient and containing a keyword, to a server between the client device and the service provider;
perform an operation at the server on at least one of the message and a data repository based on the keyword; and
forward the message from the server to the intended recipient.

76.    (Withdrawn) The medium of claim 75, further comprising instructions that cause the

computer to:

log transaction data for the message; and

generate at least one of a patch bill or an e-receipt bill.

77.    (Withdrawn) The medium of claim 74, further comprising instructions that cause the computer to::

set at least one of data access level, patching level, logging level, synchronous message condition and asynchronous message condition for the service provider within the interactive television system.

78.    (Withdrawn) The medium of claim 77, further comprising instructions that cause the computer to:

set the at least one of data access level, patching level, logging level, synchronous message condition and asynchronous message condition for the service provider in an individual message.

79.    (Withdrawn) The medium of claim 74, further comprising instructions that cause the computer to:

receive a message from a client to a service provider in a server component, the message further comprising a persistent viewer identifier;

replace the persistent viewer identifier with a transient session identifier; and

forward the message to the service provider.

80.    (Withdrawn) The method of claim 79 further comprising:

generating the session identifier based on a persistent viewer identifier; and

hiding the persistent viewer identifier from the service provider.

81.    (Withdrawn) The medium of claim 80, further comprising instructions that cause the

computer to:

generate the session identifier based on the client device identifier and the client device user nick name

82.   (Withdrawn) The medium of claim 81, further comprising instructions that cause the computer to:

insert the client device identifier is by the client device into a message before the message is sent to the service provider.

83.   (Withdrawn) The medium of claim 74, further comprising instructions that cause the computer to:

receive the message at the server from the client device;

determine synchronous and asynchronous service provider message characteristics for the message from the client device to the service provider; and

if the service provider message requirement allows asynchronous messages, send a response to the client device from the server and store the message in a queue at the server for transmission to the service provider at a later time, else if the service provider message requirement requires synchronous messaging, send the client device message to a parser for immediate processing and transmission to the service provider.

84.   (Withdrawn) The medium of claim 75, further comprising instructions that cause the computer to:

store a message in the client device for transmission to the service provider at a different time.

85.   (Withdrawn) The medium of claim 75, further comprising instructions that cause the computer to:

store a table of permitted keywords and business agent objects which handle the

permitted keywords.

86.  (Withdrawn) The medium of claim 85, further comprising instructions that cause the computer to:

determine a business agent for keyword; and

pass the keyword to the business agent.

87.  (Withdrawn) The medium of claim 85, further comprising instructions that cause the computer to:

register the business agent objects with the server comprising name, program identifier and permitted keywords.

88.  (Withdrawn) The medium of claim 74, further comprising instructions that cause the computer to:

store for each application provided by the service provider a list of permitted keywords allowed.

89.  (Withdrawn) The medium of claim 88, further comprising instructions that cause the computer to:

load the list of permitted keywords for an application when a message is received from that application.

90.  (Withdrawn) The medium of claim 89, further comprising instructions that cause the computer to:

scan the message for a keyword; pass the permitted keyword to a business agent; and reject at least one of the keyword and the message, if the keyword is not in the list of permitted keywords.

Application Serial No. 10/061,136 - Filed February 1, 2002

91.    (Withdrawn) The medium of claim 74, further comprising instructions that cause the computer to:

access a table of characteristics for at least one of viewer information transaction information, configuration parameters, network information, service provider information, service provider application information and device information.

92.    (Withdrawn) The medium of claim 91, further comprising instructions that cause the computer to:

store a portion of the information in the client device.

93.    (Withdrawn) The medium of claim 92, further comprising instructions that cause the computer to:

send a portion of the information from the client device to the server in a message; and combine the portion of information received at the server with the information in the table at the server and forwarding the combined information to the intended recipient.

94.    (Withdrawn) The medium of claim 74, further comprising instructions that cause the computer to:

allow a client device user to record personal information on the data repository.

95.    (Withdrawn) The medium of claim 94, further comprising instructions that cause the computer to:

share personal information on the data repository with other users in at least one of a permitted user group, the same household and the same client device.

96.    (Withdrawn) The medium of claim 95, further comprising instructions that cause the computer to:

perform an operation on the message based on the shared information from the data

repository.

97.    (Withdrawn) The medium of claim 74, further comprising instructions that cause the computer to:

monitor connectivity of a component connected to the interactive television system; and

monitor the integrity of data provided by a service in the interactive television system.

98.    (Withdrawn) The medium of claim 97, further comprising instructions that cause the computer to:

monitor the timeliness of a data provided to the interactive television system.

99.    (Withdrawn) The medium of claim 97, further comprising instructions that cause the computer to:

operating over different tier levels.

100.    (Withdrawn) The medium of claim 99, wherein the method does not require a central database.

101.    (Withdrawn) The medium of claim 97, further comprising instructions that cause the computer to:

monitor a connection for at least one of a service provider, broadcast equipment and broadcast stream tier.

102.    (Withdrawn) The medium of claim 97, further comprising instructions that cause the computer to:

generate an alert upon at least one of a hardware failure, a data service failure, a back channel failure, a scheduled update failure, and a scheduled MUX update failure.

103.    (Withdrawn) The medium of claim 97, further comprising instructions that cause the computer to:

generate a detailed map of at least one of the monitored component and the monitored service.

104.    (Withdrawn) The medium of claim 103, further comprising instructions that cause the computer to:

generate at least one of a summary view, a top view and a log view.

105.    (Withdrawn) The medium of claim 104, further comprising instructions that cause the computer to:

monitor at least one of application server, broadcast head end and service provider.

106.    (Withdrawn) The medium of claim 97, further comprising instructions that cause the computer to:

displaying at least one of service, type of service, number of polls, percent responded, percent missed, down-time, period, number of alerts, average delay, maximum delay and minimum delay.

107.    (Withdrawn) The medium of claim 97, further comprising instructions that cause the computer to:

monitor the status of an external server by sending a test to the external server; and generate an alert if there is no response from the external server to the test.

108.    (Original)  The method of claim 1, further comprising selecting the advertisement based on requested impressions.

109.    (New) A service platform for use in an interactive television system, the service platform comprising:

an advertising manager; and

a delivery manager;

wherein the advertising manager is configured to:

access a campaign rule, wherein the campaign rule specifies which one or more advertisements of a plurality of advertisements are to be delivered to a target, said target comprising at least one client device;

based on the campaign rule, select one or more advertisements for delivery to the target;

send the selected one or more advertisements to the delivery manager for delivery to the client device;

apply one or more rules to a client device user response to the selected one or more advertisements to predict further user interests;

generate a new campaign rule based on the predicted further user interests;

based on the new campaign rule, select a new advertisement to be delivered to the target; and

trigger the delivery manager to include the new advertisement in the one or more advertisements for delivery to the target.

110.    (New) The service platform of claim 109, further comprising a viewer manager, wherein the viewer manager is configured to:

measure client device user responses to the selected one or more advertisements; and

store in a user information database, user profile information based on the client device user responses; and

wherein the advertising manager is further configured to:

retrieve user profile information from the user information database; and

Application Serial No. 10/061,136 - Filed February 1, 2002

use the retrieved user profile information to predict further user interests.

111. (New) The service platform of claim 109, wherein the advertising manager is further configured to use a mixture of the one or more rules and statistics of measurements of a plurality of client device user responses to predict further user interests.

112. (New) The service platform of claim 109, wherein the advertising manager is further configured to select the one or more advertisements based on the number of client device users watching.

113. (New) The service platform of claim 109, wherein the advertising manager is further configured to select the advertisement based on a specified time frame.

114. (New) The service platform of claim 109, wherein the advertising manager is further configured to access a delivery plan to obtain a list of advertisements to send next.

115. (New) The service platform of claim 109, wherein the advertising manager is further configured to select the advertisement based on at least one of advertisement priority, weight, minimum display time, back fill Boolean, intra-spot-session frequency cap, intra-application frequency cap, industry exclusion, overall frequency cap, and minimum rotation interval.

116. (New) The service platform of claim 109, wherein the advertising manager is further configured to determine the target based on user profile, type of service and context.

117. (New) The service platform of claim 109, wherein the advertising manager is further configured to generate the campaign rule based on associating a specified advertisement with a specified service.

Application Serial No. 10/061,136 - Filed February 1, 2002

118.    (New) The service platform of claim 109, wherein the viewer manager is further configured to generate a report based on the user response.

119.    (New) The service platform of claim 109, wherein the delivery manager is further configured to building a product catalog for presentation to the target based on the user response.

120.    (New) The service platform of claim 109, wherein the service platform is further configured to send a business filter to at least one client device.

121.    (New) The service platform of claim 109, wherein the client device is configured to measure the user response in a client device gadget.

122.    (New) The service platform of claim 109, wherein the advertising manager is further configured to process the user response to generate at least one of a new campaign rule, a new campaign, and a new product catalog.

123.    (New) The service platform of claim 109, wherein the viewer manager is further configured to measure click through rate, purchase rate, and impressions.

124.    (New) The service platform of claim 109, wherein the delivery manager is further configured to send the advertisement to a client device gadget for rendering.

125.    (New) The service platform of claim 109, wherein the advertising manager is further configured to simulate an attempt by a target to determine if an advertising campaign can be fulfilled before triggering the delivery manager.

Application Serial No. 10/061,136 - Filed February 1, 2002

126.    (New) The service platform of claim 109, at least one of the one or more advertisements further comprising at least one of a video, imagery, and audio data.

127.    (New) The service platform of claim 109, at least one of the one or more advertisements further comprising at least one of an entertainment program and an interactive game.

128.    (New) The service platform of claim 109, at least one of the one or more advertisements further comprising audio data.

129.    (New) The service platform of claim of claim 109, wherein the advertising manager is further configured to select the one or more advertisements based on requested impressions.

130.    (New) The method of claim 1, further comprising using a mixture of the one or more rules and statistics of measurements of a plurality of client device user responses to predict further user interests.

131.    (New) The medium of claim 54, further comprising instructions that cause the computer to use a mixture of the one or more rules and statistics of measurements of a plurality of client device user responses to predict further user interests.

132. (New) The method of claim 6, wherein said selecting is further based at least in part on advertisement type and target type.

Application Serial No. 10/061,136 - Filed February 1, 2002

**<u>REMARKS</u>**

Claims 1-19, 54-73, and 108 were pending in the application.  Claims 20-53 and 74-107 were previously withdrawn.  No claims have been cancelled.  Claims 109-132 have been added.  Claims 1-4, 6, 15-19, 54- 58, 60, and 69-73 have been amended to clarify the nature of the invention.  Support for new claim 109 and the amendments to claims 1 and 54 may be found in the Specification at least at paragraph [0131], [0135], [0136], and [0142].  Support for new claim 110, 111, 130, and 131 and the amendments to claims 2 and 55 may be found in the Specification at least at paragraph [0089-0091], [0135], and [0144].  Support for new claims 112-129 may be found in pending claims 3-19 and 108, respectively.  Claims 3, 4, 6, 15-19, 56-58, 60, and 69-73 have been amended to be consistent with the other amended claims.  Claims 1-19, 54-73, and 108 accordingly remain pending after entry of the present amendment.

<u>35 U.S.C. § 102 and 103(a) Rejections</u>

Claims 1, 4-7, 11, 15, 16, 19, 58-61, 65, 69, 70, and 73 stood rejected under U.S.C. 102 as being anticipated by Flickinger, et al. (US 2002/0083441).  Claims 3, 4, 58, and 108 stood rejected under U.S.C. 103(a) as being unpatentable over Flickinger, et al. (US 2002/0083441).  Claims 2, 8-10, 12-14, 17, 18, 55, 62-64, 66-68, 71, and 72 stood rejected under U.S.C. 103(a) as being unpatentable over Flickinger, et al. (US 2002/0083441) in further view of Knudson, et al. (US 2003/0110499).  Although Applicant respectfully traverses these rejections, Applicant nevertheless has amended the claims and added new claims to clarify the nature of the invention.  Accordingly, Applicant requests reconsideration in view of the following discussion.

New claim 109 recites:

Application Serial No. 10/061,136 - Filed February 1, 2002

"A service platform for use in an interactive television system, the service platform comprising:

an advertising manager; and

a delivery manager;

wherein the advertising manager is configured to:

access a campaign rule, wherein the campaign rule specifies which one or more advertisements of a plurality of advertisements are to be delivered to a target, said target comprising at least one client device;

based on the campaign rule, select one or more advertisements for delivery to the target;

send the selected one or more advertisements to the delivery manager for delivery to the client device;

~~apply one or more rules to a client device user response to the selected one or more advertisements to predict further user interests;~~

~~generate a new campaign rule based on the predicted further user interests;~~

~~based on the new campaign rule, select a new advertisement to be delivered to the target;~~ and

trigger the delivery manager to deliver the new advertisement to the target." (Emphasis added).

It is noted that the service platform includes an advertising manager and a delivery manager. The advertising manager, in addition to triggering the delivery manager to deliver advertisement to a target, applies rules to user responses to ads in order to predict further user interests. Based on the predicted further user interests, the advertising manager generates a new campaign rule. Based on the new campaign rule, the advertising manager selects a new advertisement to be delivered to the target. Accordingly, the service platform includes an advertising manager that is configured to make a prediction and select a new advertisement based on user responses to one or more previously selected advertisements. Applicant has searched the cited art and finds no disclosure of such features, nor are any prediction mechanisms or steps disclosed. Applicant submits the above discussed features are neither disclosed nor suggested by the cited art.

In the present Office Action, on page 10, the Examiner admits Flickinger does not detail an iterative system where new campaign rules are built. However, on page 3-4, the Examiner

Application Serial No. 10/061,136 - Filed February 1, 2002

contends:

> "Regarding claim 2, Applicant argues that Knudson fails to teach building a new campaign rule because it does not take additional steps beyond analyzing the data. However, it is the Office position that the analysis itself is enough to meet the recited 'building.' When applied in a data context, 'building' means to create an association or relationship between data records, in this case associating user characteristics with as characteristics. As applicant concedes, Knudson goes beyond merely collecting the data, but analyzes it as well, revealing information about the interests of users and what ads are viewed by said users. This information is gleaned from client device user responses, therefore Knudson meets the recited "'building a new campaign rule based on the client user response.'"

Also, on page 10, the Examiner further contends:

> "While Knudson performs the analysis of users' response to transmitted ads, he does not explicitly select and send ads based on the analyzed data. However, Knudson does perform ad selection based on campaign rules – just not newly built campaign rules. One of ordinary skill in the art would readily understand that the analysis of user responses could be effective in targeting a new round of ad transmissions, and would make the best use of the most recently available user data. Targeting ads based on user's responses to previous ads would have been an obvious step, given that existing campaign rules are used for the same purpose."

While Applicant does not agree that Knudson's data analysis meets the limitation of building a new campaign rule, to further clarify the nature of the invention, Applicant has nevertheless included at least the above highlighted features to claim 109 and similarly amended independent claims 1 and 54. In the invention as presently claimed, an advertising manager predicts further user interests by applying rules to a client device user response and generates a new campaign rule based on the predicted further user interests. In contrast, Knudson merely monitoring user responses and analyzing them to reveal user interests. More specifically Knudson discloses,

Application Serial No. 10/061,136 - Filed February 1, 2002

"[0091] At step 292, the program guides collects information on which targeted advertisements are actually displayed on the user's television and which targeted actions are actually taken in the program guide. The monitoring that takes place during step 292 may occur over a number of days or any other suitable time period. At step 294, each monitoring version of the program guide transmits its information to a central facility (e.g., a facility such as television distribution facility 38 of FIG. 1, main facility 32 of FIG. 1, or some other such suitable facility). Data may be transmitted to the central facility via the return path in a two-way cable link, via modem link, or via any other suitable communications path. Data may be transmitted periodically or when a data transfer is requested from the central facility. The information collected at the central facility is analyzed at step 296. The data analysis may reveal, for example, that certain targeted advertisements are more often viewed than others and that certain targeted program guide actions are taken more often than others. Analysis may also reveal information about the interests of the users."

As may be seen from the above, Knudson performs data analysis to monitor and reveal interests that users have expressed.   However, Knudson does not disclose a component that applies rules to the user responses to predict further user interests.  Nor does Knudson disclose generating a new campaign rule based on the predicted further user interests.  Knudson merely discloses that the interests are revealed. Accordingly, Applicant submits Knudson's data analysis does not disclose or suggest a service platform that includes an advertising manager configured to "apply one or more rules to a client device user response to the selected one or more advertisements to predict further user interests; generate a new campaign rule based on the predicted further user interests;" as is recited in claim 109.  Nor are these features found in or suggested by Flickinger.

For at least these reasons, Applicant submits claim 109 is patently distinct from the cited art. As independent claims 1 and 54 include features similar to those of claim 109, claims 1 and 54 are patentably distinguished from the cited references for similar reasons.

Also, the dependent claims recite additional features neither taught nor suggested by the cited art.  For example, claim 6 recites the additional features "selecting the one or more

Application Serial No. 10/061,136 - Filed February 1, 2002

advertisements based on at least one of advertisement priority, weight, minimum display time, back fill Boolean, intra-spot-session frequency cap, intra-application frequency cap, industry exclusion, overall frequency cap, and minimum rotation interval." Applicant submits the cited art does not disclose such features, either singly or in combination. Claims 60 and 115 are similarly distinguishable from the cited art.

In addition to the above, claim 110 recites:

"The service platform of claim 109, further comprising a viewer manager,
    wherein the viewer manager is configured to:
        measure client device user responses to the selected one or more
            advertisements; and
        store in a user information database, user profile information based
            on the client device user responses; and
    wherein the advertising manager is further configured to:
        retrieve user profile information from the user information
            database; and
        use the retrieved user profile information to predict further user
            interests."

It is noted that the service platform includes a viewer manager in addition to the advertising manager that, together, are configured to perform a number of steps beyond revealing user interests including storing in a user information database, user profile information that is based on user responses and using the user profile information to predict further user interests. These features are not found anywhere in the cited art. Flickinger merely teaches storing associations between client devices and ads. Knudson, at most, discloses analyzing user responses. However, neither reference mentions creating or storing user profile information, either based on Knudson's data analysis or Flickinger's associations, let alone using user profile information to predict further user interests. Accordingly, Applicant finds no teaching or suggestion in the cited art of components configured to "measure client device user responses to the selected one or more advertisements; and store in a user information database, user profile

Application Serial No. 10/061,136 - Filed February 1, 2002

information based on the client device user responses; … and use the retrieved user profile information to predict further user interests," as is recited in claim 110. For at least these additional reasons, Applicant submits claim 110 is patently distinct from the cited art. As claims 2 and 55 include features similar to those of claim 110, claims 2 and 55 are believed patentable for similar reasons.

In addition, claim 111 recites:

"The service platform of claim 109, wherein the advertising manager is further configured to use a mixture of the one or more rules and statistics of measurements of a plurality of client device user responses to predict further user interests."

It is noted that the use of a mixture of rules and statistics to predict further user interests is not disclosed anywhere in Knudson or Flickinger. For at least these additional reasons, Applicant submits claim 111 is patently distinct from the cited art, as are claims 130 and 131 for similar reasons.

In light of the foregoing amendments and remarks, Applicants submit that all pending claims are now in condition for allowance, and an early notice to that effect is earnestly solicited. If a phone interview would speed allowance of any pending claims, such is requested at the Examiner's convenience.

Application Serial No. 10/061,136 - Filed February 1, 2002

If any extension of time (under 37 C.F.R. § 1.136) is necessary to prevent the above referenced application from becoming abandoned, Applicant hereby petitions for such an extension.  If any fees are due, the Commissioner is authorized to charge said fees to Meyertons, Hood, Kivlin, Kowert & Goetzel PC Deposit Account No. 501505/5266-08205/RDR.

Respectfully submitted,

/ Rory D. Rankin /
Rory D. Rankin
Reg. No. 47,884
Attorney for Applicant(s)

Meyertons, Hood, Kivlin,
    Kowert & Goetzel, P.C.
P. O. Box 398
Austin, Texas   78767-0398
(512) 853-8800
Date: _____August 2, 2009

# Exhibit J





## UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/419,621 | 04/21/2003 | Alain Delpuch | 5266-06201 | 2305 |

| 44015          7590          11/28/2005 | EXAMINER |
|---|---|
| OPTV/MEYERTONS | BUI, KIEU OANH T |
| THE CHASE BUILDING | |

| | ART UNIT | PAPER NUMBER |
|---|---|---|
| 700 LAVACA, SUITE 800 | 2611 | |
| AUSTIN, TX  78701 | | |

DATE MAILED: 11/28/2005

Please find below and/or attached an Office communication concerning this application or proceeding.

PTO-90C (Rev. 10/03)

| *Supplemental*<br>**Notice of Allowability** | Application No.<br>10/419,621 | Applicant(s)<br>DELPUCH ET AL. |
|---|---|---|
| | Examiner<br>KIEU-OANH T. BUI | Art Unit<br>2611 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☒ This communication is responsive to *Amendment filed on 01/21/2005*.

2. ☒ The allowed claim(s) is/are *1-23*.

3. ☒ The drawings filed on *21 April 2003* are accepted by the Examiner.

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a) ☐ All   b) ☐ Some*   c) ☐ None   of the:

      1. ☐ Certified copies of the priority documents have been received.

      2. ☐ Certified copies of the priority documents have been received in Application No. _____ .

      3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

    * Certified copies not received: _____ .

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application. **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ A SUBSTITUTE OATH OR DECLARATION must be submitted. Note the attached EXAMINER'S AMENDMENT or NOTICE OF INFORMAL PATENT APPLICATION (PTO-152) which gives reason(s) why the oath or declaration is deficient.

6. ☐ CORRECTED DRAWINGS ( as "replacement sheets") must be submitted.

    (a) ☐ including changes required by the Notice of Draftsperson's Patent Drawing Review ( PTO-948) attached

      1) ☐ hereto or 2) ☐ to Paper No./Mail Date _____ .

    (b) ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____ .

    **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

7. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**

1. ☐ Notice of References Cited (PTO-892)

2. ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)

3. ☐ Information Disclosure Statements (PTO-1449 or PTO/SB/08), Paper No./Mail Date _____

4. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material

5. ☐ Notice of Informal Patent Application (PTO-152)

6. ☐ Interview Summary (PTO-413), Paper No./Mail Date _____ .

7. ☐ Examiner's Amendment/Comment

8. ☒ Examiner's Statement of Reasons for Allowance

9. ☐ Other _____ .

*Supplemental*

Application/Control Number: 10/419,621                                    Page 2
Art Unit: 2611

## DETAILED ACTION

### *Allowable Subject Matter*

1.      Claims 1-23 are allowed.

### *Reasons for Allowance*

2.      The following is an examiner's statement of reasons for allowance:

Regarding claims 1, 13, 22 and 23, the closest prior art issued to Ben fails to teach or

suggest all of the steps of "determining whether said one or more directives includes a

prerequisite directive which indicates that acquisition of a subset of said set of resources is a

prerequisite for initiating the presentation; initiating said presentation. in response to determining

the one or more directives do not include said prerequisite directive; and prohibiting initiation of

said presentation until said subset of resources are acquired. in response to determining the one

or more directives include said prerequisite directive" as amended in claims.

Any comments considered necessary by applicant must be submitted no later than the

payment of the issue fee and, to avoid processing delays, should preferably accompany the issue

fee.  Such submissions should be clearly labeled "Comments on Statement of Reasons for

Allowance."

### *Conclusion*

3.      **Any response to this action should be mailed to:**

Commissioner of Patents and Trademarks

Washington, D.C. 20231

**or faxed to:**

(703) 872-9306, (for Technology Center 2600 only)

Application/Control Number: 10/419,621                                    Page 3
Art Unit: 2611

4.      Any inquiry concerning this communication or earlier communications from the examiner

should be directed to Kieu-Oanh Bui whose telephone number is (571) 272-7291.  The examiner

can normally be reached on Monday-Friday from 9:00 AM to 6:30 PM, with alternate Fridays

off.

        If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Christopher Grant, can be reached on (571) 272-7294.

        Information regarding the status of an application may be obtained from the Patent

Application Information Retrieval (PAIR) system.  Status information for published applications

may be obtained from either Private PAIR or Public PAIR.  Status information for unpublished

applications is available through Private PAIR only.  For more information about the PAIR

system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR

system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free).

                              Kieu-Oanh Bui
                              Primary Examiner
                              Art Unit 2611

KB
June 9, 2005